Jason S. Brookner (TX Bar No. 24033684)
Aaron M. Kaufman (TX Bar No. 24060067)
Lydia R. Webb (TX Bar No. 24083758)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, TX 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:     jbrookner@grayreed.com
           akaufman@grayreed.com
           lwebb@grayreed.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COTTONWOOD FINANCIAL LTD., *et al.*,[1] | ) | Case No. 24-80035 (SWE) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER
## PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365(a) AND FED. R.
## BANKR. P. 6006 (I) AUTHORIZING THE ASSUMPTION OF BROKERING
## AND SERVICING AGREEMENT; AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (the "Debtors) respectfully state

the following in support of this motion (this "Motion"):[2]

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtors' federal tax identification number are as follows: Cottonwood Financial Ltd. (1001); Cottonwood Financial Administrative Services, LLC (7228); Cottonwood Financial Texas, LLC (9059); Cottonwood Financial Idaho, LLC (5651); Cottonwood Financial Wisconsin, LLC (7075).  The Debtors' principal offices are located at 2100 W Walnut Hill Lane, Suite 300, Irving, TX 75038.

[2] Capitalized terms used but not yet defined herein shall have the meanings ascribed to them later in this Motion or in the First Day Declaration, as applicable.

4884-1174-1606.4

**Relief Requested**

1.      By this motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), authorizing the assumption of that certain *Amended and Restated Brokering and Servicing Agreement* (the "Agreement"), a true and correct copy of which is attached hereto as **Exhibit B**, with TreeMac Funding Group, LLC ("TreeMac"), as modified by the terms set forth in the Order, and granting such related relief as set forth herein.

**Jurisdiction and Venue**

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and this is a core matter pursuant to 28 U.S.C. § 157(b).

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a), 363(b) and 365(a) of title 11 of the United States Code (the "Bankruptcy Code"), rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9007-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas.

**Background**

5.      The Debtors operate one of the largest privately held retail consumer finance companies in the United States.  Through its Cash Store® brand, the Debtors offer their customers an array of financial products and consumer-lending services, including single payment cash advances, installment cash advances and title loans.  The Debtors utilize an innovative mix of financial technology (fintech) through its online customer portal and brick-and-mortar financial products and services through its 181 retail locations across Texas, Idaho and Wisconsin.

6.      On February 25, 2024 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the

2

appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed.

7.     A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in the *Declaration of Karen Nicolaou, Chief Restructuring Officer, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference.

## The Brokering and Serving Agreement

8.     Cottonwood Texas operates as a credit services organization ("CSO") and a licensed Credit Access Business ("CAB") under Texas law.  CSOs broker small denomination, short-term consumer loans from a third-party lender for consumers.  CABs are a subset of CSOs, and broker small denomination, short-term unsecured consumer loans that are in the form of deferred presentment transactions, as well as motor vehicle title loans.  In addition to brokering, the CSO/CAB also assists consumers in obtaining these loans from the lender by enhancing the consumers' credit to the lender.  CSOs and CABs assess fees for their services: processing the loan application, providing credit enhancement on the consumer's account for the benefit of the lender, and brokering a loan from the lender that the consumer might not otherwise qualify to receive. Applicable law requires independence between CSOs/CABs and the lenders that ultimately extend credit to consumers.[3]

9.     TreeMac is the exclusive third-party lender for loans brokered by Cottonwood Texas.  TreeMac and Cottonwood Texas are independent, unaffiliated and separate legal entities.

---

[3] *See, e.g.*, Tex. Admin Code § 83.5005 (setting forth regulations addressing the separation between a CAB and a third-party lender).

There is no overlap in management, board representation, ownership or control.  TreeMac does not own or exercise any control over Cottonwood, its operations, policies and procedures, stores or employees.  Cottonwood Texas does not own or exercise any control over TreeMac, its operations, policies and procedures, stores or employees.  All advertising by Cottonwood Texas clearly indicates that Cottonwood Texas is not the lender, and when the form of advertisement can accommodate additional disclosure, identifies TreeMac as the lender.

10.     The Agreement sets forth the terms and conditions that govern the services provided by Cottonwood to TreeMac in connection with the brokering and servicing of loans made by TreeMac to borrowers. Currently, the amount of TreeMac's loan portfolio brokered and serviced by Cottonwood exceeds $31 million.

11.     The following is an example of how a loan is arranged pursuant to the Agreement:

**Step 1:**    Borrower seeks assistance from Cottonwood Texas.  Cottonwood Texas informs Borrower that it can help arrange a loan, but it is not a lender.

**Step 2:**    Cottonwood Texas determines Borrower's eligibility for its credit services.  If approved, Borrower signs a credit services agreement with Cottonwood Texas whereby, if TreeMac approves the loan, Borrower agrees to pay Cottonwood Texas a credit services fee.

**Step 3:**    With Cottonwood Texas's assistance, Borrower completes TreeMac's loan application. If Borrower meets the underwriting criteria established by TreeMac and if Cottonwood Texas agrees to provide credit support in the form of a standby letter of credit, TreeMac approves the loan to Borrower.

**Step 4:**    Cottonwood Texas assists Borrower with completing TreeMac's loan agreement.

**Step 5:**    Cottonwood issues a standby letter of credit to TreeMac for the benefit of Borrower.

4884-1174-1606.4

> **Step 6:** TreeMac makes the loan to Borrower., and Borrower receives the loan proceeds.[4]

12.    When borrowers make payments on their loans at the Cash Store®, Cottonwood Texas remits TreeMac's portion of the payments to TreeMac by wire.  If a borrower defaults on its loan agreement with TreeMac, then TreeMac demands payment from Cottonwood Texas under the terms of the letter of credit.[5]  Once the letter of credit is called, Cottonwood Texas pays TreeMac in full on the loan.  Cottonwood Texas is then subrogated to the rights of TreeMac in the loan, and Cottonwood Texas seeks reimbursement from the borrower pursuant to the credit services agreement.

13.    Cottonwood Texas and TreeMac are also party to that certain Amended and Restated Master Letter of Credit Agreement dated December 8, 2016 (the "Master LOC Agreement"), a true and correct copy is attached hereto as **Exhibit C**.  The Master LOC Agreement provides that if Cottonwood Texas fails to fully pay or perform under the individual letters of credit issued to TreeMac for each loan arranged pursuant to the Agreement, TreeMac may draw on a letter of credit issued by BOK Financial Corporation (the "BOK Letter of Credit") to satisfy any defaulted obligation.  TreeMac may also draw on the BOK Letter of Credit in an amount not to exceed the total balance of outstanding loans if TreeMac, "in its reasonable good faith belief, has doubts, given rise to by objective indications, regarding Cottonwood's ability to perform its obligations under [the Master LOC Agreement] and the [Agreement]."  Master LOC Agreement ¶ 3(b).  The BOK Letter of Credit is secured by a $10 million deposit (the "TreeMac Deposit") held

---

[4] The foregoing is a summary and is not intended to restate or modify the terms of the Agreement.

[5] Letters of credit are intended to cover the full principal amount of the loan, including Cottonwood Texas's broker fee, plus interest and any fees earned by TreeMac up through the time of the default.

4884-1174-1606.4

in a separate Cottonwood Texas account at Bank of Texas that is not subject to the deposit account control agreement between Cottonwood Financial Ltd. and its prepetition secured lenders.

14.    The Master LOC Agreement also provides for acceleration of all outstanding loans arranged pursuant to the Agreement upon commencement of bankruptcy by Cottonwood Texas. Pursuant to the Master LOC Agreement, such obligations become fully due and payable on demand by Cottonwood Texas to TreeMac upon Cottonwood Texas's bankruptcy filing, regardless of whether the underlying borrower is then in default or whether any part of the indebtedness is then due and owing to TreeMac.  Master LOC Agreement ¶ 7.

15.    TreeMac controls and is solely responsible for establishing credit and underwriting criteria, funding the loans and managing its lending program.  It controls all program guidelines as to loans arranged pursuant to the Agreement and may unilaterally modify such program guidelines—including underwriting criteria, loan terms, interest rates, fees or charges and events of default—at any time and for any reason.  Moreover, the Agreement expressly provides that nothing therein commits TreeMac to originate or fund any level or number of loans, and TreeMac makes no representation as to the amount of funding it will be able to provide for the loans. TreeMac may immediately cease making new loans if TreeMac is unable to obtain funding sources.

16.    Cottonwood Texas controls the amount of its credit services fees assessed against a borrower pursuant to the credit services agreement.  Broker fees are earned at the time a loan is originated, paid from a portion of loan proceeds, and remitted to Cottonwood Texas pursuant to the settlement process described below.  Subsequent fees, including fees Cottonwood Texas earns for maintaining the letter of credit during the term of the loan, are paid to Cottonwood Texas directly by the consumer.

6

17.    Given the near constant flow of funds between TreeMac and Cottonwood Texas pursuant to the Agreement, the parties established a settlement process.  On a daily basis, Cottonwood Texas receives ACH transfers from TreeMac to settle fundings for loans arranged by Cottonwood Texas in the prior two to three business days.  These daily transfers total between $500,000 and $3 million.  On a daily basis, Cottonwood Texas sends a wire to TreeMac to settle loan principal and interest payments received by Cottonwood Texas at its Cash Store® locations in the prior two to three business days.  This daily wire is typically between $600,000 and $3 million.  The following diagram reflects the cash inflows and outflows resulting from the various transactions undertaken pursuant to the Agreement:



18.    Maintenance of the Agreement and the relationship with TreeMac is critical to the Company's business.

19.     The prior version of the Agreement had an effective date of January 1, 2023.  In June 2023, TreeMac and Cottonwood Texas exchanged drafts of an updated version of the Agreement (the "Draft Agreement").    The Draft Agreement contained changes to the circumstances under which TreeMac earned certain fees if (i) a borrower's payment is not honored by the borrower's bank (the "Returned Item Fee") and (ii) the borrower's payment on TreeMac's loan was more than ten (10) days late (the "Delinquency Fee").  The changes set forth in the Draft Agreement increased TreeMac's exposure to defaulted loans, as it increased the period that TreeMac maintained defaulted loans on TreeMac's books before TreeMac could call on the individual letters of credit issued by Cottonwood Texas to TreeMac for each loan arranged pursuant to the Agreement (the "Loan Defaults").  Although the Draft Agreement was never signed, the parties have operated pursuant to the terms of the Draft Agreement since approximately June 2023.

20.     Starting in January 2024, the Debtors engaged with TreeMac about Cottonwood Texas's potential restructuring to confirm that TreeMac would continue to originate loans pursuant to the Agreement during the course of these chapter 11 cases.  TreeMac initially requested an increase in the amount of the TreeMac Deposit.  However, Cottonwood Texas lacked sufficient funds to make a meaningful increase in the amount of the TreeMac Deposit.  As a result, negotiations shifted to the Draft Agreement and the parties' desire to revert back to operating pursuant to the terms of the January 1, 2023 Agreement.

21.     On February 25, 2024, and prior to the filing of these chapter 11 cases, Cottonwood Texas and TreeMac entered into an amended and restated Agreement.  The amended and restated Agreement reflects changes to TreeMac's program guidelines, including clarifying language with respect to the Returned Item Fee, the Delinquency Fee, and the Loan Defaults.  The amended and

8

restated Agreement limits TreeMac's exposure to Loan Defaults where borrowers are more than

ten (10) days delinquent on a payment and avoids the need for Cottonwood Texas to provide a

meaningful increase to the TreeMac Deposit.   The Debtors hereby seek assumption of the

Agreement, as modified by the Order. In light of the proposed assumption, TreeMac has agreed to

continue operating under the Agreement, as modified by the Order, during the course of these

chapter 11 cases and the Debtors' sale process.

### Cure Amounts

22.    In January 2024, Cottonwood Texas engaged a third-party accounting firm to

conduct a review of amounts owing by the parties pursuant to the Agreement\.  TreeMac claims to

be owed $771,007.46 from Cottonwood Texas; Cottonwood Texas disputes that any amounts are

owing to TreeMac (the "Accounting Dispute").  The parties plan to continue to attempt to resolve

the Accounting Dispute prior to entry of the Order.

23.    In addition to the Accounting Dispute, the Debtors estimate that Cottonwood Texas

will owe TreeMac approximately $3.5 million under the terms of the individual letters of credit

for Loan Defaults as of the date of assumption of the Agreement.[6]  However, as discussed above,

Cottonwood Texas will be subrogated to the rights of TreeMac in the defaulted loans, and

Cottonwood Texas will be entitled to seek reimbursement from the borrower pursuant to the terms

of Cottonwood Texas's credit services agreement.

### Basis for Requested Relief

24.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject

to the court's approval, may assume . . . any executory contract or unexpired lease of the debtor."

---

[6] The settlement amounts vary on a day-to-day basis. The Debtors will include a precise amount to be paid to TreeMac in the form of a revised proposed Order prior to the hearing.

11 U.S.C. § 365(a). A debtor's assumption of an executory contract or unexpired lease is ordinarily

governed by the "business judgment" standard. *See Mission Prod. Holdings, Inc. v. Tempnology,*

*LLC*, 139 S. Ct. 1652, 1658 (2019) ("The bankruptcy court will generally approve that choice [to

assume or reject], under the deferential 'business judgment' rule."). The business judgment

standard requires a court to approve a debtor's business decision unless that decision is the product

of "bad faith, whim, or caprice." *See In re Idearc Inc.*, 423 B. R. 138, 162 (Bankr. N.D. Tex. 2009)

("The issue . . . is whether [the debtor's decision] is so manifestly unreasonable that it could not

be based on sound business judgment, but only on bad faith, or whim or caprice.") (quoting

*Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985)

(internal quotation marks omitted)). Furthermore, under section 363(b)(1) of the Bankruptcy

Code, a debtor in possession may use estate property "other than in the ordinary course of

business" after notice and a hearing. 11 U.S.C. § 363(b)(1).

25.    Assumption of an executory contract or an unexpired lease is appropriate where

such assumption would benefit the estate. *See In re Pisces Energy, LLC*, No. 09-36591-H5-11,

2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009) ("Courts apply the 'business judgment

test,' which requires a showing that the proposed course of action will be advantageous to the

estate and the decision be based on sound business judgment."). Upon finding a debtor exercised

its sound business judgment in determining that assumption of certain contracts or leases is in the

best interests of its creditors and all parties in interest, a court should approve the assumption under

section 365(a) of the Bankruptcy Code. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762

F.2d 1303, 1309 (5th Cir. 1985) ("As long as assumption of a lease appears to enhance a debtor's

estate, court approval of a debtor-in-possession's decision to assume the lease should only be

withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions

of the Bankruptcy Code . . .") (quoting *Allied Tech., Inc. v. R.B. Brunemann & Sons*, 25 B.R. 484, 495 (Bankr. S.D. Ohio 1982) (alteration in original)).

26.    In the present case, assumption of the Agreement (as modified) will ensure the continuation of the Cottonwood Texas's business.  As discussed above, TreeMac's continued origination of loans to be brokered and serviced by Cottonwood Texas is essential to Cottonwood Texas's business.  Cottonwood Texas cannot, and does not, originate its own loans.  Without TreeMac's loans, Cottonwood Texas would have nothing to broker and service and would be unable to operate as a going concern.  As set forth in the Agreement, nothing therein commits TreeMac to originate or fund any level or number of loans, and TreeMac makes no representation as to the amount of funding it will be able to provide for the loans.

27.    TreeMac is unwilling to continue originating loans unless Cottonwood Texas assumes the Agreement immediately.  In exchange for Cottonwood Texas's assumption of the Agreement, as modified, TreeMac has agreed to continue to provide these essential services to Cottonwood Texas's consumers while the Debtors seek to sell their business as a going-concern. TreeMac's agreement to continue its longstanding practice of funding loans brokered by Cottonwood Texas, provided that the borrower's credit has been enhanced to a degree that the loan is consistent with TreeMac's underwriting criteria, allows Cottonwood Texas the opportunity to conduct an orderly sale of its assets.

28.    Absent assumption of the Agreement and TreeMac's agreement to continue to perform under the terms of the Agreement during these chapter 11 cases, the Debtors' sale process would be jeopardized.  The Debtors' investment banker believes that the most likely buyer for Cottonwood Texas's assets is a strategic player that is already part of the consumer finance industry.  Assumption of the Agreement provides potential buyers with the security that the

TreeMac loan portfolio that Cottonwood Texas services will not dissipate while the parties negotiate and obtain court approval of an asset purchase agreement. Although a strategic buyer very well may have a relationship with a third-party lender other than TreeMac, a buyer of Cottonwood Texas's assets may need to enter into a transition services agreement with TreeMac for some period of time post-closing to allow for a smooth transition.

29.    While assumption of an executory contract like the Agreement early in the case may be unusual, the Debtors believe that it is warranted under the circumstances. While a typical debtor may delay any decision regarding assumption of executory contracts until later in the case or in conjunction with a sale or plan process, Cottonwood Texas's business requires a relationship with a third party, independent lender. The Debtors do not believe that they could locate a replacement third party lender to originate loans during these chapter 11 cases. Furthermore, any replacement third party lender would require collateral, which the Debtors do not have. If the Debtors did not seek to assume the Agreement (as modified), there is no commitment that TreeMac would continue to originate loans to be brokered and serviced by Cottonwood Texas. This uncertainty could very well endanger the Debtors' cash flow that is necessary to support continued operations during these chapter 11 cases. Because of the contemporaneous settlement process described above, TreeMac would already be entitled to an administrative expense claim for any services provided postpetition, and thus, assumption of the Agreement at this stage in the case is unlikely to burden the estate with administrative claims it would not otherwise have to pay.

30.    As set forth in the Order, Cottonwood Texas will have the ability to terminate the Agreement in the event the purchaser of Cottonwood Texas's assets chooses not to take assignment of the Agreement or otherwise fails to enter into a transition services agreement with TreeMac to continue servicing the loan portfolio post-closing. The termination shall be effective upon five (5)

business days written notice to TreeMac and entry of a final order approving the sale of Cottonwood Texas's assets.  In the event of such termination, TreeMac would be entitled to (i) an allowed administrative expense claim for obligations under the Agreement related to loans originated between the Petition Date and the termination date, and (ii) an allowed general unsecured claim for all other obligations under the Agreement; provided, however, that TreeMac shall be permitted, without further notice or order of the Court, to draw on the BOK Letter of Credit to satisfy its general unsecured claim.  This mechanism limits future administrative expenses accruing to the estates by virtue of the Agreement.

31.    Moreover, TreeMac confirms and agrees that no acceleration or maturation of any obligations under such agreements has occurred, or deemed to have occurred, solely as a result of the Debtors' insolvency or the commencement of these chapter 11 cases, and no amounts shall be immediately due and payable by Cottonwood Texas as a result thereof; *provided, however*, if Cottonwood Texas fails to cure any defaults that arise under the Agreement postpetition, or these chapter 11 cases are dismissed or converted, TreeMac expressly reserves its rights and remedies under the Agreement, the Master LOC Agreement, the individual letters of credit and the BOK Letter of Credit  As a result, under the circumstances, there is very little risk to the estate, while the assumption of the Agreement (as modified) ensures that Cottonwood Texas is able to benefit from TreeMac's services on terms that ensure alignment of the parties' interests and that value is maximized.

32.    Based on the foregoing, the Debtors respectfully submit that their decision to assume the Agreement benefits their estates, is supported by sound business judgment, and should be approved by the Court.

**<u>Waiver of Bankruptcy Rules 6004 and 6006</u>**

33.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rules 6004(a) and 6006(c) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

**<u>Notice</u>**

34.    The will provide notice of this Motion to the following parties or their counsel: (a) the U.S. Trustee for the Northern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the proposed DIP Lender; (d) the lenders under the Debtors' prepetition term loan agreement; (e) counsel to TreeMac; (f) the United States Attorney's Office for the Northern District of Texas; (g) the Internal Revenue Service; (h) the state attorneys general for states in which the Debtors conduct business; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is needed.

WHEREFORE, the Debtors respectfully request that the Court enter the Order, granting the relief requested herein and such other and further relief as may be just and proper.

4884-1174-1606.4

Respectfully submitted this 25th day of February, 2024.

**GRAY REED**

By: *Lydia R. Webb*
     Jason S. Brookner (TX Bar No. 24033684)
     Aaron M. Kaufman (TX Bar No. 24060067)
     Lydia R. Webb (TX Bar No. 24083758)
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:     jbrookner@grayreed.com
          akaufman@grayreed.com
          lwebb@grayreed.com
*Proposed Counsel to the Debtors*
*and Debtors in Possession*

## Certificate of Service

I certify that on February 25, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Lydia R. Webb*
Lydia R. Webb

## Certificate of Conference

I certify that on February 25, 2024, I conferred with counsel for TreeMac, and TreeMac supports the relief sought in this Motion.

*/s/ Lydia R. Webb*
Lydia R. Webb

4884-1174-1606.4

**<u>Exhibit A</u>**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| COTTONWOOD FINANCIAL LTD., *et al.*,[1] | ) | Case No. 24-80035 (SWE) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER PURSUANT TO 11 U.S.C. §§ 105(A), 363(B), AND 365(A) AND FED. R.
BANKR. P. 6006 (I) AUTHORIZING THE ASSUMPTION OF A CLIENT SERVICES
AGREEMENT, AS MODIFIED; AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion"),[2] of the above-captioned debtors and debtors in possession

(the "Debtors") for entry of an order authorizing the assumption of the *Amended and Restated*

*Brokering and Services Agreement* (the "Agreement") attached to the Motion as **Exhibit B**, with

TreeMac Funding Group, LLC ("TreeMac"), as modified by the terms set forth in this Order; and

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtors' federal tax identification number are as follows: Cottonwood Financial Ltd. (1001); Cottonwood Financial Administrative Services, LLC (7228); Cottonwood Financial Texas, LLC (9059); Cottonwood Financial Idaho, LLC (5651); Cottonwood Financial Wisconsin, LLC (7075). The Debtors' principal offices are located at 2100 W Walnut Hill Lane, Suite 300, Irving, TX 75038.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

this Court having jurisdiction to consider the Motion pursuant to 28 U.S.C. § 1334; and this being

a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter

a final order consistent with Article III of the United States Constitution; and this Court having

found that venue of this proceeding and the Motion in this district is proper pursuant to

28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion

and opportunity for a hearing on the Motion were appropriate under the circumstances and no other

notice need be provided; and this Court having reviewed the Motion, and all objections, if any, to

the Motion having been withdrawn, resolved, or overruled; and the Court having determined that

the legal and factual bases set forth in the Motion and the record of the hearing on such motion

establish just cause for the relief granted herein; and upon all of the proceedings had before this

Court; and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY**

**ORDERED THAT:**

1.      Pursuant to sections 105(a), 363(b) and 365(a) of the Bankruptcy Code,

Cottonwood Texas is authorized to assume the Agreement, as modified by this Order.   The

Agreement (as modified herein) shall be binding and enforceable against the parties in accordance

with their terms.   To the extent Cottonwood Texas was in default of its obligations under the

Agreement as of the Petition Date, any such defaults are cured by the modifications approved

herein, and this Order serves as adequate assurances to TreeMac of Cottonwood Texas's future

performance under the Agreement.

2.      Within two (2) business days of entry of this Order, Cottonwood Texas shall pay

TreeMac [$●] (the "Cure Payment").   No cure amount is owed by Cottonwood Texas to TreeMac

with respect to the Agreement other than the Cure Payment.

4884-1174-1606.4

3.      Upon entry of this Order, the obligations of Cottonwood Texas under the Agreement shall constitute administrative expenses of Cottonwood Texas's estate pursuant to sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.

4.      Nothing included or omitted in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall impair, prejudice, waive or otherwise affect the rights of the Debtors and their estates, subject to appropriate notice and a hearing and this Court's approval unless otherwise agreed to by the parties, to assign the Agreement, pursuant to, and in accordance with, the requirements of section 365 of the Bankruptcy Code.

5.      In the event a potential purchaser of Cottonwood Texas's assets does not take assignment of the Agreement or otherwise fails to enter into a transition services agreement with TreeMac to continue servicing the loan portfolio post-closing, Cottonwood Texas shall have the ability to terminate the Agreement upon five (5) business days prior written notice to TreeMac and entry of a final order approving the sale of Cottonwood Texas's assets.  In the event of such termination, TreeMac shall be entitled to (i) an allowed administrative expense claim for obligations under the Agreement related to loans originated between the Petition Date and the termination date, and (ii) an allowed general unsecured claim for all other obligations under the Agreement; *provided, however*, that TreeMac shall be permitted, without further notice or order of the Court, to draw on the BOK Letter of Credit to satisfy, in whole or in part, its allowed general unsecured claim.

6.      TreeMac agrees to use reasonable, good faith efforts to enter into a transition services agreement with the purchaser of Cottonwood Texas's assets, with assistance from Cottonwood Texas.

4884-1174-1606.4

7.    Notwithstanding anything contained in any other agreement between the parties, including but not limited to the Master LOC Agreement, TreeMac confirms and agrees that no acceleration or maturation of any obligations under such agreements has occurred, or deemed to have occurred, solely as a result of the Debtors' insolvency or the commencement of these chapter 11 cases, and no amounts shall be immediately due and payable by Cottonwood Texas as a result thereof; *provided, however*, if Cottonwood Texas fails to cure any defaults that arise under the Agreement postpetition, or these chapter 11 cases are dismissed or converted, TreeMac expressly reserves its rights and remedies under the Agreement, the Master LOC Agreement, the individual letters of credit and the BOK Letter of Credit.

8.    The terms and conditions of this Order are immediately effective and enforceable upon their entry.  To the extent applicable, the stays described in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived.

9.    Cottonwood Texas and TreeMac are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

10.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# # # END OF ORDER # # #

Submitted by:

Jason S. Brookner (TX Bar No. 24033684)
Aaron M. Kaufman (TX Bar No. 24060067)
Lydia R. Webb (TX Bar No. 24083758)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, TX 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:       jbrookner@grayreed.com
             akaufman@grayreed.com
             lwebb@grayreed.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

## Exhibit B

**Brokering and Servicing Agreement**

## AMENDED AND RESTATED

## BROKERING AND SERVICING AGREEMENT

This Amended and Restated Brokering and Servicing Agreement (the "Agreement") is made, entered into and effective as of the 25 day of February, 2024, by and between TREEMAC FUNDING GROUP, LLC, a Delaware limited liability company ("TreeMac"), and COTTONWOOD FINANCIAL TEXAS, L.L.C., a Delaware limited liability company ("Cottonwood," and, together with TreeMac, the "Parties").

### RECITALS

WHEREAS, the Parties entered into an amended and restated Brokering and Servicing Agreement, dated January 1, 2023 (the "Amended Brokering and Servicing Agreement"), for the purpose of setting forth the terms and conditions governing certain services provided by Cottonwood to TreeMac in connection with the brokering, guaranteeing and servicing of Loans (as defined below) made by TreeMac to Borrowers (as defined below).

WHEREAS, the Parties discussed making certain changes to the Amended Brokering and Servicing Agreement in or about June 2023 but never made a formal amendment to the Amended Brokering and Servicing Agreement. Nevertheless, the Parties have operated since such time as if they executed an amendment to the Amended Brokering and Servicing Agreement.

WHEREAS, the Parties now desire to amend and restate the Amended Brokering and Servicing Agreement in its entirety as set forth herein to clarify their rights and obligations in connection with the Program (as defined in the Amended Brokering and Servicing Agreement).

NOW, THEREFORE, in consideration of the mutual promises set forth herein and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, TreeMac and Cottonwood hereby amend and restate the Amended Brokering and Servicing Agreement as follows:

1.    Definitions. Except as may be explicitly stated otherwise herein, the following terms shall have the following meanings ascribed to them below:

> "Advertising Materials" means all materials used by Cottonwood in the performance of its brokering obligations under this Agreement, including, without limitation, advertisements, brochures, and similar materials.

> "Affiliate" of a person means a person in Control of that person, a person Controlled by that person, or a person under common Control with that person.

> "Borrowers" mean those persons who are borrowers with respect to the Loans.

> "Broker's Fees" means the fees Cottonwood charges Borrowers in connection with the brokering and servicing of Loans.

"Collateral Check" means a signed, personal check made payable to TreeMac and dated as of the due date of the Loan. Collateral Check may also refer, if applicable, to an electronic debit authorization or other electronic payment authorization, issued by the borrower to TreeMac or, on TreeMac's behalf, to Cottonwood.

"Control" means the ownership or power to vote ten percent (10%) or more of the outstanding ownership or voting interests of a person.

"Credit Services Agreement" means that certain agreement that Cottonwood will enter into with each Borrower whereby Cottonwood agrees to broker a Loan to TreeMac and provide credit enhancement on the account of the Borrower and for the benefit of TreeMac.

"Default" means a Borrower's Collateral Check has been returned unpaid to Cottonwood, as special agent for TreeMac, or a Borrower has otherwise failed to repay a loan as agreed in the Loan Documents within a timeframe established by TreeMac at any time or from time to time, and TreeMac has elected to demand payment under the terms of Cottonwood's letter of credit supporting repayment of a Loan.

"Lien Recording Fee" means a fee charged by a government body for recording a security interest in a Certificate of Title, which Cottonwood will pay on the Borrower's behalf and be reimbursed directly by TreeMac from a portion of the Borrower's loan proceeds.

"Loans" means short-term loans made by TreeMac to Borrowers pursuant to this Agreement.

"Motor Vehicle" shall have the meaning assigned to that term by Section 501.002(14) of the Texas Transportation.

"Proceeds Check" means a voucher or check, as selected by TreeMac in its discretion, for delivery of the proceeds of a Loan to a Borrower.

"Program" means the lending program of TreeMac for the origination and consummation of Loans pursuant to this Agreement.

"Program Guidelines" means those guidelines established by TreeMac from time to time for the administration of the Program.

"Program Materials" means all Loan Documents (as defined below) and all other documents, materials and methods used in connection with the performance of the Parties' obligations under this Agreement, including without limitation applications, disclosures required by the Rules, and the like, but excluding Advertising Materials.

LEGAL02/36825174v2

"Regulatory Authority" means any local, state, or federal regulatory authority having jurisdiction or exercising regulatory or similar oversight with respect to TreeMac, Cottonwood, or Third Party Service Providers.

"Rules" means all local, state, and federal statutes or ordinances applicable to the acts of TreeMac, Cottonwood, or a Third Party Service Provider as they relate to the Program; any order, decision, injunction, or similar pronouncement of any court, tribunal, or arbitration panel issued with respect to TreeMac, Cottonwood, or a Third Party Service Provider in connection with this Agreement; and any regulations, policy statements, and any similar pronouncement of a Regulatory Authority applicable to the acts of TreeMac, Cottonwood, or a Third Party Service Provider as they relate to the Program.

"Third Party Service Provider" means any contractor or service provider retained by TreeMac or Cottonwood, or retained by any party directly or indirectly retained by TreeMac or Cottonwood, who provides or renders services in connection with the Program.

In addition, the terms "Applications," "Applicants," and "TreeMac Policies" shall have the meanings given to them in Subsection 4(a) below; the term "Loan Documents" shall have the meaning given to it in Subsection 4(j) below; "Letter of Credit" shall have the meaning given to it in Subsection 4(d) below; and the terms "Cottonwood Indemnified Parties," "TreeMac Indemnified Parties," "Indemnified Parties," "Indemnifying Parties," and "Losses" shall have the meanings given to them in Section 16 below.

2.    General Description. The Parties agree that, in accordance with the Program Guidelines, the Program shall consist of the making of Loans by TreeMac. Cottonwood shall broker and service such Loans and issue letters of credit to TreeMac from such locations in the State of Texas and other markets as the Parties may from time to time agree upon in writing. The Parties agree that TreeMac shall have sole responsibility for establishing credit and underwriting criteria, funding the Loans, and managing the Program. The Parties shall endeavor to begin the Program and commence making the Loans hereunder not later than December 8, 2016.

Nothing herein shall be deemed to commit TreeMac to originate or fund any particular level or number of Loans, and TreeMac makes no representation as to the amount of funding it will be able to provide for the Loans. Cottonwood specifically acknowledges and agrees that TreeMac may immediately cease making new Loans if TreeMac is unable to obtain funding sources. If TreeMac receives notice from any funding source for the Loans that it intends to terminate or materially reduce its funding, TreeMac agrees to promptly inform Cottonwood of such fact.

3.    Duties and Responsibilities of TreeMac. TreeMac shall perform and discharge the following duties and responsibilities:

(a)    Establish (and from time to time as it determines appropriate, modify) Program Guidelines and credit and underwriting criteria for the Program and the Loans.

3

(b)      Determine the form of all Loan Documents which shall comply with the Rules and develop all Program Materials. All promissory notes between Borrower and TreeMac must include any notice and related materials required by the provisions of Texas Finance Code § 393.201. In the event that any Borrower properly cancels the Credit Services Agreement between the Borrower and Cottonwood, the terms of the promissory note between Borrower and TreeMac shall provide that the cancellation is an event of default under the promissory note, and the promissory note must be made immediately due and payable.

(c)      Make a determination as to whether a Loan should be extended to a prospective Borrower (which determination may be made on a case-by-case basis or pursuant to a credit scoring system or other criteria or models established by TreeMac).

(d)      Extend credit to Borrowers in the form of Loans and fund the Loans by issuing Proceeds Checks to such Borrowers.

(e)      In accordance with the Program Guidelines (and subject to the settlement obligations set forth in Section 5 of the Agreement), upon the origination of Loans, TreeMac shall remit to Cottonwood, as Loan principal, the amount of the Broker's Fees, fees paid by Cottonwood to public officials on behalf of the Borrower, and all cash necessary to reimburse Cottonwood for its redemption of Proceeds Checks for Loans approved by TreeMac and presented to Cottonwood by Borrowers. Upon the Default by any Borrower, TreeMac shall have the authority to make immediate demand upon any credit enhancement device provided by Cottonwood in connection with such Loan or in connection with the Program, as applicable to such Loan. On each day TreeMac is paid by Cottonwood because of a Borrower's Default on a Loan, TreeMac shall subrogate all of its rights in the promissory note held by TreeMac in connection with such Loan and assign the promissory note to Cottonwood. In accordance with the Program Guidelines, TreeMac shall also remit to Cottonwood cash funds equal to any amounts paid to TreeMac by Cottonwood in performance of Cottonwood's credit enhancement obligations with respect to any Loans that were renewed by TreeMac after Cottonwood performed on any letter of credit issued in connection with such Loans, but subject to the settlement obligations of the Parties as set forth at Section 5 of this Agreement. In the event TreeMac makes a Loan to any Borrower with any outstanding financial obligations owed to Cottonwood in connection with a Loan previously made to such Borrower, TreeMac shall pay directly to Cottonwood, on behalf of Borrowers in immediately-available funds, an amount equal to the financial obligations owed by Borrowers to Cottonwood in connection with any Loan previously made to such Borrower, but subject to the settlement obligations of the Parties as set forth at Section 5 of this Agreement.

(f)      Determine the form of adverse action notices and other communications which may be required under the Rules and which shall be provided by Cottonwood to persons who apply for but are denied a Loan.

(g)      Forward to Cottonwood as soon as practicable, but in any event within five business days of receipt, copies of any notices received by TreeMac concerning the filing of a bankruptcy petition by a Borrower.

4

(h)    Review and approve or disapprove all Advertising Materials (which approval shall not be unreasonably withheld) and endeavor to review the same and respond to Cottonwood in a timely manner, and endeavor on any other matter for which TreeMac's consent is required to provide a response in a timely manner.

(i)    TreeMac (either directly or by the use of accountants or other agents or representatives) may audit, inspect, and review Cottonwood and its files, records, and books which pertain to the services provided by Cottonwood or the duties and obligations of Cottonwood hereunder or to the creditworthiness of Cottonwood or in order to respond to any examination by or request from a Regulatory Authority. TreeMac may obtain such information as necessary in order to ascertain Cottonwood's compliance with the requirements of this Agreement and compliance of the Program, Cottonwood, and Third Party Service Providers retained by Cottonwood with all applicable laws and regulations.

(j)    Maintain at its expense, within 60 days following the effective date of this Agreement, a general comprehensive liability policy with a financially sound and reputable insurer acceptable to Cottonwood. Such general comprehensive liability policies shall provide coverage limits of not less than $250,000. TreeMac shall provide copies of such insurance policies to Cottonwood and provide to Cottonwood such evidence as it may reasonably request concerning the continued existence of such coverages during the term of this Agreement.

(k)    Remain in compliance with all terms, conditions and covenants contained in any agreement between TreeMac and any creditor of TreeMac. TreeMac agrees to provide Cottonwood with prompt written notice of any default by TreeMac under any material agreement with any creditor.

(l)    In discharging the above duties and responsibilities, TreeMac shall ensure that the Loans comply with the Rules; provided, however, TreeMac shall not be held responsible for any acts or omissions by Cottonwood that causes the Loans to fail to comply with the Rules.

4.    Duties and Responsibilities of Cottonwood.

(a)    Cottonwood shall perform all services reasonably required to broker and service the Loans, including without limitation the establishment and operation of retail stores where Loan applicants ("Applicants") may submit Loan applications ("Applications") and receive disclosures required by applicable law and where Borrowers may, among other things, (i) execute and deliver Loan Documents, (ii) receive Proceeds Checks and cash, and (iii) repay Loans. In performing its services hereunder, Cottonwood shall at all times and in all material respects comply with applicable law and shall ensure that its brokering, credit support and servicing of the Loans comply with the Rules. Further, Cottonwood shall follow the reasonable and lawful practices, policies and procedures established by TreeMac and communicated in writing to Cottonwood from time to time (the "TreeMac Policies").

(b)    TreeMac hereby authorizes Cottonwood to broker, provide credit support and service Loans and to use the name, and any trade name and logo, of TreeMac in connection with such brokering, credit support and servicing, as provided in Section 7 hereof, and as otherwise reasonably necessary. All advertising and promotions for the Loans shall identify TreeMac as the lender. Cottonwood shall submit all Advertising Materials to TreeMac for TreeMac's prior review and approval under Section 3(h) of this Agreement. In connection with Cottonwood's performance of its obligations under this Agreement, it is expressly agreed that (i) TreeMac shall not hold any ownership or leasehold interest in any Cottonwood store or any personal property located therein, except for Collateral Checks, Loan Documents, Borrower files, and cash reflecting Loan repayments as may be located at such stores from time to time, (ii) no TreeMac employees shall work in any Cottonwood store, and (iii) TreeMac shall exercise no authority or control over Cottonwood's employees or methods of operation except as otherwise provided in this Agreement.

(c)    Unless otherwise agreed upon by the Parties in writing, Cottonwood is authorized to and shall broker and service Applications in accordance with the following procedures:

(i)    Cottonwood employees shall take Applications from Applicants, using an Application form approved by TreeMac. Upon request from an Applicant, Cottonwood shall provide reasonable assistance to each prospective Applicant in completing an Application. Without limiting the generality of the foregoing, Cottonwood shall not discriminate against any Applicant in the credit application process on any "prohibited basis," as such term is defined in the federal Equal Credit Opportunity Act and Regulation B (promulgated by the Consumer Financial Protection Bureau (the "CFPB")) and any other applicable State or Federal Law.

(ii)    Based upon the information provided by Applicants to TreeMac through Cottonwood and such other credit-related information as may be obtained by Cottonwood at the direction of TreeMac, Cottonwood employees shall process the making of the Loans pursuant to the loan underwriting criteria established by TreeMac and pursuant to the determination made by TreeMac as contemplated in Section 3(c) of this Agreement. Cottonwood shall provide, on behalf of TreeMac, an appropriately completed adverse action notice to any Applicant whose Application is rejected by TreeMac.

(iii)    The Loans shall be evidenced by Loan Documents including a promissory note (with all disclosures and information required by the Rules) and an arbitration agreement between the Borrower and TreeMac (which may be included in the form of a promissory note) (the "Arbitration Agreement").

(iv)    Upon a Borrower's initial Loan, Cottonwood shall: (A) have the Borrower sign the promissory note and, if a separate document, the Arbitration Agreement; (B) deliver a copy of the promissory note and Arbitration Agreement to the Borrower; (C) obtain from the Borrower the executed promissory note and Arbitration Agreement, and if applicable, a Collateral Check, which Collateral

6

Check shall be for the amount set forth in the promissory note and as described in the Program Guidelines; and (D) upon receipt (and only upon receipt) of the signed promissory note and, if applicable, the Collateral Check, deliver to the Borrower a Proceeds Check for the Loan.

Upon a Borrower's renewal of his or her Loan, if applicable, Cottonwood shall (A) have the Borrower sign a new promissory note and a new Arbitration Agreement; (B) deliver a copy of the new promissory note and the new Arbitration Agreement to the Borrower; (C) obtain from the Borrower a cash payment with respect to any fees due to TreeMac in connection with the Loan to be renewed in an amount required by the TreeMac Policies; (D) if applicable, obtain from the Borrower the Borrower's new signed Collateral Check made payable to TreeMac and dated as of the new due date of the Loan, which Collateral Check shall be for the amount set forth in the promissory note; and (E) upon receipt of the new Collateral Check, if applicable, deliver to the Borrower his or her previous Collateral Check, if applicable, and his or her previous promissory note marked "paid".

(d) As part of Cottonwood's processing of each Loan, Cottonwood shall issue a letter of credit to TreeMac for the principal amount (including Broker's Fee, as applicable) set forth in the promissory note signed by the Borrower in connection with such Loan and as described in the Program Guidelines. Cottonwood's letters of credit shall be supported by a letter of credit (the "Letter of Credit") issued for the benefit of TreeMac by an insured depository institution that is reasonably acceptable to TreeMac. The amount, form and terms of the Letter of Credit shall be reasonably acceptable to TreeMac. The rights and duties of the Parties with respect to the Letter of Credit shall be governed by that certain Amended and Restated Letter of Credit Agreement entered into by and between Cottonwood and TreeMac on December 8, 2016. Upon the Default by any Borrower, TreeMac may demand that Cottonwood pay the amount due to TreeMac pursuant to Cottonwood's letters of credit issued in connection with the applicable Loan, but subject to the settlement obligations of the Parties as set forth at Section 5 of this Agreement. If any Borrower properly cancels the Credit Services Agreement between the Borrower and Cottonwood at any time, Cottonwood shall notify TreeMac (by whatever means convenient) of the cancellation of such agreement within two (2) business days of such cancellation. Cottonwood shall provide copies of each individual letter of credit it has issued to TreeMac upon TreeMac's request.

(e) As part of Cottonwood's processing of TreeMac's Loans secured by a Collateral Check, the owner of the Loan will earn a returned item fee if the borrower's check or ACH payment is returned unpaid by the Borrower's bank. When TreeMac earns a returned item fee, Cottonwood shall remit any portion of the returned item fee owed to TreeMac it has collected pursuant to the applicable Program Guidelines. Cottonwood shall endeavor to collect any returned item fee owed to TreeMac until such time as Cottonwood determines that the debt will not be collected and writes off the uncollected amount of the debt. At such time, Cottonwood will have no further payment obligations to TreeMac for the uncollected debt. If any portion of the returned item fee owed to TreeMac is subsequently collected by Cottonwood, Cottonwood shall remit these funds to TreeMac.

7

(f)      As part of Cottonwood's processing of TreeMac's Loans secured by a letter of credit issued by Cottonwood, the owner of the Loan will earn a delinquency fee if the Borrower's payment is more than ten (10) days late. Cottonwood shall remit any portion of the delinquency fee owed to TreeMac it has collected provided that: (1) Cottonwood has collected the full amount owed to it under the terms of the Credit Services Agreement between Cottonwood and the Borrower, and (2) Cottonwood has collected all or a portion of the delinquency fee owed to TreeMac. Cottonwood shall endeavor to collect any delinquency fee owed to TreeMac until such time as Cottonwood determines that the debt will not be collected and writes off the uncollected amount of the debt. At such time, Cottonwood will have no further payment obligations to TreeMac for the uncollected debt. If any portion of the delinquency fee is subsequently collected by Cottonwood, Cottonwood shall remit these funds to TreeMac. Nothing set forth herein shall require TreeMac to wait ten (10) days or more after the due date of the Borrower payment to exercise its rights under the letter of credit issued by Cottonwood.

(g)      As part of Cottonwood's processing of TreeMac's Loans, Cottonwood is authorized to and shall issue cash funds to Borrower in return for Borrower's presentment of the Proceeds Check issued by TreeMac, if the amount of the Proceeds Check is less than or equal to $2000.00. The cash funds issued to Borrower shall be equal to the amount set forth on such Proceeds Check, unless any of such funds are to be paid by TreeMac directly to Cottonwood, on behalf of Borrower, for any outstanding financial obligations owed by Borrower to Cottonwood in connection with any Loan previously made to such Borrower, as contemplated in Section 3(e) of this Agreement.

(h)      As part of Cottonwood's processing of TreeMac's Loans, and if TreeMac elects to issue the Proceeds Check in the form of a voucher, Cottonwood is authorized to and shall issue a check, drawn on an account established by Cottonwood to Borrower in return for Borrower's presentment of the voucher issued by TreeMac, if the amount of the Proceeds Check is greater than $2000.00. The check issued to Borrower shall be equal to the amount set forth on such Proceeds Check, unless any of such funds are to be paid by TreeMac directly to Cottonwood, on behalf of Borrower, for any outstanding financial obligations owed by Borrower to Cottonwood in connection with any Loan previously made to such Borrower, as contemplated in Section 3(e) of this Agreement.

(i)      As part of its servicing of the Loans, Cottonwood is authorized to and shall monitor and inventory the Proceeds Checks, ensuring that all Proceeds Checks are issued as a result of Applications approved by TreeMac and are given to Borrowers for Loans.

(j)      Cottonwood is authorized to and shall perform all necessary servicing functions with respect to the Loans. Without limiting the foregoing:

(i)      Cottonwood shall use its reasonable best efforts to collect payments on the Loans at maturity thereof, including (without limitation) depositing Collateral Checks as agent for TreeMac in accordance with the Program Guidelines.

LEGAL02/36825174v2

(ii)   In accordance with the Program Guidelines, Cottonwood shall remit to TreeMac all cash receipts for that day and all funds due to TreeMac under Cottonwood's letters of credit on that day, but subject to the settlement obligations of the Parties as set forth at Section 5 of this Agreement.

Cottonwood shall maintain and retain on behalf of TreeMac all original Applications and copies of all adverse action notices and other documents relating to rejected Applications for the period required by applicable law. Cottonwood shall maintain originals or copies, as applicable, of all Applications, promissory notes, Arbitration Agreements, Proceeds Checks and Collateral Checks (all such documents referred to collectively as "Loan Documents") for the period required by applicable law and the Program Guidelines. All of the foregoing shall be maintained by Cottonwood in a secure environment in accordance with reasonable business practices and the requirements of the Rules.

(k)   During the term of this Agreement, Cottonwood shall provide to TreeMac data submissions and reports reasonably required by TreeMac in order to maintain effective internal controls and to monitor results under this Agreement, including without limitation the performance of the Loans, information regarding defaulted Loans and individual letters of credit and Cottonwood's obligations hereunder. Such reports shall include a daily report showing Loans made, repaid and outstanding each day, accrued interest or fees, and such other accounting detail as TreeMac may reasonably request. During the term of this Agreement and for a reasonable period thereafter, TreeMac and its auditors and lenders shall have reasonable access to Cottonwood stores and to the books and records of Cottonwood and the officers, employees and accountants of Cottonwood for the same purposes; provided that any such access shall be conducted in such a manner as to minimize the disruption to the business and operations of Cottonwood.

(l)   During the term of this Agreement and thereafter as may be required by the Rules, Cottonwood shall maintain files, records, and data with respect to the Loans as required by the Program Guidelines and the Rules, service the Loans, and reflect all Loan transactions and track Loan balances on a management information system to be maintained by Cottonwood pursuant to the requirements of Section 10 below, and promptly report to TreeMac any breaches in the security of the files, records, and data described herein which may result in unauthorized disclosures of such information that may materially affect TreeMac or its customers.

(m)   During the term of this Agreement, Cottonwood shall maintain at its expense a general comprehensive liability policy with a financially sound and reputable insurer acceptable to TreeMac. Such general comprehensive liability policies shall provide coverage limits of not less than $1,000,000. Cottonwood shall provide copies of such insurance policies to TreeMac and provide to TreeMac such evidence as it may reasonably request concerning the continued existence of such coverages during the term of this Agreement.

(n)   During the term of this Agreement, Cottonwood shall have the right to review and comment on all Program Materials and endeavor to review the same and

9

respond to TreeMac in a timely manner, and endeavor on any matter for which Cottonwood's consent is required to provide a response in a timely manner.

5.      Settlement. The Parties agree to settle amounts due from one party to the other hereunder as provided for herein or upon such other basis as the Parties may from time to time agree. Any settlement due from one party to the other hereunder shall be made by an automated clearinghouse transfer with next day settlement on a business day immediately succeeding the transaction date. Pursuant to the requirements of Section 10 below, Cottonwood shall capture and record all relevant data concerning any Loan transaction and prepare appropriate reports and summaries as may be necessary to effect settlement hereunder, facilitate the review and analysis of all Loan activity, and permit TreeMac to reflect such Loan transactions on its books and records.

6.      Program Guidelines. Attached hereto as Exhibits and incorporated herein by this reference are the Program Guidelines appropriate for the operation of the Program, as of the date of this Agreement, which take into account the Parties' respective duties and rights hereunder, the nature of the Loans and the scope of the Programs as described in Section 2 above, as well as any applicable requirements of the Rules. The Parties agree to perform their duties and responsibilities under this Agreement in accordance with the provisions of the Program Guidelines; provided, however, that TreeMac may modify the Program Guidelines from time to time as set forth in Section 34.

7.      Program Materials; Advertising Materials; TreeMac Trade Names and Trademarks. TreeMac shall be responsible for the development of the Program Materials. All Program Materials shall be subject to the prior review and approval of Cottonwood, which such approval shall not be unreasonably withheld nor provided in an untimely manner. Cottonwood may at any time retract or modify an approval previously given by it with respect to any Program Materials if Cottonwood reasonably determines that such action is necessary in order to remain in compliance with the Rules.

Subject to TreeMac's review and approval (which approval may not be unreasonably withheld), Cottonwood shall be responsible for the development of proposed Advertising Materials concerning advertising and brokering of Loans and solicitation of potential Borrowers. The nature of the Advertising Materials, the scope of their dissemination, and the total expenditures to be made on Advertising Materials for the Program shall be determined by Cottonwood in its reasonable discretion, provided that the Advertising Materials at all times comply with the Rules. TreeMac may at any time retract or modify any approval previously given by it with respect to any Advertising Materials if TreeMac reasonably determines that such action is necessary in order to remain in compliance with the Rules.

Cottonwood shall have no authority to use any trade names, trademarks, or service marks of TreeMac except by means of Loan Documents or Program Materials developed by TreeMac or Advertising Materials approved by TreeMac pursuant to this section. Likewise, TreeMac acknowledges that developed Loan Documents or Program Materials or approved Advertising Materials may contain trade names, trademarks, or service marks of Cottonwood, and TreeMac shall have no authority to use any such names or marks separate and apart from their use in the Program Materials or Advertising Materials. The Parties shall use Program Materials and Advertising Materials only for the purpose of implementing the provisions of this Agreement and

10

shall not use Program Materials or Advertising Materials in any manner that would violate the Rules or any provision of the Program Guidelines.

8.    Loan Terms and Charges. All Loan terms and all interest, fees, and other charges associated with the Loans shall be established by TreeMac and reflected in the Program Guidelines. Notwithstanding the foregoing, however, TreeMac shall have the unilateral right to modify any Loan term, interest rate, fee, or other charge. Cottonwood shall have the unilateral right to determine and establish the Broker's Fees charged Applicants.

9.    Third Party Service Providers. Cottonwood shall not, whether directly or indirectly, retain any Third Party Service Provider to assist it in performing its duties hereunder or to otherwise participate in the Program except with the prior written consent of TreeMac, which consent shall not be unreasonably withheld nor provided in an untimely manner. In seeking the approval of TreeMac to retain a Third Party Service Provider, Cottonwood shall provide to TreeMac such information concerning the proposed Third Party Service Provider as TreeMac may reasonably request. TreeMac may condition its approval of a proposed Third Party Service Provider upon obtaining a written commitment from such Third Party Service Provider to comply with the terms of this Agreement, the Rules and the Program Guidelines, submit to audits and inspections by TreeMac, and indemnify TreeMac upon such terms and conditions as TreeMac may reasonably require. Cottonwood shall be responsible for supervising any Third Party Service Providers retained by it and ensuring their compliance with this Agreement, the Program Guidelines and the Rules; Cottonwood further agrees to indemnify, defend and hold TreeMac harmless from any Third Party Service Providers retained by Cottonwood.

TreeMac hereby gives its consent to Cottonwood's retention of Cottonwood Financial Ltd. and Cottonwood Financial Administrative Services, LLC, as Third Party Service Providers.

TreeMac shall not, whether directly or indirectly, retain any Third Party Service Provider to assist it in performing its duties hereunder or to otherwise participate in the Program except with the prior written consent of Cottonwood, which consent shall not be unreasonably withheld nor provided in an untimely manner. In seeking the approval of Cottonwood to retain a Third Party Service Provider, TreeMac shall provide to Cottonwood such information concerning the proposed Third Party Service Provider as Cottonwood may reasonably request. Cottonwood may condition its willingness to approve a proposed Third Party Service Provider upon obtaining a written commitment from such Third Party Service Provider to comply with the terms of this Agreement and the Program Guidelines, submit to audits and inspections by Cottonwood, and indemnify Cottonwood upon such terms and conditions as Cottonwood may reasonably require. TreeMac shall be responsible for supervising any Third Party Service Providers retained by it and ensuring their compliance with this Agreement, the Program Guidelines, and the Rules; TreeMac further agrees to indemnify, defend and hold Cottonwood harmless from any Third Party Service Provider retained by TreeMac.

10.    MIS. Cottonwood agrees to develop and maintain, at its sole cost and expense, a comprehensive management information system (sometimes referred to herein as MIS) to accurately and immediately reflect all Loan transactions and track all Loan balances and which will satisfy the information requirements of Cottonwood and TreeMac. Cottonwood also agrees that TreeMac shall have real time access to the database of such MIS system provided at

11

Cottonwood's expense, and acknowledges that TreeMac will rely upon such MIS maintained by Cottonwood for obtaining information about and accounting for the Loans. Nothing herein, however, shall require Cottonwood to allow TreeMac to enter data into or alter Cottonwood's internal general ledger accounting system.

Upon termination of this Agreement for any reason Cottonwood shall continue to provide the MIS functions described herein for the Loans for the benefit of TreeMac and maintain the MIS system described herein for such purpose for up to one (1) month following termination of this Agreement or for such longer period of time as may be required by the Rules.

11.    <u>Cottonwood's Representations and Warranties</u>. Cottonwood makes the following warranties and representations to TreeMac, all of which shall survive the execution and termination of this Agreement for any reason:

(a)    This Agreement is valid, binding and enforceable against Cottonwood in accordance with its terms and has received all necessary partnership approvals.

(b)    Cottonwood is a limited liability company duly organized, validly existing, and in good standing under the laws of the state of Delaware and is authorized, registered, and licensed to do business in each state in which the nature of its activities makes such authorization, registration, or licensing necessary or required.

(c)    Cottonwood has the full power and authority to execute and deliver this Agreement and perform all of its obligations hereunder.

(d)    The execution of this Agreement and the completion of all actions required or contemplated to be taken by Cottonwood hereunder are within the ordinary course of Cottonwood's business, and permitted by the Rules.

(e)    The provisions of this Agreement and the performance of each of its obligations hereunder do not conflict with Cottonwood's limited liability company bylaws, or any agreement, contract, lease, or obligation to which Cottonwood is a party or by which Cottonwood is bound, including any exclusivity or other provisions of any other agreement to which Cottonwood or any related entity is a party, and including any non-compete agreement or similar agreement limiting the right of Cottonwood to engage in activities competitive with the business of any other party.

(f)    Neither Cottonwood nor any principal thereof has been or is the subject of any of the following:

(i)    Criminal conviction (other than traffic or motor vehicle related offenses);

(ii)    IRS lien;

(iii)    Enforcement agreement, memorandum of understanding, cease and desist order, administrative penalty, or similar agreement concerning lending matters or participation in the affairs of a financial institution;

LEGAL02/36825174v2

(iv)    Administrative or enforcement proceeding or material investigation commenced by the Securities and Exchange Commission, state securities regulatory authority, Federal Trade Commission, the CFPB, any banking regulator, or any other state or federal Regulatory Authority, with the exception of matters disclosed to TreeMac in writing, routine communications from a Regulatory Authority concerning a consumer complaint and routine examinations of Cottonwood conducted by a Regulatory Authority in the ordinary course of Cottonwood's business; or

(v)    Restraining order, decree, injunction, or judgment in any proceeding or lawsuit alleging fraud or deceptive practices or illegal activity on the part of Cottonwood or any principal thereof.

For purposes of this subsection the word "principal" of Cottonwood shall include (i) any person having or exercising Control over Cottonwood, (ii) any officer or director of Cottonwood, and (iii) any person actively participating in the control of Cottonwood's business.

12.    TreeMac's Representations and Warranties. TreeMac makes the following warranties and representations to Cottonwood as of the date of this Agreement, all of which shall survive the execution and termination of this Agreement for any reason:

(a)    This Agreement is valid, binding and enforceable against TreeMac in accordance with its terms and has received all necessary limited liability company approvals on the part of TreeMac and TreeMac is not required to obtain the approval of any Regulatory Authority to enter into this Agreement or perform its obligations hereunder.

(b)    TreeMac is a limited liability company duly formed, validly existing, and in good standing under the laws of Delaware.

(c)    TreeMac has the full limited liability company power and authority to execute and deliver this Agreement and perform all of its obligations hereunder and is authorized, registered, and licensed to do business in each state in which the nature of its activities makes such authorization, registration, or licensing necessary or required.

(d)    The execution of this Agreement and the completion of all actions required or contemplated to be taken by TreeMac hereunder are within the ordinary course of TreeMac's business, and permitted by the Rules.

(e)    The provisions of this Agreement and the performance of each of its obligations hereunder do not conflict with TreeMac's Certificate of Formation, Limited Liability Company Agreement, or any material agreement, contract, lease, or obligation to which TreeMac is a party or by which TreeMac is bound, including any exclusivity or other provisions of any other material agreement to which TreeMac is a party, and including any non-compete agreement or similar agreement limiting the right of TreeMac to engage in activities competitive with the business of any other party.

13

(f)    Neither TreeMac nor any principal thereof has been or is the subject of any of the following:

(i)    Criminal conviction (other than traffic or motor vehicle related offenses);

(ii)    IRS lien;

(iii)    Enforcement agreement, memorandum of understanding, cease and desist order, administrative penalty, or similar agreement concerning lending matters or participation in the affairs of a financial institution;

(iv)    Administrative or enforcement proceeding or material investigation commenced by the Securities and Exchange Commission, state securities regulatory authority, the Federal Trade Commission, the CFPB, any banking regulator, or any other state or federal Regulatory Authority; or

(v)    Restraining order, decree, injunction, or judgment in any proceeding or lawsuit alleging fraud or deceptive practices or illegal activity on the part of TreeMac or any principal thereof.

For purposes of this subsection the word "principal" of TreeMac shall include (i) any person having or exercising Control over TreeMac, (ii) any officer or manager of TreeMac, and (iii) any person actively participating in the control of TreeMac's business.

13.    Ownership and Licensing of Borrower Information. Cottonwood and TreeMac shall jointly own all Borrower names, addresses, and telephone numbers and all account and other information regarding Borrowers, Applicants who have been declined, and Applicants who are approved but ultimately do not obtain a Loan, and all records, data, and information pertaining to the foregoing; provided, however, neither Party shall use such information for any purpose other than as provided herein (except in the event of the termination of this Agreement upon the other Party's default).

Cottonwood and TreeMac agree that they shall obtain, use, and retain information concerning Borrowers and Applicants only in compliance with all applicable state and federal laws and regulations concerning the privacy and confidentiality of such information.

Upon termination of this Agreement for any reason, TreeMac shall perpetually and unconditionally license the use of the information concerning all Borrowers and all Applicants to Cottonwood upon receipt from Cottonwood of a one-time licensing payment of one hundred dollars ($100). Both during the term of this Agreement and after the termination of this Agreement for any reason, TreeMac agrees to not license the use of such information to any other party without the prior written consent of Cottonwood. Both during the term of this Agreement and after the termination of this Agreement for any reason (other than Cottonwood's default), TreeMac agrees to not use such information in order to solicit business from such Borrowers or Applicants.

LEGAL02/36825174v2

14.    Term. The term of this Agreement shall be from the effective date until December 31, 2028 (the "Term"). The Term shall automatically extend for up to three (3) additional periods of one (1) year; provided, however, that either party may terminate this Agreement prior to the expiration of its term pursuant to the provisions of this section or of Section 15 below, or both.

TreeMac shall have the right to terminate this Agreement (i) upon one hundred eighty (180) days' written notice to Cottonwood; (ii) immediately upon written notice to Cottonwood, if TreeMac determines in its reasonable discretion that the activities of the Parties under this Agreement or the Program are illegal under or prohibited by any of the Rules, provided, however, that if the illegality or prohibition is a state or local Rule, TreeMac may in its discretion discontinue those state or local operations affected by the Rule without terminating this Agreement in its entirety for such reason, and provided further that the provisions of Section 23 shall apply if only a part of this Agreement is ruled invalid or unenforceable or if the operation of the Program or compliance by a party with its obligations set forth herein causes or results in a violation of a Rule; or (iii) upon one hundred eighty (180) days' written notice to Cottonwood, or earlier if otherwise required by any Regulatory Authority, upon written notice to Cottonwood, if any Regulatory Authority having jurisdiction over TreeMac requires TreeMac to terminate this Agreement.

Cottonwood shall have the right to terminate this Agreement (i) upon thirty (30) days' written notice to TreeMac; (ii) immediately upon written notice to TreeMac if Cottonwood determines in its reasonable discretion that the activities of the Parties under this Agreement or the Program are illegal under or prohibited by any of the Rules; (iii) immediately, or as otherwise required by any Regulatory Authority, upon written notice to TreeMac, if any Regulatory Authority having jurisdiction over Cottonwood requires Cottonwood to terminate this Agreement; or (iv) upon ten (10) days' written notice to TreeMac in the event of TreeMac's modification, in accordance with Section 8, of any Loan term, interest rate, fee, or other charge, if Cottonwood determines in its reasonable discretion that such modification has a material adverse effect on Cottonwood or the profitability of the Program for Cottonwood.

Notwithstanding termination of this Agreement, the Parties' obligations with respect to outstanding Loans shall remain in effect for so long as such Loans remain outstanding.

15.    Termination Upon Default.

(a)    Either party shall have the right to terminate this Agreement upon occurrence of one or more of the following events:

(i)    failure by the other party to observe or perform that party's obligations to the other hereunder or to comply with any provision of this Agreement, so long as the failure or nonperformance is not due to the actions of the terminating party;

(ii)    in the event any material financial statement or document, representation, warranty, or certificate furnished or made available to either party by the other in connection with this Agreement, or any separate material financial statement or document delivered or made available hereunder by either party to the other, is materially false, misleading, or inaccurate as of the date made or delivered.

15

(b)     The Agreement may be terminated pursuant to Subsection 15(a)(i) above only if the default continues for a period of thirty (30) days after the defaulting party receives written notice from the other party specifying the default in the case of a non-monetary default, or ten (10) days after the defaulting party receives written notice from the other party specifying the default in the case of a failure to pay any amount when due hereunder.

(c)     In addition to any other right to terminate this Agreement, TreeMac may terminate this Agreement if Cottonwood is the subject of any of the following or if any of the following occurs with respect to Cottonwood: insolvency, inability to pay its debts as they become due, voluntary bankruptcy petition, or involuntary bankruptcy petition which is not dismissed within thirty (30) days after filing thereof, dissolution or termination of its existence as a going concern, appointment of a receiver for all or any material part of its property.

(d)     In addition to any other right to terminate this Agreement, Cottonwood may terminate this Agreement if TreeMac is the subject of any of the following or if any of the following occurs with respect to TreeMac: insolvency, inability to pay its debts as they become due, voluntary bankruptcy petition, or involuntary bankruptcy petition which is not dismissed within thirty (30) days after filing thereof, dissolution or termination of its existence as a going concern, appointment of a receiver for all or any material part of its property, or where any Regulatory Authority takes control of TreeMac.

(e)     Notwithstanding any language in this Agreement to the contrary, upon TreeMac's termination of this Agreement for cause under this Section 15, TreeMac shall have the right to assume any or all of Cottonwood's rights and duties hereunder and/or to designate a successor entity to assume any or all of Cottonwood's rights and duties hereunder.

16.     Indemnification.

(a)     Cottonwood hereby indemnifies and agrees to hold harmless TreeMac, its officers, directors, members, managers, employees, representatives, shareholders, agents and attorneys of such entities (the "TreeMac Indemnified Parties") against any and all claims, losses, liabilities, damages, penalties, demands, judgments, settlements, costs and expenses ("Losses") suffered or incurred by such TreeMac Indemnified Parties as a result of, or with respect to, or arising from (i) any breach by Cottonwood of its obligations under this Agreement or the inaccuracy of any representation or warranty of Cottonwood set forth herein; (ii) any burglary, fraud, theft, gross negligence or willful misconduct by Cottonwood or its employees; or (iii) any act or omission of any Third Party Service Provider retained by Cottonwood, the inaccuracy of any representation or warranty made for the benefit of TreeMac by any Third Party Service Provider retained by Cottonwood, or the breach of any obligation owed to TreeMac by any Third Party Service Provider retained by Cottonwood. Nothing herein, however, shall be construed to require Cottonwood to indemnify TreeMac for any loss directly arising out of any breach by TreeMac of its obligations under this Agreement or any negligence or wrongful act of TreeMac or any Third Party Service Provider retained by it.

16

(b)     TreeMac hereby indemnifies and agrees to hold harmless Cottonwood, its officers, directors, partners, employees, representatives, shareholders, agents and attorneys of Cottonwood and its affiliates (the "Cottonwood Indemnified Parties") against any and all Losses suffered or incurred by such Cottonwood Indemnified Parties as a result of, or with respect to, or arising from (i) any breach by TreeMac of its obligations under this Agreement or the inaccuracy of any representation or warranty of TreeMac set forth herein; (ii) any burglary, fraud, theft, gross negligence or willful misconduct by TreeMac or its employees; or (iii) any act or omission of any Third Party Service Provider retained by TreeMac, the inaccuracy of any representation or warranty made for the benefit of Cottonwood by any Third Party Service Provider retained by TreeMac, or the breach of any obligation owed to Cottonwood by any Third Party Service Provider retained by TreeMac. Nothing herein, however, shall be construed to require TreeMac to indemnify Cottonwood for any loss directly arising out of any breach by Cottonwood of its obligations under this Agreement or any negligence or wrongful act of Cottonwood or any Third Party Service Provider retained by it.

(c)     The TreeMac Indemnified Parties and the Cottonwood Indemnified Parties are sometimes referred to herein as the "Indemnified Parties" and Cottonwood or TreeMac, as indemnitor hereunder, is sometimes referred to herein as the "Indemnifying Party."

(d)     Any Indemnified Party seeking indemnification hereunder shall promptly notify the Indemnifying Party, in writing, of any indemnified Loss hereunder, specifying in reasonable detail the nature of the Loss, and, if known, the amount, or an estimate of the amount, of the Loss, provided that failure to promptly give such notice shall only limit the liability of the Indemnifying Party to the extent of the actual prejudice, if any, suffered by such Indemnifying Party as a result of such failure. The Indemnified Party shall provide to the Indemnifying Party as promptly as practicable thereafter information and documentation reasonably requested by such Indemnifying Party to support and verify the claim asserted.

(e)     The Indemnifying Party may assume the defense of a third party claim which it is indemnifying, or prosecute a claim resulting from such indemnified claim, and may employ counsel chosen by the Indemnifying Party (which counsel shall be reasonably acceptable to the Indemnified Party), at the Indemnifying Party's sole cost and expense. The Indemnified Party shall have the right, at its own expense, to employ counsel separate from counsel employed by the Indemnifying Party in any such action. The Indemnifying Party shall not be liable for any settlement of any claim effected without its prior written consent, which shall not be unreasonably withheld nor provided in an untimely manner. However, if the Indemnifying Party does not assume the defense or prosecution of a claim within thirty (30) days after notice thereof, the Indemnified Party may settle such claim without the Indemnifying Party's consent. The Indemnifying Party shall not agree to a settlement of any claim which provides for any relief other than the payment of monetary damages by the Indemnifying Party without the Indemnified Party's prior written consent, which shall not be unreasonably withheld nor provided in an untimely manner. Whether or not the Indemnifying Party chooses to so defend or prosecute such claim, all the Parties hereto shall cooperate in the defense or prosecution thereof and shall furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings,

17

trials and appeals, as may be reasonably requested in connection therewith, all at the Indemnifying Party's sole cost and expense.

(f)     The Parties agree that, if both Parties are named as defendants in the same lawsuit, the Parties shall negotiate in good faith to enter into a joint defense agreement reasonably acceptable to the Parties, but subject to the obligations of an Indemnifying Party hereunder.

(g)     This Section 16 shall survive any termination or expiration of this Agreement.

17.     Expenses. Except as expressly provided to the contrary in this Agreement, each party shall be responsible for all expenses incurred by it in the preparation and negotiation of, and the performance of its obligations under, this Agreement, including any expenses incurred by it in performing its duties set forth in Sections 3 or 4 above, as the case may be.

18.     Confidential Information. In performing their obligations pursuant to this Agreement, each party may have access to and receive disclosure of certain confidential information about the other party or parties, including without limitation the names and addresses of a party's customers or members, marketing plans and objectives, research and test results, and other information which is confidential and the property of the party disclosing the information ("Confidential Information"). The Parties agree that the term Confidential Information shall include this Agreement, the Program Guidelines, and the Program Materials, as the same may be amended and modified from time to time. Confidential Information shall not include information in the public domain or which is independently developed by the other party. TreeMac and Cottonwood agree that Confidential Information shall be used by each party solely in the performance of its obligations under this Agreement. Each party shall receive Confidential Information in confidence and shall not disclose Confidential Information to any third party, except as may be necessary to perform its obligations hereunder, as may be otherwise agreed in writing by the party furnishing the Confidential Information, or as required by the Rules.

Upon request or upon any expiration or termination of this Agreement, each party shall return to the other party or destroy (as the latter may instruct) all of the latter's Confidential Information in the former's possession which is in any written or other recorded form, including data stored in any computer medium; provided, however, that a party may retain the Confidential Information of the other party (but subject to the requirements of the preceding paragraph) to the extent that such party needs access to such information to continue to perform any of its obligations hereunder or to service or administer Loans.

19.     Regulatory Examinations and Financial Information.

(a)     Cottonwood and TreeMac agree to submit to any examination which may be required by any Regulatory Authority with audit and examination authority over the other party, to the fullest extent that such Regulatory Authority may require.

(b)     If and when requested by TreeMac, Cottonwood agrees to provide to TreeMac (i) quarterly unaudited financial statements within thirty (30) days following the end of each calendar quarter, and (ii) annual unaudited financial statements within ninety

(90) days following the end of each calendar year during the term hereof. All such financial statements shall be prepared on a consolidated basis, to the extent applicable, and shall be prepared in accordance with generally accepted accounting principles consistently applied. In addition, Cottonwood agrees to provide TreeMac with sufficient data and reports to reasonably enable TreeMac to monitor Cottonwood's internal controls and compliance with the provisions of this Agreement; provided, however, that nothing herein shall require Cottonwood to disclose to TreeMac any information or reports to the extent that such disclosure is prohibited by the Rules.

(c)     Cottonwood agrees that TreeMac (either directly or by the use of accountants or other agents or representatives) may audit, inspect, and review Cottonwood and its files, records, and books which pertain to the services provided by Cottonwood or the duties and obligations of Cottonwood hereunder or to the creditworthiness of Cottonwood or which TreeMac may reasonably require in order to respond to any examination by or request from a Regulatory Authority. Cottonwood agrees to submit to TreeMac such information as TreeMac may from time to time reasonably request in order to ascertain Cottonwood's compliance with the requirements of this Agreement and compliance of the Program, Cottonwood, and Third Party Service Providers retained by Cottonwood with all applicable laws and regulations. The rights of TreeMac set forth in this section shall also apply to any Third Party Service Provider and its files, records, and books, and Cottonwood agrees that any agreement it may enter into with a Third Party Service Provider shall so provide.

(d)     Cottonwood agrees to promptly notify TreeMac of the occurrence, after execution of this Agreement, of any event or matter described in Subsection 11(f) above.

(e)     If and when requested by Cottonwood, TreeMac agrees to provide to Cottonwood (i) quarterly unaudited financial statements for TreeMac within thirty (30) days following the end of each calendar quarter, and (ii) annual unaudited financial statements for TreeMac within ninety (90) days following the end of each calendar year during the term hereof. All such financial statements shall be prepared on a consolidated basis, to the extent applicable, and shall be prepared in accordance with generally accepted accounting principles consistently applied. In addition, TreeMac agrees to provide Cottonwood with sufficient data and reports to reasonably enable Cottonwood to monitor TreeMac's internal controls and compliance with the provisions of this Agreement; provided, however, that nothing herein shall require TreeMac to disclose to Cottonwood any information or reports to the extent that such disclosure is prohibited by the Rules.

(f)     TreeMac agrees that Cottonwood (either directly or by the use of accountants or other agents or representatives) may audit, inspect, and review TreeMac and its files, records, and books which pertain to the services provided by TreeMac or the duties and obligations of TreeMac hereunder or to the creditworthiness of TreeMac or which Cottonwood may reasonably require in order to respond to any examination by or request from a Regulatory Authority. TreeMac agrees to submit to Cottonwood such information as Cottonwood may from time to time reasonably request in order to ascertain TreeMac's compliance with the requirements of this Agreement and compliance of the Program, TreeMac, and any Third Party Service Providers retained by TreeMac with all applicable

19

laws and regulations. The rights of Cottonwood set forth in this section shall also apply to any Third Party Service Provider and its files, records, and books, and TreeMac agrees that any agreement it may enter into with a Third Party Service Provider shall so provide.

(g)    TreeMac agrees to promptly notify Cottonwood of the occurrence, after execution of this Agreement, of any event or matter described in Subsection 12(f) above.

20.    <u>Relationship of Parties</u>. TreeMac and Cottonwood agree they are wholly independent of each other in performing their respective obligations hereunder. Nothing in this Agreement or in the working relationship established and developed hereunder shall be deemed or is intended to be deemed, nor shall it cause, TreeMac and Cottonwood to be treated as partners, joint ventures, or otherwise as joint associates for profit.

Cottonwood shall not have any authority with respect to TreeMac other than that expressly granted in this Agreement. No actions or failure to act on the part of TreeMac shall be construed to imply the existence of any authority not expressly granted herein. Cottonwood is not authorized to, and shall not make or amend any contract, incur any debt or liability, or extend any credit or enter into any obligation on behalf of TreeMac; modify or amend any Loan Document or other instrument received from TreeMac; extend the time for making any payment which may become due under any Loan Document; or waive any of TreeMac's rights or privileges under any agreement made by TreeMac or under TreeMac Policies and guidelines. Cottonwood will not directly or indirectly, in any manner whatsoever, offer or allow any customer or any other person any advantage which is not offered by TreeMac. Cottonwood understands and agrees that Cottonwood's name shall not appear on any Loan Document as a maker of a Loan. Cottonwood shall refer to TreeMac any inquiries concerning the accuracy, interpretation, or legal effect of any Loan Document. Cottonwood shall not negotiate the terms of any Loan Document on behalf of TreeMac. Cottonwood shall not represent to anyone that Cottonwood has the authority or power to do any of the foregoing and shall make no representations concerning TreeMac's transactions except as expressly authorized in writing.

TreeMac shall not have any authority or control over Cottonwood or any of the property interests or employees of Cottonwood, nor shall TreeMac have any authority or control over any of the property interests or employees of those affiliates or subsidiaries of Cottonwood that own and operate the Cottonwood stores at which potential Borrowers will be offered the opportunity to complete and submit applications for Loans. TreeMac shall inform Cottonwood of any inquiries concerning the accuracy, interpretation, or legal effect of any Loan Document, whether referred to TreeMac by Cottonwood or otherwise, within a reasonable amount of timing following the receipt of such inquiry.

21.    <u>Exclusive Relationship</u>. During the term of this Agreement TreeMac agrees that neither it nor any Affiliate of TreeMac shall use the services of any other party for the purpose of making loans similar to the Loans at locations in the state of Texas without prior consent of Cottonwood. Further, TreeMac agrees that until the termination of this Agreement, neither TreeMac nor any Affiliate thereof shall enter into a similar agreement with another service provider for the assistance of making loans similar to the Loans in states other than Texas without prior consent of Cottonwood.

22.    <u>Governing Law; Arbitration</u>. This Agreement shall be construed and performed in accordance with the laws of the State of Texas. At the request of either party, any dispute between the Parties relating to this Agreement shall be submitted to binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association. The Parties agree that any arbitration proceedings hereunder, unless otherwise agreed to by the Parties, shall be in Dallas, Texas, and that, without limiting the provisions hereof requiring arbitration, the exclusive venue for any litigation concerning this Agreement or disputes hereunder (such as litigation to compel arbitration or to enforce the results of an arbitration proceeding) shall be in Dallas County, Texas, or federal District Court for the district encompassing Dallas County, Texas, and each party hereto consents to the jurisdiction over it by any court of general jurisdiction therein.

In the event that a party initiates a lawsuit in court concerning an arbitrable claim, controversy or dispute, such party shall pay the other party for the costs, including attorneys' fees, that the other party incurs to obtain an order from the court to stay or dismiss the lawsuit or otherwise compel arbitration. The arbitrator shall be authorized to award such relief as is allowed by law. Except as provided below, each party shall be responsible for its own attorneys' fees incurred during the course of the arbitration, as well as the costs of any witnesses or other evidence such party produces or causes to be produced. The award of the arbitrator shall include findings of fact and conclusions of law. Such award shall be kept confidential, and shall be final, binding, and conclusive on the Parties. Judgment on the award may be entered by any court of competent jurisdiction. The arbitrator in any such proceeding shall have the authority to require one party in such arbitration proceeding to pay all or a portion of the other party's legal fees and other expenses incurred in connection therewith, as determined in the reasonable discretion of the arbitrator.

23.    <u>Severability</u>. In the event that any part of this Agreement is ruled by a court, Regulatory Authority, or other public or private tribunal of competent jurisdiction to be invalid or unenforceable, such provision shall be deemed to have been omitted from this Agreement. The remainder of this Agreement shall remain in full force and effect, and shall be modified to any extent necessary to give such force and effect to the remaining provisions, but only to such extent. In addition, if the operation of the Program or the compliance by a party with its obligations set forth herein causes or results in a violation of a Rule, the Parties agree to negotiate in good faith to modify the Program or this Agreement as necessary in order to permit the Parties to continue the Program in full compliance with all Rules.

24.    <u>Successors and Third Parties</u>. This Agreement and the rights and obligations hereunder shall bind and inure to the benefit of the Parties hereto and their successors and assigns. The rights and benefits hereunder are specific to the Parties and shall not be delegated or assigned without the prior written consent of the other party, which shall not be unreasonably withheld nor provided in an untimely manner. Nothing in this Agreement is intended to create or grant any right, privilege, or other benefit to or for any person or entity other than the Parties hereto.

25.    <u>Notices</u>. All notices, requests, and approvals required or permitted by this Agreement shall be in writing and addressed/directed to the other party at the address/telefacsimile number below or at such other address of which the notifying party hereafter receives notice in conformity with this section. All such notices, requests, and approvals shall be deemed given upon the earlier of facsimile transmission or actual receipt thereof:

21

| To TreeMac: | TreeMac Funding Group, LLC<br>8340 Meadow Road, Suite 244<br>Dallas, TX 75231<br>Attention: Scott R. McArron<br>Telephone: (214) 346-3476 |
| --- | --- |
| Copy to: | Jason M. Cover, Esq.<br>Troutman Pepper Hamilton Sanders LLC<br>Two Logan Center, 30th Floor<br>Eighteenth and Arch Streets<br>Philadelphia, PA 19103<br>Telephone (215) 981-4000<br>Email: Jason.Cover@Troutman.com |
| To Cottonwood: | Cottonwood Financial Texas, L.L.C.<br>2100 W. Walnut Hill Ln<br>Suite 300<br>Irving, Texas 75038<br>Attention: Trevor L. Ahlberg<br>Telephone: (972) 753-0822 (x1114)<br>Facsimile: (972) 753-0376 |
| Copy to: | Sanford M. Brown, Esq.<br>Alston & Bird LLP<br>2200 Ross Ave, Suite 2300<br>Dallas, Texas 75201<br>Telephone: (214) 922-3505<br>Facsimile: (214) 922-3899 |

26.    Waiver. Neither party shall be deemed to have waived any of its rights, powers, or remedies hereunder except in an express writing signed by an authorized agent or representative of the party to be charged.

27.    Counterparts. This Agreement may be executed and delivered by the Parties hereto in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

28.    Specific Performance. Certain rights which are subject to this Agreement are unique and are of such a nature as to be inherently difficult or impossible to value monetarily. In the event of a breach of this Agreement by either party, an action at law for damages or other remedies at law would be inadequate to protect the unique rights and interests of the Parties. Accordingly, the terms of this Agreement shall be enforceable in a court of equity by a decree of specific performance or injunction. Such remedies shall, however, be cumulative and not be exclusive and shall be in addition to any other remedy which the Parties may have.

22

LEGAL02/36825174v2

29.     Further Assurances. From time to time, the Parties will execute and deliver to the other such additional documents and will provide such additional information as either may reasonably require to carry out the terms of this Agreement.

30.     Entire Agreement. This Agreement, and the documents executed and delivered pursuant hereto, constitute the entire agreement between the Parties, and may be amended or modified only by a writing signed by duly authorized representatives of each party and dated subsequent to the date hereof. No course of dealing between the Parties shall be deemed to have modified the terms of this Agreement and/or the Amended Brokering and Servicing Agreement or to subsequently modify the terms of this Agreement and/or the Amended Brokering and Servicing Agreement. This Agreement shall supersede and merge all prior communications, representatives, or agreements, either oral or written, between the Parties hereto with respect to the subject matter hereof except where survival of prior written agreements is expressly provided for herein.

31.     Identity Theft Prevention. Each party recognizes its responsibility to comply with the requirements of Section 114 and 315 of the Fair and Accurate Credit Transactions Act of 2003 ("FACT Act"), also known as the Identity Theft Red Flags Rule. Each party acknowledges that it has reviewed, approved, and will comply with the other party's Identity Theft Prevention Program.

32.     Anti-Money Laundering. Each Party is responsible for complying with the Bank Secrecy Act and provisions of the USA PATRIOT ACT of 2001 including the establishment of an anti-money laundering program, a Customer Identification Program and filing of Suspicious Activity Reports.

33.     Right of Set-Off. TreeMac may set off any amount it otherwise owes Cottonwood against any matured but unpaid obligation of Cottonwood to TreeMac.

34.     Program Modifications. TreeMac shall have the right, by giving written notice to Cottonwood, to unilaterally modify at any time or from time to time, in its good faith discretion and without the necessity of Cottonwood approval, the TreeMac Policies, Program Guidelines and Program Materials, and to unilaterally require Cottonwood to modify the Advertising Materials at any time or from time to time. Without limiting the generality of the foregoing, TreeMac may: (a) impose different or more stringent underwriting requirements on all Loans or any class of Loans; (b) increase minimum Loan amounts or decrease maximum Loan amounts; (c) impose volume limits on all Loans or any class of Loans; or (d) suspend or end making Loans to new Borrowers or any Borrowers at its absolute discretion. TreeMac shall provide notice to Cottonwood of its changes to the Program Guidelines, Program Materials, and Advertising Materials within ten (10) days of making any such changes.  TreeMac Acknowledges that Cottonwood will require sufficient time to modify any related systems, training procedures, and  materials.  Cottonwood will endeavor to implement such changes within a commercially reasonable period of time. TreeMac acknowledges that the amount of time required to implement changes will depend on the scope and nature of the changes.  Notwithstanding anything to the contrary above, nothing herein shall limit TreeMac's absolute discretion  with respect to the origination or funding of Loans under this Agreement. Cottonwood specifically acknowledges and agrees that TreeMac may immediately cease making new Loans at any time and for any reason, and Cottonwood will immediately cease origination-related activities under this Agreement upon notice by TreeMac.

LEGAL02/36825174v2

[*Signature Pages Follow*]

24

IN WITNESS WHEREOF, this Agreement is executed by the Parties' authorized officers and representatives and shall be effective as of the date first above written.

COTTONWOOD FINANCIAL TEXAS, LLC

By:   Cottonwood Financial Ltd.,
     its sole member

By: Cottonwood Financial Management, Inc.,
     its sole General Partner

By: _____
     Trevor L. Ahlberg, President

25

TREEMAC FUNDING GROUP, LLC

By: _____

Its managing member

LEGAL02/36825174v2

**EXHIBIT A-1**

**PROGRAM GUIDELINES**

**SHORT-TERM, SECURED LOAN GUIDELINES**

**SINGLE-PAYMENT LOANS SECURED BY LETTER OF CREDIT ISSUED IN
CONNECTION WITH A CERTIFICATE OF TITLE TO A MOTOR VEHICLE
TREEMAC FUNDING GROUP, LLC ("TREEMAC")**

**COTTONWOOD FINANCIAL TEXAS, L.L.C. ("COTTONWOOD")
(dba) THE CASH STORE**

These Program Guidelines shall be effective as of the date of the Amended and Restated Brokering Agreement to which they are attached ("BSA"). Capitalized terms used herein but not otherwise defined have the meaning set forth in the BSA.

**A.    Loan Guidelines**

1.    All loans will be priced so that TreeMac's interest rate yields an approximate annual percentage rate of 9.75%.

2.    Loan terms will be thirty (30) days, unless the loan maturity date falls on a non-business day, in which case the loan term will be 31 or 32 days to ensure the loan maturity date falls on a business day

3.    All loans to be repaid with cash, debit card, ACH, money order or cashier's check.

4.    TreeMac will earn a delinquency fee and/or dishonored payment fee when applicable as described further below.

**ANNUAL PERCENTAGE RATE CALCULATION**

The annual percentage rate calculation is derived from the Federal Truth-in-Lending Act annual percentage rate calculation guidelines. If a broker is used to arrange the loan, the broker's fee must be included in the Truth-in-Lending for state law purposes disclosures, even though the broker's fee is not payable to TreeMac nor is the broker's fee deemed interest for state law purposes.

Example:      $200.00 advance amount [1]

Broker's fee:

= 30% of the advance amount [2]
= 30% of $200.00
= .3 * $200.00
= $60.00

Lien Recording fee:

= $33 [3]

---

[1]    "Advance Amount" used herein refers to the amount of cash or the amount of the check the borrower is provided in connection with the loan, not the amount of credit actually extended to the borrower.

LEGAL02/36825174v2

[2] Calculations of the Broker's Fee throughout this document assume a fee equal to 30% of the amount provided to the Borrower. This rate is subject to change at Cottonwood's discretion.

[3] $33 in Texas counties not meeting federal air quality standards. $28 in all other Texas counties.

Loan Principal:
$$= \text{Broker's Fee} + \text{Advance Amount} + \text{Lien Recording Fee}$$
$$= \$60.00 + \$200.00 + \$33$$
$$= \$293.00$$

TreeMac's interest:
$$= \text{Principal amount} * \text{Interest Rate} / 365 \text{ days per year} * 30 \text{ day loan term}$$
$$= \$293.00 * 9.75\% \text{ APR} / 365 \text{ days per year} * 30 \text{ day term}$$
$$= \$293 * 0.0975 / 365 * 30$$
$$= \$2.35$$
$$= \$2.35 \text{ interest}$$

Finance Charge:
$$= \text{TreeMac's Interest} + \text{Broker's fee}$$
$$= \$2.35 + \$60.00$$
$$= \$62.35$$

APR $= [(\text{Total of Payments/advance amount}) - 1] * [365 \text{ days per year} / 14 \text{ day loan term}]$
$$= [(\$295.35/\$233.00) - 1] \text{ X } [365/30]$$
$$= [0.267597] \text{ X } [12.16666]$$
$$= 0.267597 \text{ X } 12.1666$$
$$= 3.255757$$
$$= 325.58\% \text{ Annual Percentage Rate}$$

## B.     TreeMac's Rules:

- Maximum number current loans              **1**
- Maximum advance amount                    **$20,000.00 plus lien recording fees**
- Minimum advance amount                     **$100.00 plus lien recording fees**
- Maximum allowable loan principal will be $27,033.00 in principal, including Broker's Fee and lien filing fee. The maximum allowable loan amount shall never be more than the amount on the face of the letter of credit provided by the Borrower.
- The actual loan amount offered to any borrower will not exceed the amount of the letter of credit issued by Cottonwood, less any potential delinquency fees and interest included in the amount of the letter of credit.
- Borrower must complete a new application.     **Every Transaction**
- As used herein, a "**Default**" shall occur as follows:
  - Through and until the date of an order approving the assumption of the BSA by an applicable bankruptcy court (an "Assumption Order"):
    - Default occurs immediately after a Borrower's failure to repay a Loan as agreed in the payment schedule of the Loan Documents for a period of 10 days or, immediately upon the return of a Borrower's Collateral Check if such Collateral Check is returned after the same 10-day period.
  - On the first day following the date of an Assumption Order:

28

- Default occurs immediately upon the return of a Borrower's Collateral Check or upon a Borrower's failure to repay a Loan as agreed in the payment schedule of the Loan Documents.

### C.  TreeMac's Underwriting Criteria:

- Must have a valid driver's license.
- Must obtain a letter of credit from Cottonwood.
- Must be at least 18 years old.

### D.  Renewal conditions:

- Borrower must pay all finance charges outstanding on their loan.
- Borrower must meet the basic qualifications stated in Section C above.

### E.  Courtesy Holds:

- No courtesy holds will be offered. Interest will continue to accrue past the scheduled payment date until one of the following events i) repayment in full ii) TreeMac demands payment under the terms of the Letter of Credit issued by Cottonwood. TreeMac may in its discretion defer the demand for payment on any Loan and the related letter of credit from Cottonwood for any Loan which remains unpaid as of the close of business ten days beyond the scheduled payment date.

### F.  Settlement and reconciliation process:

- To TreeMac from Cottonwood
  (1) Upon payment of Loans prior to Default, the amount of principal and interest of such Loans.
  (2) Upon Default on any Loan, the amount of any principal and interest due from the Borrower to TreeMac on such Loan, all of which shall be paid pursuant to Cottonwood's letter of credit.
  (3) Upon collection of any Delinquency Fee from Borrower for any payment more than 10 days late, and/or the accrual of any dishonored payment fee, the amount of such fee due from the Borrower to TreeMac.

- To Cottonwood from TreeMac
  (1) Upon origination of Loans, the amount to reimburse Cottonwood for its redemption of Proceeds Checks presented to Cottonwood for Loans approved by TreeMac.
  (2) Upon origination of Loans, the amount of the Broker's fee earned by Cottonwood from the borrower for brokering the loan.
  (3) Upon origination of Loans, the amount of the Lien Filing Fee to be paid to the County Tax Assessor when filing lien against the Borrower's Motor Vehicle Certificate of Title.
  (4) Amount previously paid to TreeMac by Cottonwood in performance of Cottonwood's letter of credit with respect to any Loans that are renewed by TreeMac after Cottonwood performs on its letter of credit.
  (5) Amount of any financial obligation owed to Cottonwood by a Borrower in connection with a Loan previously made by TreeMac to the Borrower in the event that TreeMac makes another Loan to such Borrower.

### G.  Fees:

LEGAL02/36825174v2

TreeMac will earn a Delinquency Fee pursuant to Tex. Fin Code § 302.001 and/or a dishonored payment fee. The amount of this Delinquency Fee will be the greater of $7.50 and 5% of the outstanding payment amount, provided that the payment is more than ten (10) days delinquent. The amount of the dishonored payment fee will be up to $30. Cottonwood will take reasonable measures in an attempt to collect from Borrowers Delinquency fees or dishonored payment fee and will forward the fee to TreeMac.

H.    **Additional Laws and Regulations:**

### Federal

Equal Credit Protection Act ("ECOA") and Regulation B (12 C.F.R. Part 1002)
Federal Debt Collections Practices Act
Fair Credit Reporting Act
Gramm-Leach-Bliley Act and Regulation P (12 C.F.R. Part 216)
The Dodd–Frank Wall Street Reform and Consumer Protection Act

### Texas

Tex. Fin. Code Chapter 393
Tex. Fin Code § 302.001
Tex. Fin. Code § 341.406(3)(B)
Tex. Bus. & Com. Code § 3.506
Texas Debt Collections Act
Tex. Bus. & Com. Code § 36.10
1 T.A.C. § 74.22

Texas Transportation Code § 501

30

## EXHIBIT A-2

## PROGRAM GUIDELINES

## MULTI-INSTALLMENT LOAN PRODUCT GUIDELINES

## TREEMAC FUNDING GROUP, LLC ("TREEMAC") COTTONWOOD
## FINANCIAL TEXAS, L.L.C. ("COTTONWOOD")

## (dba) THE CASH STORE

These Program Guidelines shall be effective as of the date of the Amended and Restated Brokering Agreement to which they are attached ("BSA"). Capitalized terms used herein but not otherwise defined have the meaning set forth in the BSA.

**Installment Product Description**

TreeMac offers 6-payment or 12-payment, fully-amortized installment loans to Texas consumers. Pursuant to the Brokering and Servicing Agreement, Cottonwood Financial provides credit services to these consumers to ensure that they will qualify for a loan under TreeMac's terms. Specifically, Cottonwood issues a Letter of Credit that secures the consumer's loan. Upon proper revocation of a loan and refund to TreeMac of any amounts advanced, the Letter of Credit is revocable by Cottonwood upon three days notice to TreeMac. The consumer must tender payment to Cottonwood to ensure that the Letter of Credit is not revoked during the term of the loan. In exchange for its services, Cottonwood charges a credit services fee, which is payable by the consumer in installments, with payments corresponding to the consumer's loan repayment schedule. In the event a borrower fails to tender payment either on the loan or under the terms of the credit services agreement, Cottonwood will notify TreeMac that the Letter of Credit is scheduled to expire or that Cottonwood intends to revoke the letter of credit. Upon notice of Cottonwood's intent to revoke the letter of credit, the consumer will be in default under the terms of TreeMac's loan agreement.

**A.      Installment Loan Product Guidelines**

1.      All loans will be priced so that TreeMac's interest rate yields an approximate 9.75% annual percentage rate.

2.      Loan terms will be between 151 and 180 days.

3.      All loans to be repaid with cash, debit card, ACH, money order or cashier's check. If payment is not received in person, and if Cottonwood and/or TreeMac has authorization from the customer, Cottonwood will initiate an electronic debit to the customer's bank account in the combined amount of the payment owed to Cottonwood and to TreeMac.

4.      TreeMac will charge a $30.00 NSF fee for any dishonored check or ACH.

5.      TreeMac will charge a delinquency fee when applicable as described further below.

### ANNUAL PERCENTAGE RATE CALCULATION

The annual percentage rate calculation is derived from the Federal Truth-in-Lending Act annual percentage rate calculation guidelines. If a broker is used to arrange the loan, the broker's fee must be included in the

31

LEGAL02/36825174v2

Truth-in-Lending for state law purposes disclosures, even though the broker's fee is not payable to TreeMac nor is the broker's fee deemed interest for state law purposes.

**B.**    **TreeMac's Rules:**

- ◻ Maximum number current loans                    **1**
- ◻ Maximum loan amount                               **$3,945 plus interest**
- ◻ Minimum loan amount                               **$100.00 plus interest**
- ◻ Maximum allowable loan will be $3,945.00 in principal. The maximum allowable loan amount shall never be more than the amount on the face of the letter of credit provided by the Borrower.
- ◻ Borrower must complete a new application.         **Every Transaction**
- ◻ As used herein, a "**Default**" shall occur as follows:
  - ○ Through and until the date of an order approving the assumption of the BSA by an applicable bankruptcy court (an "Assumption Order"):
    - ▪ Default occurs immediately after a Borrower's failure to repay a Loan as agreed in the payment schedule of the Loan Documents for a period of 10 days or, immediately upon the return of a Borrower's Collateral Check if such Collateral Check is returned after the same 10-day period.
  - ○ On the first day following the date of an Assumption Order:
    - ▪ Default occurs immediately upon the return of a Borrower's Collateral Check or upon a Borrower's failure to repay a Loan as agreed in the payment schedule of the Loan Documents.

**C.**    **TreeMac's Underwriting Criteria:**

- ◻ Must have a valid driver's license or state identification card.
- ◻ Must have an open and active checking account.
- ◻ Must obtain a letter of credit from Cottonwood.
- ◻ Must be at least 18 years old.

**D.**    **Renewal Conditions:**

- ◻ Borrower must pay all interest/fees due.
- ◻ Borrower must meet the basic qualifications stated in Section C above.

**E.**    **Courtesy Holds:**

- ◻ None

**F.**    **Settlement and Reconciliation Process:**

- ◻ To TreeMac from Cottonwood
  - (1) Upon payment of Loans at (or prior to) maturity, the amount of principal and interest of such Loans.
  - (2) Upon deposit of a Borrower's Collateral Check, immediate credit for the full amount of the Collateral Check.
  - (3) Upon initiation of an electronic funds transfer from the borrower's account for a scheduled loan payment, immediate credit for the interest and principal portion of the transfer.
  - (4) Upon Default on any Loan, the amount of any principal and interest due from the Borrower to TreeMac on such Loan, all of which shall be paid pursuant to Cottonwood's letter of credit.

32

    (5) Upon assessment of any NSF fee owed from Borrower for any dishonored check or returned ACH, 100% ($30) of the amount of the NSF fee due from the Borrower to TreeMac.

□   To Cottonwood from TreeMac
    (1) Upon origination of Loans, the amount to reimburse Cottonwood for its redemption of Proceeds Checks presented to Cottonwood for Loans approved by TreeMac (including any Broker's fee included in principal) .
    (2) Amount previously paid to TreeMac by Cottonwood as immediate credit upon the deposit of a Collateral Check that is subsequently returned unpaid or an electronic funds transfer which is subsequently returned unpaid.
    (3) Amount previously paid to TreeMac by Cottonwood in performance of Cottonwood's letter of credit with respect to any Loans that are renewed by TreeMac after Cottonwood performs on its letter of credit.
    (4) Amount of any financial obligation owed to Cottonwood by a Borrower in connection with a Loan previously made by TreeMac to the Borrower in the event that TreeMac makes another Loan to such Borrower.

**G.**     **Fees:**

TreeMac will earn a Delinquency Fee pursuant to Tex. Fin Code § 302.001 and/or a dishonored payment fee. The amount of this Delinquency Fee will be the greater of $7.50 and 5% of the outstanding payment amount, provided that the payment is more than ten (10) days delinquent. The amount of the dishonored payment fee will be up to $30.

**H.**     **Additional Laws and Regulations:**

**Federal**
Equal Credit Protection Act ("ECOA") and Regulation B (12 C.F.R. Part 1002)
Federal Debt Collections Practices Act
Fair Credit Reporting Act
Gramm-Leach-Bliley Act and Regulation P (12 C.F.R. Part 216)
The Dodd–Frank Wall Street Reform and Consumer Protection Act

**Texas**
Tex. Fin. Code Chapter 393
Tex. Fin Code § 302.001
Tex. Fin. Code § 341.406(3)(B)
Tex. Bus. & Com. Code § 3.506
Texas Debt Collections Act
Tex. Bus. & Com. Code § 36.10
1 T.A.C. § 74.22

EXHIBIT A-3

PROGRAM GUIDELINES

MULTI-INSTALLMENT LOAN PRODUCT GUIDELINES
LOANS SECURED BY MOTOR VEHICLE TITLE

TREEMAC FUNDING GROUP, LLC ("TREEMAC")

COTTONWOOD FINANCIAL TEXAS, L.L.C. ("COTTONWOOD")
(dba) THE CASH STORE

These Program Guidelines shall be effective as of the date of the Amended and Restated Brokering Agreement to which they are attached ("BSA"). Capitalized terms used herein but not otherwise defined have the meaning set forth in the BSA.

**Installment Title Product Description**

TreeMac offers 12-payment, fully-amortized installment loans to Texas consumers. Pursuant to the Brokering and Servicing Agreement, Cottonwood Financial provides credit services to these consumers to ensure that they will qualify for a loan under TreeMac's terms. Specifically, Cottonwood issues a Letter of Credit that secures the consumer's loan. The Letter of Credit is revocable by Cottonwood upon three days notice to TreeMac. The consumer must tender payment to Cottonwood to ensure that the Letter of Credit does not expire and is not revoked during the term of the loan. In exchange for its services, Cottonwood charges a credit services fee, which is payable by the consumer in installments, with payments corresponding to the consumer's loan repayment schedule. In the event a borrower fails to tender payment either on the loan or under the terms of the credit services agreement, Cottonwood will notify TreeMac that the Letter of Credit is scheduled to expire or that Cottonwood intends to revoke the letter of credit. Upon notice of Cottonwood's intent to revoke the letter of credit, the consumer will be in default under the terms of TreeMac's loan agreement.

A.   **Installment Loan Product Guidelines**

1.   All loans will be priced so that TreeMac's interest rate yields an approximate 9.75 annual percentage rate.

2.   Loan terms will be between 155 and 180 days.

3.   All loans to be repaid with cash, money order or cashier's check.

4.   TreeMac may charge a late fee equal to 5% or $7.50, whichever is greater, for any payment more than 10 days past due, and a dishonored payment fee of up to $30 for each check or ACH payment that is dishonored or returned.

5.   Cottonwood will tender payment to TreeMac for each accrued late fee or dishonored payment fee TreeMac assesses upon collection of the fee from the Borrower.

ANNUAL PERCENTAGE RATE CALCULATION

The annual percentage rate calculation is derived from the Federal Truth-in-Lending Act annual percentage rate calculation guidelines. If a broker is used to arrange the loan, the broker's fee must be included in the

34

Truth-in-Lending for state law purposes disclosures, even though the broker's fee is not payable to TreeMac nor is the broker's fee deemed interest for state law purposes.

**B.      TreeMac's Rules:**

- Maximum number current loans                    **1**
- Maximum loan amount                                  **$26,000.00 plus interest**
- Minimum loan amount                                   **$100.00 plus interest**
- Maximum allowable loan will be $26,000.00 in principal. The maximum allowable loan amount shall never be more than the amount on the face of the letter of credit provided by the Borrower.
- Borrower must complete a new application.          **Every Transaction**
- As used herein, a "**Default**" shall occur as follows:
    - Through and until the date of an order approving the assumption of the BSA by an applicable bankruptcy court (an "Assumption Order"):
        - Default occurs immediately after a Borrower's failure to repay a Loan as agreed in the payment schedule of the Loan Documents for a period of 10 days or, immediately upon the return of a Borrower's Collateral Check if such Collateral Check is returned after the same 10-day period.
    - On the first day following the date of an Assumption Order:
        - Default occurs immediately upon the return of a Borrower's Collateral Check or upon a Borrower's failure to repay a Loan as agreed in the payment schedule of the Loan Documents.

**C.      TreeMac's Underwriting Criteria:**

- Must have a valid driver's license or state identification card.
- Must present a letter of credit.
- Must be at least 18 years old.

**D.      Renewal Conditions:**

- Borrower must pay all interest/fees due.
- Borrower must meet the basic qualifications stated in Section C above.

**E.      Courtesy Holds:**

- None

**F.      Settlement and Reconciliation Process:**

- To TreeMac from Cottonwood
    - (1) Upon payment of Loans prior to Default, the amount of principal and interest of such Loans.
    - (2) Upon Default on any Loan, the amount of any principal and interest due from the Borrower to TreeMac on such Loan, all of which shall be paid pursuant to Cottonwood's letter of credit.
    - (3) Upon collection of any Delinquency Fee or dishonored payment fee, the amount of such fee due from the Borrower to TreeMac.
- To Cottonwood from TreeMac

35

(1) Upon origination of Loans, the amount to reimburse Cottonwood for its redemption of Proceeds Checks presented to Cottonwood for Loans approved by TreeMac.

(2) Upon origination of Loans, the amount of the Broker's fee earned by Cottonwood from the borrower for brokering the loan.

(3) Upon origination of Loans, the amount of the Lien Filing Fee to be paid to the County Tax Assessor when filing lien against the Borrower's Motor Vehicle Certificate of Title.

(4) Amount previously paid to TreeMac by Cottonwood in performance of Cottonwood's letter of credit with respect to any Loans that are renewed by TreeMac after Cottonwood performs on its letter of credit.

(5) Amount of any financial obligation owed to Cottonwood by a Borrower in connection with a Loan previously made by TreeMac to the Borrower in the event that TreeMac makes another Loan to such Borrower.

### G.    Fees:

TreeMac will earn a Delinquency Fee pursuant to Tex. Fin Code § 302.001 and/or a dishonored payment fee. The amount of this Delinquency Fee will be the greater of $7.50 and 5% of the outstanding payment amount, provided that the payment is more than ten (10) days delinquent. The amount of the dishonored payment fee will be up to $30.

### H.    Additional Laws and Regulations:

#### Federal
Equal Credit Protection Act ("ECOA") and Regulation B (12 C.F.R. Part 1002)
Federal Debt Collections Practices Act
Fair Credit Reporting Act
Gramm-Leach-Bliley Act and Regulation P (12 C.F.R. Part 216)
The Dodd–Frank Wall Street Reform and Consumer Protection Act

#### Texas
Tex. Fin. Code Chapter 393
Tex. Fin Code § 302.001
Tex. Fin. Code § 341.406(3)(B)
Tex. Bus. & Com. Code § 3.506
Texas Debt Collections Act
Tex. Bus. & Com. Code § 36.10
1 T.A.C. § 74.22

Texas Transportation Code § 501

LEGAL02/36825174v2

## EXHIBIT A-4

### PROGRAM GUIDELINES

#### SINGLE-PAYMENT SHORT-TERM, UNSECURED LOAN GUIDELINES
#### LOANS SECURED BY ELECTRONIC PAYMENT AUTHORIZATION

#### TREEMAC FUNDING GROUP, LLC ("TREEMAC")

#### COTTONWOOD FINANCIAL TEXAS, L.L.C. ("COTTONWOOD")
#### (dba) THE CASH STORE

These Program Guidelines shall be effective as of the date of the Amended and Restated Brokering Agreement to which they are attached ("BSA").  Capitalized terms used herein but not otherwise defined have the meaning set forth in the BSA.

**A.    Loan Guidelines**

      1.    All loans will be priced so that TreeMac's interest rate yields an approximate annual percentage rate of 9.75%.

      2.    All loans to be repaid with cash, money order or cashier's check.

      3.    TreeMac will charge a $30.00 NSF fee for any dishonored check or returned ACH.

      4.    TreeMac will earn a delinquency fee when applicable as described further below.

      5.    Cottonwood will remit any NSF fees to Treemac upon assessment.

**B.    TreeMac's Rules:**

- Maximum number current loans       **1**
- Maximum loan amount       **$ 3,945 plus interest**
- Minimum loan amount       **$ 100 plus interest**
- Maximum allowable loan will be $3,945 in principal.  The maximum allowable loan amount shall never be more than the amount on the face of the letter of credit provided by Cottonwood.
- Borrower must complete a new application.       **Every Transaction**
- As used herein, a "**Default**" shall occur as follows:
  - Through and until the date of an order approving the assumption of the BSA by an applicable bankruptcy court (an "Assumption Order"):
    - Default occurs immediately after a Borrower's failure to repay a Loan as agreed in the payment schedule of the Loan Documents for a period of 10 days or, immediately upon the return of a Borrower's Collateral Check if such Collateral Check is returned after the same 10-day period.
  - On the first day following the date of an Assumption Order:
    - Default occurs immediately upon the return of a Borrower's Collateral Check or upon a Borrower's failure to repay a Loan as agreed in the payment schedule of the Loan Documents.

**C.    TreeMac's Underwriting Criteria:**

37

Case 24-80035-swe11    Doc 15    Filed 02/26/24    Entered 02/26/24 01:39:23    Desc Main
Document      Page 60 of 71

- Must have a valid driver's license or state identification card.
- Must present a letter of credit.
- Must be at least 18 years old.

**D.**   **Renewal conditions:**

- Borrower must pay all interest/fees due.
- Borrower must meet the basic qualifications stated in Section C above.

**I.**   **Fees:**

TreeMac will earn a Delinquency Fee pursuant to Tex. Fin Code § 302.001 and/or a dishonored payment fee. The amount of this Delinquency Fee will be the greater of $7.50 and 5% of the outstanding payment amount, provided that the payment is more than ten (10) days delinquent. The amount of the dishonored payment fee will be up to $30.

**F.**   **Additional Laws and Regulations:**

**Federal**

Equal Credit Protection Act ("ECOA") and Regulation B (12 C.F.R. Part 202)
Federal Debt Collections Practices Act
Fair Credit Reporting Act
Gramm-Leach-Bliley Act and Regulation P (12 C.F.R. Part 216)

**Texas**

Tex. Fin. Code Chapter 393
Tex. Fin Code § 302.001
Tex. Fin. Code § 341.406(3)(B)
Tex. Bus. & Com. Code § 3.506
Texas Debt Collections Act
Tex. Bus. & Com. Code § 36.10
1 T.A.C. § 74.22

## Exhibit C

**Master LOC Agreement**

## AMENDED AND RESTATED

## MASTER LETTER OF CREDIT AGREEMENT

**THIS AMENDED AND RESTATED MASTER LETTER OF CREDIT AGREEMENT** is made and entered into effective as of the 8th day of December, 2016 (as further amended, modified or restated from time to time, this "Agreement"), by and between **COTTONWOOD FINANCIAL TEXAS, LLC**, a Delaware limited partnership ("Cottonwood") with offices at 1901 Gateway Drive, Suite 200, Irving, Texas 75038, and **TREEMAC FUNDING GROUP, LLC**, a Delaware limited liability company (together with its successors and assigns, "Lender") with offices at 8340 Meadow Road, Suite 244, Dallas, TX 75231.

## RECITALS

**WHEREAS**, Cottonwood and Lender have entered into that certain Amended and Restated Brokering and Servicing Agreement dated as of October 14, 2015 (as amended, modified, or restated from time to time, the "Brokering Agreement") pursuant to which Cottonwood has agreed to assist Borrowers in obtaining Loans from Lender. (Pursuant to the provisions below, terms not otherwise defined herein shall have the same meanings as in the Brokering Agreement.)

**WHEREAS**, the original Guaranty Agreement, dated June 30, 2005 (the "Original Guaranty Agreement"), was entered into by Cottonwood for the benefit of Lender as a condition precedent to Lender's agreement to make the Loans to Borrowers and was an integral part of the transactions contemplated under the Brokering Agreement.

**WHEREAS**, Cottonwood and Lender have previously agreed to amend and restate the Original Guaranty Agreement to rename the Original Guaranty Agreement the Amended and Restated Master Letter of Credit Agreement and to otherwise amend and restate the Original Guaranty Agreement in its entirety.  The understanding of the parties before execution of this Agreement is set forth in that certain Amended and Restated Master Letter of Credit Agreement dated as of January 1, 2015 (the "Master Letter of Credit Agreement").

**WHEREAS**, Cottonwood and Lender desire to further amend and restate the Master Letter of Credit Agreement in its entirety as set forth herein.

**WHEREAS**, BOK Financial Corporation has issued a Letter of Credit Security Agreement, dated December 8, 2016 (the "BOK Letter of Credit"), attached hereto as **Exhibit A**, for the benefit of Lender, subject to the terms and conditions set forth in this Agreement;

**WHEREAS**, it is expressly understood between Cottonwood and Lender that (a) the execution and delivery of this Agreement; (b) Cottonwood's issuance of each Letter of Credit (as defined herein) for the benefit of Lender pursuant to the terms of this Agreement and the Brokering Agreement; and (3) BOK Financial Corporation's issuance of the BOK Letter of Credit are conditions precedent to Lender's agreement to make the Loans to Borrowers and are an integral part of the transactions contemplated under the Brokering Agreement.

**WHEREAS**, the extension of credit to Borrowers provides a substantial and direct benefit to Cottonwood.

**NOW, THEREFORE**, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, Cottonwood hereby agrees to issue Letters of Credit to Lender to ensure the prompt payment and performance of the Obligations, and Lender hereby agrees to the limitations as specified herein with respect to the BOK Letter of Credit. Cottonwood and Lender hereby amend and restate the Original Guaranty Agreement as follows:

1.    **Definitions**. As used in this Agreement, the following terms have the following meanings:

(a)    "Debtor Relief Laws" means Title 11 of the United States Code, as now or hereafter in effect, or any other applicable law, domestic or foreign, as now or hereafter in effect, relating to bankruptcy, insolvency, liquidation, receivership, reorganization, arrangement or composition, extension or adjustment of debts, or similar laws affecting the rights of creditors.

(b)    "Obligations" means (i) all indebtedness of Borrowers to Lender under the Loan Documents, (ii) all costs and expenses incurred by Lender in connection with the collection of all or any part of the indebtedness and obligations described in (i) above or the protection or preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations, including without limitation all reasonable attorneys' fees, and (iii) all renewals, extensions, modifications and rearrangements of the indebtedness and obligations described in (i) and (ii) above.

Terms not otherwise defined herein shall have the same meanings as in the Brokering Agreement.

2.    **Issuance of Letters of Credit**.

(a)    Cottonwood hereby agrees to issue a letter of credit (each a "Letter of Credit" and all the "Letters of Credit") to Lender for each of the Loans, thereby opening a credit in Lender's favor, providing for the payment upon Default, whether by lapse of time, by acceleration of maturity, or otherwise, of the Obligations. This Agreement covers the Obligations, whether presently outstanding or arising subsequent to the date hereof, including all amounts advanced by or owed to Lender under the Loan Documents. Cottonwood acknowledges and agrees that Cottonwood may be required to pay and perform under the Letters of Credit in full without assistance or support from any Borrower or any other party. Cottonwood agrees that if all or any part of the Obligations shall not be punctually paid, whether on the scheduled payment date, by lapse of time, by acceleration of maturity or otherwise, Cottonwood shall, immediately upon demand by Lender, pay the amount due on the Obligations to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Obligations, and may be made from time to time with respect to the same or different items of Obligations. Such demand shall be made, given and received in accordance with the notice provisions hereof.

2

(b)      Each Letter of Credit covered by this Agreement is incorporated herein by reference, and a schedule of each Letter of Credit covered by this Agreement (categorized by originating office) is attached as Appendix One. It is contemplated that Appendix One will be amended from time to time as new Letters of Credit are issued and previously issued Letters of Credit expire are released, or otherwise terminate. For each Letter of Credit the payment obligation of Cottonwood, the identification of the applicant and the beneficiary, the draw and draft requirements, the expiration date, and certain additional terms applicable to each Letter of Credit are made a part hereof for all purposes, the same as if set forth herein verbatim. As a result of such incorporation by reference Lender (or a Creditor pursuant to <u>Section 9</u> below) may use the original or a copy of this Agreement as the original Letter of Credit to effect a draw under each Letter of Credit as long as the requirements of the pertinent Letter of Credit are met by Lender (or Creditor) as beneficiary. Multiple drafts and draws are permitted under this Agreement; provided, however, the total amount drawn under each Letter of Credit may not exceed the face amount of the applicable Letter of Credit.

3.      **BOK Letter of Credit.**  Cottonwood and Lender agree to the following with respect to the BOK Letter of Credit:

(a)      Lender may draw on the BOK Letter of Credit after 9:00 A.M. Dallas, Texas time on the next business day following the day on which Lender makes a valid, written demand (during normal business hours) to Cottonwood for payment under any Letter of Credit pursuant to Section 2(a) of this Agreement if Cottonwood fails to fully pay or perform under the Letter of Credit, only to the extent necessary to be made whole with respect to the Obligation(s) then in Default.

(b)      Notwithstanding the provisions of Section 3(a) of this Agreement, Lender is entitled to draw on the BOK Letter of Credit in an amount up to, but not exceeding, the total balance of outstanding Loans if Lender, in its reasonable good faith belief, has doubts, given rise to by objective indications, regarding Cottonwood's ability to perform its obligations under this Agreement and the Brokering Agreement.  Lender shall provide at least 5 business days' advance written notice to Cottonwood before exercising its rights pursuant to this Subsection 3(b).

(c)      Lender is only entitled to payment under the BOK Letter of Credit pursuant to the circumstances described in Sections 3(a) and 3(b) herein, and shall not demand payment under the BOK Letter of Credit except in such circumstances.

4.      **Primary Liability of Cottonwood**. In the event of default in payment or performance of the Obligations, or any part thereof, when such Obligations become due, whether by its terms, by acceleration, or otherwise, Cottonwood shall, immediately upon demand by Lender, pay the amount due thereon to Lender, in lawful money of the United States of America, or perform the obligations to be performed hereunder, and it shall not be necessary for Lender in order to enforce such payment and performance by Cottonwood first, or contemporaneously, to institute suit or exhaust remedies against any Borrower or others liable on the Obligations, or to enforce any rights, remedies, powers, privileges or benefits of

Lender against any collateral, or any other security or collateral which shall ever have been given to secure the Obligations. Any time that Lender is entitled to exercise its rights or remedies hereunder, Lender may in its discretion elect to demand payment. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy by Lender.

5.      **Obligations Not To Be Diminished**. Cottonwood hereby agrees that its obligations under this Agreement shall not be released, discharged, diminished, impaired, reduced, or affected for any reason or by the occurrence of any event, including, without limitation, one or more of the following events, whether or not with notice to or the consent of Cottonwood: (a) the taking or accepting of collateral as security for any or all of the Obligations or the release, surrender, exchange, or subordination of any collateral now or hereafter securing any or all of the Obligations; (b) any partial release of the liability of any Borrower or the full or partial release of any other guarantor or obligor from liability for any or all of the Obligations; (c) any disability of any Borrower, or the insolvency or bankruptcy of any Borrower, or any other party at any time liable for the payment of any or all of the Obligations; (d) any renewal, extension, modification, waiver, amendment, or rearrangement of any or all of the Obligations or any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Obligations; (e) any adjustment, indulgence, forbearance, waiver, or compromise that may be granted or given by Lender to any Borrower or any other party ever liable for any or all of the Obligations; (f) any neglect, delay, omission, failure, or refusal of Lender to take or prosecute any action for the collection of any of the Obligations or to foreclose or take or prosecute any action in connection with any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Obligations; (g) the unenforceability or invalidity of any or all of the Obligations or of any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Obligations; (h) any payment by any Borrower or any other party to Lender is held to constitute a preference under applicable bankruptcy or insolvency law or if for any other reason Lender is required to refund any payment or pay the amount thereof to someone else; (i) the settlement or compromise of any of the Obligations; (j) the non-perfection of any security interest or lien securing any or all of the Obligations; (k) any impairment of any collateral securing any or all of the Obligations; (l) the failure of Lender to realize upon any collateral securing any or all of the Obligations in a commercially reasonable manner or as otherwise required by law; or (m) any other circumstance which might otherwise constitute a defense available to, or discharge of any Borrower other than payment.

6.      **Waivers**. Cottonwood waives (a) any right to revoke this Agreement with respect to future Obligations; (b) any right to require Lender to do any of the following before Cottonwood is obligated to pay the Obligations or before Lender may proceed against Cottonwood: (i) sue or exhaust remedies against any Borrower and other guarantors or obligors, (ii) sue on an accrued right of action in respect of any of the Obligations or bring any other action, exercise any other right, or exhaust all other remedies, or (iii) enforce rights against any collateral pledged by a Borrower to secure the Obligations; (c) any right relating to the timing, manner, or conduct of Lender's enforcement of rights against any collateral pledged by a Borrower to secure the Obligations; (d) if Cottonwood and a Borrower (or a third-party) have each pledged assets to secure the Obligations, any right to require Lender to proceed first against

the other collateral before proceeding against collateral pledged by Cottonwood; (e) except as expressly required hereby, promptness, diligence, notice of acceleration r intent to accelerate, notice f acceptance of this Agreement, presentment, notice of protest, notice of dishonor, notice of the incurring by a Borrower of additional indebtedness, notice of any suit or other action by Lender against a Borrower or any other Person, any notice to any party liable for the obligation which is the subject of the suit or action, and all other notices and demands with respect to the Obligations and this Agreement; (f) each of the foregoing rights or defenses regardless whether they arise under (i) Section 34.01 et seq. of the Texas Business and Commerce Code, as amended, (ii) Section 17.001 of the Texas Civil Practice and Remedies Code, as amended, (iii) Rule 31 of the Texas Rules of Civil Procedure, as amended, (iv) common law, in equity, under contract, by statute, or otherwise, and (g) any and all rights under Sections 51.003, 51.004 and 51.005 of the Texas Property Code, as amended.

7.     **Insolvency**. Should Cottonwood become insolvent, or fail to pay Cottonwood's debts generally as they become due, or voluntarily seek, consent to, or acquiesce in the benefit or benefits of any Debtor Relief Law, or become a party to (or be made the subject of) any proceeding provided for by any Debtor Relief Law (other than as a creditor or claimant) that could suspend or otherwise adversely affect the rights and remedies of Lender granted hereunder, then, in any such event, the Obligations shall be, as between Cottonwood and Lender, a fully matured, due, and payable obligation of Cottonwood to Lender (without regard to whether a Borrower is then in default under the Loan Documents or whether the Indebtedness of a Borrower, or any part thereof, is then due and owing to Lender), payable in full by Cottonwood to Lender upon demand, which shall be the estimated amount owing in respect of the contingent claim created hereunder.

8.     **Termination**. Cottonwood's obligations hereunder shall remain in full force and effect until all commitments to lend under the Brokering Agreement have terminated, and the Obligations have been paid in full. Cottonwood's obligations hereunder shall be supported by the Letter of Credit issued for the benefit of Lender in accordance with the Brokering Agreement and the rights and duties of the parties with respect to the Letter of Credit are governed by that certain Letter of Credit Agreement by and between Cottonwood, Cottonwood Financial Ltd., a Texas limited partnership, and Lender, entered into and effective as of June 30, 2005 (as amended, modified, or restated from time to time).

9.     **Representations and Warranties**. Cottonwood represents and warrants as follows:

(a)     Cottonwood has the power and authority and legal right to execute, deliver, and perform its obligations under this Agreement and this Agreement constitutes the legal, valid, and binding obligation of Cottonwood, enforceable against Cottonwood in accordance with its terms, except as limited by bankruptcy, insolvency, or other laws of general application relating to the enforcement of creditor's rights.

(b)     The execution, delivery, and performance by Cottonwood of this Agreement do not and will not violate or conflict with any law, rule, or regulation or any order, writ, injunction, or decree of any court, governmental authority or agency, or arbitrator and do not and will not conflict with, result in a breach of, or constitute a

default under, or result in the imposition of any lien upon any assets of Cottonwood pursuant to the provisions of any indenture, mortgage, deed of trust, security agreement, franchise, permit, license, or other instrument or agreement to which Cottonwood or its properties are bound.

(c)     No authorization, approval, or consent of, and no filing or registration with, any court, governmental authority, or third party is necessary for the execution, delivery, or performance by Cottonwood of this Agreement or the validity or enforceability thereof.

(d)     Cottonwood has, independently and without reliance upon Lender and based upon such documents and information as Cottonwood has deemed appropriate, made its own analysis and decision to enter into this Agreement, and Cottonwood has adequate means to obtain from a Borrower on a continuing basis information concerning the financial condition such Borrower, and Cottonwood is not relying upon Lender to provide (and Lender shall have no duty to provide) any such information to Cottonwood either now or in the future.

(e)     The value of the consideration received and to be received by Cottonwood is reasonably worth at least as much as the liability and obligation of Cottonwood hereunder, and such liability and obligation may reasonably be expected to benefit Cottonwood directly or indirectly.

10.     **Successors and Assigns**. (a) This Agreement is for the benefit of Lender and its successors and assigns, and, the rights and remedies hereunder, to the extent applicable to any indebtedness assigned, may be transferred with such indebtedness. It is contemplated that Lender will create a security interest in and/or assign Lender's interest in some or all of the Letters of Credit to third party creditors ("Creditor" whether one or more) in order to secure one or more extensions of credit ("Creditor Loan") from Creditor to Lender. In the event of such assignment/security interest ("Assignment"), Cottonwood shall be notified in writing by Lender and/or Creditor of such Assignment. If a default occurs under a Creditor Loan, after providing all applicable notices, grace periods and opportunities to cure, Lender shall cause all future payments under the Letter of Credit which secures such Creditor Loan to be paid directly to the applicable Creditor (and not to Lender). In that regard, Cottonwood, in advance, acknowledges and consents to the Assignment of proceeds of and rights to payment and performance under the Letters of Credit and agrees to comply with the above requests and instructions, and if requested to make all future payments, after notification, under the Letters of Credit directly to the applicable Creditor and not to Lender or any other person or entity. One purpose of this Section 9 is to establish "control" (as that term is defined and used in Sections 9.107 and 5.114 of the Texas Business and Commerce Code as amended from time to time) by and in the applicable Creditor of the above stated Letters of Credit proceeds plus rights to payment and performance. Lender and Cottonwood will not agree to or cause or permit any amendment, replacement, or termination of this Section 9 without the then existing Creditor's written consent. Creditor (now and in the future) is a third party beneficiary of this Section 9.

(a)     This Agreement is binding on Cottonwood, and Cottonwood's permitted successors and assigns; provided that, Cottonwood may not assign its obligations under

this Agreement without obtaining the prior written consent of Lender, and any assignment purported to be made without the prior written consent of Lender shall be null and void.

11.     **Amendments**. No amendment or waiver of any provision herein nor consent to any departure therefrom by Cottonwood shall be effective unless the same shall be in writing and signed by Lender and the affected Creditor, and then, such amendment, waiver, or consent shall be effective only in the specific instance and for the specific purpose for which given.

12.     **Time of Essence**. Time shall be of the essence in this Agreement with respect to all of Cottonwood's obligations hereunder.

13.     **Governing Law**. This Agreement shall be construed and performed in accordance with the laws of the State of Texas. At the request of either party, any dispute between the parties relating to this Agreement shall be submitted to binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association. The parties agree that any arbitration proceedings hereunder, unless otherwise agreed to by the parties, shall be in Dallas, Texas, and that, without limiting the provisions hereof requiring arbitration, the exclusive venue for any litigation concerning this Agreement or disputes hereunder (such as litigation to compel arbitration or to enforce the results of an arbitration proceeding) shall be in Dallas County, Texas, or federal District Court for the district encompassing Dallas County, Texas, and each party hereto consents to the jurisdiction over it by any court of general jurisdiction therein. In the event that a party initiates a lawsuit in court concerning an arbitrable claim, controversy or dispute, such party shall pay the other party for the costs, including attorneys' fees that the other party incurs to obtain an order from the court to stay or dismiss the lawsuit or otherwise compel arbitration. The arbitrator shall be authorized to award such relief as is allowed by law. Except as provided below, each party shall be responsible for its own attorneys' fees incurred during the course of the arbitration, as well as the costs of any witnesses or other evidence such party produces or causes to be produced. The award of the arbitrator shall include findings of fact and conclusions of law. Such award shall be kept confidential, and shall be final, binding, and conclusive on the parties. Judgment on the award may be entered by any court of competent jurisdiction. The arbitrator in any such proceeding shall have the authority to require one party in such arbitration proceeding to pay all or a portion of the other party's legal fees and other expenses incurred in connection therewith, as determined in the reasonable discretion of the arbitrator.

14.     **Subrogation**. Upon the payment of any Obligation with respect to a Loan, Cottonwood shall be subrogated to any of the rights, remedies or liens of Lender with respect to such Obligations and Lender's interest in the related Loan, the Loan Documents and all collateral securing the same shall be automatically transferred to Cottonwood without any representation or warranty.

15.     **WAIVER OF RIGHT TO TRIAL BY JURY. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM THAT RELATES TO OR ARISES OUT OF THIS AGREEMENT OR ANY OF THE LOAN**

**DOCUMENTS OR THE ACTS OR FAILURE TO ACT OF OR BY LENDER IN THE ENFORCEMENT OF ANY OF THE TERMS OR PROVISIONS OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.**

16.  **NO ORAL AGREEM E NTS.** **THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BY THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**REMAINDER OF PAGE LEFT INTENTIONALLY BLANK**

**EXCUTED as** of the first date herein set forth.

**CONTTONWOOD:**

COTTONWOOD FINANCIAL TEXAS, LLC.

By:    Cottonwood Financials Ltd., its Sole Member

By: Cottonwood Financial Management,.Inc., its sole General Partner

By: _____
Name:_ Trevor L. Ahlberg _____
Title:__ President _____

**LENDER:**

TREEMAC FUNDING GROUP, LLC

By:_____
Name:_ Scott R. McArron _____
Title:_ President _____

**APPENDIX ONE**

**Schedule of Letters of Credit as of _____, 2014**