**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| COTTONWOOD FINANCIAL LTD., *et al.*,[1] | § § | Case No. 24-80035 (SWE) |
| Debtors. | § § § | (Joint Administration Requested) |

**[CORRECTED] DECLARATION**
**OF KAREN NICOLAOU, CHIEF RESTRUCTURING OFFICER,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Karen Nicolaou declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:[2]

1.      I am the Chief Restructuring Officer of Cottonwood Financial Ltd. ("Cottonwood," and together with each of the other above-captioned debtors and debtors in possession, the "Debtors" or the "Company").  I have held this position since December 8, 2023.

2.      As Chief Restructuring Officer, I am responsible for overseeing the operations and financial activities of the Debtors, including, but not limited to, monitoring cash flow, business relationships, workforce issues, and financial planning.  As a result of my tenure with the Debtors and my turnaround experience, my review of public and non-public documents, and my discussions with other members of the Company's management team, I am generally familiar with the Company's business and financial condition.  Except as otherwise noted, I have personal

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtors' federal tax identification number are as follows: Cottonwood Financial Ltd. (1001); Cottonwood Financial Administrative Services, LLC (7228); Cottonwood Financial Texas, LLC (9059); Cottonwood Financial Idaho, LLC (5651); Cottonwood Financial Wisconsin, LLC (7075).  The Debtors' principal offices are located at 2100 W Walnut Hill Lane, Suite 300, Irving, TX 75038.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the applicable First Day Motions (defined and described below).

knowledge of the matters set forth herein or have gained knowledge of such matters from the Company's management team and its advisors.

3.      I am over the age of 18, and I am authorized to submit this declaration on behalf of the Debtors.   This declaration is submitted to assist the Court and parties in interest in understanding the circumstances surrounding the commencement of these chapter 11 cases, and in support of the Debtors' chapter 11 petitions and First Day Motions (as defined below).

### Preliminary Statement

4.      Cottonwood is one of the largest privately held retail consumer finance companies in the United States.  Operating under the name Cash Store®, Cottonwood offers an innovative mix of solutions to its customers.  These solutions are made available through the Company's 181 brick-and-mortar retail locations across Texas, Idaho, and Wisconsin.  Additionally, customer account management services are made available via Cottonwood's online consumer portal.

5.      Cottonwood's customers comprise a diverse mix of consumers who typically have a temporary need for financing to cover unexpected expenses, *e.g.*, medical bills, auto repairs, or home repairs.  Cottonwood provides access to small, convenient, short-term loans.  Cottonwood filed these chapter 11 cases so that it may continue providing these valuable services to its customers.

6.      To familiarize the Court with the Company, its business, the circumstances leading up to these chapter 11 cases, and the relief the Company is seeking through the First Day Motions, this declaration is organized into four parts.  **Part I** provides background information on the Company's corporate history and operations; **Part II** offers detailed information on the Company's prepetition capital structure; **Part III** describes the circumstances leading to the filing of these chapter 11 cases; and **Part IV** summarizes the relief requested in, and the legal and factual bases in support of, the First Day Motions.

4857-8962-9351.3

7.      As further described herein, today (the "Petition Date"), the Company filed certain motions and pleadings (collectively, the "First Day Motions") requesting necessary operational and procedural relief to allow the Company to continue its ordinary course operations through these chapter 11 cases, while pursuing a going concern sale of the business.

8.      The Company remains in a strong operational position but is in default under its Prepetition Obligations (defined below), which were accelerated before the Petition Date.  The Company is working collaboratively with the Prepetition Secured Lenders (defined below) while it explores strategic alternatives such as a sale, recapitalization, or alternative sources for refinancing.

9.      To aid in the Company's efforts to find long-term solutions to its financial issues, the Company engaged Harney Partners as financial advisor in December 2023 and retained Oppenheimer & Co. Inc. ("OpCo") as investment bankers in February 2024 to explore strategic sale or refinancing alternatives for the Company.  The Company determined that a 363 sale process is the best path to optimize value of the Debtors' assets and related business, and has worked closely with Harney Partners and OpCo to develop a marketing strategy designed to promote competitive offers from experienced market participants.

10.     Most important to this process and maximizing value is minimizing business disruptions to the Company's customers.  To minimize business disruptions while maximizing the Company's going concern value, the Company seeks approval of bidding procedures to allow the Company (through OpCo) to complete its marketing efforts.  The procedures contemplate approval and consummation of a sale approximately 75 days after the Petition Date.  Such a deliberate and streamlined process is necessary to ensure the highest and best value for the Company's assets,

while not compromising customer confidence, both of which, as stated above, are critical to the continued vitality of the Company and the success of these chapter 11 cases.

**Background**

I.      **Overview of the Debtors and Their Business**

     A.      **Consumer Finance Industry**

11.      Small dollar lending in the United States dates to the early 1900s. With the banking deregulation and consolidation in the early 1990s, many traditional banking institutions (commercial banks and credit unions) stopped offering short-term, small dollar loans. Some also reduced or eliminated their short-term, small dollar lending programs because of the costs associated with originating these loans and the negative impact of these loans cannibalizing their more profitable overdraft protection and bounced check fee products.

12.      The demand for these short-term, small dollar loans was still present, so individual states began passing legislation allowing for the formation of alternative financial products. With the entrance of retail consumer finance companies to fill the void left by the exit of traditional banking institutions, the U.S. consumer finance industry has grown to annual revenue of greater than $150 billion. The U.S. consumer credit regulatory environment is dynamic, multilayered, and complex, in particular for nonbank-issued personal loans. States have full flexibility to write, adopt, and repeal legislation and regulations.

13.      The industry is homogenous: storefronts of different companies may be clustered within a specific region or location and different lenders may have common borrowers. As with many other retail businesses, lenders depend on repeat business from their many loyal customers.

14.     The Texas Finance Code Chapter 393 allows for the operation of a credit services organization ("CSO"), under Subchapter B, and a licensed credit access business ("CAB"), under Subchapter G.

15.     CSOs assist consumers in obtaining small denomination, short-term loans from a third-party lender that are not "deferred presentment transactions."  In addition to brokering, the CSO accomplishes this by enhancing the consumers' credit to the lender.  CSOs assess fees for their services: processing the loan application, providing the credit enhancement on the consumer's account, and brokering the loan from the lender the consumer might not otherwise qualify to receive.

16.     CSOs broker small denomination, short-term consumer loans from a third-party lender for consumers.  CABs are a subset of CSOs, and broker small denomination, short-term unsecured consumer loans that are in the form of deferred presentment transactions, as well as motor vehicle title loans.  In addition to brokering, the CSO/CAB also assists consumers in obtaining these loans from the lender by enhancing the consumers' credit to the lender.  CSOs and CABs assess fees for their services: processing the loan application, providing credit enhancement on the consumer's account for the benefit of the lender, and brokering a loan from the lender that the consumer might not otherwise qualify to receive.  Applicable law requires independence between CSOs/CABs and the lenders that ultimately extend credit to consumers.

17.     In 2022, CABs assisted over 1.4 million Texas consumers in obtaining an extension of consumer credit.  The average principal amount of cash advance loans was $624, and the average principal amount of title secured loans was $1,634.  While store-front originated small consumer loans in Texas have continued to decline since COVID, demand for short-term, smaller

loans persists as 37% of consumers in Texas are unable to cover a $400 emergency with current savings.[3]

### B.    Corporate History and Structure

18.    Cottonwood Financial Ltd. is a Texas limited partnership founded in 1996. Cottonwood Financial Management, Inc. (the "General Partner") owns approximately 1% of Cottonwood Financial Ltd. as the sole general partner.  Certain entities owned or controlled, directly or indirectly, by Trevor Lee Ahlberg and related family trusts own (a) 100% of the General Partner and (b) approximately 95.5% of the shares of Cottonwood Financial Ltd. as limited partners.  Outside investors make up the remaining 3.5% of Cottonwood Financial Ltd.'s ownership as limited partners.

19.    A current illustration of the Company's organizational structure is as follows:[4]



---

[3] TX Office of Consumer Credit Commissioner 2023 Report on Availability, Quality and Pricing of Certain Financial Services and Consumer Loan Products, available at https://occc.texas.gov/sites/default/files/2023-12/study_consumer_loan_products_12-01-2023__0.pdf.

[4] Debtor entities are highlighted in green.

20.     At its height, Cottonwood operated retail locations in nine states.  As of 2020, the Company operated in seven states: Texas, Idaho, Wisconsin, Utah, Michigan, Illinois, and New Mexico.  Between 2020 and 2022, the Company ceased operating in Utah, Michigan, Illinois, and New Mexico.  The Company closed its Utah and Michigan stores as a result of the COVID-19 pandemic.  The Company closed its Illinois and New Mexico locations in light of a change in state-passed legislation that made continued operations unprofitable.  At present, Cottonwood maintains brick-and-mortar stores in three states: Texas, Idaho, and Wisconsin.

21.     There are three separate operating companies within the Cottonwood organization (collectively, the "Operating Companies"): Cottonwood Financial Texas, LLC ("Cottonwood Texas"), Cottonwood Financial Idaho, LLC ("Cottonwood Idaho"), and Cottonwood Financial Wisconsin, LLC ("Cottonwood Wisconsin").  As the names indicate, Cottonwood Texas conducts the Company's day-to-day operations in Texas, Cottonwood Idaho conducts the Company's day-to-day operations in Idaho, and Cottonwood Wisconsin conducts the Company's day-to-day operations in Wisconsin.

22.     Cottonwood Financial Administrative Services, LLC ("CFAS") manages the administrative functions for the Company, including but not limited to, the Cash Management System.

23.     The Company's administrative offices are in Irving, Texas.  Retail locations are divided into districts (29), then grouped into regions (9), areas (3), and rolled up into a single territory.

**C.     The Company's Loan Products and Customer Experience**

24.     The Company offers three types of loan products: single payment cash advances, installment cash advances, and title loans.

7

a. <u>Single Payment Cash Advances</u>.  Single payment cash advances are small, unsecured, short-term cash loans of up to $3,000.  These loans are repaid in a single payment on the consumer's next pay date.  Requirements for single payment cash advances include a regular source of income, an active checking account, and a valid driver's license or state ID.

b. <u>Installment Cash Advances</u>.  Installment cash advances are small, unsecured, short-term cash loans of up to $3,000.  These loans are repaid with a fixed number of periodic equal-sized payments.  Requirements for installment cash advances include a regular source of income, an active checking account, and a valid driver's license or state ID.

c.  <u>Title Loans</u>.  Title loans are small, secured, short-term auto equity cash loans of up to $25,000.[5]  These loans are repaid with a fixed number of periodic equal-sized payments.  Requirements for a title loan include a regular source of income, a free and clear title, and a valid driver's license or state ID.

25.    The Cash Store® customer experience is consistent across the three states in which the Company currently operates.  Customers can pre-qualify online by using the Company's secure portal.  New customers must complete the process in person at a Cash Store® location.  Customers present the required documentation to a Cash Store® employee, who processes the application, runs the necessary checks to confirm the application meets the applicable lending criteria, and if approved, distributes cash to the customer on the spot.

**D.    Cottonwood Texas as a Credit Services Organization**

26.    Cottonwood Idaho and Cottonwood Wisconsin can make and service loans directly to consumers as first-party lenders under applicable state law.  Cottonwood Texas operates as a CSO and CAB under Texas law.

27.    TreeMac Funding Group, LLC ("<u>TreeMac</u>") is the exclusive third-party lender for loans brokered by Cottonwood Texas.  TreeMac and Cottonwood Texas are independent and separate legal entities.  There is no overlap in management, board representation, ownership, or

---

[5] The maximum amount available varies by state: (i) Texas, $20,000; (ii) Wisconsin, $25,000; and (iii) Idaho, (a) auto equity loans ($20,000) and (b) title loans ($500).

control.  TreeMac does not own or exercise any control over Cottonwood Texas, its operations, policies and procedures, stores, or employees.  Cottonwood Texas does not own or exercise any control over TreeMac, its operations, policies and procedures, stores or employees.  All advertising by Cottonwood Texas clearly indicates that Cottonwood Texas is not the lender, and when the form of advertisement can accommodate additional disclosure, identifies TreeMac as the lender.

28.    Cottonwood Texas and TreeMac are parties to that certain Amended and Restated Brokering and Servicing Agreement (the "BSA").  The BSA sets forth the terms and conditions that govern the services provided by Cottonwood to TreeMac in connection with the brokering and servicing of loans made by TreeMac to borrowers.  Currently, the amount of TreeMac's loan portfolio brokered and serviced by Cottonwood exceeds $31 million.  For the avoidance of doubt, Cottonwood Texas does not have any ownership interest in TreeMac's loan portfolio.  TreeMac's loan portfolio is not collateral potentially available for Cottonwood Texas's creditors.

29.    The following is an example of how a loan is arranged pursuant to the BSA:

**Step 1:**    Borrower seeks assistance from Cottonwood Texas.  Cottonwood Texas informs Borrower that it can help arrange a loan, but it is not a lender.

**Step 2:**    Cottonwood Texas determines Borrower's eligibility for its credit services.  If approved, Borrower signs a credit services agreement with Cottonwood Texas whereby, if TreeMac approves the loan, Borrower agrees to pay Cottonwood Texas a credit services fee.

**Step 3:**    With Cottonwood Texas's assistance, Borrower completes TreeMac's loan application.  If Borrower meets the underwriting criteria established by TreeMac, TreeMac approves the loan to Borrower.

**Step 4:**    Cottonwood Texas assists Borrower with completing TreeMac's loan agreement.

**Step 5:**    Cottonwood issues a standby letter of credit to TreeMac for the benefit of Borrower.

**Step 6:**    TreeMac makes the loan to Borrower, and Borrower receives the loan proceeds.

9

30.     When borrowers make payments on their loans at the Cash Store®, Cottonwood Texas remits TreeMac's portion of the payments to TreeMac by wire.  If a borrower defaults on its loan agreement with TreeMac, then TreeMac demands payment from Cottonwood Texas under the terms of the letter of credit.  Once the letter of credit is called, Cottonwood Texas pays TreeMac in full on the loan.  Cottonwood Texas is then subrogated to the rights of TreeMac in the loan, and Cottonwood Texas seeks reimbursement from the borrower pursuant to the credit services agreement.

31.     Cottonwood Texas and TreeMac are also party to that certain Amended and Restated Master Letter of Credit Agreement dated December 8, 2016 (the "Master LOC Agreement").  The Master LOC Agreement provides that if Cottonwood Texas fails to fully pay or perform under the individual letters of credit issued to TreeMac for each loan arranged pursuant to the BSA, TreeMac may draw on a letter of credit issued by BOK Financial Corporation (the "BOK Letter of Credit") to satisfy any defaulted obligation.  TreeMac may also draw on the BOK Letter of Credit in an amount not to exceed the total balance of outstanding loans if TreeMac, "in its reasonable good faith belief, has doubts, given rise to by objective indications, regarding Cottonwood's ability to perform its obligations under [the Master LOC Agreement] and the [BSA]."  Master LOC Agreement ¶ 3(b).  The BOK Letter of Credit is secured by a $10 million deposit (the "TreeMac Deposit") held in a separate Cottonwood Texas account at Bank of Texas that is not subject to the deposit account control agreement between Cottonwood Financial Ltd. and Third Coast (as defined below).  For the avoidance of doubt, the TreeMac Deposit is not currently collateral potentially available for Cottonwood Texas's creditors.

32.     TreeMac controls and is solely responsible for establishing credit and underwriting criteria, funding the loans and managing its lending program.  It controls all program guidelines

as to loans arranged pursuant to the BSA and may unilaterally modify such program guidelines—including underwriting criteria, loan terms, interest rates, fees or charges and events of default—at any time and for any reason.  Moreover, the BSA expressly provides that nothing therein commits TreeMac to originate or fund any level or number of loans, and TreeMac makes no representation as to the amount of funding it will be able to provide for the loans.  TreeMac may immediately cease making new loans if TreeMac is unable to obtain funding sources.

33.    Cottonwood Texas controls the amount of its credit services fees assessed against a borrower pursuant to the credit services agreement.  Broker fees are earned at the time a loan is originated, paid from a portion of loan proceeds, and remitted to Cottonwood Texas pursuant to the settlement process described below.  Subsequent fees, including fees Cottonwood Texas earns for maintaining the letter of credit during the term of the loan, are paid to Cottonwood Texas directly by the consumer.

34.    Given the near constant flow of funds between TreeMac and Cottonwood Texas pursuant to the BSA, the parties established a settlement process.  On a daily basis, Cottonwood Texas receives ACH transfers from TreeMac to settle fundings for loans arranged by Cottonwood Texas in the prior two to three business days.  These daily transfers total between $500,000 and $3 million.  On a daily basis, Cottonwood Texas sends a wire to TreeMac to settle loan principal and interest payments received by Cottonwood Texas at its Cash Store® locations in the prior two to three business days.  This daily wire is typically between $600,000 and $3 million.  The following diagram reflects the cash inflows and outflows resulting from the various transactions undertaken pursuant to the BSA:

4857-8962-9351.3



35.    Maintenance of the BSA and the relationship with TreeMac is critical to the Company's business.  Contemporaneously herewith, the Debtors are filing a motion to assume the BSA.

**E.    The Consent Order**

36.    The Company has always endeavored to provide its services in accordance with applicable state and federal laws and regulations.  On or around 2015, the Consumer Financial Protection Bureau (the "CFPB") initiated an examination of the Company.  On April 1, 2020, the CFPB issued a consent order (the "Consent Order") identifying alleged violations of the Consumer Financial Protection Act of 2010, the Fair Credit Reporting Act, and the Truth in Lending Act.  The Consent Order required certain modifications to the Company's practices, entry into a compliance plan through April 1, 2025, and payment of (a) $286,675.64 in redress to affected consumers and (b) $1,100,000 in civil penalties to the CFPB.  The Company has made all monetary

payments due pursuant to the Consent Order.  The Company believes that it is in compliance with the Consent Order as of the Petition Date.

## II.   **The Debtors' Prepetition Capital Structure**

### A.   **Main Street Loan**

37.   For the first 24 years of its history, the Company had no significant long-term debt of any kind.  However, as discussed below in **Section III**, by the end of 2020, the Company needed outside financing in order to maintain its operations.

38.   On December 9, 2020, Cottonwood entered into that certain Loan Agreement (the "Loan Agreement") with Third Coast Bank, SSB ("Third Coast") in the aggregate principal amount of $25 million (the "Main Street Loan").[6]  Ninety-five percent (95%) of the Main Street Loan ($23,750,000) is held by MS Facilities LLC (together with Third Coast, the "Prepetition Secured Lenders"), a special purpose vehicle established by the Federal Reserve Bank of Boston. The remaining five percent (5%) of the Main Street Loan ($1,250,000) is held by Third Coast. Cottonwood Texas and CFAS are guarantors of the Main Street Loan.  The obligations under the Main Street Loan are secured by first priority liens on substantially all of the assets of Cottonwood, Cottonwood Texas, and CFAS.[7]  As of the Petition Date, the aggregate amount outstanding under the Main Street Loan is approximately $26,743,881.44 (the "Prepetition Obligations").

39.   Prior to the event of default discussed further below in **Part III**, the maturity date under the Main Street Loan was December 9, 2025.  As discussed more fully below, Cottonwood

---

[6] The Main Street Loan was issued under the Main Street Lending Program, established by the Federal Reserve to support lending to small and medium-sized businesses that were in sound financial condition before the onset of the COVID-19 pandemic.

[7] The Prepetition Secured Lenders do not have liens on the assets of Cottonwood Wisconsin or Cottonwood Idaho.

4857-8962-9351.3

failed to make the scheduled principal and interest payment due on December 9, 2023, and the

Prepetition Secured Lenders subsequently accelerated the debt.

**B.    Subordinated Loan**

40.    On July 5, 2022, Cottonwood Financial Ltd. executed that certain Subordinated

Debt Note in the amount of $25 million (the "Subordinated Loan").  Bomani Business Lending,

LLC is the current holder of the Subordinated Loan.  The Subordinated Loan is in all respects

junior to the Main Street Loan.  Third Coast consented to the Subordinated Loan.

41.    On July 5, 2023, an amendment to the Subordinated Loan was entered into which

increased the borrowing capacity to $37,150,000, plus any accrued and unpaid interest.  The

outstanding balance on the Subordinated Loan, including capitalized interest, is $38,162,527.97 as

of the Petition Date.

**C.    Unsecured Debt**

42.    As of the Petition Date, the Debtors are approximately 60 days in arrears with

several of their vendors.  The Debtors estimate the current amount of unsecured debt is

approximately $4 million.

**III.    Circumstances Leading to Commencement of These Chapter 11 Cases**

43.    A series of factors have led to Company's recent financial difficulties.

44.    First, the COVID-19 pandemic resulted in changes in consumer behavior that have

adversely impacted the Company's business.  Economic impact payments, stimulus payments, and

advances on child tax credits made by the federal government in 2020 and 2021 increased the cash

available to consumers, thereby decreasing demand for the Company's loan products.

45.    Moreover, even though the Company was able to continue operating as an essential

business, the COVID-19 pandemic accelerated consumers' shifting preference for obtaining short

term, small dollar loans from brick-and-mortar lending locations to online providers.  The

Company does not have a competitive platform in the online marketplace for short-term consumer loans. Although the Company offers an online portal where customers may get pre-approved and make payments, new customers must still go to a physical Cash Store® location to complete the loan process and receive loan proceeds. Certain of the Company's competitors have been quick to institute fintech platforms and thus, offer consumers a fully virtual method of obtaining small, convenient, short-term loans.

46.    <u>Second</u>, there has been significant regulation in major markets in the state of Texas that have made it unprofitable for the Company to operate in those areas. This is primarily due to city ordinances limiting the terms on which consumer finance companies like Cottonwood can broker loans. For example, the City of Dallas enacted an ordinance prohibiting CSOs and CABs from brokering a loan for a consumer that exceeded twenty percent of the consumer's gross monthly income, required repayment of the principal, interest, and all fees in four or fewer payments, and required each payment to reduce by at least twenty-five percent the total amount of the transaction. Under this ordinance, CSOs and CABs are also prohibited from refinancing or renewing the consumer's loan more than three times and required the consumer to pay down the total amount of the transaction by at least twenty-five percent in order to refinance or renew the loan.

47.    <u>Third</u>, to keep pace with consumer behavior and demand for its services, the Company's underwriting practices are in a near constant state of transformation. Even though the Company's underwriting practices have been historically attuned to consumer habits, the Company was unable to quickly adapt its brick-and-mortar underwriting model to the sudden and dramatic shift in consumer behavior precipitated by the COVID-19 pandemic. This resulted in a higher percentage of bad debt than the Company had previously experienced. Bad debt as a

percentage of operating revenues increased from 19% in 2020 to 43% in 2023.  Although the Company has taken numerous steps to remedy the issue, the circumstance continues to negatively impact operations.

48.     <u>Fourth</u>, over the course of its operating history, the Company has closed stores as a result of (a) changes in regulations or legislation that made operating in certain jurisdictions unprofitable and (b) internal analysis identifying unprofitable branches.  Since the beginning of the COVID-19 pandemic, the Company has closed 168 stores and ceased all operations in four (4) states.  While headcount was decreased at the branches, proportional rationalization of corporate overhead was not simultaneously fully undertaken.  The outsized overhead has negatively impacted profitability.

### A.     Default and Acceleration of the Main Street Loan

49.     Due to the factors discussed above, by the end of 2023, the Company was facing serious strains on its liquidity.  In order for it to have sufficient cash to meet ongoing payroll obligations, the Company missed the December 9, 2023, principal and interest payment due on the Main Street Loan.

50.     On December 15, 2023, Third Coast sent the Company notice of event of default and accelerated the entire outstanding amount due under the loan.  The Company immediately took steps to negotiate a forbearance.  The Company has worked collaboratively with the Prepetition Secured Lenders to ensure continued access to cash while it has explored strategic alternatives.

### B.     Footprint Rationalization and Reductions in Force

51.     To aid in its prepetition efforts to right-size its footprint, the Company undertook an analysis of its brick-and-mortar locations to identify underperforming stores.  As a result, the

4857-8962-9351.3

Company closed 44 locations in January 2024: three (3) in Idaho, five (5) in Wisconsin, and thirty-six (36) in Texas.  The loans serviced at these locations were moved either to the online portal or to a nearby store for servicing.  The Company expects to save in excess of $2 million annually as a result of these store closures.

52.     The Company also reduced its workforce by sixty-seven (67) employees in January 2024 and twenty-nine (29) employees in February 2024.  The corresponding reduction in salaries and benefits will result in a savings to the Company of approximately $6.5 million during 2024.

### C.     Engagement of Harney Partners and OpCo

53.     In light of the Company's ongoing liquidity concerns, the Company engaged Harney Partners in December 2023 to provide financial advisory services.  Harney Partners assisted the Company in assessing restructuring objectives, including debt reduction, operational efficiency improvements, financial stability, and downsizing the business by closing unprofitable stores.  Pursuant to these discussions, the Company has undertaken the steps to right-size the business, including the closure of non-performing stores and reduction of its workforce discussed above.

54.     In January 2024, the Company sought to retain an investment banker to advise on strategic alternatives, including but not limited to a sale of substantially all of the Company's assets.  The criteria for identifying an investment bank included: expertise in the consumer finance industry, knowledge and proven track record in dealing with subprime, small dollar consumer finance businesses, experience with financial restructuring, and market reach.  Fourteen (14) investment banks meeting the criteria were initially identified.  Seven (7) of the identified firms executed NDAs, and the firms were provided with financial information, including audited and internally prepared financial statements, loan tape, and cash flow forecasts.  The Company

ultimately selected OpCo, which in the Company's business judgment most closely meets the identified criteria. OpCo has immediately commenced marketing the Company.

## IV. **Evidentiary Support for First Day Motions**

55.     Along with this Declaration, the Debtors have also filed the First Day Motions listed below seeking orders granting various forms of relief intended to avoid irreparable harm, stabilize the business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a smooth restructuring. The First Day Motions include the following:

a.  *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "<u>Joint Administration Motion</u>");

b.  *Notice of Designation as Complex Chapter 11 Bankruptcy Case*;

c.  *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, and Statements of Financial Affairs, and (II) Granting Related Relief* (the "<u>SOFA Motion</u>");

d.  *Debtors' Emergency Application for Entry of an Order Authorizing the Retention and Employment of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent* (the "<u>Claims Agent Retention</u>");

e.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Serve a Consolidated List of Creditors and a Consolidated List of the 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information, (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases, and (IV) Granting Related Relief* (the "<u>Creditor Matrix Motion</u>");

f.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Continue to Operate Their Cash Management System and Perform Customer Transactions and Intercompany Transactions, and (II) Granting Related Relief* (the "<u>Cash Management Motion</u>");

g.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* (the "<u>Wages Motion</u>");

h.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Insurance Policies and Honor All*

*Obligations in Respect Thereof, (B) Renew, Supplement, and Enter into New Insurance Policies, and Pay Premiums Thereunder, and (C) Maintain Their Surety Bond Program, and (II) Granting Related Relief* (the "<u>Insurance Motion</u>");

i.   *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* (the "<u>Utilities Motion</u>");

j.   *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Rejection of Certain Leases, (II) Authorizing the Abandonment of Certain Property, and (III) Granting Related Relief* (the "<u>Lease Rejection Motion</u>");

k.   *Debtors' Emergency Motion for Entry of an Order (A) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (B) Granting Related Relief* (the "<u>Customer Programs Motion</u>"); and

l.   *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief* (the "<u>Tax Motion</u>").

56.     A description of the relief requested in, and the facts supporting each of, the First Day Motions is set forth in **<u>Exhibit A</u>** attached hereto and incorporated herein by reference.  I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Company to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element in the Company achieving a successful sale process to maximize value for the estates' stakeholders, (c) best serves the Debtors' estates and creditors' interests, and (d) must be approved on an emergency basis to avoid immediate and irreparable harm to the Debtors.

57.     I have reviewed each of the First Day Motions and the facts set forth therein are true and correct to the best of my knowledge and are incorporated herein in their entirety by

reference.  If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions and **Exhibit A**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 26th day of February, 2024.

/s/ Karen Nicolaou
Karen Nicolaou
Chief Restructuring Officer

4857-8962-9351.3

## Exhibit A

**Evidentiary Support for First Day Motions[1]**

---

[1] Capitalized terms used but not described herein have the meanings given to them in the applicable First Day Motion.

4857-8962-9351.3

I.      ***Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "<u>Joint Administration Motion</u>")**

1.      The joint administration of these five (5) chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in these chapter 11 cases will affect all Debtor entities. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration also will allow the Office of the U.S. Trustee for the Northern District of Texas and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

2.      Moreover, joint administration will not adversely affect the Debtors' respective constituencies because this motion seeks only administrative, not substantive, consolidation of the Debtors' estates. Parties in interest will not be harmed by the relief requested, but instead will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.

II.     ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Serve a Consolidated List of Creditors and a Consolidated List of the 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information, (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases, and (IV) Granting Related Relief* (the "<u>Creditor Matrix Motion</u>")**

3.      Through the Creditor Matrix Motion, the Debtors request authority to file one consolidated list of creditors for all of the Debtors. The Debtors are unlikely to have many distinct creditors and thus, I believe that the preparation of separate lists of creditors for each Debtor would cause unnecessary expense. The Debtors additionally request authority to file their Top 30 List, which is a single, consolidated list of their 30 largest general unsecured creditors. Because a large number of creditors may be shared amongst the Debtors, I believe that the Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

4857-8962-9351.3

4.      The Debtors also request the redaction of confidential commercial information, namely, their Customer List.  The Customer List contains confidential, commercial information such as the names of individuals and entities, email addresses, physical addresses, and telephone numbers.  I believe that redaction of the names and contact information of parties on the Customer List in any documents filed or to be filed with the Court in these chapter 11 cases, including the Creditor Matrix, Schedules, and Statements is necessary to protect value for the benefit of the Debtors, their estates, and all parties in interest.

5.      The Debtors operate in a highly specialized industry and there is a narrow market for the types lending and services offered by the Debtors.  The industry is highly competitive, and many of the Debtors' customers are actively sought after by businesses similar to the Debtors in the areas where the Debtors operate.  These customers will become even easier targets for the Debtors' competitors after the Petition Date, risking that competitors would steal the Debtors' customers.  Any loss in the Debtors' customer base will have a detrimental effect on the Debtors' business postpetition.

6.      Further, I believe that the Customer List will be a key asset in the sale of the Debtors' business as a going concern, will only be provided to the winning bidder upon sale closing, and I expect that any purchaser will expect (if not insist) that the confidentiality of the Customer List be maintained.  The Customer List is a key component of the Debtors' (and thus the ultimate purchaser's) go-forward business and as such, it is critical that the customers continue to do business with the Debtors instead of taking their business elsewhere.  If the Customer List is disclosed, such information could be used, among other things, to contact and solicit business from such customers, putting the Debtors at a severe competitive disadvantage. Disclosure of the Customer List would provide an unfair advantage to the Debtors' competitors, causing irreparable

23

harm to the value of the Debtors' businesses and undermining any potential sale process. The Customer List is critical asset of the Debtors' estate.   As such, I believe that continued confidentiality of the Debtors' Customer List is absolutely necessary to maintain the Debtors' competitive advantage in the industry, while also maintaining the Debtors' going concern value.

7.      Additionally, the Debtors request the redaction of personally identifiable information of all individual parties in interest in these cases.  I believe that redaction of individuals' home addresses in the Creditor Matrix and other public filings is necessary to protect them from an undue risk of identity theft or injury.  With potentially hundreds of creditors and other parties in interest, the Debtors cannot reasonably know with sufficient certainty whether a release of each creditor's personal information could potentially jeopardize their safety.  In these circumstances, I believe that it is appropriate to redact from any documents filed or to be filed with the Court in these chapter 11 cases, including the Creditor Matrix, the home addresses of individuals, including those of the Debtors' creditors, employees, and former employees.  Such information could be used, among other things, to perpetrate identity theft or locate survivors of domestic violence or stalking who have otherwise taken steps to conceal their whereabouts.  Thus, to protect the privacy of individuals, I believe that it is necessary to redact from (or, for affidavits of service, file under seal) any paper filed or to be filed with the Court in these chapter 11 cases, including the Creditor Matrix and Schedules and Statements, the home addresses of individuals.

8.      I believe that the requested relief will protect the privacy of individual parties in interest.  Absent such relief, the Debtors would unnecessarily render individuals more susceptible to identity theft, and the Debtors could jeopardize the safety of individuals who, unbeknownst to the Debtors, are survivors of domestic violence, harassment, or stalking by publishing their home addresses without any advance notice or opportunity to opt out or take protective measures.

4857-8962-9351.3

III.   ***Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, and Statements of Financial Affairs, and (II) Granting Related Relief* (the "<u>SOFA Motion</u>").**

9.      Through the SOFA Motion, the Debtors seek an extension of the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs under the Bankruptcy Code (collectively, the "<u>Schedules and Statements</u>").  Completing the Schedules and Statements requires the Debtors and their advisors to spend considerable time and effort to collect, review, and assemble copious amounts of information in addition to attending to the daily demands of the chapter 11 process.  In the days leading up to the Petition Date, the Debtors were not in a position to complete the Schedules and a substantial amount of work will still need to be done to complete the Schedules and Statements, which will be in direct competition with the demands upon the Debtors' personnel to address critical operational matters during the initial postpetition period.  Therefore, I believe that the Debtors' requested extension is in the best interests of the Debtors' estates and parties in interest, ensuring the Debtors' personnel has sufficient time to complete the Schedules and Statements.

IV.   ***Debtors' Emergency Application for Entry of an Order Authorizing the Retention and Employment of Epiq Corporate Restructuring, LLC as Claims and Noticing, and Solicitation Agent* (the "<u>Claims Agent Retention Application</u>")**

10.     The Debtors request authority to employ Epiq Corporate Restructuring, LLC as noticing, claims, and solicitation agent in their chapter 11 cases to provide the services outlined in the Services Agreement.

11.     I believe that Epiq's employment is in the best interest of the estates because its rates are competitive and reasonable, as set forth in the Claims Agent Retention Application, and Epiq has the requisite expertise in complex chapter 11 cases such as these.

25

12.     Moreover, although the Debtors have not yet filed their schedules of assets and
liabilities, I anticipate that numerous persons and entities may file proofs of claim in these chapter
11 cases.  In light of the significant number of anticipated claimants and other parties in interest in
these chapter 11 cases, as well as the complexity of the Debtors' businesses, I believe that the
appointment of Epiq as the Claims and Noticing Agent will relieve the administrative burden on
the Debtors and/or the Office of the Clerk of the Bankruptcy Court of noticing and administering
certain claim-related tasks, and, therefore, is in the best interests of both the Debtors' estates and
their stakeholders.

**V.**     ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to
Continue to Operate Their Cash Management System and Perform Customer
Transactions and Intercompany Transactions, and (II) Granting Related Relief
(the "Cash Management Motion")***

13.     Through the Cash Management Motion, the Debtors seek authorization to continue
to use their integrated, centralized Cash Management System to manage cash in a cost-effective,
efficient manner and to continue to perform customer transactions and intercompany transactions
consistent with historical practice.

14.     The Debtors use the Cash Management System in the ordinary course of business
to collect, transfer, and distribute funds generated from their operations and to facilitate cash
monitoring, forecasting, and reporting.  The Cash Management System allows the Debtors to
control funds, ensure cash availability for each operating entity, facilitate customer transactions,
and reduce administrative costs by allowing for the movement of funds among multiple entities.
The Debtors maintain daily oversight over the Cash Management System and implement cash
management controls for entering, processing, and releasing funds, including in connection with
Intercompany Transactions and Customer Transactions (both described below).  The Debtors'
accounting department regularly reconciles the Debtors' books and records to ensure that all

transfers are accounted for properly.  Given the economic and operational scale of the Debtors' businesses, I believe that any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' businesses and operations to the detriment of their estates and numerous stakeholders.

15.     The Cash Management System includes a total of 46 Bank Accounts at 28 different Cash Management Banks.  The Cash Management System is organized to monitor cash flows across the Debtors' enterprise and to centralize procurement for general administrative and operating expenses.  As depicted in the Cash Management Schematic below, the Debtors utilize various types of Bank Accounts throughout their Cash Management System.  Of those Bank Accounts, the main operating accounts are at Bank of Texas and Plains Capital Bank, both of which are listed on the U.S. Trustee's Authorized Depository Listing as authorized depositories.



4857-8962-9351.3

16.     Each Operating Company has an ACH/Operating Account, a Debit Card Account, and an RCC Account.    The Operating Companies also utilize Cottonwood Financial Administrative Services, LLC's Repay Account at SouthState Bank to fund loans directly onto a customer's debit card.

17.     In addition, the Operating Companies maintain Store Bank Accounts for each of the Debtors' stores, typically at financial institutions with branches located in the same area as those stores.    The Debtors' field employees use the Store Bank Accounts for small cash loans, petty cash, and to replenish store cash registers.    The Debtors maintain a target bank balance of approximately $5,000 for each store, which is managed via deposits to, and withdrawals from, the Store Bank Account and the applicable Operating Company's ACH/Operating Account.    Because some Store Bank Accounts are utilized by more than one store, those accounts may contain more than $5,000 at any given time.

18.     The Debtors estimate that their total cash receipt collections averaged approximately $43.8 million per month in the twelve months prior to the Petition Date.    This amount, however, varies month-to-month.    As of the Petition Date, the Debtors have an aggregate of approximately $416,608.46 in cash in the Operating Accounts.    The Bank Accounts are described in more detail below:[9]

| Bank of Texas | |
| --- | --- |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Ltd** Bank Account – 8712 | This account is an Operating Account that receives funds from each of the other Operating Accounts (the "Main Operating Account").    Funds from this account are used to fund Bank Account no. 3938 at Third Coast Bank to make loan payments on the Prepetition Obligations.    This account is also used to make distributions to equity.    This account has also historically funded other Debtor accounts when necessary. |

---

[9] These descriptions of Bank Account types are for illustrative purposes only.

4857-8962-9351.3

| | |
|---|---|
| **Cottonwood Financial Administrative Services, LLC**<br>Bank Account – 8690<br>Bank Account – 8701<br>Bank Account – 3802<br>Bank Account – 3813 | Bank Account no. 8690 is Cottonwood Financial Administrative Services, LLC's Operating Account that is used to pay invoices to suppliers and vendors for goods and services provided to the Operating Companies; specifically, to Bank Account nos. 1477, 8723, and 9255.<br><br>Bank Account no. 8701 is a zero-balance account that funds the Debtors' payroll through its third-party payroll provider Ceridian.<br><br>Bank Account nos. 3802 and 3813 are zero-balance legacy accounts that are no longer used as part of the Cash Management System. |
| **Cottonwood Financial Idaho, LLC**<br>Bank Account – 9255<br>Bank Account – 3057<br>Bank Account - 3953 | Bank Account no. 9255 is an ACH/Operating Account. Funds are transferred from Operating Account no. 8690 to this account to cover operating expenses.<br><br>Bank Account no. 3057 is a Debit Card Account.<br><br>Bank Account no. 3953 is an RCC Account. |
| **Cottonwood Financial Texas, LLC**<br>Bank Account – 1123<br>Bank Account – 1477<br>Bank Account – 9702<br>Bank Account – 3909 | Bank Account no. 1123 is a letter of credit account benefiting TreeMac (the "<u>Bank of Texas LOC Account</u>").<br><br>Bank Account no. 1477 is the account from which TreeMac settlement transfers are paid pursuant to the BSA, as explained in further detail below and in the First Day Declaration (the "<u>Settlement Account</u>").<br><br>Bank Account no. 1477 is an ACH/Operating Account. Funds are transferred from Operating Account no. 8690 to this account to cover operating expenses.<br><br>Bank Account no. 9702 is a Debit Card Account.<br><br>Bank Account no. 3909 is an RCC Account. |
| **Cottonwood Financial Wisconsin, LLC**<br>Bank Account – 8723<br>Bank Account – 8734<br>Bank Account - 3931 | Bank Account no. 8723 is an ACH/Operating Account. Funds are transferred from Operating Account no. 8690 to this account to cover operating expenses.<br><br>Bank Account no. 8734 is a Debit Card Account.<br><br>Bank Account no. 3931 is an RCC Account. |
| **Plains Capital Bank** | |
| **<u>Bank Account</u>** | **<u>Bank Account Description</u>** |
| **Cottonwood Financial Ltd**<br>Bank Account – 6124 | Legacy account with no activity. |
| **Cottonwood Financial Administrative Services, LLC**<br>Bank Account - 5635 | Operating Account used to issue referral and coupon checks pursuant to the Debtors' incentive programs and to receive any third-party collections. |
| **Cottonwood Financial Texas, LLC**<br>Bank Account - 6129 | Texas Store Bank Account |

| Third Coast Bank | |
| --- | --- |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Ltd**<br>Bank Account – 3938<br>Bank Account – 5303 | Bank Account no. 3938 is an Operating Account funded from the Main Operating Account for loan payments on the Prepetition Obligations.<br><br>Bank Account no. 5303 is the account associated with the Main Street Loan. |
| Southstate Bank | |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Administrative Services, LLC**<br>Bank Account - 5737 | The Repay Account |
| Washington Federal Bank | |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Idaho, LLC**<br>Bank Account - 9308 | Idaho Store Bank Account |
| Umpqua Bank | |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Idaho, LLC**<br>Bank Account - 0520 | Idaho Store Bank Account |
| First Convenience | |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Texas, LLC**<br>Bank Account – 9491<br>Bank Account – 8895 | Texas Store Bank Accounts |
| Prosperity Bank | |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Texas, LLC**<br>Bank Account - 9308 | Texas Store Bank Account |
| Southside Bank | |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Texas, LLC**<br>Bank Account -7278 | Texas Store Bank Account |

| Guaranty Bank & Trust | |
|---|---|
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Texas, LLC**<br>Bank Account - 8108 | Texas Store Bank Account |
| Simmons Bank | |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Texas, LLC**<br>Bank Account - 7879 | Texas Store Bank Account |
| American National Bank | |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Texas, LLC**<br>Bank Account -9821 | Texas Store Bank Account |
| Broadstreet Bank | |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Texas, LLC**<br>Bank Account -5867 | Texas Store Bank Account |
| Amarillo National Bank | |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Texas, LLC**<br>Bank Account - 2771 | Texas Store Bank Account |
| Citizens Bank | |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Texas, LLC**<br>Bank Account - 1283 | Texas Store Bank Account |
| VeraBank | |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Texas, LLC**<br>Bank Account - 6484 | Texas Store Bank Account |
| Extraco Bank | |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Texas, LLC**<br>Bank Account - 7206 | Texas Store Bank Account |

4857-8962-9351.3

| First Financial Bank | |
|---|---|
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Texas, LLC**<br>Bank Account - 4001 | Texas Store Bank Account |

| Herring Bank | |
|---|---|
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Texas, LLC**<br>Bank Account - 0848 | Texas Store Bank Account |

| HomeBank | |
|---|---|
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Texas, LLC**<br>Bank Account - 3477 | Texas Store Bank Account |

| Security State Bank & Trust | |
|---|---|
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Texas, LLC**<br>Bank Account -3796 | Texas Store Bank Account |

| State Bank of DeKalb | |
|---|---|
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Texas, LLC**<br>Bank Account - 1058 | Texas Store Bank Account |

| BankFirst | |
|---|---|
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Wisconsin, LLC**<br>Bank Account – 9091 | Wisconsin Store Bank Account |

| Community First Bank | |
|---|---|
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Wisconsin, LLC**<br>Bank Account – 6860 | Wisconsin Store Bank Account |

| Marine Credit Union | |
|---|---|
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Wisconsin, LLC**<br>Bank Account – 6192 | Wisconsin Store Bank Account |

4857-8962-9351.3

| First National Bank | |
|---|---|
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Wisconsin, LLC** Bank Account – 6197 | Wisconsin Store Bank Account |
| **Citizens Community Federal Bank** | |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Wisconsin, LLC** Bank Account –0887 | Wisconsin Store Bank Account |
| **BMO Harris Bank** | |
| **Bank Account** | **Bank Account Description** |
| **Cottonwood Financial Wisconsin, LLC** Bank Account – 9709 Bank Account – 7950 | Wisconsin Store Bank Accounts |

19.    The Debtors are assessed Bank Fees in connection with the Bank Accounts to the Cash Management Banks on a monthly basis.  The Bank Fees total approximately $6,000 per month.  The Debtors do not believe that they owe any Bank Fees as of the Petition Date, but in the event such Bank Fees are owing, the Debtors seek authority, but not direction, to pay the prepetition Bank Fees and continue paying the Bank Fees in the ordinary course on a postpetition basis, consistent with historic practice.

20.    Part and parcel of the Debtors' Cash Management System is utilization of a company credit card.  This Company Card is with Citi Bank, and although it is in the personal name of the Debtors' CEO, the Company Card is solely used for vendor-related payment obligations of the Debtors.  The Debtors have long utilized the Company Card to pay certain vendors that only accept payment via credit card.  The Debtors' accounting and financing teams review the Company Card statement monthly prior to remitting payment to confirm that all expenses are corporate, not personal obligations.  The average monthly statement balance on the

4857-8962-9351.3

Company Card is approximately $7,000.  The Debtors estimate that no amount is owed on the Company Card as of the Petition Date.

21.      ***Customer Transactions.***  Cottonwood Idaho and Cottonwood Wisconsin can make and service loans directly to consumers under applicable state law.  However, Cottonwood Texas operates as a CSO registered under Subchapter B, Chapter 393 of the Texas Finance Code and a licensed Credit Access Business CAB under Subchapter G, Chapter 393 of the Texas Finance Code.  As shown in the Cash Management Schematic, the Debtors' Cash Management System plays an essential role in the provision of the Debtors' Customer Transactions, including the provision of loan products and services to their customers.

22.      When a customer enters one of the Debtors' brick and mortar locations, he or she either borrows money directly from the Debtors (in Idaho or Wisconsin) or utilizes the Debtors' services as a CSO (in Texas).  The Debtors provide funds to the consumer customers via cash, check, or directly onto the customer's debit card, as depicted in the Cash Management Schematic.  For loans provided directly onto the customer's debit card, the Debtors use the Repay Account at SouthState Bank.  When customers make payments on their loans, they can do so through cash, debit card, RCC, or ACH, for which the Debtors utilize their corresponding accounts depending on the type of payment made.  The Company also utilizes third party payment processors to process payments from customers via debit card, RCC, or ACH.

23.      TreeMac is the exclusive lender for loans brokered by Cottonwood Texas pursuant to that certain Amended and Restated Brokering and Serving Agreement BSA.[10]  Given the near constant flow of funds between TreeMac and Cottonwood Texas pursuant to the BSA, the parties established a settlement process.  On a daily basis, Cottonwood Texas receives ACH transfers from

---

[10] Contemporaneously herewith, the Debtors are filing a motion to assume the BSA.

4857-8962-9351.3

TreeMac to settle fundings for loans arranged by Cottonwood Texas in the prior two to three business days. These daily transfers total between $500,000 and $3 million. On a daily basis, Cottonwood Texas sends a wire to TreeMac to settle loan principal and interest payments received by Cottonwood Texas at its Cash Store® locations in the prior two to three business days. This daily wire is typically between $600,000 and $3 million. The Bank of Texas LOC Account holds the $10 million collateral for the line of credit pursuant to the BSA.

24.    ***Intercompany Transactions.*** In the ordinary course of business, the Debtors maintain Intercompany Transactions that have historically resulted in Intercompany Claims.[11] The Debtors settle Intercompany Transactions as receivables and payables, from time to time, to reimburse certain Debtors for various expenditures associated with their businesses operations and/or fund the Bank Accounts in anticipation of such expenditures, as needed, by and through the Operating Accounts.

25.    The Intercompany Transactions are made through account transfers either to (a) reimburse certain Debtors for various expenditures associated with their business, (b) fund certain Debtors' accounts in anticipation of such expenditures, as needed, or (c) transfer funds up to an Operating Account when such excess revenue is available. I believe that the Intercompany Transactions are an essential component of the Debtors' operations and centralized Cash Management System and that any interruption of the Intercompany Transactions would severely disrupt the Debtors' operations and would harm the Debtors' estates and their stakeholders.

26.    If the Debtors are required to open a new set of books and records, such requirement would create unnecessary administrative burdens and hardship and would cause unnecessary

---

[11] For the avoidance of doubt, the Intercompany Transactions are solely between the Debtors; the Debtors do not seek to pay any affiliated or unaffiliated third parties pursuant to the Intercompany Transactions.

expense, use of resources, and delay.  The Debtors, in the ordinary course of their businesses, use Business Forms—that is, checks, invoices, stationary, and other business forms.  By virtue of the nature and scope of the businesses in which the Debtors are engaged and the numerous other parties with whom they deal, the Debtors need to use their existing Business Forms without alteration or change.  Printing new business forms would take an undue amount of time and expense.  Fulfillment of the requirement would likely delay the payment of postpetition claims and negatively affect operations and the value of the Debtors' estates.

27.    I am concerned about unnecessary delay and disruption to the Debtors' businesses and personnel, including the risk that funds needed for the Debtors' operations would be delayed were they required to change the Cash Management System.  The Debtors issue ACH, wire, and checks to vendors, service providers, employees and others in the ordinary course of their business and obtaining new accounts and checks will delay and disrupt the Debtors' ability to operate.  The Debtors' Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtors including, among other things, the ability to control funds and reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.

28.    The Debtors' businesses and financial affairs are complex and require the collection, disbursement, and movement of funds through the Debtors' multiple Bank Accounts.  Thus, I believe that the immediate enforcement of opening the new accounts and revising cash management procedures to conform to the U.S. Trustee Guidelines would severely disrupt the Debtors' operations and could potentially erode the value of the Debtors' business.  Because the Debtors' have employed sophisticated financial and legal professionals in these cases, I believe

4857-8962-9351.3

that closing accounts is an unnecessary step to effectively demarcate pre- and postpetition transactions.

29.     Furthermore, the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of prepetition obligations.  Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' accounting departments.  The Debtors will continue to work closely with the Cash Management Banks to ensure that appropriate procedures are in place to prevent checks issued prepetition from being honored without the Court's approval.

30.     The financial institutions where the Debtors' Operating Accounts are located—Bank of Texas and PlainsCapital Bank—are U.S. Trustee-approved Authorized Depositories.[12] However, the Debtors' remaining banks are not Authorized Depositories.  Most of these Unauthorized Banks are local banks used by stores in the field for petty cash needs and do not hold large deposits of cash.  Each of the Cash Management Banks is insured by the FDIC or the NCUA.

31.     Requiring the Debtors to change their deposits and other procedures would place a needless administrative burden on the Debtors, impose significant costs to the Debtors' estates, and could result in disruption to the Cash Management System.  Conversely, I believe that the Debtors' estates and creditors will not be harmed by the maintenance of the status quo because of the safe and prudent practices utilized by the Debtors.  Any postpetition funds received from DIP loans, for instance, will be collected in the Cottonwood Financial Ltd. account no. 8712 with Bank of Texas and only transferred to other Bank Accounts on an as-needed basis.  The Debtors have

---

[12] The Debtors also have Store Bank Accounts at the following Authorized Depositories: Citizens Bank, Prosperity Bank, BMO Harris Bank N.A., Southside Bank, and Amarillo National Bank.

4857-8962-9351.3

already been in communication with the U.S. Trustee and will continue to engage in good faith discussions with the U.S. Trustee to make other arrangements that are acceptable to the U.S. Trustee and the Court.

32.    Finally, maintaining the current Cash Management System will allow the Debtors' treasury and accounting employees to focus on their daily responsibilities. The Debtors' continued use of the Cash Management System will facilitate their transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in the payment of postpetition amounts due. Accordingly, I believe that a sound business purpose exists to allow the Debtors to continue their Cash Management System, including continuing the Customer Transactions and Intercompany Transactions in accordance with prepetition practices.

**VI.** ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* (the "<u>Wages Motion</u>")**

33.    Through the Wages Motion, the Debtors seek authorization to pay prepetition wages, salaries, other compensation, and reimbursable expenses on account of the Workforce Programs, to continue to administer the Workforce Programs in the ordinary course of business, including the payment of prepetition obligations related to the same.

<u>**The Debtors' Workforce**</u>

34.    I believe that the Debtors' ability to preserve their businesses and successfully reorganize is dependent on the expertise and continued service of their active workforce. As of the Petition Date, the Debtors employ approximately 510 Employees, of which 503 are employed on a full-time basis and seven (7) are employed on a part-time basis. The Debtors' Employees include approximately 408 Hourly Employees, and approximately 102 Salaried Employees. These

Employees are neither represented by a union nor are they subject to a collective bargaining or similar agreement.

35.    The Employees performs a wide variety of functions critical to the Debtors' business.  I believe that the Debtors' Employees consists of skilled personnel intimately familiar with the Debtors' business, processes, and systems—many of whom have developed relationships with customers and vendors that are essential to the Debtors' business.  Without the continued, uninterrupted services of the Debtors' Employees, I believe that the Debtors' business operations will be halted and the administration of the estates materially impaired.

36.    The Debtors' Employees rely on compensation and benefits to pay their daily living expenses and other necessities.  I believe that these individuals could experience significant hardship if the Court does not permit the Debtors to continue paying their compensation and providing them with health and other benefits.

**Workforce Programs**

37.    In the ordinary course of business, the Debtors maintain Workforce Programs to (a) pay standard wage compensation and paid time off, (b) maintain reimbursement programs, and (c) maintain certain benefits for their workforce.  As of the Petition Date, the Debtors estimate that the total amount outstanding in Workforce Obligations on account of the Workforce Programs is approximately $902,462.64, all, or nearly all, of which will become due and owing shortly after the Petition Date.  The Debtors do not believe any Employee is owed any prepetition amounts in excess of the $15,150 priority wage cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code and, thus, the Debtors do not seek authority to pay any amounts in excess of such cap at this time.  The Workforce Obligations consist of the following:

4857-8962-9351.3

| Workforce Obligations | Estimated Prepetition Amount Outstanding |
|---|---|
| **Compensation Obligations** | |
| Accrued and Unpaid Wages | $569,441.49 |
| Reimbursable Expenses | $28,085.68 |
| PTO and Sick Leave | $17,295.22 |
| Deductions | $148,054.56 |
| Non-Insider Incentive Programs | $46,670.20 |
| **Total** | **$809,547.15** |
| | Estimated Prepetition Amount Outstanding |
| **Benefit Obligations** | |
| Medical, Dental, and Vision Insurance | $0 |
| Retirement Savings | $2,070.12 |
| Life, AD&D, and Disability Insurance | $11,510.42 |
| Workers' Compensation | $75,804.44 |
| Other Miscellaneous Employee Programs | $3,530.51 |
| **Total** | **$92,915.49** |
| **Total Compensation Obligations & Benefit Obligations** | **$902,462.64** |

38.     *Wages.*  The Employees are paid bi-weekly in arrears. As a result, Employees often have wages and other compensation that has accrued, but is unpaid, at any given point in time. As of the Petition Date, the Debtors estimate that they owe approximately $569,441.49 on account of accrued but unpaid wages for the Employees for the approximately one-week prior to the Petition Date.  The Debtors' payroll processing functions for Employees and Independent Contractors are managed by Ceridian.  Specifically, the Debtors fund payroll obligations in the normal course by sending money to the payroll processor Ceridian typically 2 to 3 days in advance, and then Ceridian makes the payment.  For example, for the payroll due on February 23, 2024, the Debtors processed the payroll to Ceridian on or around February 19, 2024, to fund the payroll on February 21, 2024, and which was paid to Employees on February 23, 2024.  As of the Petition Date, the Debtors owe prepetition wages for the week on February 19, 2024. The payroll is funded through the Debtor entity Cottonwood Financial Administrative Services, LLC to Ceridian.  The Debtors estimate that there are no outstanding balances owed to Ceridian.

41

39.    ***Reimbursements.***  In the ordinary course of business, the Debtors reimburse their Employees for a variety of ordinary, necessary, and reasonable expenses that the Employees incur within the scope of their job duties.  Such expenses include travel-related expenses for mileage, airfare, and hotel, meals, and car rental.  The Employees are expected to use sound judgment when incurring business expenses for which they seek reimbursement.  Once expenses are approved by the submitting Employee's supervisor, the reimbursements are paid in the ordinary course of the Debtors' businesses.

40.    More specifically, the Employees pay such amounts with personal funds and submit requests for approval for reimbursement.  Mileage reimbursements for Employees who travel between the Debtors' stores or who otherwise travel in connection within the scope of their employment are submitted through the Employee's daily timesheet on the day that they incur such expenses and are processed through Ceridian and paid through payroll.  For mileage, the Debtors use the 2024 IRS rate of 67 cents.  Non-mileage reimbursements are processed through accounts payable once submitted by the Employee for approval.  Employees traveling out of the corporate office that incur business expenses submit reimbursement requests via expense reports, which are processed through accounts payable.  As of the Petition Date, the Debtors believe they owe approximately $28,085.68 in accrued but unpaid reimbursable expenses to the Employees.  The Debtors seek authority to pay these expense reimbursements and to continue the expense reimbursements in the ordinary course of business.

41.    ***Paid Time Off, Vacation, and Sick Days.***  All the Debtors' full-time Employees are entitled to paid time off, vacation, and sick days ("PTO") on an annual basis.  The PTO policy for Employees depends on their years of service and ranges from 5–15 days with an accrual cap at 1.5% annual PTO allotment, and Employees are entitled to 5 sick days per year.  The Debtors

estimate that, as of the Petition Date, the total accrued and used PTO that is owed to the Employees for the week of February 19 to February 24, 2024 is approximately $17,295.22. Through this Motion, the Debtors seek the authority, but not direction, to pay this amount. Additionally, as of the Petition Date, the unused PTO is $846,549.64. Additionally, the Debtors provide certain eligible Employees with leave including for medical reasons, emergencies, bereavement, jury duty, military service, and maternity, among others.

42. ***Deductions.*** In the ordinary course of business, Ceridian processes deductions from Employees' payroll with respect to federal, state, and local income taxes, FICA, and other pretax deductions payable pursuant to certain of the health benefits, welfare, and retirement savings programs detailed herein and forwards those amounts to the various third-party entities on whose behalf the Deductions were made. As of the Petition Date, the Debtors estimate that the aggregate amount of Deductions that have been taken but not yet paid to the appropriate recipient is approximately $148,054.56.

43. ***Non-Insider Employee Incentive Programs.*** In the ordinary course of business, to encourage and reward outstanding performance, the Debtors maintain sales-incentive and collections-incentive programs for certain in-store Employees. When stores reach certain pre-determined sales or collection goals—based on average loan size, new customers, and collections—that store's Employees are eligible for certain monetary incentive rewards. Such monetary rewards are paid out monthly in arrears for the prior month's rewards earned. The rewards earned are paid to the Employees through payroll typically on the last payroll of the month. None of the Employees who are eligible to receive such rewards are insiders of the Debtors.

44. Some incentive payments were included in the Debtors' payroll and paid on February 23, 2024. However, as of the Petition Date, approximately $21,670.20 is owed for certain

employee incentives earned in January 2024.  Additionally, the Debtors owe approximately $25,000 for certain incentives accrued in February to be paid in March 2024.

45.     ***Benefits***.  The Debtors offer their workforce various standard employee benefits, including, without limitation, (a) medical, dental and vision insurance, (b) life insurance, (c) disability insurance, (d) life insurance, (e) retirement savings plans, and (f) employee assistance programs provided to the workforce in the ordinary course of business (collectively, the "Benefits").

46.     The Debtors pay for medical, vision, and dental insurance through third-party providers for the Employees (the "Medical Insurance").  The Debtors' third-party providers for Medical Insurance are: Blue Cross Blue Shield, American Worker Medical, and EyeMed Vision. The Debtors pay certain of the Medical Insurance either in advance monthly premiums or at the end of the month in arrears.  Claims made pursuant to the Medical Insurance are paid weekly in arrears.  As of the Petition Date, the Debtors do not believe any amounts are owed on account of the Medical Insurance.

47.     The Debtors provide retirement savings plan in the form of 401(k) plans to their Employees. The 401(k) plan generally provides for pretax salary deductions of compensation up to limits set by the Internal Revenue Code and Employee 401(k) contributions are deducted automatically from their respective wages.  The Debtors match 25% of Employee contributions on the first 4% of Employee contributions.  In 2023, the Debtors spent approximately $85,919 in matching contributions under the 401(k) plans.  As of the Petition Date, and the Debtors believe that approximately $2,070.12 is due for such programs.

48.     The Debtors provide life insurance, accidental death and dismemberment ("AD&D"), disability insurance to the Employees.  The AD&D benefits are provided through Blue

Cross Blue Shield. AD&D insurance is paid monthly. The Debtors provide basic life and AD&D insurance to the Salaried Employees. Certain eligible Employees may purchase voluntary life insurance, AD&D insurance, and long-term disability insurance. The aggregate monthly cost for such benefits is approximately $12,000 per month. As of the Petition Date, the Debtors believe that $11,510.42 is owed for the month of February.

49.     The Debtors also provide critical illness/accident benefits to certain eligible Employees. Critical illness and accident benefits are provided through Unum. Such benefits are paid monthly. The aggregate annual cost for such insurance is approximately $3,700 per month. As of the Petition Date, the Debtors estimate that $3,530.51 is owed for such benefits.

50.     ***Workers' Compensation.*** In each state in which the Debtors operate, they maintain workers' compensation insurance for Employees at the statutorily required levels for claims arising from or related to their employment with the Debtors. The Debtors have two Workers' Compensation Programs. Although the amount paid annually on account of the Workers' Compensation Program varies from year to year, the approximate cost of the current Workers' Compensation Program is approximately $130,000 per year. Premiums on the Worker's Compensation policy are typically paid monthly. As of the Petition Date, the Debtors estimate that they owe approximately $75,804.44 in Workers' Compensation Obligations.

51.     The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, and anticipated access to cash collateral and an interim draw on a forthcoming debtor in possession facility. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the

Workforce Obligations.  Accordingly, I believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently.

52.     In sum, I believe that continuing Workforce Programs will help maintain Workforce morale and minimize the adverse effect of these chapter 11 cases on the Debtors' ongoing business operations.  Accordingly, I believe that it is essential to pay and honor the Debtors' prepetition obligations to their Workforce.  I believe that the relief requested in the Wages Motion is necessary for the Debtors to operate their businesses in the ordinary course, maximize the value of their estates for the benefit of all stakeholders, and avoid immediate and irreparable harm.

**VII.**   ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Insurance Policies and Honor All Obligations in Respect Thereof, (B) Renew, Supplement, and Enter into New Insurance Policies, and Pay Premiums Thereunder, and (C) Maintain Their Surety Bond Program, and (II) Granting Related Relief (the "Insurance Motion")***

53.     By the Motion, the Debtors seek authority to continue insurance coverage entered into prepetition and satisfy obligations related thereto, renew, supplement, or purchase insurance coverage as needed postpetition, and to continue their Surety Bond Program.

54.     The Debtors maintain approximately four Insurance Policies that are administered as part of the Insurance Program by the Debtors' third-party Insurance Carriers.  The Insurance Policies provide coverage for, among other things, the Debtors' property, general liability, automobile liability, and umbrella coverage.   The Insurance Policies are essential to the ongoing operation of the Debtors' businesses.  The aggregate annual amount in premiums for the Insurance Policies is approximately $180,000 plus applicable taxes and surcharges.  In addition to the Insurance Policies, the Debtors maintain several additional workers' compensation and other insurance policies and for which relief is sought in the Wages Motion.

55.     The Insurance Policies are generally one year in length and are typically paid on an annual or monthly basis or in installments pursuant to the terms set forth in each applicable

Insurance Policy. As of the Petition Date, the Debtors believe that they owe a total of $52,536.00 on account of the Insurance Program.

56.    Under certain Insurance Policies, the Debtors are required to pay various deductibles Insurance Deductibles. Generally, if a claim is made against the Insurance Policies that is subject to an Insurance Deductible, the applicable insurance carrier will administer the claim and make payments in connection therewith and then invoice the Debtors for any Insurance Deductibles. As of the Petition Date, the Debtors do not believe there are any amounts due or outstanding relating to Insurance Deductibles.

57.    The Debtors retain the services of Higginbotham Insurance Agency, Inc. as their insurance Broker to help manage their portfolios of risk. The Broker, among other things, (a) assists the Debtors in obtaining comprehensive insurance coverage for the Debtors' operations in a cost-effective manner, (b) manages renewal data, (c) markets the Insurance Policies, (d) provides all interactions with carriers including negotiating policy terms, provisions, and premiums, and (e) provides ongoing support throughout the applicable policy periods. The Broker collects commission payments for its services as part of the premiums paid on account of the Insurance Policies. The Debtors do not directly pay for the Broker's services. As of the Petition Date, the Debtors do not believe there are any amounts due or outstanding to the Broker.

58.    The Debtors' continuation of the Insurance Program on a postpetition basis is consistent with their prepetition practices. I believe that maintaining the Insurance Policies and payments for such policies is standard practice in most industries, including the one in which the Debtors operate. The continuation of the Insurance Program and entry into new insurance policies is essential to the preservation of the value of the Debtors' businesses and operations. Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that

govern the Debtors' commercial activities, including the requirement by the U.S. Trustee that a debtor maintain adequate coverage given the circumstances of its chapter 11 case. Thus, the Debtors must be able to continue their Insurance Program without disruption to ensure their operations remain in compliance with various legal and contractual obligations.

59.     I believe that any interruption in insurance coverage would also expose the Debtors to a number of risks, including: (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been covered by the Insurance Policies; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed, such as attorneys' fees for certain covered claims; (c) the possible inability to obtain similar types and levels of insurance coverage on terms equally favorable as the present coverage; and (d) the possible incurrence of higher costs for re-establishing lapsed Insurance Policies or obtaining new insurance coverage. In short, failure to maintain the Insurance Program could have a detrimental impact on the Debtors' businesses and the value of their estates. Maintaining the Insurance Policies enables the Debtors to avoid the incurrence of possibly significant liabilities and I therefore believe it represents a sound exercise of the Debtors' business judgment.

60.     Additionally, the Debtors believe that the continued retention of the Broker allows the Debtors and their employees to focus on core operational matters. The Debtors are not well-suited to bring the services provided by the Broker in-house. Thus, continuing to retain the Broker's services allows the Debtors to focus on their operations, to the benefit of all stakeholders.

61.     Additionally, to operate as CSO, it is my understanding that state law requires the Debtors to maintain various Surety Bonds to secure the Debtors' payment of damages if the Debtors violate state law in addition to maintaining appropriate debt collection bonds as required under state law. Therefore, the Debtors have maintained the Surety Bond Program. Jet Insurance

Company, AAA Surety, and NFP Property and Casualty make of the Debtors' Sureties and are the issuers of the Debtors' current outstanding Surety Bonds. As of the Petition Date, the Debtors maintain approximately 199 Surety Bonds in an aggregate bond amount of approximately $2,030,000. The Debtors make premium payments to maintain the Surety Bond Program in the ordinary course of business. The Debtors pay approximately $20,388 per year in surety premiums. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Surety Bonds. Out of an abundance of caution, however, the Debtors seek to honor any prepetition amounts owed to the Sureties to ensure the uninterrupted continuation of the Surety Bond Program.

62.    The Debtors must be able to continue to provide financial assurance through the Surety Bond Program, and thus, must be able to pay the associated premiums. Failing to provide, maintain, or timely replace the Surety Bonds could have a detrimental effect on the Debtors' going-concern business. Based on the Debtors' current circumstances, it is not likely that the Debtors will be able to renew, or obtain replacement of, existing bonds on terms more favorable than those offered by the Sureties. Moreover, the process of establishing a new Surety Bond Program would be burdensome to the Debtors, and it is doubtful that the Debtors could replace all of the Surety Bonds in time to avoid defaults of the applicable obligations or other negative consequences.

63.    The Debtors have sufficient funds to pay the amounts described in the Insurance Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to postpetition financing. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, I believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently.

64.     Maintaining the Insurance Programs and Surety Bond Program is necessary to preserve the value of the Debtors' assets, thereby ensuring the adequate protection of the Debtors' property for any party in interest, and to minimize exposure to risk.  Accordingly, I believe that it is necessary and in the best interests of the Debtors' estates (1) for the Debtors to pay their prepetition insurance premiums and fees to the Broker to ensure that the Debtors are able to renew, supplement, or purchase insurance coverage on a postpetition basis in the ordinary course of business, and (2) to continue the Surety Bond Program.

**VIII.   *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief (the "*Tax Motion*")***

65.     Through the Tax Motion, the Debtors seek entry of an order authorizing them to remit and pay certain Taxes and Fees without regard to whether such obligations accrued or arose before or after the Petition Date.  The Debtors collect, withhold, and incur certain Taxes and Fees, including Sales and Use Taxes, Franchise Taxes, and Property Taxes.  The Debtors collect (as applicable) and remit the Taxes and Fees to various state and federal taxing authorities.

66.     Taxes and Fees are remitted or paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.  The Debtors pay the Taxes and Fees to the Authorities on a periodic basis, remitting them monthly or annually depending on the nature, jurisdiction, and incurrence of a particular Tax or Fee.  The Debtors estimate that approximately $454,794.91 in Taxes and Fees will have accrued as of the Petition Date.

67.     ***Sales and Use Taxes***.  In the ordinary course of business, the Debtors incur, collect, and remit Sales and Use Taxes to the applicable Authorities in connection with the sale and purchase of goods and services.  The Debtors purchase a variety of goods and services necessary for the operation of their businesses from certain vendors who collect sales taxes in connection

with the Debtors' purchase of such goods or services.  The Debtors also incur use taxes for the purchase of such goods and services when vendors are not registered to collect or have not collected sales taxes.  In these cases, applicable law generally requires the Debtors to subsequently pay use taxes on such purchases to the applicable Authorities.  Additionally, the Debtors collect and remit Sales and Use Taxes in the ordinary course of their businesses.  When such amounts are collected by the Debtors from their customers, they are held in trust.  As of the Petition Date, the Debtors estimate that approximately $168,291 in trust fund Sales and Use Taxes have accrued.

68.     Additionally, for a period of approximately 18 months, the Debtors did not remit Sales and Use Taxes in Texas due to an error by the Debtors' third-party point of sale system vendor, who collects and remits Sales and Use Taxes on the Debtors' behalf in the ordinary course of the Debtors' business.

69.     ***Property Taxes***.  State and local laws in the jurisdictions where the Debtors operate generally grant Authorities the power to levy Property Taxes against the Debtors' personal property.  To avoid the imposition of statutory liens on their personal property, the Debtors typically pay Property Taxes on property that they own on an annual basis.  The Debtors estimate that they have accrued approximately $86,503.91 in Property Taxes as of the Petition Date.

70.     ***Franchise Taxes***.  The Debtors are required to pay various state Franchise Taxes to continue conducting their business in accordance with state laws.  The Debtors believe that as of the Petition Date, they will owe approximately $200,000 in Franchise Taxes, which will become due and payable in May 2024.

71.     I believe that any failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways: (a) the Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the restructuring process;

4857-8962-9351.3

(b) the Authorities may attempt to suspend the Debtors' operations, seek to lift the automatic stay, or pursue other remedies that will harm the estates; and (c) the Debtors' estates may incur additional penalties, interest, or fees to the detriment of their estates and creditors.

72.     The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash during the bankruptcy cases.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein.  Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently.

73.     I believe that the relief requested in the Tax Motion is necessary for the Debtors to operate their businesses in the ordinary course, maximize the value of their estates for the benefit of all stakeholders, and avoid immediate and irreparable harm.  I believe that payment of Taxes and Fees as described herein is an exercise of sound business judgment and is necessary to ensure a smooth transition into—and, perhaps more importantly, out of—chapter 11.

**IX.     *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* (the "<u>Utilities Motion</u>")**

74.     Through the Utilities Motion, the Debtors seek approval of their proposed adequate assurance of payment for future utility services, prohibiting utility companies from altering, refusing, or discontinuing services, and approving adequate assurance requests.  The Debtors obtain Utility Services, including electricity, natural gas, telecommunications, water, waste management (including sewer and trash), internet, cable, employee cell phone service, and other similar services from various Utility Companies to facilitate their business operations.

75.     The Utility Services are essential for the Debtors to maintain and operate their businesses, which require electricity, water, natural gas, telecommunications, and other Utility Services.  Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted.  The Debtors Pay for all Utility Services by check, ACH, and online payments.  To the best of the Debtors' knowledge, there are no defaults or arrearages with respect to the Debtors' undisputed invoices for prepetition Utility Services.

76.     The Debtors estimate that, after rejecting certain leases as contemplated in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Rejection of Certain Leases, (II) Authorizing the Abandonment of Certain Property, and (III) Granting Related Relief*, their cost for Utility Services during the next 30 days (not including any deposits to be paid) will be approximately $197,000.00 per month.  Additionally, although the Debtors provided certain of the Utility Companies cash deposits in the total amount of $11,119.68, the Debtors believe that such deposits have been applied and exhausted in full prior to the Petition Date.

77.     The Debtors intend to pay postpetition obligations owed to the Utility Companies in a timely manner.  Cash held by the Debtors, cash generated in the ordinary course of business, and cash made available to the Debtors under the proposed DIP facility, will provide sufficient liquidity to pay the Debtors' Utility Service obligations for postpetition services.  Nonetheless, as additional adequate assurance, the Debtors propose to segregate $98,459.55 within the Debtors' existing cash, which represents an amount equal to approximately one-half of the Debtors' average monthly cost of Utility Services.  Any Utility Company that is not satisfied with the Proposed Adequate Assurance may make a request for adequate assurance of future payment pursuant to the Adequate Assurance Procedures.  The Adequate Assurance Procedures provide a streamlined process for Utility Companies to address potential concerns with respect to the Proposed Adequate

Assurance, while allowing the Debtors to continue uninterrupted operations. Specifically, the Adequate Assurance Procedures permit a Utility Company to object to the Proposed Adequate Assurance by serving an Adequate Assurance Request upon certain notice parties. The Debtors, in their discretion, may then resolve any Adequate Assurance Request by mutual agreement with the Utility Company and without further order of the Court. If the Debtors determine that the Adequate Assurance Request cannot be resolved by mutual agreement, the Debtors will seek Court resolution of the Adequate Assurance Request.

78.     The Debtors have made a good-faith effort to identify all Utility Companies and include them on the Utility Services List. If the Debtors identify new or additional Utility Companies or discontinue services from existing Utility Companies, the Debtors will amend the Utility Services List to add or remove parties from the Utility Services List and the Debtors will give notice of any such amendment to the Notice Parties.

79.     I believe that the relief requested in the Utilities Motion is necessary for the Debtors to operate their businesses in the ordinary course, maximize the value of their estates for the benefit of all stakeholders, and avoid immediate and irreparable harm. I believe that the proposed Adequate Assurance Procedures are fair and equitable, within the Debtors' sound business judgement, and reasonable.

X.     ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Rejection of Certain Leases, (II) Authorizing the Abandonment of Certain Property, and (III) Granting Related Relief*** (the "<u>Lease Rejection Motion</u>")

80.     Through the Lease Rejection Motion, the Debtors seek to reject certain of their prepetition unexpired leases of nonresidential real property and authority to abandon any *de minimis* equipment, furniture, and other personal property.

81.     The Debtors have determined that the costs of the Leases exceed any marginal benefits that could potentially be achieved from assignments of such Leases. The majority of the

Leases are the Debtors' retail locations—locations that are either are not profitable, are no longer operating, or are in the process of winding down operations. Prior to the proposed rejection of the Leases, the Debtors paid approximately $1,050,000 per month to lease their store locations. If rejection of the Leases as of the Petition Date is approved, the Debtors' monthly store rental obligations will be reduced to approximately $850,000. Given that the retail locations governed by these Leases were either already shut down prepetition or are winding down business and will no longer be operating postpetition, I do not believe there is any benefit to the Debtors' estates, creditors, or parties in interest in maintaining such Leases.

82.    Before the Petition Date, the Debtors notified each affected landlord in writing of their unequivocal and irrevocable decision to surrender the premises and property and turn over keys, key codes, and security codes, if any, to each affected landlord, providing the landlords with opportunity to mitigate any rejection damages arising from the rejection of the applicable Lease. As of January 2024, the Debtors have vacated the premises of all the Leases subject to the Lease Rejection Motion.

83.    I do not believe there is any valuable property remaining on the premises for the Leases sought to be rejected by this motion. The property to be abandoned consist of safes secured to the ground and file cabinets. I believe that the property is of inconsequential value to the estate, or that the cost of removing and storing such property outweighed any potential benefit of retaining such property. I believe that that rejecting the Leases, effective as of the Petition Date, is in the best interests of the Debtors, their estates, and their creditors.

**XI.**    ***Debtors' Emergency Motion for Entry of an Order (A) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (B) Granting Related Relief (the "Customer Programs Motion")***

84.    Through the Customer Programs Motion, the Debtors seek to maintain and administer their Customer Programs and honor certain prepetition obligations to customers in the ordinary course of business consistent with past practices.

85.    The Debtors have developed a variety of incentives through coupons, discounts, and referral programs to attract customers and maintain positive customer relationships.  Prior to the Petition Date, in the ordinary course of the Debtors' business and as is customary in their industry, the Debtors offered and engaged in certain customer incentive programs and practices. The Customer Programs include:  (a) the New Customer Coupon Program, and (b) the Friendly Referral Program.  Payments to customers pursuant to the Customer Programs are made weekly to qualifying customers.

86.    Payments to customers pursuant to the Customer Programs are made weekly to qualifying customers.  In 2023, the Debtors spent an estimated $275,000 on the New Customer Coupon Program and $350,000 on the Friendly Referral Program.  The Debtors estimate that there are approximately $142,645.27 in checks issued by the Debtors to customers for the Customer Programs that are outstanding/not cleared as of the Petition Date.  The life cycle of such checks is 60 days, and many of these checks are never cashed by the customer.

87.    As of the Petition Date, the Debtors estimate that there are approximately $75,000 of prepetition obligations outstanding related to Customer Programs.  This is the Debtors best estimate based on current information regarding what will be owed on these Customer Programs. However, due to the seasonality and unpredictability of the Debtors' business, this amount is

difficult to estimate and could increase or decrease as coupons and/or referrals are received by the Debtors.

88.     To effectuate a smooth transition into chapter 11, the Debtors must maintain customer loyalty and goodwill by continuing to honor their obligations under the Customer Programs.  The Debtors have implemented each of the Customer Programs in the ordinary course of their businesses to maintain positive, productive, and profitable relationships with their customers that ultimately promote customer satisfaction, develop new customers, and ensure that the Debtors remain competitive.  Specifically, the Debtors use the Customer Programs as marketing tools to develop new customers and encourage existing customers to pay off their obligations and to continue to do business with the Debtors.

89.     I believe that failure to continue the Customer Programs, or failure by the Debtors to meet their obligations under such programs, would damage the Debtors' standing with their current and potential customers at this critical time in their operations.  The success and viability of the Debtors' businesses, and ultimately the Debtors' ability to maximize the value of their assets, is dependent upon the continued patronage and loyalty of their customers.  I believe that termination of the Customer Programs or the inability to honor them postpetition would decrease the number of new and existing customers utilizing the Debtors' business.  Any delay in honoring obligations to customers and third parties on account of the Customer Programs would impair customer relations, drive away valuable current and new customers, and disincentivize current customers from making timely payments on their obligations, thereby harming the Debtors' efforts to maximize the value of their assets to the benefit of all interested parties.  Therefore, I believe that honoring the Customer Programs in in the Debtors' sound business judgment and is in the best interest of the estates and all parties in interest.

4857-8962-9351.3