Craig A. Bernstein
Texas Bar No. 02219400
Todd Goldberg
Texas Bar No. 24072121
LAW OFFICES OF CRAIG A. BERNSTEIN
3710 Rawlins, Suite 1300
Dallas, Texas 75219
214-521-9256 – Telephone
214-521-8995 – Fax
cbernstein@bernsteinlawdallas.com
tgoldberg@bernsteinlawdallas.com

**ATTORNEYS FOR CREDITOR
GR ASSOCIATES LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| COTTONWOOD FINANCIAL LTD., *et al.* | § | Case No. 24-80035-swe11 |
| | § | |
| *Debtor*. | § | |
| ──────────────────────── | § | |
| | § | |
| GR ASSOCIATES LLC | § | |
| | § | |
| v. | § | |
| | § | |
| COTTONWOOD FINANCIAL TEXAS LLC | § | |
| f/k/a COTTONWOOD FINANCIAL LTD. | § | |

### APPENDIX IN SUPPORT OF MOTION TO LIFT AUTOMATIC STAY

Creditor GR Associates LLC, a creditor in the above-referenced case, files this Appendix

in Support of Motion to Lift Automatic Stay, which contains the following evidence:

| Description | Page(s) |
|---|---|
| Affidavit of Lisa Sanders | App. 001-002 |
| Exhibit A – Lease | App. 003-066 |
| Exhibit B – Amendment | App. 067-069 |
| Exhibit C – Letter to Debtor (11/15/2021) | App. 070-072 |
| Exhibit D – Lease Ledger | App. 073 |

Respectfully submitted,

*/s/ Craig A. Bernstein*
Craig A. Bernstein
Texas Bar No. 02219400
Todd Goldberg
Texas Bar No. 24072121
3500 Maple Ave., Suite 1220
Dallas, Texas 75219
(214) 521-9256 – Telephone
(214) 521-8995 – Facsimile
cbernstein@bernsteinlawdallas.com
tgoldberg@bernsteinlawdallas.com

**ATTORNEYS FOR CREDITOR
GR ASSOCIATES LLC**

<u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify that, on March 11, 2024, a true and correct copy of the foregoing document was served on all parties and/or counsel for the parties via the CM/ECF filing system.

*/s/ Todd Goldberg*
Todd Goldberg

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| COTTONWOOD FINANCIAL LTD., *et al.* | § | Case No. 24-80035 |
| | § | |
|    *Debtor*. | § | |
| _____ | § | |
| | § | |
| GR ASSOCIATES LLC | § | |
| | § | |
| v. | § | |
| | § | |
| COTTONWOOD FINANCIAL TEXAS LLC | § | |
| f/k/a COTTONWOOD FINANCIAL LTD. | § | |

## AFFIDAVIT OF LISA SANDERS

| | |
|---|---|
| STATE OF MISSOURI | § |
| | § |
| COUNTY OF ST. LOUIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Lisa Sanders, known to me to be the person whose name is subscribed to the following instrument, and who, having been by me duly sworn, upon her oath deposes and states as follows:

1.     My name is Lisa Sanders. I am over the age of 21 years old, am of sound mind, and am fully authorized and competent to make this Affidavit and testify as to all matters herein. The facts stated in this Affidavit are within my personal knowledge and are true and correct.

2.     I have personal knowledge of and am a qualified witness as to the authenticity of the records of GR Associates LLC ("Landlord"), which is the successor-in-interest to the former landlord, North Garland Crossing Ltd., because I am employed as the Property Administrator for C.A. Bianco, Inc. d/b/a Bianco Properties, which is the manager of Landlord. Landlord is a creditor of Debtor Cottonwood Financial Texas LLC f/k/a Cottonwood Financial Ltd. ("Debtor"), which is a debtor in the above-captioned bankruptcy proceeding.

3.     I am a custodian of the records of Landlord. Attached hereto are seventy-one (71) pages of records from Landlord. These records are kept by Landlord in the regular course of its business, and it was the regular course of Landlord's business for an employee or representative of Landlord, with knowledge of the act, event, condition, opinion, or diagnosis recorded, to make the records or to transmit information thereof to be included in such records; and the records were made at or near the time or reasonably soon thereafter. The records attached hereto are the originals or exact duplicates of the originals.

4.     On or about August 23, 2004, Landlord and Debtor, as tenant, executed the Standard Commercial Shopping Center Lease ("Lease") to lease the premises containing about 1,050 square feet of leasable floor area located at the North Garland Crossing Shopping Center, 5345 N. Garland Avenue, Suite 380, Garland, Texas 75040 (the "Premises"). A true and correct

copy of the Lease is attached hereto as Exhibit A (App. 003-066). Landlord is the owner of the Premises and the landlord under the Lease.

5.       On or about March 4, 2019, Landlord and Debtor executed the Third Amendment to Standard Commercial Lease (the "Amendment") extending the term of the Lease until November 30, 2024 and providing for fixed annual minimum guaranteed rental rates and additional rent for the term of the Amendment. A true and correct copy of the Amendment is attached hereto as Exhibit B (App. 067-069).

6.       On or about November 15, 2021, Landlord purchased the Premises from North Garland Crossing Ltd., the former landlord, and sent Debtor a letter providing notice of the change of ownership. A true and correct copy of the Letter from Landlord to Debtor dated November 15, 2021 re: Notice of Change of Ownership of North Garland Crossing is attached hereto as Exhibit C (App. 070-072).

7.       On or about March 1, 2024, Debtor most recently defaulted on its monthly rental payment obligations under the Lease, and as of the signing of this Affidavit, remains in default under the Lease. As of March 5, 2024, Debtor has a delinquent balance of at least $5,323.31 due to Landlord, which is reflected by the Lease Ledger maintained by Landlord. A true and correct copy of the Lease Ledger is attached hereto as Exhibit D (App. 073).


_Lisa Sanders_
LISA SANDERS,
on behalf of GR Associates LLC


SUBSCRIBED AND SWORN TO BEFORE ME, this _6_ day of March, 2024, to certify which witness my hand and official seal.


_Dawn M Burgess_
Notary Public in and for the State of Missouri

DAWN M. BURGESS
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Charles County
My Commission Expires: October 22, 2025
Commission Number: 13397784

LL

# STANDARD COMMERCIAL

# SHOPPING CENTER LEASE

# BETWEEN

## NORTH GARLAND CROSSING, LTD.

### AS LANDLORD

### AND

## COTTONWOOD FINANCIAL TEXAS, LP
### AS TENANT

### AT

## NORTH GARLAND CROSSING SHOPPING CENTER

VICTOR\DATA\TG REAL ESTATE\A M&R WORKING FILES\01\MTX ACTIVE\GARLAND, TX - N. GARLAND CROSSING\COTTONWOOD FINANCIAL-36.MTH GARLAND.DOC
8/12/04 08:50AM



EXHIBIT

A

tabbies®

## TABLE OF CONTENTS

Page No.

ARTICLE 1    Definitions and Certain Basic Provisions ........................................... 1
1.2    Initial Monthly Payment of Rent ....................................................... 2
1.3    General .................................................................................... 2

ARTICLE 2    Granting Clause ........................................................................ 2

ARTICLE 3    Commencement Dates; Financing ................................................... 3
3.1    Premises Ready for Occupancy ........................................................ 3
3.2    Commencement Date ..................................................................... 3
3.3    Landlord's Financing .................................................................... 3
3.4    Landlord's Refinancing .................................................................. 3

ARTICLE 4    Rent ...................................................................................... 4
4.1    General .................................................................................... 4
4.2    Minimum Guaranteed Rental ........................................................... 4
4.3    Percentage Rental ....................................................................... 4
4.4    Additional Rent ........................................................................... 4

ARTICLE 5    Tenant's Sales Reports and Records ............................................... 4
5.1    Gross Sales ............................................................................... 4
5.2    Statement of Gross Sales ............................................................... 4
5.3    Records of Gross Sales .................................................................. 5
5.4    Audit of Tenant's Records .............................................................. 5
5.5    Financial Disclosures .................................................................... 5

ARTICLE 6    Common Area ........................................................................... 5
6.1    General .................................................................................... 5
6.2    Common Area Costs ..................................................................... 5
6.3    Substitute Parking Area ................................................................. 6
6.4    Employee Parking ........................................................................ 6

ARTICLE 7    Use and Care of Premises ............................................................ 6
7.1    Limitations on Use ....................................................................... 6
7.2    Impact on Insurance ..................................................................... 6
7.3    Limitations on Operations .............................................................. 6
7.4    Care of Premises ......................................................................... 7
7.5    Hazardous Waste ......................................................................... 7
7.6    Display Windows .......................................................................... 7
7.7    Advertising ................................................................................ 7
7.8    Permits and Licenses and Compliance with Applicable Laws ................... 7
7.9    Allocation of Space within Premises .................................................. 7
7.10   Open for Business ........................................................................ 7
7.11   No Solicitations ........................................................................... 8

ARTICLE 8    Maintenance and Repair of Premises ............................................... 8
8.1    Maintenance and Repair by Landlord ................................................ 8
8.2    Replacement of Electric Bulbs ......................................................... 8
8.3    General Maintenance and Repair by Tenant ......................................... 8
8.4    HVAC Maintenance and Repair by Tenant ........................................... 8

ARTICLE 9    Alterations ................................................................................ 8
9.1    Landlord Consent ........................................................................ 8
9.2    Requirements for Construction of Alterations ....................................... 9
9.3    Alterations Impacting the Roof; General Requirements ........................... 9
9.4    No Warranty .............................................................................. 9

ARTICLE 10    Landlord's Right of Access; Use of Roof ......................................... 9
10.1    Landlord's Right of Access ............................................................ 9
10.2    Use of Roof .............................................................................. 9

ARTICLE 11    Sign; Store Fronts .................................................................... 9
11.1    Restrictions on Signs ................................................................... 9
11.2    Installation and Removal of Signs .................................................... 9
11.3    Advertising Premises for Rent ......................................................... 9

ARTICLE 12    Utilities ................................................................................. 10
12.1    Landlord's Responsibilities ........................................................... 10
12.2    Tenant's Responsibilities .............................................................. 10
12.3    Interruption of Service ................................................................. 10

**ARTICLE 13**    Insurance ...... 10
   13.1    Tenant's Insurance ...... 10
   13.2    Cost of Landlord's Insurance ...... 10
   13.3    Increases in Coverage ...... 11

**ARTICLE 14**    Waiver of Negligence Claims; No Subrogation; Non-Liability for Certain Damages ...... 11
   14.1    Waiver of Negligence Claims; No Subrogation ...... 11
   14.2    Non-Liability for Certain Occurrences ...... 11

**ARTICLE 15**    Damage by Casualty ...... 11
   15.1    Notice to Landlord ...... 11
   15.2    Landlord's Obligation to Repair and Rebuild ...... 11
   15.3    Tenant's Obligation to Repair and Rebuild ...... 12
   15.4    Continuance of Tenant's Business ...... 12
   15.5    Requirements of Mortgagee ...... 12

**ARTICLE 16**    Eminent Domain ...... 12
   16.1    Substantial Taking ...... 12
   16.2    Partial Taking ...... 12
   16.3    Common Area Condemnation ...... 12
   16.4    Condemnation Award ...... 12

**ARTICLE 17**    Assignment and Subletting ...... 12
   17.1    Generally ...... 12
   17.2    Proposal Notice and Landlord's Rights ...... 13
   17.3    Proceeds of Assignment ...... 13
   17.4    Additional Restrictions on Assignment ...... 13
   17.5    Prohibition on Leasehold Mortgages ...... 13
   17.6    Assignment by Landlord ...... 13

**ARTICLE 18**    Taxes ...... 13
   18.1    Personal Property and Fixtures ...... 13
   18.2    Tax Payment ...... 14
   18.3    Tax Consultant; Taxes Contested by Landlord ...... 14
   18.4    Payment for Partial Year ...... 14

**ARTICLE 19**    Events of Default and Remedies ...... 14
   19.1    Events of Default by Tenant and Remedies ...... 14
   19.2    Exercise of Landlord's Remedies ...... 15
   19.3    Termination of Lease ...... 16
   19.4    No Termination ...... 16
   19.5    Additional Costs and Expenses of Default ...... 16
   19.6    Reletting the Premises ...... 16
   19.7    Landlord's Refinancing ...... 16
   19.8    Joint and Several Liability ...... 17
   19.9    Security Deposit ...... 17
   19.10    Additional Security ...... 17
   19.11    Percentage Rental After Tenant's Default ...... 17
   19.12    Repossession of the Premises ...... 17
   19.13    Additional Remedies ...... 18

**ARTICLE 20**    Mechanics' Liens ...... 18

**ARTICLE 21**    Surrender; Holding Over ...... 18

**ARTICLE 22**    Subordination; Attornment; Notice to Landlord's Mortgagee ...... 18
   22.1    Subordination ...... 18
   22.2    Attornment ...... 18
   22.3    Notice to Landlord's Mortgagee ...... 18

**ARTICLE 23**    Merchants' Association and Promotion Fund ...... 19

**ARTICLE 24**    Notices ...... 19
   25.1    Penalties for Late Payment ...... 19
   25.2    Non-Sufficient Funds ...... 19

**ARTICLE 26**    Tenant's Efforts ...... 19

**ARTICLE 27**    Landlord's Lien ...... 20

**ARTICLE 28**    Miscellaneous ...... 20
   28.1    No Partnership ...... 20
   28.2    Caption; Construction of Terms ...... 20

C:\DOCUMENTS AND SETTINGS\TRODGERS\DESKTOP\CVETTON\FOOD FINANCIAL--NORTH OAKLAND.DOC
8/17/04 10:26AM

(ii)

| 28.3 | No Waiver | 20 |
| 28.4 | Joint and Several Liability | 20 |
| 28.5 | Landlord's Liability | 20 |
| 28.6 | Time of the Essence; Force Majeure | 20 |
| 28.7 | Quiet Enjoyment | 21 |
| 28.8 | Amendment | 21 |
| 28.9 | Brokers | 21 |
| 28.10 | Estoppel Certificate | 21 |
| 28.11 | Governing Law | 21 |
| 28.12 | Binding Effect | 21 |
| 28.13 | Validity and Severability | 21 |
| 28.14 | Rights Reserved by Landlord | 21 |
| 28.15 | Expenses Following Default | 21 |
| 28.16 | Independent Covenants | 21 |
| 28.17 | No Election of Remedies | 22 |
| 28.18 | Incorporation of Exhibits | 22 |
| 28.19 | Full Execution | 22 |
| 28.20 | Waiver of Jury Trial | 22 |

EXHIBIT A - DEPICTION OF SHOPPING CENTER AND PREMISES ..... A-1
EXHIBIT B-1 - LEGAL DESCRIPTION OF SHOPPING CENTER ..... B-1
EXHIBIT B-2 - LEGAL DESCRIPTION OF SHOPPING CENTER ..... B-2
EXHIBIT C - TENANT FINISH-WORK: ALLOWANCE ..... C-1
EXHIBIT D - TENANT SIGN CRITERIA ..... D-1
EXHIBIT E - TENANT DESIGN CRITERIA ..... E-1
EXHIBIT F - CONTRACTOR'S AFFIDAVIT ..... F-1
EXHIBIT F - CONTRACTOR'S RELEASE AND CERTIFICATE ..... F-2
EXHIBIT F - SUBCONTRACTOR'S AND/OR SUPPLIER'S RELEASE ..... F-3
EXHIBIT G - EXTENSION OPTIONS ..... G-1
EXHIBIT H - GUARANTY ..... H-1

<u>LIST OF DEFINED TERMS</u>

Page No.

Additional Rent4
Advance Deposit1
affiliate2
Breakpoint1
Claimant17
Collateral20
Commencement Date3
Common Area5
Common Area Costs5
Construction Allowance C-2
controlling percentage)3
Environmental Law7
Event of Default14
Gross Sales4
Guarantor H-1
Hazardous Substances7
HVAC8
including2
Indemnity Payments16
Index19
Insurance10
Landlord1
Landlord's Mortgagee18
Law2
Laws2
Lease1
Loss11
Minimum Guaranteed Rental1
Mortgage18
Percentage Rental1
Permitted Use1
Premises1
Primary Lease18
Promotion Fund19
Promotion Fund Charge19
Proposal Notice13
Rent1
Security Deposit1
Shopping Center1
Succeeding Period19
Taxes14
Tenant1
Tenant Party2
Tenant's Address in Shopping Center1
Tenant's Proportionate Share2
Tenant's Trade Name1
Term1
Total Construction Costs C-1
UCC20

## STANDARD COMMERCIAL
## SHOPPING CENTER LEASE

This Standard Commercial Shopping Center Lease (this "Lease") is executed as of *August 23*, 20 *04* between Landlord and Tenant (each as defined below).

**ARTICLE 1)**     **Definitions and Certain Basic Provisions.**

a)     i)     Landlord : North Garland Crossing, Ltd.

ii)     Landlord's Address: 120 Austin Hwy, Suite 105, San Antonio, Texas 78209

iii)     Tenant : Cottonwood Financial Texas, L.P., a Delaware limited partnership

iv)     Tenant's Mailing Address:1300 W. Walnut Hill Lane, Suite 225 Irving, Texas 75038

v)     Tenant's Trade Name: The Cash Store

vi)     Tenant's Address in Shopping Center:  Bay directly behind Starbucks between Starbucks and Super Target.  Front door faces south.

vii)     Premises :  Approximately 1,050 square feet, as depicted on the plan attached hereto as Exhibit A, and situated upon the property described in Exhibit B and any adjacent property acquired and affirmatively integrated into the Shopping Center by Landlord.  Exhibit A sets forth the general layout of the Shopping Center and certain proposed stores adjoining the Shopping Center, but shall not be deemed to be a warranty, representation or agreement on the part of the Landlord that the Shopping Center or stores be exactly as indicated.  ~~Landlord reserves the right to relocate the Premises within the Shopping Center at any time prior to the delivery of possession thereof to Tenant.~~  Landlord and Tenant stipulate that the number of square feet stated above is correct.

viii)     Commencement Date: November 15, 2004, subject to adjustment as provided in Section 3.2.

ix)     Term:  Commencing on the Commencement Date and ending on the last day of the 60th calendar month thereafter.

x)     Permitted Use: consumer finance and related products and services and no other use.

xi)     Minimum Guaranteed Rental: The following amounts for the following periods of time:

| Time Period | Minimum Guaranteed Rental Per Month | Minimum Guaranteed Rental Annually |
|---|---|---|
| Yrs 1 - 5 | $2,800.00 | $33,600.00 |

xii)     Percentage Rental: ~~_____ percent (____%) of Gross Sales (as defined in Section 5.1) in excess of $_____ per month (such monthly amount being herein after referred to as the "Breakpoint") during each calendar year of the Term, payable on or before the tenth day of each following month.~~

xiii)     Rent: Minimum Guaranteed Rental, Percentage Rental and Additional Rent, and all other sums payable by Tenant under this Lease.

xiv)     Security Deposit: $3,260.48.

xv)     Advance Deposit:  $3,260.48, which amount represents one full monthly installment of Minimum Guaranteed Rental plus a single monthly installment of (1) Tenant's Proportionate Share of Common Area Costs (per Section 6.2), (2) Tenant's share of Landlord's cost of insurance (per Section 13.2), (3) Tenant's Tax Payment (per Section 18.2), and (4) Tenant's Promotion Fund Charge (per Article 23).  The Advance Deposit will be paid by Tenant to Landlord at the time of execution hereof and shall be credited by Landlord against Tenant's first full monthly installment(s) of Minimum Guaranteed Rental and such other charges coming due hereunder.

| INITIAL | |
|---|---|
| Landlord | Tenant |

**App. 008**

xvi) **Tenant's Proportionate Share**: A fraction, the numerator of which shall be the number of rentable square feet of floor space in the Premises and the denominator of which shall be the number of rentable square feet of floor space in all stores in the Shopping Center that are leased or leasable as of January 1 of the applicable year and which contribute on a Proportionate Share basis to the pass-through item in question. In calculating Tenant's Proportionate Share of certain items (or components thereof), the following provisions shall apply: (1) in the case of Common Area Costs, the denominator of the fraction shall exclude (a) the rentable square feet of premises occupied by ground lessees or owners of outparcels within the Shopping Center who do not contribute on a Proportionate Share basis to the Shopping Center's Common Area Costs because they are obligated to maintain separately certain common areas appurtenant to their ground leased or owned premises, and (b) with regard to specific Common Area Cost items, the rentable square feet of all other tenants in the Shopping Center who do not include such items within the calculation of such other tenant's share of Common Area Costs because such other tenants are individually responsible for the item in question (e.g., if an anchor tenant provides for its own trash removal and the cost of trash removal is not part of such tenant's Common Area Cost obligation, that tenant's rentable square feet shall be excluded from the denominator in determining Tenant's Proportionate Share of trash removal costs); (2) in the case of Insurance, Tenant's Proportionate Share of Landlord's cost of casualty insurance shall exclude from the denominator of the fraction the rentable square feet of any building in the Shopping Center which is separately insured by the tenant of such building, and which tenant as a result does not contribute to Landlord's cost of casualty insurance; and (3) in the case of Taxes, Tenant's Proportionate Share of Taxes shall exclude from the denominator of the fraction the rentable square feet of any leased building in the Shopping Center which is separately assessed and whose tenant pays such separately assessed tax amount pursuant to its lease in lieu of paying a Proportionate Share of Taxes assessed for the Shopping Center as a whole.

xvii) **Estimated Completion Date**: July 21, 2004

b) **Initial Monthly Payment of Rent**. The following shall constitute Tenant's initial monthly payment of Rent required pursuant to Articles 4, 6, 13, 18 and 23, to be adjusted as and when required under the terms of this Lease.

|  | Initial Monthly Amount |
|---|---|
| Monthly Minimum Guaranteed Rental | $2,800.00 |
| Tenant's Proportionate Share of Common Area Costs | $153.13 |
| Tenant's Proportionate Share of Insurance Premiums | $21.88 |
| Tenant's Proportionate Share of Taxes | $262.50 |
| Tenant's Promotion Fund Charges | $0 |
| Administrative Fee | $22.97 |
| Total Initial Monthly Payment of Rent | $3,260.48 |

c) **General**. Each of the foregoing definitions and basic provisions shall be construed in conjunction with and limited by references thereto in other provisions of this Lease. Additionally, the following terms shall have the following meanings: "**Law**" means all federal, state, and local laws, rules and regulations, all court orders, all governmental directives and governmental orders, and all restrictive covenants affecting the Property, and "**Law**" means any of the foregoing; "**affiliate**" means any person or entity which, directly or indirectly, controls, is controlled by, or is under common control with the party in question; "**Tenant Party**" shall include Tenant, any assignees claiming by, through, or under Tenant, any subtenants claiming by, through, or under Tenant, and any agents, contractors, employees, invitees of the foregoing parties; and "**including**" means including, without limitation.

**ARTICLE 2) Granting Clause**

In consideration of the obligation of Tenant to pay Rent as herein provided, and the other terms, covenants and conditions hereof, the receipt and sufficiency of which are hereby acknowledged, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises TO HAVE AND TO HOLD for the Term, all upon the terms and conditions set forth in this Lease.

**ARTICLE 3) Commencement Date; Financing**

a) **Premises Ready for Occupancy**. Landlord shall proceed to construct improvements upon the Premises in substantial compliance with the Description of Landlord's Work in Exhibit C, with such minor variations as Landlord in its sole discretion may deem advisable, and tender the Premises to Tenant. The Premises shall be deemed to be "**Ready for Occupancy**" when Landlord certifies in writing to Tenant that Landlord has substantially completed Landlord's Work, as described in Exhibit C. In no event shall the determination of the date upon which the Premises are deemed Ready for Occupancy be predicated upon the construction of any of Tenant's Work as described in Exhibit C. Upon Tenant's request, which request shall be made within five days following Landlord's delivery to Tenant of the Ready for Occupancy notice set forth above, Landlord agrees to participate in a joint walk-through and inspection of the Premises

C:\DOCUMENTS AND SETTINGS\TROGGER\DESKTOP\COTTONWOOD FINANCIAL—NORTH OAKLAND.DOC
6/1996-01/2/3AM

2

| INITIAL | |
|---|---|
| Landlord | Tenant |

with Tenant, provided that such inspection shall not delay the Ready for Occupancy date nor Tenant's obligation to commence construction of Tenant's Work. If the Premises are not Ready for Occupancy prior to the Estimated Completion Date, Landlord shall not be deemed to be in default hereunder or otherwise liable in damages to Tenant, nor shall the term of this Lease be affected; however, if the Premises are not Ready for Occupancy within 18 months following the Estimated Completion Date, Tenant may as its option terminate this lease by written notice to Landlord delivered within 30 days following the expiration of each 18-month period, in which event neither party shall have any further liabilities or obligations hereunder, except the Landlord shall repay to Tenant any Advance Deposit and/or Security Deposit. When the Premises are Ready for Occupancy, Tenant agrees to accept possession thereof and to proceed with due diligence to perform the work described under "Description of Tenant's Work" in Exhibit C, all of such work to be performed in compliance with Exhibit C and to install its fixtures, furniture and equipment. Any Tenant Work involving venting, opening, sealing, waterproofing or any altering of the roof shall be performed by Landlord's roofing contractor at Tenant's sole expense. Upon completion of such work, Tenant shall provide Landlord with a certificate from Landlord's roofing contractor stating that all of Tenant's Work involving venting, opening, sealing, waterproofing or in any way altering the roof has been performed in compliance with Exhibit C. Tenant hereby indemnifies and holds Landlord harmless from any damage to the Premises resulting, directly or indirectly, from Tenant's venting, opening, sealing, waterproofing or other altering of the roof unless such a certificate from Landlord's roofing contractor has been delivered to Landlord before the date of any such damage. If any dispute arises as to work performed or required to be performed by Landlord or Tenant pursuant to Exhibit C, the certificate of Landlord's architect or engineer shall be conclusive. By initiating Tenant Work, Tenant shall be deemed to have accepted the Premises and to have acknowledged that the same fully complies with Landlord's covenants and obligations hereunder (irrespective of whether Landlord has certified to Tenant that the Premises are Ready for Occupancy). Tenant agrees to furnish to Landlord a Certificate of Occupancy from applicable local authorities on or before the Commencement Date; however Tenant's failure to do so shall not delay the Commencement Date.

b)    **Commencement Date.** Tenant agrees to open the Premises for business to the public no later than the Commencement Date of this Lease. The "**Commencement Date**" of this Lease shall be 60 days after Landlord has notified Tenant that the Premises are Ready for Occupancy pursuant to Section 3.1, or the date upon which Tenant actually opens the Premises to the public for business, whichever shall first occur. Occupancy of the Premises by Tenant prior to the Commencement Date shall be at Tenant's sole risk, and deemed pursuant to, and subject to, all of the terms and provisions of this Lease, excepting only those requiring the payment of Rent; however, in no event shall Tenant be entitled to enter the Premises or take occupancy thereof prior to the date it receives Landlord's notice that the same are Ready for Occupancy. Following the written request of either party hereto, the non-requesting party shall, following the Commencement Date, execute and deliver a certificate or written statement acknowledging that Tenant has accepted possession of the Premises, reciting the exact Commencement Date and expiration date of this Lease, certifying that Landlord has fully complied with all Landlord's covenants and obligations hereunder, and confirming the square footage of the Premises.

c)    **Landlord's Financing.** Landlord shall not be obligated to proceed with construction on the Premises unless and until construction financing acceptable to Landlord has been obtained. Unless commitments for such financing have been obtained and all conditions to such commitments (other than construction of the Shopping Center) shall have been fulfilled within 12 months following the Estimated Completion Date, Landlord may terminate this Lease by notifying Tenant in writing of Landlord's inability to obtain financing within 30 days following the expiration of such 12-month period, and this Lease shall thereupon cease and terminate and each of the parties hereto shall be released and discharged from all liability and responsibility hereunder. No expenditure of any sum or incurring of any liability by Tenant for merchandise, fixtures, equipment, labor, materials or otherwise shall affect the rights of Landlord hereunder or give rise to any claim by Tenant for reimbursement thereof. If Landlord can obtain financing only upon modification of the terms and provisions of this Lease, Landlord shall have the right to cancel this Lease if Tenant refuses to approve any such modification in writing within 15 days after Landlord's request thereof. If such right to cancel is exercised, this Lease shall thereafter be null and void, any Security Deposit and/or Advance Deposit hereunder shall be returned to Tenant, and thereafter neither party shall have any further rights or liabilities to the other hereunder.

d)    **Landlord's Refinancing.** If Landlord refinances the indebtedness currently secured by the Shopping Center and, as a part of such refinancing, the new lender requires modifications of the terms and provisions of this Lease, Tenant shall negotiate in good faith to modify this Lease to conform with such new lender's requirements; however, Tenant shall not be required to agree to any changes to the material terms of this Lease or to any changes which would increases Tenant's financial obligations hereunder and, regardless of whether or not Landlord and Tenant are able to agree as to any such requested modifications to this Lease, Landlord shall reimburse Tenant's reasonable, out-of-pocket attorney's fees in connection with the proposed lease modifications.

**ARTICLE 4)    Rent.**

a)    **General.** Rent shall accrue hereunder from the Commencement Date, and shall be payable by Tenant to Landlord, in immediately available funds, at the place designated for the delivery of notices to Landlord at the time for payment (or at such other place as Landlord may designate in writing to Tenant from time to time), without previous demand and without set-off or deduction.

b)    **Minimum Guaranteed Rental.** Monthly Minimum Guaranteed Rental payments shall be due and payable, in advance, on or before the first day of each calendar month during the Term. If the Commencement Date is a date other than the first day of a calendar month, there shall be due on such date a sum equal to that proportion of the Minimum Guaranteed Rental specified for the first full calendar month in which a monthly payment of Minimum

INITIAL

| Landlord | Tenant |
|---|---|
|  |  |

Guaranteed Rental is due, which the number of days from the Commencement Date to the end of the calendar month during which the Commencement Date shall fall bears to the total number of days in such month.  Under such circumstances, the next occurring monthly installment of Minimum Guaranteed Rental shall be paid by application of the Advance Deposit.

c)  ~~Percentage Rental.  In addition to the Minimum Guaranteed Rental, Additional Rent and other charges due hereunder, Tenant shall pay Percentage Rental to Landlord during the entire term of this Lease.  The Percentage Rental shall be payable monthly as specified in Section 1.1(f) and as further set forth herein and in Article V hereof.  If the total of the monthly payments of Percentage Rental for any calendar year is not equal to the annual Percentage Rental computed on the amount of Gross Sales (defined below) for such calendar year in excess of the annualized Breakpoint in accordance with the specified rate or rates, then Tenant shall pay to Landlord any deficiency or Landlord shall refund to Tenant any overpayment, as the case may be, within 60 days after the end of such calendar year.  In no event shall the Rent to be paid by Tenant and retained by Landlord for any calendar year be less than the annual Minimum Guaranteed Rental herein specified.  If this Lease should commence on a date other than the first day of a calendar year following the Commencement Date or preceding the termination date, as the case may be, shall be paid at the specified rate or rates for all sales made during such fractional part of a calendar year in excess of a proportionate share of the annualized Breakpoint (such proportionate share based upon the number of days in such fractional part of the calendar year as compared to a full calendar year), such Percentage Rental to be paid in monthly installments as provided above with respect to full calendar years.~~

d)  **Additional Rent.**  In addition to Minimum Guaranteed Rental and Percentage Rental, Tenant shall pay, as "**Additional Rent**" hereunder:  i) Tenant's Proportionate Share of Common Area Costs, as set forth in Section 6.2;  ii) Tenant's Proportionate Share of premiums for the Insurance for the Shopping Center, as set forth in Section 13.2, iii) Tenant's Proportionate Share of Taxes, as set forth in Article 18;  iv) ~~the Promotion Fund Charges, as specified in Article 23;  v)~~ the Tenant's Grand Opening Contribution as specified in Article 23; and vi) all other sums or charges due or to become due from Tenant to Landlord hereunder.  Any payment of monies called for herein to be made by Tenant to Landlord is deemed Additional Rent.  Tenant shall pay its Proportionate Share of Additional Rent in the same manner as provided above for Minimum Guaranteed Rental.

**ARTICLE 5)   Tenant's Sales Reports and Records.**

~~a)   **Gross Sales.**  The term "**Gross Sales**" as used herein shall include the following: i) the entire amount of the sales price, whether for cash or otherwise, of all sales of merchandise (including gift and merchandise certificates), ii) the entire amount of fees received for services, and iii) all other receipts whatsoever (including interest on consumer finance contracts, time price differential, finance charges, service charges, and credit and layaway sales), from all business conducted in or from the Premises by Tenant and all subtenants, concessionaires or licensees of Tenant as may be permitted hereunder, including (1) mail or telephone order received or filled at the Premises, (2) deposits not refunded to purchases, (3) orders taken (although said orders may be filled elsewhere), (4) sales to employees, (5) sales through vending machines or other devices, and (6) sales by any sublessee, concessionaire or licensee or otherwise in or from the Premises.  No discounts shall be deducted from any actual sale price for any selected category of customer.  If a discount is given to any special class of customer, the amount of such discount will be regarded by Landlord as a fringe benefit and regarded under this definition of Gross Sales.  Each sale or layaway, upon installment or credit, shall be treated as a sale for the full price in the month during which such sale was made, irrespective of the time when Tenant receives payment from its customer.  No deduction shall be allowed for uncollected or uncollectible credit accounts, service charges, finance charges, bank card charges or postage fees.  The following amounts are excluded from Gross Sales:  (a) any sums collected and paid out for any sales or direct excise tax imposed by any duly constituted governmental authority, (b) the exchange of merchandise between other stores of Tenant, if any, where such exchanges are made solely for the convenient operation of Tenant's business and not for the purpose of consummating a sale made in or from the Premises and/or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made in or from the Premises, (c) returns to shippers or manufacturers, (d) any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by purchaser and accepted by Tenant, and (e) sales of Tenant's fixtures (other than fixtures which constitute inventory of Tenant's business in the Premises).~~

b)  ~~**Statement of Gross Sales.**  On or before the tenth day of each calendar month during the Term, Tenant shall prepare and deliver to Landlord a written statement of Gross Sales during the preceding calendar month, certified by Tenant to be accurate.  Within 30 days after the expiration of each calendar year, and within 60 days after termination of this Lease, Tenant shall prepare and deliver to Landlord a statement of Gross Sales during the preceding calendar year (or partial calendar year), certified to be correct by an independent certified public accountant.  All such statements shall be in such form as Landlord may require.  If any such certified statement discloses an error in the calculation of the Percentage Rental for any period, an appropriate adjustment of the Percentage Rental shall be made, subject, however, to Landlord's right under Section 5.4.  Should Tenant fail to furnish Landlord, when due, with any Gross Sales Report or the monetary report required herein, then Landlord shall have the right to assess a fee of Twenty-five and no/100 dollars ($25.00) per day until the required report is furnished, from and after the thirtieth (30th) day following the date on which any such report shall have been due in the office of Landlord, and such fee shall be paid by Tenant to Landlord at such time.~~

c)  ~~**Records of Gross Sales.**  Tenant shall keep in the Premises (or, if approved in writing by Landlord, at Tenant's principal place of business in the city in which the Premises are located), a permanent, accurate set of books and records, in an auditable format, of all sales of merchandise, fees for services, and revenue derived from business conducted in or from the Premises, and all supporting records such as tax reports, banking records, cash register tapes, sequential sales~~

INITIAL

| Landlord | Tenant |
|----------|--------|
| [signature] | [signature] |

slips and other sales records. All such books and records shall be retained and preserved for at least 36 months after the end of the calendar year to which they relate, and shall be subject to inspection and audit by Landlord and its agents at all reasonable times. If Tenant fails to maintain all necessary records and make them available to Landlord, then, at Landlord's sole option, in addition to all other rights and remedies, Tenant shall pay to Landlord, upon demand, Additional Rent on a monthly basis equal to 20% of its Monthly Minimum Guaranteed Rental payments due for each such month, in lieu of Percentage Rental.

d)    Audit of Tenant's Records.  Landlord shall have the right to audit all books and records, wherever located, pertaining to sales made in or from the Premises during the Term. If any statements submitted by Tenant are found to be incorrect to an extent of more than 2% over the figures submitted by Tenant (or if Tenant fails to submit any statement), Tenant shall reimburse Landlord for all costs incurred by Landlord in connection with such audit.  In the event of any overpayment by Tenant established by any such audit, Landlord shall promptly refund such overpayment to Tenant. In the event of any deficiency in Tenant's Sales report established by any such audit, Tenant shall promptly pay such deficiency to Landlord together with interest thereon at the lesser of 18% per annum or the maximum rate permitted by applicable Law from the date such deficiency would have been due if accurately reported.

e)    **Financial Disclosures.**  Tenant shall provide true, complete and accurate financial information and documentation about itself and any guarantor to Landlord or Landlord's designee, within ten days after Landlord's written request therefor. The individuals executing this Lease on Tenant's behalf represent and warrant that the financial statements and other information submitted to Landlord by Tenant prior to the execution hereof are true, complete and accurate, were prepared in accordance with generally accepted cash accounting principles applied on a consistent basis, and accurately reflect Tenant's net worth as of the date hereof.

ARTICLE 6)    Common Area.

a)    **General.**  As used herein, the "**Common Area**" shall mean that part of the Shopping Center designated by Landlord from time to time for the common use of all tenants, including equipment, signs, parking areas, sidewalks, landscaping, curbs, loading areas, private streets and alleys, lighting facilities, hallways, malls, restrooms, and all other areas and improvements provided by Landlord for the common use of all tenants, all of which shall be subject to Landlord's sole management and control and shall be operated and maintained in such manner as Landlord, in its discretion, shall determine. Landlord reserves the right to construct, maintain, and operate lighting and other facilities, temporary and/or permanent improvements and buildings, equipment and signs on all parts of the Common Area; increase, reduce or change the number, size, height, layout, or locations of buildings, walks, parking and/or common areas now or hereafter forming a part of the Shopping Center; to police the Common Area; to restrict parking by tenants and other occupants of the Shopping Center and their employees, agents and invitees; to close temporarily all or any portion of the Common Area to make repairs, changes or to avoid public dedication; to discourage or prohibit noncustomer parking; and to employ and discharge personnel with respect to maintenance of the Common Area. Landlord may delegate its rights with regard to the Common Area to an independent contractor or management company, which may be an affiliate of Landlord. Subject to Landlord's rights, Tenant and its employees, customers, subtenants licensees and concessionaires shall have the non-exclusive right and license to use the Common Area as constituted from time to time for ingress, egress and parking. Tenant and Tenant's agents, employees and invitees shall comply fully with all rules and regulations which Landlord may establish for the Shopping Center from time to time. Landlord may change such rules and regulations or promulgate other rules and regulations for the safety and/or cleanliness of the Shopping Center and for preservation of good order therein. Tenant shall further be responsible for the compliance with such rules and regulations by each other Tenant Party.

b)    **Common Area Costs.**  Tenant shall pay as Additional Rent during the Term Tenant's Proportionate Share of the Common Area Costs. "**Common Area Costs**" shall mean all costs and expenses in operating, maintaining, repairing, lighting, signing, cleaning, painting, stripping, insuring, equipping, staffing, managing, heating and cooling, securing, and policing of the Common Area, including all costs associated with the following items or services: i) alarm systems, patrol services and fire protection; ii) maintenance of irrigation systems; iii) insurance, including liability insurance for personal injury, death and property damage to the extent not reimbursed by Tenant under Section 13.2; iv) surcharges levied upon or assessed against parking spaces or areas, payments toward mass transit or car pooling facilities or otherwise as required by federal, state or local governmental authorities; v) landscaping, including lawn maintenance, new plantings and replacement of existing landscaping; vi) repairing, cleaning, sweeping, painting, striping, replacing and repaving of paving, curbs, walkways, guardrails, bumpers, fences, screens, flagpoles, bicycle racks, signs and other markers, drainage pipes, ducts, conduits, lighting facilities and all other Common Area site amenities; vii) maintenance, repair and replacement of utility systems serving the Shopping Center, including water, sanitary sewer and storm water lines and drainage systems (including any preventative jet washing of such lines and systems), electrical, gas, telephone and lighting systems (including bulbs, poles, and fixtures) and other utility lines, pipes and conduits, and all payments of utility charges in connection with any of the foregoing systems; viii) maintenance, repair, replacement and substitution of and for all portions of the buildings in the Shopping Center (but excluding the Premises and premises leased to other tenants), including walls, roofs and roof flashings, canopies, skylights, signs, planters, benches, fire exits, doors and hardware, windows, glass and glazing; ix) inspection, maintenance, repair and acquisition costs (including depreciation) of any and all machinery and equipment used in the operation and maintenance of the Common Area, including personal property taxes and other charges and taxes incurred in connection with such equipment; x) removal of snow, ice, trash and debris; xi) maintenance and compliance with federal, state or local governmental sanitized air, environmental, health and safety standards; xii) all materials, supplies and services purchased or hired in connection with the operation of the Common Area; xiii) compensation and benefits paid to any and all personnel, including security and maintenance persons, secretaries, and bookkeepers; xiv) seasonal

C:\DOCUMENTS AND SETTINGS\RODGORBK\DESKTOP\COTTONWOOD FINANCIAL—NORTH GARLAND.DOC
8/17/04 10:26 AM

5

| | INITIAL | |
|---|---|---|
| | Landlord | Tenant |
| | | |

decorations; xv) pest control; xvi) expenses incurred in connection with tax consultants and contests pursuant to Section 18.3; xvii) management fees charged for management of the Shopping Center; and xviii) an overhead administrative cost allowance in the amount of 15% of the total Common Area Costs. Tenant's Proportionate Share of Common Area Costs shall be paid by Tenant in monthly installments in such amounts as are estimated and billed by Landlord to Tenant at the beginning of each 12-month period commencing and ending on dates designated by Landlord, each installment being due on the first day of each calendar month. If at any time during such 12-month period it shall appear that Landlord has underestimated Tenant's Proportionate Share of Common Area Costs, Landlord may re-estimate Tenant's Proportionate Share of Common Area Costs and may bill Tenant for any deficiency which may have accrued during such 12-month period and thereafter the monthly installment payable by Tenant shall also be adjusted. Within 120 days after the end of each such 12-month period, Landlord shall deliver to Tenant a statement setting forth the actual Common Area Costs for such 12-month period, Tenant's Proportionate Share thereof, and the total amount paid by Tenant to Landlord under this Section 6.2 during such period. If the amounts paid by Tenant during such period are greater or lesser than Tenant's Proportionate Share of the Common Area Costs as set forth on such statement, Tenant shall pay to Landlord or Landlord shall credit Tenant's account (or, if such adjustment occurs at the end of the Term, pay to Tenant), as the case may be, within 30 days of receipt of such statement, the amount of any excess or deficiency. Failure of Landlord to provide the statement called for hereunder shall not relieve Tenant from its obligations under this Section 6.2 or elsewhere in this Lease. If Tenant fails to object to the items contained in Landlord's statement within 30 days after the statement has been delivered to Tenant, Landlord's calculation of such items shall be final. Landlord's good faith judgment regarding the proper interpretation of this Lease and the proper accounting for Common Area Costs shall be binding on Tenant.

c)    **Substitute Parking Area.** Landlord may from time to time substitute for any parking area shown on Exhibit A other areas or multi-level parking facilities reasonably accessible to the tenants of the Shopping Center.

d)    **Employee Parking.** Upon request by Landlord, Tenant shall provide the license plate numbers of all employees of Tenant to Landlord, and shall advise its employees to park only in designated "Employee Parking" areas; employee cars that are not parked in the designated "Employee Parking" areas may be towed and/or fined, and all fines so addressed shall be the responsibility of, and payable by, Tenant.

ARTICLE 7)    **Use and Care of Premises.**

a)    **Limitations on Use.** The Premises may be used only for the purpose specified in Section 1.1(i) and for no other purpose. In transacting business in the Premises, Tenant shall use the trade name specified in Section 1.1(e) and no other trade name. Tenant shall not at any time leave the Premises vacant, but shall in good faith continuously throughout the Term conduct and carry on in the entire Premises the type of business for which the Premises are leased. Tenant shall stock its business with a complete line and full selection of first class merchandise of current style and type, attractively displayed. ~~Tenant shall operate its business in an efficient, high-class and reputable manner so as to produce the maximum amount of sales from the Premises, and shall keep the Premises open to the public for business with adequate and competent personnel in attendance on all days and during all hours (including evenings) established by Landlord from time to time as store hours for the Shopping Center (which shall in no event be less than from 10:00 a.m. to 7:00 p.m. every day except Sundays and holidays), and during any other days and hours when the Shopping Center generally is open to the public for business, except to the extent Tenant may be prohibited from being open for business by law.~~

b)    **Impact on Insurance.** Tenant shall not keep anything within the Premises or use the Premises in a manner which causes an increase in the insurance cost or invalidates any insurance policy carried on the Premises or other part of the Shopping Center. Tenant shall pay, as Additional Rent, upon demand of Landlord, any such increased cost due to any Tenant Party's use of the Premises.

c)    **Limitations on Operations.** Tenant shall not conduct or operate within any part of the premises i) fire, auction, bankruptcy or "going out of business" sales, ii) a "wholesale" or "factory outlet" store, iii) a cooperative store, iv) a "second hand" store, v) a "flea market" store, vi) a "surplus" store, or vii) a store commonly referred to as a "discount house." Tenant shall not advertise that it sells products or services at "discount," "cut-price" or "cut-rate" prices. Tenant shall not (1) permit any objectionable or unpleasant odors to emanate from the Premises; (2) place or permit any radio, television, loudspeaker or amplifier on the roof or outside the Premises or where the same can be seen or heard from outside the building or in the Common Area; (3) place an antenna, awning or other projection on the exterior of the Premises; (4) solicit business or distribute leaflets or other advertising material in the Common Area; (5) take any other action which would constitute a nuisance or would disturb or endanger other tenants of the Shopping Center or unreasonably interfere with their use of their respective premises; nor (6) ~~do anything which would tend to injure the reputation of the Shopping Center.~~ If Landlord, in its sole but reasonable discretion, incurs any expense in connection with any Tenant Party's violation of this Section, Tenant shall immediately reimburse Landlord and all of Landlord's expenses therefor.

d)    **Care of Premises.** Tenant shall take good care of the Premises and shall keep the Premises clean, safe and free from deterioration and waste, and shall maintain the Premises, and conduct all business therein, in accordance with this Lease and all Laws and lawful directions of proper police officials. Additionally, Tenant shall keep the Premises and sidewalks, serviceways and loading areas adjacent to the Premises neat, clean and free from dirt, rubbish, insects and pests at all times. Tenant will store all trash and garbage within the area designated by Landlord and shall, at its sole expense, arrange for the regular pickup of such trash and garbage at a frequency determined by Landlord. Receiving and delivery of goods and merchandise and removal of garbage and trash shall be made only in the manner and areas from time to time prescribed by

| INITIAL |  |
|---|---|
| Landlord | Tenant |
|  | F |

Landlord. Landlord may arrange for collection of all trash and garbage and, should Landlord exercise such election, the cost thereof will be a Common Area Cost. Tenant shall not operate an incinerator or burn trash or garbage within the Shopping Center. Subject to Landlord's approval rights set forth in Section 9.1, Tenant further agrees to refurbish the interior of the Premises at the end of every third full lease year, or at such earlier time period if so deemed necessary in Landlord's sole discretion, to keep the appearance of the Premises fresh.

e)    **Hazardous Waste.** The term "**Hazardous Substances**," as used in this lease, shall mean pollutants, contaminants, toxic or hazardous wastes, or any other substances, the removal of which is required or the use or storage of which is restricted, prohibited, regulated or penalized by any "**Environmental Law**," which term shall mean any federal, state, or local law or ordinance relating to pollution or protection of the environment. Tenant agrees that i) no activity will be conducted on the Premises that will produce any Hazardous Substance; ii) the Premises will not be used in any manner for the storage of any Hazardous Substances; iii) no portion of the Premises will be used as a landfill or a dump; iv) Tenant will not install any underground tanks of any type; v) Tenant will not allow any surface or subsurface conditions to exist or come into existence that constitute, or with the passage of time may constitute, a public or private nuisance; and vi) Tenant will not permit any Hazardous Substances to be brought into the Premises. If any such Hazardous Substance is so brought or found located in or on the Premises, the same shall be immediately removed by Tenant, with proper disposal, and all required cleanup procedures shall be diligently undertaken pursuant to all Environmental Laws, by Tenant, at Tenant's sole expense. If, at any time during or after the term of this Lease, the Premises are found to be so contaminated or subject to said conditions, or if Tenant shall, by act or omission, breach any of its obligations under this Section 7.5, Tenant agrees to indemnify, defend and hold harmless Landlord from any and all claims, demands, actions, liabilities, causes, damages, losses (including any loss in fair market value) and obligations of any nature (including attorneys' fees and litigation costs) arising from or as a result thereof. The foregoing indemnification shall survive the expiration or earlier termination of this Lease.

f)    **Display Windows**. Subject to Section 11.1, Tenant shall maintain all display windows in a neat, attractive condition (as determined by Landlord in its sole but reasonable discretion), and shall keep all display windows and exterior electric signs in front of the Premises lighted from dusk until 3:00 a.m. every day, including Sundays and holidays. Landlord reserves the right to connect all canopy signs in the Shopping Center, including Tenant's, to a common electrical line controlled by Landlord, in order to control the hours during which such signs are kept lighted, and all charges for the installation, maintenance and repair of such electrical line, as well as all electrical usage charges associated therewith, shall be included in Common Area Costs.

g)    **Advertising**. Tenant shall include the address and identity of its business activities in the Premises in all advertisements made by Tenant in which the address and identity of any similar local business activity of Tenant is mentioned.

h)    **Permits and Licenses and Compliance with Applicable Laws**. Tenant shall procure, at its sole expense, all permits and licenses required for its operations and the transaction of business in the Premises and shall otherwise comply with all applicable Laws.

i)    **Allocation of Space within Premises**. Tenant shall warehouse, store or stock on the Premises only such goods, wares and merchandise as Tenant intends to offer for sale at retail in or from the Premises, and as is permitted under this Lease, and Tenant may use for office or non-selling purposes only such space as is reasonably required for Tenant's business. In no event, however, shall the aggregate amount of space in the Premises utilized for office or non-selling purposes exceed 20% of the gross leasable area of the Premises. Without limiting the generality of the foregoing, areas used for the storage or stocking of inventory which are not publicly displayed shall be deemed used for "non-selling" purposes.

j)    **Open for Business**. If Tenant shall fail to i) open for business to the public in the Premises fixtured, stocked and staffed as herein provided on the Commencement Date, ii) open and remain open for business as herein provided during such hours as herein required, or iii) maintain during such hours a staff of employees and stock of merchandise as herein required, the same shall constitute an Event of Default hereunder, as set forth in Section 19.1, without the necessity of any notice thereof from Landlord to Tenant.

k)    **No Solicitations**. Tenant shall not engage in, nor permit its employees, agents, affiliates or customers to engage in, solicitations, demonstrations, itinerant vending or other activities inconsistent with good shopping center standards.

### ARTICLE 8)    Maintenance and Repair of Premises

a)    **Maintenance and Repair by Landlord**. Landlord shall keep the foundation of the Premises in good repair, ordinary wear and tear excepted. Any repairs required to be made by Landlord hereunder which are occasioned by the act or negligence of Tenant, its agents, employees, subtenants, licensees, concessionaires and/or invitees, shall be paid for by Tenant upon demand to the extent not covered by net insurance proceeds paid to Landlord therefor. If the Premises should become in need of repairs required to be made by Landlord hereunder, Tenant shall give immediate written notice thereof to Landlord and Landlord shall not be responsible for failure to make any such repairs until a reasonable time shall have elapsed after delivery of such written notice. Landlord's obligation hereunder is limited to performing the repairs specified in this Section 8.1 only, and Landlord shall have no liability for any damages, loss, injury or other expense

C:\DOCUMENTS AND SETTINGS\TDODGER\DESKTOP\COTTONWOOD FINANCIAL—NORTH GARLAND.DOC
9/17/04 10:36 AM

7

INITIAL

| Landlord | Tenant |
|---|---|

incurred or suffered by any Tenant Party arising out of, or as a consequence of, any condition or occurrence causing a need for such repairs.

b)    **Replacement of Electric Bulbs**. Tenant shall furnish, maintain and replace all electric light bulbs, tubes and tube casings.

c)    **General Maintenance and Repair by Tenant**. Tenant shall keep and maintain the Premises (including the exterior and interior walls/store fronts, plate glass windows, doors, door closure devices, window and door frames, molding, locks and hardware and painting or other treatment of interior and exterior walls) in good, clean and safe condition and shall, at its sole cost and expense, make all needed repairs and replacements thereto (including replacement of cracked or broken glass) unless such repairs and replacements are expressly required to be made by Landlord under the provisions of Section 8.1 or Articles 15 or 16. Tenant shall keep all plumbing units, pipes and connections free from obstruction and protected against ice and freezing. Tenant shall be responsible for the cleaning and maintenance of any grease trap serving the Premises and shall enter into, and furnish to Landlord upon request a copy of a grease trap cleaning and maintenance contract reasonably acceptable to Landlord. If any repairs, replacements or maintenance required on the part of Tenant hereunder are not accomplished within ten days after written notice to Tenant from Landlord (or, in the event of emergency, such shorter notice, or no notice, as is reasonable under the circumstances), Landlord may, at its option, perform such repairs, replacements or maintenance without liability to Tenant for any loss or damage which may result to its stock or business by reason thereof, and Tenant shall pay to Landlord immediately upon demand, as Additional Rent hereunder, all costs associated with such repairs, replacements or maintenance, plus an administrative fee equal to 15% of such cost. The foregoing notwithstanding, Landlord specifically reserves the right to maintain and service any grease trap and to bill Tenant for the cost thereof if Tenant fails to maintain or repair the same within 24 hours after telephonic notice from Landlord to Tenant of the need for any maintenance or repair thereto.

d)    **HVAC Maintenance and Repair by Tenant**. Maintenance of air conditioning and heating equipment for the Premises shall be solely the responsibility of Tenant throughout the entire Term. Tenant shall, at its own cost and expense, enter into a regularly scheduled preventive maintenance/service contract with a maintenance contractor for servicing all hot water, heating and air conditioning ("**HVAC**") systems and equipment within the Premises. The maintenance contractor and the contract must be approved by Landlord. The service contract must include all services suggested by the equipment manufacturer within the operation/maintenance manual and must become effective (and a copy thereof delivered to Landlord) within 30 days of the date Tenant takes possession of the Premises. Tenant shall from time to time upon request furnish proof reasonably satisfactory to Landlord that all such systems and equipment are being serviced in accordance with the maintenance/service contract. Within the 30-day period preceding Tenant's vacating the Premises for any reason, whether due to expiration or earlier termination of the Term, or otherwise, Tenant shall have the systems and equipment checked and serviced to insure proper functioning and shall furnish Landlord satisfactory proof thereof upon request.

**ARTICLE 9)    Alterations.**

a)    **Landlord Consent**. Tenant shall not make any alterations, additions or improvements to the Premises without the prior written consent of Landlord, except for the installation of unattached, movable trade fixtures which may be installed without drilling, cutting or otherwise defacing the Premises. In each instance where Landlord's approval is required hereunder, Tenant shall reimburse Landlord for all reasonable out-of-pocket costs and expenses incurred in such review regardless of whether the request is approved. All alterations, additions, improvements and fixtures (other than unattached, movable trade fixtures) which may be made or installed by either party upon the Premises shall remain upon and be surrendered with the Premises and become the property of Landlord upon the expiration or earlier termination of this Lease, unless Landlord requests their removal, in which event Tenant shall remove the same and restore the Premises to its original condition at Tenant's expense. Any linoleum, carpeting or other floor covering which may be cemented or otherwise affixed to the floor of the Premises is a permanent fixture and shall become the property of Landlord without compensation to Tenant.

b)    **Requirements for Construction of Alterations**. All construction work done by Tenant within the Premises, including (if applicable) Tenant's Work referred to in Exhibit C, shall be performed in a good and workmanlike manner, in compliance with all Laws and Tenant Design Criteria (Exhibit DD), and in such manner as to cause a minimum of interference with other construction in progress, and with the transaction of business, in the Shopping Center.

c)    **Alterations Impacting the Roof: General Requirements**. After receiving Landlord's prior written consent, all venting, opening, sealing, waterproofing or altering of the roof, if any, shall be performed by Landlord's roofing contractor at Tenant's expense and when completed, Tenant shall furnish to Landlord a certificate from Landlord's roofing contractor stating that all such alterations have been completed in accordance with the plans and specifications approved by Landlord and in accordance with any and all applicable Laws. All improvements, alterations, repairs or other work performed upon the Premises under any provision of this Lease shall be performed under the direction of a general contractor selected from an Approved Contractors List furnished by Landlord upon written request of Tenant. The plans and drawings for installation or revision of mechanical, electrical or plumbing systems shall be designed by an engineer selected from an Approved Engineers List furnished by Landlord upon written request of Tenant, such design work to be done at Tenant's expense after Tenant receives Landlord's prior written consent to such work.

| INITIAL | |
|---|---|
| Landlord | Tenant |
|  | |

d)    **No Warranty**. Landlord's consent to or approval of any alterations, additions or improvements (or the plans therefor) shall not constitute a representation or warranty by Landlord, nor Landlord's acceptance, that the same comply with sound architectural and/or engineering practices or with all applicable Laws, and Tenant shall be solely responsible for ensuring all such compliance.

### ARTICLE 10)    Landlord's Right of Access; Use of Roof.

a)    **Landlord's Right of Access**. Landlord shall have the right to enter upon the Premises at any reasonable time (and at any time during an emergency, as determined by Landlord in its sole but reasonable discretion) for the purpose of inspecting the same, or of making repairs to the Premises, or of making repairs, alterations or additions to adjacent premises, or of showing the Premises to prospective purchasers, lenders or lessees.

b)    **Use of Roof**. Use of the roof above the Premises is reserved to Landlord. Tenant shall not be allowed on the roof without Landlord's prior written consent.

### ARTICLE 11)    Sign; Store Fronts.

a)    **Restrictions on Signs**. Tenant shall not, without Landlord's prior written consent: i) make any changes to or paint the store front; ii) install any exterior lighting, decorations or paintings; or iii) erect or install any signs, banners, canopy, window or door lettering, placards, decorations or advertising media of any type which can be viewed from the exterior of the Premises, excepting only dignified displays of customary type for its display window. Tenant shall not place, erect or maintain on the doors, any exterior surface, or in any vestibule any sign, lettering, declaration or advertising except as permitted herein. All signs, decorations and advertising media shall conform in all respects to the sign criteria established by Landlord attached hereto as Exhibit D for the Shopping Center from time to time and shall be subject to the prior written approval of Landlord as to construction, method of attachment, size, shape, height, lighting, color, and general appearance. All signs shall be kept in good condition and in proper operating order at all times. Landlord reserves the right to designate a uniform type of sign for the Shopping Center to be installed and paid for by Tenant.

b)    **Installation and Removal of Signs**. Tenant shall have all signs erected and/or installed and fully operative on or before the Commencement Date, subject to Landlord's prior approval thereof as set forth in Section 11.1, all at Tenant's risk and expense. Upon Tenant's vacating the Premises, or the removal or alteration of its sign for any reason, Tenant shall be responsible for the repair, painting, and/or replacement of the building fascia surface where signs are attached. After the end of the Term or after Tenant's right to possess the Premises has been terminated, Landlord i) may require that Tenant remove the Tenant's signs by delivering to Tenant written notice thereof or ii) may use Tenant's signs, in which case such signs shall become the property of Landlord without compensation to Tenant. If Tenant fails to timely remove its signs after Landlord's written request therefor, Landlord may, at Tenant's expense, remove such signs, perform the related restoration and repair work as described herein and dispose of such signs in any manner Landlord deems appropriate. Tenant shall defend, indemnify and hold harmless Landlord from all losses, claims, costs and liabilities arising in connection with or related to the construction, installation, maintenance, use or removal of Tenant's signs. The rights granted to Tenant under this Section 11.2 may not be assigned to any party.

c)    **Advertising Premises for Rent**. During the period that is six months prior to the end of the Term, and at any time Tenant is in default hereunder, Landlord may erect on the Premises signs indicating that the Premises are available for lease.

### ARTICLE 12)    Utilities.

a)    **Landlord's Responsibilities**. Landlord agrees to cause to be provided and maintained the necessary mains, conduits and other facilities necessary to supply water, electricity, gas (if applicable), telephone service and sewage service to the Premises, subject to any provisions contained in Exhibit C. Landlord shall not be responsible for providing any meters or other devices for the measurement of utilities supplied to the Premises. Tenant shall, at Tenant's sole expense, arrange for the installation of all such meters, sub-meters or other devices.

b)    **Tenant's Responsibilities**. Tenant shall promptly pay all charges for electricity, water, gas, telephone service, sewage service and other utilities furnished to the Premises (including all tap fees and similar assessments made in connecting the Premises to such utilities) and shall promptly pay any maintenance charges therefor. Landlord may, if it so elects, furnish one or more utility services to Tenant, and in such event Tenant shall purchase such services as are tendered by Landlord, and shall pay on demand as Additional Rent the rates established therefor by Landlord which shall not exceed the rates which would be charged for the same services if furnished directly by the local public utility companies. Landlord may at any time discontinue furnishing any such service without obligation to Tenant other than to connect the Premises to the public utility, if any, furnishing such service.

c)    **Interruption of Service**. Landlord shall not be liable to Tenant, or any other person or entity whatsoever, for abatement of rent as a result of, or for any other loss or damages whatsoever occurring in connection with, any interruption or failure whatsoever in utility services, and Tenant shall comply with all terms and provisions of this Lease notwithstanding any such failure or interruption.

### ARTICLE 13)    Insurance.

C:\DOCUMENTS AND SETTINGS\ROOGEARD\DESKTOP\COTTONWOOD FINANCIAL-NORTH GARLAND.DOC
3/17/04 10:38AM

9

| | INITIAL | |
|---|---|---|
| | Landlord | Tenant |
| | | |

a)     <u>Tenant's Insurance</u>. Tenant shall procure and maintain throughout the Term, at its sole cost and expense: i) a policy of commercial general public liability insurance, including an all-risk legal liability endorsement, and an assumed contractual liability endorsement, insuring both Tenant and Landlord (and all persons, firms and corporations designated by Landlord) as an additional insured, against all claims, demands or actions arising out of or in connection with occurrences within the Premises, Tenant's use or occupancy of the Premises, the condition of the Premises, the acts or omissions of all Tenant Parties in the Premises and elsewhere in the Shopping Center, and for liabilities assumed under this Lease, the limits of such policy or policies to be in an amount not less than $~~$2,000,000~~ $1,000,000per occurrence; ii) fire and extended coverage insurance covering the full replacement value of all alterations, additions, partitions, improvements, equipment, furniture, fixtures and inventory made or placed by Tenant in the Premises against "all-risk" of physical loss and covering loss of income or business interruption losses; iii) insurance covering glass breakage in the Premises; and iv) worker's compensation insurance with limits no less than that required by Law. All such policies shall be written by insurance companies licensed to do business in the state in which the Shopping Center is located and from a responsible company satisfactory to Landlord. Tenant shall obtain a written obligation on the part of each insurance company to notify Landlord at least 30 days prior to cancellation of such insurance, and the liability policy shall contain an assumed contractual liability endorsement. Tenant's liability policy shall include coverage for premises and operations, products and completed operations, blanket contractual, personal injury, operation, ownership, maintenance and use of owned, non-owned and hired automobiles, bodily injury and property damage, as aforesaid. All insurance policy(ies) required under this Section 13.1 shall (1) contain a cross-liability endorsement, (2) contain a provision that such policy and the coverage evidenced thereby shall be primary and noncontributing with respect to any policies carried by Landlord and that any coverage carried by Landlord shall be excess insurance, (3) be written on an "occurrence" basis and not on a "claims-made" basis, (4) contain a waiver by the insurer of any right of subrogation against Landlord, its agents, employees or representatives, as contemplated by Section 14.1, and (5) provide that, at the election of Landlord's mortgagee, the proceeds of any insurance will be paid to a trustee or depository designated by Landlord's Mortgagee. At Landlord's election, Tenant shall also name Landlord's Mortgagee as loss payee under all fire and extended coverage policies, and as an additional insured under all general public liability policies of insurance, as its interest may appear. Such policies or duly executed certificates of insurance shall promptly be delivered to Landlord, and in all events, prior to the Commencement Date, and renewals thereof shall be delivered to Landlord at least 30 days prior to the expiration of the respective policy terms. Tenant's failure to comply with the foregoing requirements relating to insurance shall constitute an Event of Default hereunder. In addition to the remedies provided in Article 19 of this Lease, upon such failure by Tenant, Landlord may, but is not obligated to, obtain such insurance on behalf of the parties hereto, whereupon Tenant shall pay to Landlord upon demand as Additional Rent the premium cost thereof plus interest thereon at the rate of 18% per annum or the maximum rate permitted by Law from the date of payment by Landlord until repaid by Tenant.

b)     <u>Cost of Landlord's Insurance</u>. Tenant agrees to pay its Proportionate Share of the cost of the property and liability insurance carried by Landlord from time to time with respect to the Shopping Center (including all buildings, other improvements and the Common Areas), which may include fire and extended coverage insurance (including extended and broad form coverage risks, mudslide, land subsidence, volcanic eruption, flood, earthquake and rent loss insurance) and comprehensive general public liability insurance and excess liability insurance, in such amounts and containing such terms as Landlord deems necessary or desirable (collectively, the "<u>Insurance</u>"). During each month of the Term, Tenant shall make a monthly payment to Landlord equal to 1/12th of its Proportionate Share of the Insurance which will be due and payable for that particular year. Each Insurance payment shall be due and payable at the same time as, and in the same manner as, the payment of Minimum Guaranteed Rental as provided herein. The initial monthly Insurance payment is based upon Landlord's good faith estimate of Tenant's Proportionate Share of the estimated Insurance for the remainder of the first calendar year, and the monthly Insurance payment is subject to increase or decrease as determined by Landlord to reflect accurately Tenant's estimated Proportionate Share of the Insurance. If, following Landlord's receipt of the actual insurance premiums for a calendar year, Landlord determines that Tenant's total Insurance payments are less than Tenant's actual Proportionate Share of the Insurance on the Shopping Center, Tenant shall pay to Landlord upon demand the difference; if the total Insurance payments of Tenant are more than Tenant's actual Proportionate Share of the Insurance on the Shopping Center, Landlord shall retain such excess and credit it to Tenant's future Insurance payments (or at Landlord's election, credit to Tenant), except in the case of the last lease year of the Term, in which event Landlord shall refund such excess to Tenant.

~~c)     Increases in Coverage. Landlord shall have the right, from time to time as Landlord shall determine, but not more often than once annually, to increase the policy limits for all insurance which Tenant is required to obtain under this Article 13, to such amount as Landlord determines is comparable to the policy limit requirements of other shopping centers of comparable size, location and character as the Shopping Center, or as is otherwise required by Landlord's Mortgagee.~~

### ARTICLE 14)   <u>Waiver of Negligence Claims; No Subrogation; Non-Liability for Certain Damages</u>.

~~a)     Waiver of Negligence Claims; No Subrogation. Landlord shall not be liable to any Tenant Party for any injury to or death of any person or persons or the damage to or theft, destruction, loss, or loss of use of any property or inconvenience (a "Loss") caused by casualty, theft, fire, third parties, or any other matter (including Losses arising through repair or alteration of any part of the Shopping Center, or failure to make repairs, or from any other cause), regardless of whether the negligence of any party caused such Loss in whole or in part. Landlord and Tenant each waives any claim it might have against the other for any damage to or theft, destruction, loss, or loss of use of any property, to the extent the same is insured against under any insurance policy maintained by it that covers the Shopping Center, the Premises,~~

INITIAL

| Landlord | Tenant |
|----------|--------|
| *(initials)* | *(initials)* |

Landlord's or Tenant's fixtures, personal property, leasehold improvements, or business, or is required to be insured by it against under the terms hereof, regardless of whether the negligence or fault of the other party caused such loss; however, Landlord's waiver shall not include any deductible amounts on insurance policies carried by Landlord. Each party shall cause its insurance carrier to endorse all applicable policies waiving the carrier's rights of recovery under subrogation or otherwise against the other party. Additionally, all property kept, stored or maintained within the Premises by Tenant shall be at Tenant's sole risk.

b)    **Non-Liability for Certain Occurrences.** Landlord and Landlord's partners, agents, employees, officers and directors shall not be liable to Tenant or to Tenant's employees, agents or visitors, or to any person or entity whomsoever, for injury to person or damage to or loss of property i) occurring in, on or about the Premises, regardless of the cause, ii) occurring within the Common Area, if caused by the sole negligence or misconduct of any Tenant Party; iii) arising out of the use of the Premises by Tenant and the conduct of its business therein, iv) arising out of any breach or default by Tenant in the performance of its obligations hereunder, v) occasioned by or through the acts or omissions of other tenants of the Shopping Center or of any other persons or entities whomsoever, excepting only the sole negligence or willful misconduct of duly authorized employees and agents of Landlord, or vi) resulting from any other cause except Landlord's sole negligence or willful misconduct; and, in any of such events, Tenant hereby shall indemnify Landlord and Landlord's partners, agents, employees, officers and/or directors, defend and hold each of them harmless from any and all liability, loss, damage, claim, action or expense (including all court costs and attorneys' fees) arising out of such damage or injury due to any of the causes described above (other than those described in Sections 14.2(e) and 14.2(f) even though caused or alleged to be caused by the joint, comparative or concurrent negligence or fault of Landlord or its agents, and even though any such claim, cause of action or suit is based upon or alleged to be based upon the strict liability of Landlord or its agents. **This indemnity provision is intended to indemnify Landlord and its agents against the consequences of their own negligence or fault as provided above when Landlord or its agents are jointly, comparatively, or concurrently negligent with Tenant. The provisions of this section shall survive the termination of this Lease.**

ARTICLE 15)    Damage by Casualty.

a)    **Notice to Landlord.** Tenant shall give immediate written notice to Landlord of any damage to the Premises by fire or other casualty.

b)    **Landlord's Obligation to Repair and Rebuild.** If the Premises are damaged or destroyed by fire or other casualty insurable under standard fire and extended coverage insurance and Landlord does not elect to terminate this Lease as hereinafter provided, Landlord shall proceed with reasonable diligence to rebuild and repair the Premises, and in such event Tenant shall pay its Proportionate Share of the deductible applicable under Landlord's insurance with respect to any casualty occurring in the Shopping Center, unless Tenant or another tenant (or the employees, agents, contractors, concessionaires, licensees or subtenants of Tenant or any other tenant) are responsible for such casualty by way of negligence or willful misconduct, in which event the responsible tenant(s) shall pay the entire amount of the deductible upon demand. If the building in which the Premises is located shall i) be destroyed or substantially damaged by a casualty not covered by Landlord's insurance, ii) be destroyed or rendered untenantable to an extent in excess of 50% of the first floor area by a casualty covered by Landlord's insurance, iii) be damaged to such extent that the remaining term of this Lease is not sufficient to amortize the cost of reconstruction, or iv) be damaged due to the willful misconduct of any Tenant Party, then Landlord may elect to either terminate this Lease as hereinafter provided or to proceed to rebuild and repair the Premises. Should Landlord elect to terminate this Lease, it shall give written notice of such election to Tenant within 90 days after the occurrence of such casualty. If Landlord does not elect to terminate this Lease, Landlord shall proceed with reasonable diligence to rebuild and repair the Premises, utilizing insurance proceeds for such purpose, and Landlord agrees to make available to Landlord any insurance proceeds it is entitled to for such purposes. In the event of any damage or destruction to the Premises, Tenant shall, upon notice from Landlord, remove, at Tenant's sole cost and expense, such portion or all of Tenant's trade fixtures and all other property belonging to Tenant or Tenant's licensees from such portion or all of the Premises as Landlord shall request.

c)    **Tenant's Obligation to Repair and Rebuild.** Landlord's obligation to rebuild and repair under this Article 15 shall be limited to restoring the Premises to building shell condition, and shall be further limited to the extent of the insurance proceeds available to Landlord for such restoration, and Tenant agrees that promptly after completion of such work by Landlord, it shall proceed with reasonable diligence and at its sole cost and expense to rebuild, repair and restore its signs, fixtures and equipment and other items of Tenant's Work as described in Exhibit C (if any) and otherwise to substantially the same condition in which the Premises existed prior to the casualty.

d)    **Continuance of Tenant's Business.** Tenant agrees that during any period of reconstruction or repair of the Premises it will continue the operation of its business within the Premises to the extent practicable. During the period from the occurrence of the casualty until Landlord's repairs are completed, the Minimum Guaranteed Rental shall be reduced to such extent as may be fair and reasonable under the circumstances, however, there shall be no abatement of the Percentage Rental, Additional Rent or other charges provided for herein.

e)    **Requirements of Mortgagee.** Notwithstanding anything herein to the contrary, if any Landlord's Mortgagee requires that the insurance proceeds be applied to its indebtedness, then Landlord shall have the right to i) terminate this Lease by delivering written notice of termination to Tenant within 30 days after such requirement is made or first attempted to be enforced by any such holder, whereupon all rights and obligations hereunder shall cease and terminate as of the date of such notice (other than those provisions which are expressly stated to survive termination of this Lease), or

INITIAL

| Landlord | Tenant |
|---|---|

ii) delay reconstruction until such time as it is able to procure construction financing therefor, in which event this Lease shall remain in full force and effect prior to and after completion of such reconstruction.

### ARTICLE 16)  Eminent Domain.

a)        **Substantial Taking**. If more than 20% of the floor area of the Premises should be taken for any public or quasi-public use under any governmental Law, ordinance or regulation or by right of eminent domain or by private purchase in lieu thereof, this Lease shall terminate and the Rent (excluding Rent accruing with respect to the period prior to the date of such termination) shall be abated during the unexpired portion of this Lease, effective on the date physical possession is taken by the condemning authority.

b)        **Partial Taking**. If less than 20% of the floor area of the Premises should be taken as aforesaid, this Lease shall not terminate; however, the Minimum Guaranteed Rental payable hereunder during the unexpired portion of this Lease shall be reduced in proportion to the area taken, effective on the date physical possession is taken by the condemning authority. The Percentage Rental Breakpoint shall be proportionately adjusted to reflect such change in the Minimum Guaranteed Rental. Following such partial taking, Landlord shall make all necessary repairs or alterations within the scope of the improvements made by Landlord to the Premises for Tenant in connection with this Lease (if any) necessary to make the Premises an architectural whole.

c)        **Common Area Condemnation**. If any part of the Common Area shall be taken as aforesaid, this Lease shall not terminate, nor shall the Rent payable hereunder be reduced; however, either Landlord or Tenant may terminate this lease if the area of the Common Area remaining following such taking plus any additional parking area provided by Landlord in reasonable proximity to the Shopping Center shall be less than 70% of the area of the Common Area immediately prior to the taking. Any election to terminate this Lease in accordance with this provision shall be evidenced by written notice of termination delivered to the other party within 30 days after the date physical possession is taken by the condemning authority.

d)        **Condemnation Award**. All compensation awarded for any taking for public purposes, whether permanent or temporary (or the proceeds of private sale in lieu thereof), of the Premises or Common Area shall be the property of Landlord, and Tenant hereby assigns its interest in any such award to Landlord; however, Landlord shall have no interest in any award made to Tenant for loss of business or for the taking of Tenant's fixtures and other personal property of Tenant if a separate award for such items is made to Tenant. Tenant shall not be entitled to any award made for the value of the unexpired Term of this Lease.

### ARTICLE 17)  Assignment and Subletting.

a)        **Generally**. Tenant shall not assign or transfer all or any portion of its legal or equitable interest in this Lease or in the Premises, nor sublet all or any portion of the Premises, nor enter into any management or similar contract which provides for a direct or indirect transfer of operating control over the business operated in the Premises, without the prior written consent of Landlord. Any assignment, sublease or other such transfer without Landlord's prior written consent shall be voidable, and, at Landlord's election, shall constitute an Event of Default by Tenant hereunder. Consent by Landlord to one or more assignments or sublettings shall not operate as a waiver of Landlord's rights with respect to any subsequent assignment or subletting. If Tenant is a partnership, a withdrawal or change (voluntary, involuntary, or by operation of Law) of any partner owning 20% or more of the partnership, or the dilution or liquidation of the partnership, shall be deemed an assignment of this Lease. If Tenant consists of more than one person, a purported assignment (voluntary, involuntary, or by operation of Law) from any of such persons to any other person or entity shall be deemed an assignment of this Lease. If Tenant is a corporation, any dissolution, merger, consolidation, or other reorganization of Tenant, or the sale or other transfer of the controlling percentage of the capital stock of Tenant, or the sale of 51% of the value of the assets of Tenant, shall be deemed an assignment of this Lease. The phrase "**controlling percentage**" means the ownership of, and the right to vote, stock possessing at least 51% of the total combined voting power of all classes of Tenant's capital stock issued, outstanding, and entitled to vote for the election of directors. The term "sublet" shall be deemed to include the granting of licenses, concessions, and any other rights of occupancy of any portion of the Premises.

b)        **Proposal Notice and Landlord's Rights**. If Tenant desires to assign this Lease, or to sublet all or any portion of the Premises, to any person, firm, corporation or entity, Tenant shall deliver written notice by registered mail, return receipt requested, to Landlord identifying the proposed assignee or sublessee (the "**Proposal Notice**"), which Proposal Notice shall include, inter alia, among other things, current financial and other information with respect to the financial ability, operating experience and business reputation of the proposed assignee or sublessee sufficient for Landlord to evaluate the proposal; a form of assignment and assumption agreement, or sublease agreement, for Landlord's review and approval; a certificate from the Tenant's Chief Executive Officer certifying that the proposed assignee shall continue to use the Premises strictly in accordance with the uses permitted hereby; and a check made payable to Landlord in the amount of $500 to defray Landlord's expenses in reviewing such request. Tenant shall also reimburse Landlord immediately upon request for its attorneys' fees incurred in connection with considering any request for consent to a Proposal Notice. Landlord shall have no obligation to consent to or otherwise respond to any proposed assignment or sublease if Tenant fails to deliver a Proposal Notice to Landlord completed in accordance with this Section 17.2. Within 30 days after receipt of the Proposal Notice, Landlord shall, in its sole discretion, elect by written notice to Tenant either to i) consent to such proposed assignment or sublease; ii) terminate this Lease; or iii) deny its consent to such proposed assignment or sublease. If Landlord elects to terminate this Lease: (1) this Lease and the term hereof shall terminate as of a date designated by

INITIAL

| Landlord | Tenant |
|----------|--------|
|          |        |

Landlord, which shall be not less than 60 nor more than 180 days after the date of Landlord's notice of its election to terminate; (2) Tenant shall be released from all liability under the lease with respect to the period after the date of termination (other than indemnities and obligations of Tenant which expressly survive termination of this Lease, as set forth herein); (3) all Minimum Guaranteed Rental, Percentage Rental, Additional Rent and other charges shall be prorated to the date of such termination; and (4) upon such termination date, Tenant shall surrender the Premises to Landlord in accordance with Article 21. Following Landlord's election to terminate this Lease, Landlord may lease the Premises to any party in its sole discretion, including Tenant's proposed transferee, without any liability to Tenant whatsoever.

c)    **Proceeds of Assignment**. All cash or other proceeds of any assignment, subletting, or other transfer in excess of the rentals called for hereunder, and all cash or other proceeds of any other transfer of Tenant's interest in this Lease, shall be paid to Landlord as received by Tenant, and Tenant hereby assigns all rights in such proceeds to Landlord.

d)    **Additional Restrictions on Assignment**. Consent by Landlord to one or more assignments or sublettings shall not operate as a waiver of Landlord's rights as to any subsequent assignments and sublettings. Notwithstanding any assignment or subletting, Tenant and any guarantor of Tenant's obligations under this Lease shall at all times remain fully and primarily responsible and liable for the payment of all Rent and other monetary obligations herein specified and for the compliance with and performance of all of its other obligations under this Lease. Upon any subletting or assignment by Tenant in accordance with the terms hereof, any and all renewal options, expansion options, rights of first refusal and/or exclusive use provisions herein contained shall immediately terminate. Landlord shall be entitled to reimbursement by Tenant for reasonable fees incurred by Landlord for the processing of any requests for assignment or subletting by Tenant, including but not limited to attorneys' fees.

e)    **Prohibition on Leasehold Mortgages**. Tenant shall not mortgage, pledge or otherwise encumber its interest in this Lease or in the Premises, and any such mortgage, pledge or encumbrance shall be void and of no force and effect.

f)    **Assignment by Landlord**. If Landlord transfers or assigns its interest in this Lease and in the building containing the Premises to a person or entity assuming Landlord's obligations under this Lease, Landlord shall thereby be released from any further obligation hereunder, and Tenant agrees to look solely to such successor in interest of the Landlord for performance of such obligations. Any security given by Tenant to secure performance of Tenant's obligations hereunder may be assigned and transferred by Landlord to such successor in interest, and Landlord shall thereby be discharged of any further obligation relating thereto.

### ARTICLE 18)  Taxes.

a)    **Personal Property and Fixtures**. Tenant shall be liable for all taxes levied against personal property and trade fixtures placed by Tenant in the Premises. If any such taxes are levied against Landlord or Landlord's property and if Landlord elects to pay the same or if the assessed value of Landlord's property is increased by inclusion of personal and trade fixtures placed by Tenant in the Premises and Landlord elects to pay the taxes based on such increase, Tenant shall pay to Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder.

b)    **Tax Payment**. Tenant shall pay its Proportionate Share of all taxes, assessments and governmental charges of any kind and nature whatsoever levied or assessed against the Shopping Center, any other charges, taxes and/or impositions now in existence or hereafter imposed by any governmental authority based upon the privilege of renting the Premises or upon the amount of rent collected therefor, and any tax, fee, levy, assessment or charge which is imposed as the result of a transfer, either partial or total, of Landlord's interest in the Premises or which is added to a tax or charge hereinbefore included within the definition of real property tax by reason of such transfer (collectively, "**Taxes**"). Taxes shall also be deemed to include any special taxing district assessment which is imposed in order to fund public facilities for the area in which the Shopping Center is located. During each month of the Term, Tenant shall make a monthly payment to Landlord equal to 1/12 of its Proportionate Share of the Taxes on the Shopping Center which will be due and payable for that particular year (the "**Tax Payments**"). Tenant authorizes Landlord to use the funds deposited with Landlord under this Section 18.2 to pay the Taxes levied or assessed against the Shopping Center. Each Tax Payment shall be due and payable at the same time and in the same manner as the time and manner of the payment of Minimum Guaranteed Rental as provided herein. The initial monthly Tax Payment is based upon Tenant's Proportionate Share of the Taxes on the Shopping Center for the fiscal tax year in which the Commencement Date is to occur, as estimated by Landlord in good faith, and the monthly Tax Payment is subject to increase or decrease as determined by Landlord to reflect accurately Tenant's Proportionate Share of the Taxes. If following Landlord's receipt of all Tax bills for any fiscal tax year Landlord determines that Tenant's total Tax Payments for such period are less than Tenant's actual Proportionate Share of the Taxes on the Shopping Center, Tenant shall pay to Landlord the difference upon demand; if the total Tax Payments of Tenant exceed Tenant's actual Proportionate Share of the Taxes on the Shopping Center, Landlord shall retain such excess and credit it to Tenant's future Tax Payments or, at Landlord's election, refund such excess to Tenant.

c)    **Tax Consultant; Taxes Contested by Landlord**. Landlord shall have the right to employ a tax consulting firm to attempt to assure a fair tax burden on the Shopping Center. Tenant shall pay to Landlord upon demand from time to time, as Additional Rent, the amount of Tenant's Proportionate Share as of the cost of such service. Additionally, Landlord shall have the right to contest any tax assessment, valuation or levy against the Shopping Center, and to retain legal counsel and expert witnesses to assist in such contest and otherwise to incur expenses in such contest, and Tenant shall pay upon demand Tenant's Proportionate Share of any fees, expenses and costs incurred by Landlord in

C:\DOCUMENTS AND SETTINGS\FRODGERS\DESKTOP\COTTONWOOD FINANCIAL –NORTH GARLAND.DOC
8/19/04 10:24 AM

13

INITIAL

| Landlord | Tenant |
|----------|--------|
|          |        |

**App. 020**

contesting any assessments, levies or tax rate applicable to the Shopping Center or portions thereof whether or not such contest is successful. If such contest results in a refund of Taxes in any year, Tenant shall be entitled to receive its Proportionate Share of such refund, pro-rated for the period with respect to which Tenant paid its share of Taxes for such year, after deducting from the refund all fees, expenses and costs incurred by Landlord in such contest.

d)    **Payment for Partial Year.** Any payment to be made pursuant to this Article 18.4 with respect to the real estate tax year in which this Lease commences or terminates shall bear the same ratio to the payment which would be required to be made for the full tax year as that part of such tax year covered by the Term of this Lease bears to a full tax year.

ARTICLE 19)    **Events of Default and Remedies.**

a)    **Events of Default by Tenant and Remedies.** Each of the following events shall be an "**Event of Default**" by Tenant under this Lease:

i)    If Tenant shall fail to pay Rent when due and the continuance of such failure for a period of five days after Landlord has delivered to Tenant written notice thereof; however, an Event of Default shall occur hereunder without any obligation of Landlord to give any notice if Landlord has given Tenant written notice under this Section 19.1(a) on more than one occasion during the 12-month interval preceding such failure by Tenant.

ii)    If Tenant shall fail (1) to obtain the insurance coverage required hereunder, (2) to comply with the provisions of Section 7.5 regarding Hazardous Waste, or (3) to open for business and maintain adequate inventory as specified under Section 7.10.

iii)    If any petition is filed by or against Tenant (the term "Tenant" shall include, for the purpose of this Section 19.1(c), any guarantor of Tenant's obligations hereunder) (1) in any bankruptcy or other insolvency proceeding; (2) seeking any relief under any state or federal debtor relief law; (3) for the appointment of a liquidator or receiver for all or substantially all of Tenant's property or for Tenant's interest in this Lease; or (4) for the reorganization or modification of Tenant's capital structure.

iv)    If Tenant admits that it cannot meets its obligations as they become due or the making by Tenant of an assignment for the benefit of its creditors.

v)    If Tenant shall vacate the Premises and permit the same to remain unoccupied and unattended, or shall remove or attempt to remove or manifest an intent to remove, not in the ordinary course of business, Tenant's goods or property from or out of the Premises.

vi)    If Tenant shall create or suffer the creation of a lien upon the Premises in violation of Article 20.

vii)    If the business operated by Tenant shall be closed for failure to pay any State sales tax as required or for any other reason.

viii)    If Tenant shall fail to commence promptly its Tenant's Work in the Premises as required in Section 3.2, or shall fail to prosecute the same diligently to completion.

ix)    ~~If Tenant shall fail to open for business to the public in the Premises fixtured, stocked and staffed as herein provided on the Commencement Date.~~

x)    If Tenant shall fail, after once being open for business in the Premises, to be open for business to the public for more than three consecutive days when required by this Lease to be so open, or for more than an aggregate of five such days in any one lease year, or shall otherwise abandon, desert or vacate the Premises.

xi)    If any execution, levy, attachment, or other process of law shall occur upon Tenant's goods, fixtures or interest in the Premises.

xii)    If Tenant shall fail to deliver an estoppel certificate to Landlord within ~~five~~ fifteen days after Landlord's request therefor, pursuant to the requirements of Section 28.10.

xiii)    If Tenant shall at any time be in breach or default in the observance or performance of any of the other covenants and/or agreements required to be performed and/or observed by Tenant hereunder for a period of five days; provided that if such default is curable but shall reasonably require more than five days to cure, Tenant shall be afforded an additional time period to effect such cure, not to exceed 30 days, provided Tenant commences to cure the default within the initial five-day period and diligently prosecutes the same to completion.

Upon the occurrence of any such Event of Default, Landlord shall have the option to pursue any one or more of the following remedies without any notice or demand whatsoever:

C:\DOCUMENTS AND SETTINGS\TBDOGERLD\DESKTOP\COTTONWOOD FINANCIAL--NORTH GARLAND.DOC
8/17/06 10:26AM

14

     (1)    Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so Landlord may, without prejudice to any other remedy which Landlord may have for omission or arrearages in rental, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, by force if necessary, without being liable for prosecution or any claim of damages therefor.

     (2)    Enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof without being liable for prosecution or any claim for damages therefor, with or without having terminated this Lease.

     (3)    Perform any act Tenant is obligated to perform under the terms of this Lease (and enter upon the Premises in connection therewith if necessary) in Tenant's name and on Tenant's behalf, without being liable for any claim for damages therefor, and Tenant shall reimburse Landlord on demand for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease (including, but not limited to, collection costs and legal expenses), plus interest thereon at the lesser of 18% per annum or the maximum rate permitted by Law.

     (4)    Alter all locks and other security devices at the Premises without terminating this Lease.

In addition to the other remedies provided in this Lease, and anything contained herein to the contrary notwithstanding, Landlord shall be entitled to restrain any default or violation, or attempted or threatened default or violation of any of the terms, covenants, conditions or other provisions of this Lease, by injunction, order of specific performance or other appropriate equitable relief.

b)    **Exercise of Landlord's Remedies.**  The remedies provided to Landlord hereunder are intended to be cumulative, and may be exercised by Landlord in any order, or simultaneously, without such exercise being a waiver by Landlord of its right to exercise any other remedy granted to Landlord hereunder (or under applicable Laws) with respect to the same default. Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance or surrender of the Premises by Tenant, whether by agreement or by operation of Law, it being understood that such surrender can be effected only by the written agreement of Landlord and Tenant. No alteration of locks or other security devices and no removal or other exercise of dominion by Landlord over the property of Tenant or others at the Premises shall be deemed unauthorized or constitute a conversion or a tortious interference with the business, contracts or operations of Tenant, Tenant hereby consenting, after any Event of Default, to the aforesaid exercise of dominion over Tenant's property within the Premises. All claims for damages by reason of such re-entry and/or repossession and/or alteration of locks or other security devices are hereby waived, as are all claims for damages by reason of any distress warrant, forcible detainer proceedings, sequestration proceedings or other legal process. Tenant agrees that any re-entry by Landlord may be pursuant to judgment obtained in legal proceedings, or without the necessity for any legal proceedings, as Landlord may elect, and Landlord shall not be liable in trespass, for tortious interference with business or contract, or otherwise in connection therewith. To the fullest extent permitted by applicable Law, Landlord shall have the right to bring an action for unlawful detainer or possession separate from any action brought to recover damages due from Tenant by virtue of its default, and the bringing of such separate action for unlawful detainer or possession shall in no way prejudice or cut off Landlord's right to seek damages or to exercise any of its other rights and remedies under this Lease after recovering possession of the Premises.

c)    **Termination of Lease.**  If, after the occurrence of an Event of Default, Landlord elects to terminate this Lease, then notwithstanding such termination (and in addition to the additional costs and expenses recoverable from Tenant pursuant to Section 19.5), Tenant shall be liable for and shall pay to Landlord the sum of all Rent and other amounts payable to Landlord pursuant to the terms of this Lease which have accrued to the date of such termination, plus, as damages, an amount equal to the total Rent (Minimum Guaranteed Rental, Percentage Rental and Additional Rent, including Tenant's Proportionate Share of Common Area Costs and Landlord's Insurance payments, ~~the Promotion Fund Charge~~, and Tenant's Tax Payments hereunder) for the remaining portion of the Term (had such Term not been terminated by Landlord prior to the date of its scheduled expiration), less the present value of the then fair rental value of the Premises for such period based upon a discount rate of 10% per annum. In lieu of the damages for future rent measured under the formula set forth in the preceding sentence, but in addition to the additional costs and expenses recoverable from Tenant pursuant to Section 19.5, ~~Landlord may, in the event of termination pursuant to this Section 19.3, elect to recover Indemnity Payments from Tenant.~~ For purposes of this Lease "**Indemnity Payments**" means an amount equal to the Rent and other payments provided for in this Lease which would have become due and owing thereunder from time to time during the unexpired Term (with Percentage Rental due calculated pursuant to Section 19.11, less the Rent and other payments, if any, actually collected by Landlord and allocable to the Premises). Tenant shall, on demand, make Indemnity Payments monthly, and Landlord may sue for all Indemnity Payments at any time after they accrue, either monthly, or at less frequent intervals. Tenant further agrees that Landlord may bring suit for Indemnity Payments at or after the end of the Term as originally contemplated under this Lease, and Tenant agrees that in such event Landlord's cause of action to recover the Indemnity Payments shall be deemed to have accrued on the last day of the Term as originally contemplated. Tenant hereby irrevocably waives any defense based on application of a statute of limitation with respect to any action on behalf of Landlord to recover such Indemnity Payments as long as such action is brought within the applicable limitation period as measured from the last day of the Term.

INITIAL

| Landlord | Tenant |
|----------|--------|
|          |        |

d)    **No Termination**. If Landlord elects to repossess the Premises without terminating this Lease, then (in addition to the additional costs and expenses recoverable from Tenant pursuant to Section 19.5) Tenant shall be liable for and shall pay to Landlord at the address specified for notice to Landlord herein all Rent and other amounts payable to Landlord pursuant to the terms of this Lease which have accrued to the date of such repossession, plus total Rent (Minimum Guaranteed Rental, Percentage Rental (calculated pursuant to Section 19.11) and Additional Rent, including Tenant's Proportionate Share of Common Area Costs and Landlord's Insurance payments, the Promotion Fund Charge, and Tenant's Tax Payments) required to be paid by Tenant to Landlord during the remainder of the Term until the scheduled date of expiration of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting expenses incurred by Landlord as provided in Section 19.5). In reletting the Premises on Tenant's behalf, Landlord shall be entitled to grant any concessions it deems advisable, including free rent. In no event shall Tenant be entitled to any excess of any rental obtained by reletting over and above the rental herein reserved. Actions to collect amounts due by Tenant to Landlord as provided in this Section 19.4 may be brought from time to time on one or more occasions, without the necessity of Landlord's waiting until expiration of the Term, or such action may be brought at or after the end of the Term, in which event Landlord's cause of action to collect such amounts shall be deemed (for purposes of applying any applicable statute of limitations) to have accrued on the last day of such Term, and Tenant hereby waives any defense based on application of a statute of limitations with respect to an action brought by Landlord to recover such amounts, as long as such action is brought within the applicable limitation period as measured from the last day of the Term.

e)    **Additional Costs and Expenses of Default**. Following the occurrence of any Event of Default, Tenant shall also be liable for and shall pay to Landlord, in addition to any sum provided to be paid above: i) costs and expenses incurred by Landlord to obtain possession of the Premises; ii) broker's fees incurred by Landlord in connection with reletting the whole or any part of the Premises; iii) the costs of removing, storing and/or disposing of Tenant's or other occupant's property; iv) the amount of all damages suffered by Landlord as a result of Tenant's default prior to termination or recovery of the Premises, as the case may be; v) the cost of making repairs and replacements required to be made by Tenant hereunder, and of performing all covenants of Tenant relating to the condition of the Premises; vi) the cost of repairing, altering, remodeling or otherwise putting the Premises into condition acceptable to a new tenant or tenants; and vii) all reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies at law, equity or hereunder, including reasonable attorneys' fees, litigation expenses and court costs.

f)    **Reletting the Premises**. In the event of termination of this Lease or repossession of the Premises after an Event of Default, Landlord shall not have any obligation to relet or attempt to relet the Premises or any portion thereof, or to collect rental after reletting; Landlord may relet the whole or any portion of the Premises for any period, to any tenant, and for any use and purpose, upon such terms as it deems appropriate, and may grant any rental or other lease concessions as it deems advisable, including free rent.

g)    **Landlord's Refinancing**. If Landlord refinances the indebtedness currently secured by the Shopping Center and, as a part of such refinancing, the new lender requires modifications of the terms and provisions of this Lease, Tenant shall negotiate in good faith to modify this Lease to conform with such new lender's requirements; however, Tenant shall not be required to agree to any changes to the material terms of this Lease or to any changes which would increase Tenant's financial obligations hereunder.

h)    **Joint and Several Liability**. If Tenant is comprised of more than one person and/or entity, all such persons and/or entities shall be jointly and severally liable for all of the obligations and liabilities of Tenant under this Lease.

i)    **Security Deposit**. Upon receipt from Tenant of the sum stated in Section 1.1(n), such Security Deposit shall be held by Landlord without interest as security for the performance by Tenant of Tenant's obligations under this Lease; such deposit is not an advance payment of rental or a measure of Landlord's damages in the event of any default by Tenant. If at any time during the Term any of the Rent herein reserved shall be overdue and unpaid, or any other sum payable by Tenant to Landlord hereunder shall be overdue and unpaid, then Landlord may, at its option, apply any portion of said deposit to the payment of any such overdue Rent or other sum. In the event of the failure of Tenant to keep and perform any of the other terms, covenants and conditions of this Lease to be kept and performed by Tenant, then the Landlord at its option may apply the Security Deposit, or so much thereof as may be necessary, to compensate the Landlord for loss, cost or damage sustained, incurred or suffered by Landlord due to such breach on the part of Tenant. Should the Security Deposit or any portion thereof be applied by Landlord as herein provided, Tenant shall, upon written demand of Landlord, remit to Landlord a sufficient amount in cash to restore the Security Deposit to the original sum deposited, and Tenant's failure to do so within five fifteen days after receipt of such demand shall constitute an Event of Default under this Lease. Any remaining balance of the Security Deposit shall be returned by Landlord to Tenant at such time after termination of this Lease that all of Tenant's obligations under this Lease have been fulfilled. Landlord hereby reserves the right to commingle Tenant's Security Deposit with any other accounts that it holds, and Tenant hereby consents thereto. Should Landlord choose to apply the Security Deposit against damages suffered by it, such application shall not establish or signify a waiver of any other rights or remedies of Landlord hereunder, nor shall such application constitute an accord or satisfaction.

j)    **Additional Security**. If a default by Tenant occurs hereunder, and either i) Landlord elects not to terminate this Lease in connection therewith, or ii) Tenant otherwise cures such default and/or redeems its right of possession of the Premises prior to Landlord's termination of this Lease becoming effective, whether pursuant to applicable

Law, or otherwise, then in addition to any other rights of Landlord exercisable in connection therewith, Landlord shall have the right to demand from Tenant, and Tenant agrees to deposit with Landlord, as additional security for the performance of Tenant's obligations hereunder, an amount equal to one month's Monthly Minimum Guaranteed Rental at the rental rate in effect at such time. Such additional security amount shall be held by Landlord as an addition to the Security Deposit, if any, previously tendered by Tenant to Landlord under this Lease, and shall be administered by Landlord in accordance with Section 19.9. Landlord shall have the right to demand tender of such additional security on each occasion where Tenant commits a default hereunder, and on more than one occasion, if applicable, and Tenant's failure to make such payment within five days after Landlord's demand therefor shall be deemed an Event of Default under Section 19.1(a).

k) ~~Percentage Rental After Tenant's Default. For the purpose of computing the amount of Tenant's liability under this Article 19 for Percentage Rental after the occurrence of an Event of Default, the Percentage Rental for which Tenant shall be liable after termination of Tenant's right to possession or termination of the Lease shall be the amount Tenant was obligated to pay as Percentage Rental during the prior lease year (or, in the event of Landlord's exercise of its remedies under Article 19 prior to the expiration of one full lease year, the last calendar quarter, multiplied by 4), for each lease year remaining in the original Term hereof. Tenant will also pay a pro rata part of such Percentage Rental based upon the length of time between Tenant's last payment of Percentage Rental and the date of termination, and upon such termination Tenant will be obligated to submit to Landlord a statement accurately showing Gross Sales made since submission of its last previous statement, together with such additional supporting financial records as Landlord may require.~~

l)     **Repossession of the Premises.** If Landlord takes possession of the Premises pursuant to the authority herein granted, then Landlord shall have the right to keep in place and use all of the furniture, fixtures and equipment at the Premises, including that which is owned by or leased to Tenant at all times prior to any foreclosure thereon by Landlord or repossession thereof by any lessor thereof or third party having a lien thereon. Landlord shall also have the right to remove from the Premises (without the necessity of obtaining a distress warrant, writ of sequestration or other legal process and without being liable for prosecution or any claim for damages therefor) all or any portion of such furniture, fixtures, equipment and other property located thereon and place the same in storage at any place within the county in which the Premises is located or dispose of the same; and in such event, Tenant shall be liable to Landlord for costs incurred by Landlord in connection with such removal, storage and/or disposal and shall indemnify and hold Landlord harmless from all loss, damage, cost, expense and liability in connection with such removal, storage and/or disposal. Landlord shall also have the right to relinquish possession of all or any portion of such furniture, fixtures, equipment and other property to any person ("**Claimant**") claiming to be entitled to possession thereof who presents to Landlord a copy of any instrument purporting to have been executed by Tenant (or any predecessor of Tenant) granting Claimant the right under various circumstances to take possession of such furniture, fixtures, equipment or other property, without the necessity on the part of Landlord to inquire into the authenticity of said instrument and without the necessity of Landlord's making any investigation or inquiry as to the validity of the factual or legal basis upon which Claimant purports to act; and Tenant agrees to indemnify, defend and hold Landlord harmless from all cost, expense, loss, damage and liability incident to Landlord's relinquishment of possession of all or any portion of such furniture, fixtures, equipment or other property to Claimant. Should Tenant abandon the Premises and leave property therein, Landlord may elect whether or not to accept the property, liquidate said property and apply the proceeds against any sums due and owing by Tenant, or to dispose of said property, and Tenant waives any claim to such property after any such abandonment. For purposes of the foregoing, Tenant shall be deemed to have abandoned its interest in such property if the same is not removed from the Premises by Tenant within ten days after Landlord's proper demand that Tenant remove same, or within ten days after expiration or earlier termination of this Lease, whichever first occurs.

m)     **Additional Remedies.** The rights and remedies of Landlord herein stated shall be in addition to, and not in lieu of, any and all other rights and remedies which Landlord has or may, hereafter have against Tenant or any other person or entity, at law or in equity, and Tenant stipulates and agrees that the rights herein granted Landlord are understood and have been expressly agreed to by Tenant.

**ARTICLE 20)   Mechanics' Liens.**

Tenant shall have no authority, express or implied, to create, place or suffer the creation or placement of any lien or encumbrance of any kind or nature whatsoever upon the Shopping Center and/or Premises, or in any manner to bind the interest of Landlord or Tenant in the Shopping Center and/or Premises, or to charge the Rent payable hereunder, for any claim in favor of persons and/or entities dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant shall pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises with respect to which any lien is or can otherwise be validly and legally asserted against its leasehold interest in the Premises or the improvements thereon. Tenant shall discharge any such lien by payment or bonding within ten days after the same has been filed, failing which Landlord shall have the right, but not the obligation, in addition to all other remedies herein provided, to discharge such lien at Tenant's expense and in such event Landlord's cost thereof, plus interest thereon at the lesser of 18% per annum or the maximum rate permitted by Law, shall be reimbursed by Tenant to Landlord upon demand as Additional Rent hereunder. Landlord and Tenant further agree that any repairs or improvements made by Tenant to the Premises shall be deemed authorized and ordered by the Tenant only, not the Landlord (although Landlord preserves any right contained herein to approve, consent to, or inspect such repairs or improvements).

**ARTICLE 21)   Surrender; Holding Over.**

INITIAL

| Landlord | Tenant |
|---|---|
|  |  |

Tenant shall deliver up and surrender to the Landlord possession of the Premises upon the expiration of the Term, or its earlier termination for any reason, in as good condition and repair as the same shall be at the commencement of the Term (ordinary wear and tear excepted), shall deliver the keys to the Shopping Center manager, and shall inform Landlord of all combinations to locks, safes and vaults, if any, in the Premises. Upon such surrender by Tenant, should the Premises require any repairs which are the responsibility of Tenant hereunder, Landlord shall have the right to make such repairs at Tenant's sole cost. If any Tenant Party remains in possession of the Premises after the expiration of this Lease, Tenant shall i) be a tenant at will, ii) pay, in addition to all other Rent, a daily Minimum Guaranteed Rental and Percentage Rental equal to 200% of the daily Minimum Guaranteed Rental and Percentage Rental herein provided, iii) be subject to all of the conditions, provisions and obligations of this Lease, including, but not limited to, Tenant's obligation to pay its Proportionate Share of Common Area Costs, Landlord's Insurance payments, the Promotion Fund Charge and Tenant's Tax Payments hereunder and all other obligations constituting Rent as set forth herein, adjusted by Landlord as is necessary or appropriate to make the same applicable to a tenancy at will, and iv) pay to Landlord all damages sustained by Landlord resulting from retention of possession by Tenant, including the loss of any proposed subsequent tenant for any portion of the Premises.

### ARTICLE 22)   Subordination; Attornment; Notice to Landlord's Mortgagee.

a)      **Subordination**. This Lease shall be subordinate to any deed of trust, mortgage, or other security instrument (a "**Mortgage**"), or any ground lease, master lease, or primary lease (a "**Primary Lease**"), that now or hereafter covers all or any part of the Premises (the mortgagee under any Mortgage or the lessor under any Primary Lease is referred to herein as "**Landlord's Mortgagee**"). Notwithstanding the subordination provided herein, any Landlord's Mortgagee may subordinate its Mortgage or Primary Lease (as the case may be) to this Lease. Tenant shall execute such documentation as a Landlord's Mortgagee may reasonably request to evidence the subordination of this Lease to such Landlord's Mortgagee's Mortgage or Primary Lease or, if the Landlord's Mortgagee so elects, the subordination of such Landlord's Mortgagee's Mortgage or Primary Lease to this Lease.

b)      **Attornment**. Tenant shall attorn to any party succeeding to Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease, or otherwise, upon such party's request, and shall execute such agreements confirming such attornment as such party may reasonably request.

c)      **Notice to Landlord's Mortgagee**. Tenant shall not seek to enforce any remedy it may have for any default on the part of the Landlord without first giving written notice by certified mail, return receipt requested, specifying the default in reasonable detail, to any Landlord's Mortgagee whose address has been given to Tenant, and affording such Landlord's Mortgagee a reasonable opportunity to perform Landlord's obligations hereunder.

### ~~ARTICLE 23)   Merchants' Association and Promotion Fund.~~

~~If Landlord organizes a merchants association composed of tenants in the Shopping Center, Tenant shall promptly join, actively participate in and maintain current membership in such association, shall pay such dues and assessments as may be fixed and determined from time to time by the association and will comply with such group advertising decisions, reasonable bylaws, and rules and regulations as may be adopted from time to time by the association. Additionally, commencing with the Commencement Date, Tenant shall pay on the first day of each calendar month, an amount equal to 1/12 of the "Promotion Fund Charge" which, together with the contributions by other tenants (collectively, the "Promotion Fund"), shall be used to pay costs and expenses incurred in connection with the promoting of the Shopping Center, including but not limited to, grand opening costs and the costs of special events, shows, displays, signs, seasonal events, promotional literature, advertisements, and all other activities designed to attract customers to the Shopping Center. The "Promotion Fund Charge" is equal to $.50 per square foot of the rentable area of the Premises per year and shall constitute Additional Rent payable by Tenant to Landlord hereunder. Tenant's Promotion Fund Charge, as hereinafter provided, shall be subject to further adjustment from time to time during the Lease Term as follows: Effective upon the commencement of the second full calendar year of the Lease Term, and thereafter upon commencement of each succeeding calendar year (the "Succeeding Period"), the Promotion Fund Charge set forth above shall be multiplied by a fraction, the numerator of which shall be the Consumer Price Index for Urban Wage Earners and Clerical Workers (Dallas/Fort Worth), (1982-84=100) (hereinafter "Index"), published by the Bureau of Labor Statistics of the United States Department of Labor, for the immediately preceding December (and thereafter for the December preceding the commencement of the applicable Succeeding Period) and the denominator of which is the Index for the month in which the Commencement Date occurred or if no Index is available for such month, the most proximate month in which the Index is available; provided that in no event shall Tenant's Promotion Fund Charge be less than the Promotion Fund Charge for the preceding 12 month period. [Tenant agrees to participate in a joint opening of the Shopping Center if requested to do so by Landlord, and to pay a prorata share (as defined in Section 6.2) of Landlord's grand opening costs for the Shopping Center if a grand opening is held, which Grand Opening Contribution shall (together with the Grand Opening Contributions of other tenants in the Shopping Center) be expended by Landlord in promotional and other activities associated with such grand opening. If the amount in the Promotion Fund at the time of such grand opening is insufficient to pay all costs and expenses incurred by Landlord in connection therewith, Tenant agrees to pay to Landlord, upon demand, its Proportionate Share of any such deficiency.]~~

### ARTICLE 24)   Notices.

|  | INITIAL |
|---|---|
| Landlord | Tenant |

All notices and other communications given pursuant to this Lease shall be in writing and shall be i) mailed by first class, United States Mail, postage prepaid, certified, with return receipt requested, and addressed to the parties hereto at the address specified in the Basic Lease Information, ii) hand delivered to the intended address, or iii) sent by prepaid telegram, cable, facsimile transmission, or telex followed by a confirmatory letter. Notice sent by certified mail, postage prepaid, shall be effective three business days after being deposited in the United States Mail; all other notices shall be effective upon delivery to the address of the addressee. The parties hereto may change their addresses by giving notice thereof to the other in conformity with this provision.

### ARTICLE 25)   Late Fee.

a)       **Penalties for Late Payment**  If Tenant fails to pay to Landlord when due any installment of Rent or any other sum to be paid to Landlord which may become due hereunder, the parties acknowledge that Landlord will incur administrative expenses in an amount not readily ascertainable and which has not been elsewhere provided for herein between Landlord and Tenant. Accordingly, if Tenant should fail to pay to Landlord when due any installment of Rent or other sum to be paid hereunder, Tenant shall pay Landlord on demand a late fee equal to the greater of i) $100, or ii) 10% of the past due amount. Failure to pay such a late fee upon demand therefor shall constitute an Event of Default hereunder. Provision for such late fee shall be in addition to all other rights and remedies available to Landlord hereunder or at law or in equity and shall not be construed as liquidated damages or as a limitation on Landlord's remedies in any manner.

b)       **Non-Sufficient Funds.**  If Tenant pays any installment of Fixed Minimum Rent or any other sum by check and such check is returned for insufficient funds or other reason not the fault of Landlord, then Tenant shall pay to Landlord on demand a processing fee of Fifty and no/100 dollars ($50.00) per returned check.

### ARTICLE 26)   Tenant's Efforts.

Tenant acknowledges that Tenant's monetary contribution to Landlord (in the form of rentals) and Tenant's general contribution to commerce within the Shopping Center (also important in Landlord's determination to execute this Lease with Tenant) will be substantially reduced if, during the term of this Lease, either Tenant or any person, firm or corporation, directly or indirectly controlling, controlled by or under common control with Tenant shall directly or indirectly operate, manage, conduct or have any interest in any establishment within commercial proximity of the Shopping Center. Accordingly, during the term of this Lease neither Tenant nor any person, firm or corporation, directly or indirectly controlling, controlled by or under common control with Tenant (and also, in the event Tenant is a corporation, if any officer or director thereof or shareholder owning more than ten percent (10%) of the outstanding stock thereof, or parent, subsidiary or related or affiliated corporation) shall directly or indirectly operate, manage, conduct or have any interest (as equity owner, debt financier, franchiser or otherwise) in any commercial establishment engaged in a use substantially similar to Tenant's permitted use as set forth in Article 7, within three miles of the Shopping Center, except that any such commercial establishment existing at the date of this Lease may continue to be operated, managed, conducted and owned in the same manner (and under the same trade name) as on the date of this Lease, without the same constituting a violation of this Article 26, provided there is no increase in the size of such commercial establishment. Nothing in this Article 26, nor within any other provision of this Lease, shall be deemed to create an express or implied exclusive use covenant in favor of Tenant.

### ARTICLE 27)   Landlord's Lien.

In addition to the statutory landlord's lien, Tenant grants to Landlord, to secure performance of Tenant's obligations hereunder, a security interest in all equipment, fixtures, furniture, improvements, and other personal property of Tenant now or hereafter situated on the Premises, and all proceeds therefrom (the "**Collateral**"), and the Collateral shall not be removed from the Premises without the consent of Landlord until all obligations of Tenant have been fully performed. Upon the occurrence of an Event of Default, Landlord may, in addition to all other remedies, without notice or demand except as provided below, exercise the rights afforded a secured party under the Texas Uniform Commercial Code (the "**UCC**"). In connection with any public or private sale under the UCC, Landlord shall give Tenant five-days' prior written notice of the time and place of any public sale of the Collateral or of the time after which any private sale or other intended disposition thereof is to be made, which is agreed to be a reasonable notice of such sale or other disposition. Tenant shall execute such financing statements and other instruments reasonably requested by Landlord to perfect or continue the perfection of Landlord's security interest under this Section 27. Additionally, Tenant grants to Landlord a power of attorney to execute and file any financing statement or other instrument necessary to perfect Landlord's security interest under this Section 27, which power is coupled with an interest and shall be irrevocable during the Term. Landlord may also file a copy of this Lease as a financing statement to perfect its security interest in the Collateral.

### ARTICLE 28)   Miscellaneous.

a)       **No Partnership.**  Nothing herein contained shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between Landlord and Tenant.

b)       **Caption; Construction of Terms.**  The captions used herein are for convenience only and do not limit or amplify the provisions hereof.  The language in all parts of this Lease shall in all cases be construed as a whole and according to its fair meaning, and not strictly for or against either Landlord or Tenant, and the construction of this Lease and

**INITIAL**

| Landlord | Tenant |
|----------|--------|
|          |        |

any of its various provisions shall be unaffected by any argument or claim, whether or not justified, that it has been prepared, wholly or in substantial part, by or on behalf of Landlord or Tenant. Whenever herein the singular number is used, the same shall include the plural, and words of any gender shall include each other gender. ~~If any provision of this Lease subjects any action, inaction, activity or other right or obligation of Tenant to the prior consent or approval of Landlord, Landlord shall be deemed to have the right to exercise its sole and unfettered discretion in determining whether to grant or deny such consent or approval, unless the provision in question states that Landlord's consent or approval "shall not be unreasonably withheld," in which event Landlord's consent shall be subject to Landlord's sole, but reasonable, discretion.~~

c)      **No Waiver**. One or more waivers of any covenant, term or condition of this Lease by either party shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition. The consent or approval by either party shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition. The consent or approval by either party to or of any act by the other party requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any subsequent similar act.

d)      **Joint and Several Liability**. If there is more than one Tenant, then the obligations hereunder imposed upon Tenant shall be joint and several. If there is a guarantor of Tenant's obligations hereunder, then the obligations hereunder imposed upon Tenant shall be the joint and several obligations of Tenant and such guarantor, and Landlord need not first proceed against Tenant before proceeding against such guarantor nor shall any such guarantor be released from its guaranty for any reason whatsoever.

e)      **Landlord's Liability**. If Landlord fails to perform any of its obligations hereunder within 30 days after written notice from Tenant specifying such failure (or such longer period of time as may be necessary to cure such default so long as Landlord is diligently pursuing such cure to completion), Tenant's exclusive remedy shall be an action for damages. Unless Landlord fails to so cure such default after such notice, Tenant shall not have any remedy or cause of action by reason thereof. Liability of Landlord to Tenant for any default by Landlord, shall be limited to actual, direct, but not consequential, damages therefor and shall be recoverable only from the interest of Landlord in the Shopping Center, and neither Landlord nor Landlord's owners or managers shall have any personal liability therefor. Tenant hereby waives its statutory lien under Section 91.004 of the Texas Property Code.

f)      **Time of the Essence; Force Majeure**. Time is of the essence with respect to all provisions of this Lease. The foregoing notwithstanding, whenever a period of time is herein prescribed for action to be taken by Landlord, Landlord shall not be liable or responsible for, and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental Laws or any other causes of any kind whatsoever which are beyond the reasonable control of Landlord.

g)      **Quiet Enjoyment**. Landlord agrees that if Tenant shall perform all of the covenants and agreements herein required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the continuance of this Lease have the peaceable and quiet enjoyment and possession of the Premises, without hindrance by Landlord or anybody claiming by, through or under Landlord, but not otherwise.

h)      **Amendment**. No agreement shall be effective to change or modify this Lease in whole or in part unless such agreement is in writing and duly signed by the party against whom enforcement of such change or modification is sought.

i)      **Brokers**. Tenant warrants that it has had no dealing with any broker or agent in connection with the negotiation or execution of this Lease other than Reata Real Estate Services, LLC and _____ and Tenant agrees to indemnify, defend and hold Landlord harmless from and against any claims by any broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this leasing transaction.

j)      **Estoppel Certificate**. Tenant shall furnish from time to time when requested by Landlord or any Landlord's Mortgagee a certificate signed by Tenant confirming and containing such factual certifications and representations deemed appropriate by Landlord or any Landlord's Mortgagee, and Tenant shall, within ~~five~~ fifteen days following receipt of said certificate from Landlord, return a fully executed copy thereof to Landlord. If Tenant fails to return a fully executed copy of such certificate to Landlord within the foregoing ~~five~~ fifteen-day period, then Tenant shall be deemed to have approved and confirmed all of the terms, certifications and representations contained in such certificate. Tenant hereby irrevocably appoints Landlord as attorney-in-fact for the Tenant with full power and authority to execute and deliver in the name of Tenant such certificate if Tenant fails to deliver the same within such ~~five~~ fifteen-day period and such certificate as signed by Landlord shall be fully binding on Tenant. In addition to the foregoing, Tenant's failure to deliver an executed estoppel certificate within the ~~five~~ fifteen-day period set forth above shall constitute an Event of Default hereunder.

k)      **Governing Law**. The internal laws of the state in which the Premises are located shall govern the interpretation, validity, performance and enforcement of this Lease (without reference to choice of law principles).

l)      **Binding Effect**. The terms, provisions and covenants contained in this Lease shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors in interest and legal representatives except as otherwise herein expressly provided.

C:\DOCUMENTS AND SETTINGS\TRDDGERS\DESKTOP\CITY\DEWOOD FINANCIAL--NORTH GARLAND.DOC
8/17/06;10:56AM

20

INITIAL

| Landlord | Tenant |
|---|---|
| [signature] | TZ |

m)    **Validity and Severability.** Each provision of this Lease shall be construed in such manner as to give such provision the fullest legal force and effect possible. To the extent any provision herein (or part of such provision) is held to be unenforceable or invalid when applied to a particular set of facts, or otherwise, the unenforceability or invalidity of such provision (or part thereof) shall not affect the enforceability or validity of the remaining provisions hereof (or of the remaining parts of such provision), which shall remain in full force and effect, nor shall such unenforceability or invalidity render such provision (or part thereof) inapplicable to other facts in the context of which such provision (or part thereof) would be held legally enforceable and/or valid.

n)    ~~Rights Reserved by Landlord. Landlord reserves the right at any time to change the name by which the Shopping Center is designated. Landlord may, at Landlord's expense, relocate Tenant within the Shopping Center in space which is comparable in size to the Premises and is reasonably suited for Tenant's use. If Landlord relocates Tenant, Landlord shall reimburse Tenant for Tenant's reasonable out-of-pocket expenses for moving Tenant's furniture, equipment, supplies and telephone equipment from the Premises to the relocation space and for reprinting Tenant's stationery of the same quality and quantity of Tenant's stationery supply on hand immediately prior to Landlord's notice to Tenant of the exercise of this relocation right. Upon such relocation, the relocation space shall be deemed to be the Premises and the terms of this Lease shall remain in full force and shall apply to the relocation space.~~

*[handwritten right margin: Landlord Reserves the right at any time to change the name by which the Shopping Center is designated]*

o)    **Expenses Following Default.** In the event of a breach by Tenant of any of the covenants or provisions hereof, and irrespective of whether Landlord declares an Event of Default or exercises its remedies under Article 19 in connection therewith, Landlord shall have the right to bring a legal action against Tenant in connection therewith, to obtain an injunction of such breach therein, and the right to invoke any other remedies allowed at law or at equity as if re-entry, summary proceedings, or other remedies were not herein provided for; and in the event of such breach by Tenant, Landlord shall be entitled to recover from Tenant, payable as Additional Rent hereunder, any and all reasonable expenses as Landlord may incur in connection with its efforts to secure such injunctive relief or other remedy at law or in equity, including, but not limited to, court costs and attorneys' fees.

p)    **Independent Covenants.** If Landlord shall commence any proceeding for nonpayment of Rent, or any other payment of any other kind to which Landlord may be entitled, or which it may claim hereunder, Tenant will not interpose any counterclaim or setoff of whatever nature or description, (other than compulsory counterclaim) in such proceedings. The parties hereto specifically agree that Tenant's covenants to pay Rent or any other payments required of it hereunder are independent of all other covenants and agreements herein contained. The foregoing shall not be construed as a waiver of Tenant's right to assert any such claim in a separate action brought by Tenant against Landlord.

q)    **No Election of Remedies.** Mention in this Lease of any particular remedy shall not preclude Landlord from any other remedy at law or in equity to which it may be entitled, and all remedies herein provided are cumulative.

r)    **Incorporation of Exhibits.** All exhibits attached hereto, and any rider, addendum or special stipulations attached hereto, are incorporated herein by this reference and made a part of this Lease.

s)    **Full Execution.** This lease shall not be effective, and no leasehold or other agreement shall be deemed or construed to have been created between Landlord and Tenant, until such time as this Lease has been fully executed by both Landlord and Tenant, and a fully executed original has been delivered from Landlord to Tenant. Delivery to Tenant of drafts of this Lease by Landlord or agents of Landlord shall in no way constitute the making of an offer to Lease, or any other offer, by Landlord to Tenant, and Landlord shall not be bound by any terms or provisions set forth in such drafts, even if the draft in question was prepared by Landlord or its agents and signed by Tenant, unless and until the same has been duly executed and delivered by both Landlord and Tenant.

t)    **Waiver of Jury Trial.** Landlord and Tenant hereby expressly waive, to the maximum extent permitted by law, trial by jury in any action, proceeding or counterclaim, brought by either of them against the other, on any claim or matter whatsoever arising out of or in any way connected with this Lease, their relationship as landlord and tenant, Tenant's use and occupancy of the Premises and/or any claim of injury or damage.

g)    **Validity of Lease Offer.** This lease shall be valid if and only if both Tenant and Landlord have executed the lease document no later than September 17th, 2004.

| INITIAL | |
|---------|---------|
| Landlord | Tenant |

LANDLORD AND TENANT EXPRESSLY DISCLAIM ANY IMPLIED WARRANTY THAT THE PREMISES ARE SUITABLE FOR TENANT'S INTENDED COMMERCIAL PURPOSE, AND TENANT'S OBLIGATION TO PAY RENT HEREUNDER IS NOT DEPENDENT UPON THE CONDITION OF THE PREMISES OR THE PERFORMANCE BY LANDLORD OF ITS OBLIGATIONS HEREUNDER, AND, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, TENANT SHALL CONTINUE TO PAY THE RENT, WITHOUT ABATEMENT, SETOFF, DEDUCTION, NOTWITHSTANDING ANY BREACH BY LANDLORD OF ITS DUTIES OR OBLIGATIONS HEREUNDER, WHETHER EXPRESS OR IMPLIED.

THE PARTY OR PARTIES SIGNING THIS LEASE ON BEHALF OF TENANT ACKNOWLEDGE THAT HE, SHE OR THEY HAVE READ THIS LEASE, COMPLETELY UNDERSTAND THE RIGHTS AND LIABILITIES OF TENANT HEREUNDER, HAVE BEEN GIVEN THE OPPORTUNITY TO SEEK THE ADVICE OF COUNSEL, AND HEREBY KNOWINGLY AND VOLUNTARILY EXECUTE THIS INSTRUMENT.

TENANT:

By: _____

Name:    Timothy Rodgers

Title:    Director of Real Estate

Date Executed:    8/8/04


LANDLORD:

NORTH GARLAND CROSSING, LTD.,
A TEXAS LIMITED PARTNERSHIP

By:    North Garland General LLC,
       a Texas limited liability company,
       General Partner

By: _____

Name:    Robert W. Barnes
Title:    Manager

Date Executed:    8-20-04

EXHIBIT A - DEPICTION OF SHOPPING CENTER AND PREMISES

C:\DOCUMENTS AND SETTINGS\TRODGERS.DD\DESKTOP\COTTONWOOD FINANCIAL--NORTH GARLAND.DOC
8/1/3/04 10:26AM

A-1

| INITIAL | |
|---|---|
| Landlord | Tenant |





EXHIBIT A - DEPICTION OF SHOPPING CENTER AND PREMISES

STATE HIGHWAY 190
N GARLAND ROAD
EXISTING TRAFFIC SIGNAL
Site

INITIAL

| Landlord | Tenant |
|---|---|
| | |

\\REATA01\Company\Leases_Master\North Garland Master Lease.wpd
9/11/03 3:19pm

A-1

### EXHIBIT B-1 – LEGAL DESCRIPTION OF SHOPPING CENTER

FIELD NOTE DESCRIPTION

STATE OF TEXAS
COUNTY OF DALLAS

BEING a tract of land situated in the ONOFRE ALVARADO SURVEY, Abstract No.2, Dallas County, Texas, and being all of Lot 7, Block 1 of the replat of NORTH GARLAND CROSSING, an addition to the City of Garland as recorded in Volume 2003081, Page 070, of the Deed Records of Dallas County, Texas (DRDCT), and being more particularly described as follows:

BEGINNING at a point, said point being in the northwesterly right-of-way line of NORTH GARLAND AVENUE (100' right-of-way) and being the most easterly corner of said Lot 7, Block 1 and being the most southerly corner of Lot 6, Block 1 of said replat of NORTH GARLAND CROSSING;

THENCE along the northwesterly right-of-way line of said NORTH GARLAND AVENUE as follows:

South 46 deg 09 min 16 sec West a distance of 222.96 feet to a point for corner;

South 52 deg 25 min 14 sec West a distance of 68.72 feet to a point for corner;

South 46 deg 09 min 23 sec West a distance of 9.00 feet to a point for corner, said point being the in the common line of said Lot 7, Block 1 and Lot 2R, Block 1 of the replat of NORTH GARLAND CROSSING, an addition to the City of Garland as recorded in Volume 2002238, Page 0317 (DRDCT);

THENCE departing the northwesterly right-of-way line of said NORTH GARLAND AVENUE and along the common line of said Lot 7, Block 1 and said Lot 2R, Block 1 as follows:

North 43 deg 50 min 52 sec West a distance of 270.50 feet to a point for corner;

North 46 deg 09 min 08 sec East a distance of 247.00 feet to a point for corner, said point being in the common line of said Lot 7, Block 1 and said Lot 6, Block 1;

THENCE departing the common line of said Lot 7, Block 1 and said Lot 2R, Block 1 and along the common line of said Lot 7, Block 1 and said Lot 6, Block 1 as follows:

North 46 deg 09 min 08 sec East a distance of 36.00 feet to a point for corner;

South 43 deg 50 min 52 sec East a distance of 153.36 feet to a point for the beginning of a curve to the left, said curve to the left having a radius of 150.00 feet and a chord bearing South 53 deg 37 min 01 sec East, a distance of 50.90 feet;

INITIAL

| Landlord | Tenant |
|----------|--------|

Along said curve to the left through a central angle of 19 deg 32 min 16 sec for an arc length of 51.15 feet to a point for the beginning of a curve to the right, said curve to the right having a radius of 150.00 feet and a chord bearing South 53 deg 37 min 01 sec East, a distance of 50.90 feet;

Along said curve to the right through a central angle of 19 deg 32 mi11 16 sec for an arc length of 51.15 feet to a point for corner;

South 43 deg 50 min 52 sec East a distance of 24.33 feet to the POINT OF BEGINNING;

CONTAINING within these metes and bounds 1.829 acres or 79,639 square feet of land more or less. Bearings recited herein are based upon a deed to Peter W Baldwin, as recorded in Volume 69079, Page 0479 of the Deed Records of Dallas County, Texas, between Controlling Monuments No.1 & 2.

| INITIAL | |
|---|---|
| Landlord | Tenant |

EXHIBIT B-2 - LEGAL DESCRIPTION OF SHOPPING CENTER

FIELD NOTE DESCRIPTION

STATE OF TEXAS
COUNTY OF DALLAS

BEING a tract of land situated in the ONOFRE ALVARDO SURVEY, Abstract No.2, Dallas County, Texas, and being a portion of Lot 3R2, Block 1 of the replat of NORTH GARLAND CROSSING, an addition to the City of Garland as recorded in Volume 2003081, Page 075, of the Deed Records of Dallas County, Texas (DRDCT), and being more particularly described as follows:

BEGINNING at a point, said point being the most northerly corner of Lot 6, Block 1 of the replat of NORTH GARLAND CROSSING, an addition to the City of Garland as recorded in Volume 2003081, Page 070 (DRDCT);

THENCE along the common line of said Lot 3R2, Block 1 and said Lot 6, Block 1 South 46 deg 09 min 08 sec West a distance of 167.00 feet to a point for corner, said point being in the common line of Lot 2R Block 1 of the replat of NORTH GARLAND CROSSING, an addition to the City of Garland as recorded in Volume 2002238, Page 0317 (DRDCT)

THENCE departing the common line of said Lot 3R2, Block 1 and said Lot 6, Block 1 and along the common line of said Lot 3R2, Block 1 and said Lot 2R, Block 1 as follows:

North 43 deg 50 min 52 sec West a distance of 353.50 feet to a point for corner;

South 46 deg 09 min 08 sec West a distance of 38.00 feet to a point for corner;

North 43 deg 50 min 52 sec West a distance of 244.33 feet to a point for corner;

North 46 deg 09 min 08 sec East a distance of 10.17 feet to a point for corner;

North 43 deg 50 min 52 sec West a distance of 218.71 feet to a point for corner, said point being in the common line of said Lot 3R2, Block 1 and PARCEL NO.2 conveyed to CLAUDE EDWARD WOOTEN ET AL. as recorded in Volume 3975, Page 0304 (DRDCT);

THENCE departing the common line of said Lot 3R2, Block 1 and said Lot 2R, Block 1 and along the common line of said Lot 3R2, Block 1 and said PARCEL NO.2 North 46 deg 10 min 56 sec East a distance of 407.42 feet to a point for corner, said point being in the southwesterly right-of-way line of said STATE HIGHWAY 190;

THENCE departing the common line of said Lot 3R2, Block 1 and said PARCEL NO.2 and along the southwesterly right-of-way line of said STATE HIGHWAY 190 as follows:

C:\DOCUMENTS AND SETTINGS\TRCI\DESK\INDEX\TOP\COTTONWOOD FINANCIAL--NORTH OAKLAND.DOC
6/13/04 10:26AM

B-3

| INITIAL | |
|---------|---------|
| Landlord | Tenant |
| | |

South 52 deg 50 min 31 sec East a distance of 56.76 feet to a point for corner;

South 50 deg 28 min 47 sec East a distance of 412.10 feet to a point for corner;

THENCE departing the southwesterly right-of-way line of said STATE HIGHWAY 190 South 46 deg 03 min 47 sec West a distance of 269.06 feet to a point for corner;

THENCE South 43 deg 50 min 52 sec East a distance of 350.51 feet to the POINT OF BEGINNING.

CONTAINING within these metes and bounds 6.069 acres or 264,355 square feet of land more or less. Bearings recited herein are based upon a deed to Peter W Baldwin, as recorded in Volume 69079, Page 0479 of the Deed Records of Dallas County, Texas, between Controlling Monuments No.1 & 2.

C:\DOCUMENTS AND SETTINGS\THOOGE\INSERTON\COTTONWOOD FINANCIAL-NORTH OAKLAND.DOC
9/7/04 10:36AM

B-4

INITIAL

| Landlord | Tenant |
|----------|--------|
|          |   R    |

## EXHIBIT C – TENANT FINISH-WORK: ALLOWANCE

1.    Except as set forth in this Exhibit, Tenant accepts the Premises in their "as is" condition on the date that this lease is entered into.

2.    On or before ~~September 1, 2004~~ October 1, 2004, Tenant shall provide to Landlord for its approval final working drawings, prepared by an architect that has been approved by Landlord (which approval shall not be unreasonably withheld), of all improvements that Tenant proposes to install in the Premises; such working drawings shall include the partition layout, ceiling plan, electrical outlets and switches, telephone outlets, drawings for any modifications to the mechanical and plumbing systems of the building in which the Premises are located (the "**Building**"), and detailed plans and specifications for the construction of the improvements called for under this Exhibit in accordance with all applicable governmental laws, codes, rules, and regulations. Further, if any of Tenant's proposed construction work will affect the Building's HVAC, electrical, mechanical, or plumbing systems, then the working drawings pertaining thereto shall be prepared by the Building's engineer of record, whom Tenant shall at its cost engage for such purpose. Landlord's approval of such working drawings shall not be unreasonably withheld, provided that (a) they comply with all applicable governmental laws, codes, rules, and regulations, (b) such working drawings are sufficiently detailed to allow construction of the improvements in a good and workmanlike manner, and (c) the improvements depicted thereon conform to the rules and regulations promulgated from time to time by the Landlord for the construction of tenant improvements (a copy of which has been delivered to Tenant). As used herein, "**Working Drawings**" shall mean the final working drawings approved by Landlord, as amended from time to time by any approved changes thereto, and "**Work**" shall mean all improvements to be constructed in accordance with and as indicated on the Working Drawings. Approval by Landlord of the Working Drawings shall not be a representation or warranty of Landlord that such drawings are adequate for any use, purpose, or condition, or that such drawings comply with any applicable law or code, but shall merely be the consent of Landlord to the performance of the Work. Tenant shall, at Landlord's request, sign the Working Drawings to evidence its review and approval thereof. All changes in the Work must receive the prior written approval of Landlord, and in the event of any such approved change Tenant shall, upon completion of the Work, furnish Landlord with an accurate, reproducible "as-built" plan (e.g., sepia) of the improvements as constructed, which plan shall be incorporated into this Lease by this reference for all purposes.

3.    The Work shall be performed only by contractors and subcontractors approved in writing by Landlord, which approval shall not be unreasonably withheld. All contractors and subcontractors shall be required to procure and maintain (a) insurance against such risks, in such amounts, and with such companies as Landlord may reasonably require and (b) payment and performance bonds covering the cost of the Work and otherwise reasonably satisfactory to Landlord. Certificates of such insurance, with paid receipts therefor, and copies of such bonds must be received by Landlord before the Work is commenced. The Work shall be performed in a good and workmanlike manner that is free of defects and is in strict conformance with the Working Drawings, and shall be performed in such a manner and at such times as to maintain harmonious labor relations and not to interfere with or delay Landlord's other contractors, the operation of the Building, and the occupancy thereof by other tenants. All contractors and subcontractors shall contact Landlord and schedule time periods during which they may use Building facilities in connection with the Work (e.g., elevators, excess electricity, etc.).

4.    If a delay in the performance of the Work occurs (a) because of any change by Tenant to the space plans or the Working Drawings, (b) because of any specification by Tenant of materials or installations in addition to or other than Landlord's standard finish-out materials, or (c) if Tenant, any contractor or subcontractor, or Tenant's agents otherwise delays completion of the Work, then, notwithstanding any provision to the contrary in this Lease, Tenant's obligation to pay Rent hereunder shall commence on the scheduled Commencement Date. If the Premises are not ready for occupancy and the Work is not substantially completed (as reasonably determined by Landlord) on the scheduled Commencement Date for any reason other than the reasons specified in the immediately preceding sentence, then the obligations of Landlord and Tenant shall continue in full force and Rent shall be abated until the date the Work is substantially completed, which date shall be the Commencement Date.

5.    Tenant shall bear the entire cost of performing the Work (including, without limitation, design of the Work and preparation of the Working Drawings, costs of construction labor and materials, electrical usage during construction, additional janitorial services, general tenant signage, related taxes and insurance costs, and the construction supervision fee referenced in Section 7 of this Exhibit, all of which costs are herein collectively called the "**Total Construction Costs**") in excess of the Construction Allowance (hereinafter defined). Upon approval of the Working Drawings and selection of a contractor, Tenant shall promptly (a) execute a work order agreement prepared by Landlord which identifies such drawings, itemizes the Total Construction Costs and sets forth the Construction Allowance, and (b) pay to Landlord 50% of the amount by which the estimated Total Construction Costs exceed the Construction Allowance. If the Work will not be substantially completed before the expiration of the first full calendar month after the approval of the Working Drawings and selection of a contractor, the remaining portion of such excess shall be payable in equal monthly installments on the first day of each month, beginning the first day of the second full calendar month after approval of the Working Drawings and selection of a contractor, and on the substantial completion date. The monthly installments due on the first day of each month shall equal the portion of such remaining excess divided by the number of scheduled payment dates (including the substantial completion date) from the date hereof through the estimated substantial completion date for the Work. Upon substantial completion of the Work and before Tenant occupies the Premises to conduct business therein, Tenant shall pay to Landlord an amount equal to the Total Construction Costs (as adjusted for any approved changes to the Work), less (1) the amount of the payments already made by Tenant, and (2) the amount of the Construction Allowance.

C:\DOCUMENTS AND SETTINGS\TBDOGERS\DESKTOP\COTTONWOOD FINANCIAL—NORTH GARLAND.DOC
9/17/04 10:28AM

X–1

**INITIAL**

| Landlord | Tenant |
|----------|--------|

## EXHIBIT C - TENANT FINISH-WORK: ALLOWANCE

6.    Landlord shall provide to Tenant a construction allowance (the "**Construction Allowance**") equal to the lesser of (a) Fifteen and 00/100 Dollars ($15.00) per rentable square foot in the Premises or (b) the Total Construction Costs, as adjusted for any approved changes to the Work.  The Construction Allowance will only be paid after Landlord receives from Tenant's Contractor the applicable Contractor Affidavit and Releases in Exhibit F.

7.    Landlord or its affiliate shall supervise the Work, make disbursements required to be made to the contractor, and act as a liaison between the contractor and Tenant and coordinate the relationship between the Work, the Building, and the Building's systems.  In consideration for Landlord's construction supervision services, Tenant shall pay to Landlord a construction supervision fee equal to ten percent of the Total Construction Costs.

8.    To the extent not inconsistent with this Exhibit, Article 9 of this Lease shall govern the performance of the Work and the Landlord's and Tenant's respective rights and obligations regarding the improvements installed pursuant thereto.

| INITIAL | |
| --- | --- |
| Landlord | Tenant |

**EXHIBIT C**

**DESCRIPTION OF LANDLORD AND TENANT CONSTRUCTION RESPONSIBILITIES**

| LANDLORD | TENANT | LANDLORD FOR TENANT - AT TENANT'S EXPENSE | DESCRIPTION OF WORK |
|---|---|---|---|
| | | | *Any Item Not Specifically Identified Below Will Be The Responsibility of The Tenant* |
| | | | **ARCHITECTURE** |
| X | | | Exterior walls are tilt-up concrete .  Exterior tilt-up concrete wall maintenance will be by Landlord. |
| X | | | Roof with FM 90 rating and with a minimum of R-11 insulation.  Roof maintenance will be by Landlord. |
| | X | | Back of house service door |
| | X | | Demising walls between Tenants, constructed in accordance with City Code and coordinated with adjacent Tenant construction.  Demising wall maintenance will be by Tenant. |
| | X | | Fire separation walls, where required and in accordance with City Code.  Fire wall maintenance will be by Tenant. |
| | X | | Storefront and doors as designed for the specific, specialty retail building to be occupied by the Tenant.  Storefront maintenance will be by Tenant and approved by Landlord. |
| | X | | Tenant designed storefront and storefront doors to be approved by Landlord.  Storefront and doors maintenance will be Tenant's responsibility. |
| X | | | Cast-in place concrete floor slab at ground level designed to support 100 lbs./psf in accordance with City Code and ACI tolerances. |
| X | | | Access to the Premises will be accessible by the handicapped in accordance with City Code and the State of Texas handicapped access codes. |
| | X | | Toilets or other build-out within Tenant Premises required to conform to ADA requirements. |
| X | | | All interior Premises to be occupied by the Tenant will be broom clean with all shell building construction materials removed from the interior of Premises.  On going exterior work may continue. |
| | | | **PLUMBING** |
| X | | | Sanitary waste line of 4" id. stubbed into Tenant Premises in accordance with City and National Codes. |
| | X | | Sanitary waste branch line distribution and fixtures/trim per Tenant plans and specifications. |
| X | | | Domestic, potable water supply line of 3/4" id. stubbed into Tenant Premises and capped with gate valve.  Pressure will be equal to City supplied water pressure. |
| | X | | Domestic water distribution lines, fixtures/trim per Tenant plans and specifications. |
| | X | | Domestic hot water distribution, fixtures/trim per Tenant plans and specifications. |
| | | X | Plumbing vent lines and vents through roof per Tenant plans and specifications. |
| | | | **FIRE PROTECTION** |
| X | | | Main supply line, riser, back flow preventer, tamper and flow switches and general distribution sprinkler piping grid throughout the Tenant Premises, sized in accordance with City, State of Texas and National Plumbing Codes.  Pressure to be equal to City supplied water pressure.  A charge of 75¢ per square foot will be deducted from Tenant Allowance. |
| | X | | Distribution lines and sprinkler heads per Tenant plans and specifications.  Approval of appropriate inspectors. |
| | | | **MECHANICAL EQUIPMENT AND HVAC** |
| | | X | Curbs and flashings for roof mounted mechanical equipment located by Tenant plans.  Curbs and flashings will be maintained by Landlord. |
| | X | | Mechanical equipment, motors, HVAC fans, etc. in accordance with Tenant plans and specifications to be approved by Landlord.  Tenant HVAC and related equipment will be |

| INITIAL | |
|---|---|
| Landlord | Tenant |
|  | *Fe* |

**EXHIBIT C**

**DESCRIPTION OF LANDLORD AND TENANT CONSTRUCTION RESPONSIBILITIES**

| LANDLORD | TENANT | LANDLORD FOR TENANT - AT TENANT'S EXPENSE | DESCRIPTION OF WORK |
|---|---|---|---|
| | | | maintained by Tenant and monitored by Landlord. |
| **TELEPHONE AND CABLE** | | | |
| | X | | Conduit and pull string stubbed into Tenant Premises and capped for telephone and cable (if required). |
| | X | | Distribution of telephone and cable wiring per applicable codes and Tenant plans and specifications. |
| **PARKING** | | | |
| X | | | Clear and grade site. Install compacted base, 1½" asphalt and 4" wide painted striping in accordance with City and ADA codes for quantity of car spaces, traffic patterns and grading. |
| **SIDEWALKS AND SITE ACCESS** | | | |
| X | | | Install concrete or other approved paving surface for perimeter sidewalks with ramps as required at entrance aprons, crossings and building access points in accordance with applicable codes. |
| **ELECTRICAL** | | | |
| X | | | Service from utility company at 480 volt, 3 phase to tap can at rear of the Building to a maximum tenant usage of 20 watts per square foot of Tenant Premises. |
| | X | | Main feeders from utility service point to meter and service panel in Premises, a main breaker and a main disconnect to be dedicated for Tenant's use only. |
| | X | | Service panel at voltage phase and wire count as required by Tenant for in Premises distribution. |

| INITIAL | |
|---|---|
| **Landlord** | **Tenant** |

EXHIBIT D -TENANT SIGN CRITERIA

GENERAL SIGN CRITERIA

1.  Tenant shall be required, at his sole cost and expense, to manufacturer and install an exterior storefront sign prior to opening for business in the premises. Tenant shall be allowed one sign on each exterior storefront side, provided however, if Tenant whose premises has an angled corner of the Shopping Center, shall be allowed one (1) per each exterior storefront of the premises to be approved by the Landlord at his sole discretion.

2.  All exterior signage including building mounted, pylon sign and shopping center pylon sign modules are to be submitted for review and approved by the Landlord. Tenant shall include an elevation showing all signage (including mounting heights) with submittal.

3.  All exterior signs shall be designed, manufactured and installed to U.L. specifications, using U.L. recognized components, and shall include the U.L. label number on the external back of the sign.

4.  Tenant shall be required to obtain a sign permit, if required by code, for the installation of its exterior sign from the appropriate governing authority, prior to the installation of such sign.

5.  Tenant's exterior storefront sign shall be limited to the operating name of the store. Tenant shall not use any other sign, symbol, crest, logo, other corporate insignia, information or advertising as part of its exterior sign, without Landlord's prior written approval. If Landlord, in his sole and absolute discretion, approves the use of a logo, such logo shall not exceed 28" in height when installed, measured from the lowest to the highest point of the sign on installation.

~~5.1 Tenant's sign package is attached to Exhibit D. Landlord signature of this lease~~ /RB/ ~~indicates acceptance of Tenant's sign package.~~  /T/

6.  Shop drawings are required for all signage. Shop drawings shall show complete sign layout at a scale of not less than one inch equals one foot (1" = 1'), cross sections, mounting details at a scale of three inches equals one foot (3" = 1') and all dimensions, materials, and colors. Signage shop drawings shall show all sources of illumination in section. Shop drawings shall include an elevation with all connection locations to building shown dashed. The elevation shall also indicate and note the top of the window with a dashed line. If requested by Landlord, Tenant shall furnish to Landlord samples of materials proposed for use.

7.  The following types of signs shall not be permitted: rotating, box, cabinet, painted signage, flashing, noise making, odor producing, back-lit canopy or raceway. Exposed neon is only allowed at the sole discretion of the Landlord.

8.  Tenant shall not penetrate the roof of the premises in the course of installing Tenant's sign. If roof penetration is required, it must be done by Landlord's roofing contractor in accordance with the construction documents.

9.  All materials and components used in the manufacturer and installation of Tenant's sign shall be new stock, free from defects that impair strength, durability and appearance. All signage material shall be of non-corrosive material or treated. Any deviation from the Tenant Sign Criteria shall not be allowed unless specifically approved in writing by the Landlord.

10. Landlord reserves the right to change the Tenant Sign Criteria at any time prior to Tenant's submission of its proposed sign for approval.

C:\DOCUMENTS AND SETTINGS\TRDDGER\DESKTOP\COTTONWOOD FINANCIAL–NOB IN GARLAND.DOC
8/17/04 10:25AM

A-1

| INITIAL | |
|---------|---------|
| Landlord | Tenant |
| /RB/ | /T/ |

11. Landlord shall have the right to waive any and/or all of the provisions of this Tenant Sign Criteria at any time and for any reason he so deems necessary in his sole and absolute discretion.

12. Landlord shall have the right to inspect Tenant's sign during and after the installation process. Tenant shall be required to conform its sign to the approved sign drawings within five (5) days of receipt of written notice from Landlord that such sign does not conform to the approved sign drawings. In the event Tenant fails to make such changes within the five (5) day period, Landlord may, at its option, make the changes necessary and bill Tenant for the entire cost of the changes. Tenant shall reimburse Landlord upon receipt of Landlord's billing.

13. ~~Tenant has the right to rear and or side signage.~~ *[initials]*

14. Tenant has the right to be on ~~future~~ pylon's which ~~are built.~~ *IS SHOWN ON* ~~FOLLOWING A~~ *pylon Drawing on Following page.* *[initials]*

<u>SIGN DESIGN CRITERIA</u>

1. General Requirements:

    A. The following restrictions shall apply:

|  | INITIAL | |
| --- | --- | --- |
|  | Landlord | Tenant |
|  | *[initials]* | *[initials]* |

    (1)   Individual dimensional letters shall not exceed a maximum height of 28". Individual Tenants in excess of 15,000 s.f. may have tenant signs which shall not exceed a maximum height of 6 feet without special consideration by the Landlord. Each letter shall be at least 4" wide and shall not project from the surface more than 5".

    (2)   Channel letters shall have opaque metal sides and translucent plastic faces and shall have either brushed aluminum or black returns.

    (3)   All individual signage letters shall be of the same color without special consideration by the Landlord.

B.  Landlord shall determine at his sole discretion for all Tenants the quantity of lines required for the signage.

C.  The maximum overall length of the Tenant's installed storefront sign shall not exceed 75% of the storefront width, or the maximum length allowed by the local governing authority, whichever is less. If Tenant's fascia length is less than the storefront width, such as at the corners of canopies, then Tenant's maximum sign length shall be the lesser of (a) 90% of the allotted space, (b) 75% of the storefront width, or (c) the maximum allowed by the local governing authority.

D.  Exterior signs shall be limited to single-faced can type internally illuminated signs, mounted on continuous raceway (wiring gutter). All metal portions of sign and raceway to be prefinished or shop finished. No site painting allowed.

    (1)   The vertical height of all signs shall be as noted above in A(1), on one horizontal line. If upon Landlord's determination, more than one horizontal line of lettering is necessary to provide adequate signage, Landlord will allow Tenant to use two horizontal lines of lettering not to exceed a total height of 54".

    (2)   Metal letter returns and backs of letters are to be prefinished to match Dark Bronze.

          Plastic letter faces shall be one of the following Rohm & Hass colors:

        a.  #2051 Blue
        b.  #2415 Red
        c.  #2047 Green
        d.  #2324 Blue
        e.  #    White

          Face retainers shall be 1" wide Jewelite trimcap to match the returns. Neon tubing is to be 6500° White.

    (3)   Letters shall be mounted on a 1/8" brushed anodized, aluminum backer plate, Silver. Plate to extend 3" outside of perimeter of letters. (See enclosed)

    (4)   Raceway will house all wiring and supports for the sign letters. Letters shall be centered vertically and horizontally on the raceway and shall be centered vertically and horizontally on the sign band. Raceway shall be fabricated of .050 aluminum and shall be uniformly 2" deep x 12" high to allow appropriate internal reinforcing, anchorage to wall structure and access to all hardware. Raceway shall be attached using expansion bolts sleeving and penetrating through the sign band. No exposed angle iron or other supports will be allowed. Raceway color is to match the building wall. (See color schedule below.) Signs with greater than one letter width between them shall have separate raceways, unless otherwise approved in writing by the Landlord. Tenant signage requiring two horizontal rows (stacked rows) shall

| INITIAL |  |
|---|---|
| Landlord | Tenant |
|  | *T* |

have two separate raceways. All rear sign letter supports mounting to the raceway are to be concealed, not visible.

(5)  Color Schedule:

_____
_____
_____

## METHOD OF INSTALLATION

A.  Tenant's installation company must use industry standard safety equipment and methods during installation of Tenant's sign.

B.  All signs are to be hung level and plumb and placed on the exterior storefront as shown on the approved drawings using the approved method of installation. Should Tenant's installation company discover problems with the placement or method of installation of Tenant's sign once installation has begun, Tenant shall immediately stop all installation work and immediately inform Landlord of the problem. Landlord shall then approve a change in method of installation or notify Tenant to proceed in the manner previously approved. Tenant shall then proceed diligently to finish installation in a timely manner.

C.  All fasteners, screws, bolts, etc. used in the mounting of the letters to the building shall be rust proof stainless steel. All signs shall be mounted with all wiring, transformers and reinforcing concealed. Penetrations through the building fascia shall be made through mortar only on masonry buildings. No penetration, mounting device or other sign-related item shall be attached to brick or drilled through brick. All wiring penetrating through the building fascia and inside the building shall use U.L. recognized components and be sealed and water-tight.

D.  Tenant's installation company shall protect all adjacent surfaces, including paving and sidewalks, from damage during installation and shall be responsible for repairing any damage prior to leaving the job site. Tenant shall notify Landlord of any damage prior to repair in order that the correct repair materials be specified by Landlord. Tenant shall promptly repair the damage to "like-new condition."

E.  Following installation, Tenant's sign installation company shall remove all traces of visible tape, adhesive, chalk lines and wrapping from the exterior building fascia. Tenant's installation company shall be responsible for clean-up and removal of all debris caused by his installation at the job site, at the time of finish of installation.

## SECONDARY SIGNS

1.  Exterior Signs:

A.  Blade signs may be provided by Tenants to designate their space. Blade signs shall be located within the Tenant's lease lines and shall project perpendicular to the building. The sign bracket shall be the shopping center's standard bracket design and shall be securely fastened to the building wall by the Landlord at the Tenant's expense. There must be a minimum of 8 feet clearance below the bottom of the blade sign and supporting bracket. Overall dimensions shall not exceed 4" thick, 2 feet high, and 3 feet wide. It is encouraged that all signage materials be a mix of wood, cast iron, stainless steel or sheet metal. Plastic and internally illuminated signs are not permitted. The blade sign design, elevations (3" scale or greater), attachment details to the sign bracket, and finishes shall be submitted to the Landlord for review and approval with the preliminary design package.

A.  No secondary signs shall be placed by Tenant on the exterior building walls.

C.  No "Sandwich" or easel/portable signs shall be placed by Tenant on the exterior of the premises, except with the written consent of the Landlord.

INITIAL

| Landlord | Tenant |
|----------|--------|
|          | *F*    |

D. Tenant shall be allowed to place the store address numerals on the front of the storefront using 3" high white vinyl numbers in the Helvetica Medium typeface (or as allowed by the City). These numbers shall be mounted on the exterior storefront glass above the door, or as directed by the U.S. Postal Service and local fire department.

E. Store logo or name (maximum 3" high), interior mounted, may be used on glass or a graphic band to identity glass with maximum height being 36" from the floor, subject to Landlord's approval.

F. Tenant shall be required to place the name of the store on the rear or front wall service door. Tenant's name shall be made of 3" high black vinyl letters in the Helvetica Medium typeface. The letters shall be mounted in the center of the rear service door at a height of 5'-6" from the bottom of the rear service door to the bottom of the letters.

G. Tenant shall be required to place the name of the store or the suite number in permanent 2" high letter/numbers on the housings of all roof top units.

H. "Coming Soon" signage may be in place a maximum of thirty (30) days. Signage may not attach to the building or impair the progress of the work to the shell building. Tenant shall coordinate location with the Landlord.

I. No banners, posters, flyers or advertising material of any kind shall be permitted to be mounted on the exterior glass or walls of the premises without Landlord's prior written approval. Notwithstanding the above, if Tenant opens later than 30 days after the "Grand Opening", Tenant shall be allowed one "Grand Opening" banner, limited in size to 50 square feet, with prior written approval of Landlord regarding (1) design, (2) materials used, (3) location and (4) method of installation. The "Grand Opening" banner shall be allowed on the exterior storefront from the date of Tenant's store opening business and continuing for a period of 10 days. Tenant must have a permit for such banner, if necessary by code. Tenant's banner shall be professionally made. Any and all damage to base building by banner shall be repaired by the Landlord at Tenant's expense.

2. Interior Signs

A. No interior signs, which can be viewed from the exterior of the Demised Premises shall be allowed within 10 feet of any exterior window or door, except as required by law and as approved by Landlord.

## SIGN OPERATION AND MAINTENANCE

1. Per operating hours of Center and Lease Agreement.

### EXHIBIT E - TENANT DESIGN CRITERIA

The Architectural Design for North Garland Crossing has been established to provide a first class shopping center experience. The elements in the architecture have been designed in a cohesive manner which promotes individuality. Each tenant is encouraged in its design efforts to be creative in developing a unique storefront atmosphere with transoms and signage personalities that will reflect its individual product presentation, while retaining the integrity of the overall project. Drawings will be reviewed by the Owner and Architect.

Although Landlord has established the architectural framework, no prerequisites or predetermined design solutions shall be enforced, and each Tenant design shall be evaluated on its individual merit. It is not the intent of the Landlord to in any way constrain the expression of Tenant personality; notwithstanding the above, Landlord shall, by virtue of the control of both the quality and longevity, create a shopping center which both enhances the individual shops and establishes a complimentary atmosphere.

## GENERAL INFORMATION

### TYPE OF CONSTRUCTION

C:\DOCUMENTS AND SETTINGS\RODGERS\DESKTOP\COTTONWOOD FINANCIAL - NORTH GARLAND.DOC
W17641262446

A-5

| INITIAL | |
|---|---|
| Landlord | Tenant |
| | *(initials)* |

Buildings are Type V-N (Sprinkled)

**BUILDING CODES (AS OF JAN 2003)**

2000 IBC, 1994 UBC, 1999 NEC, 1997 IPC, 1997 IMC, 2000 IEC (Tenants Architect shall verify all codes.)

**EXTERIOR DESIGN ELEMENTS**

3.   Storefront designs may be both full height and wainscot kneewall configurations, using new or antique elements such as cast iron and cast stone pilasters, wood, aluminum mullions painted in color schemes which are a part of the Tenant's overall graphics package. Entrance doors and surrounds may be a mix of both glass and solid materials, both wood and aluminum framed, using new or antique elements. Materials not acceptable include, but are not limited to, plywood, simulated wood or stone and plastic.

2.   Transom lights above the storefront base level where indicated on elevation shall be provided by the Tenant. Individualizing grilleage or other framework may be provided by the Tenant. Metal or wood grilleage may be painted in one or more colors to reflect the personality of the storefront.

3.   Wall sconces or coach lamps at Tenant entrances may be allowed, subject to Landlord's approval and agreement on illumination source, wattage, style and color. No fluorescent illumination shall be allowed.

| Comments * |
| --- |
|  |

4.   Facade sign may overlap demising partitions or neutral piers at Landlord's sole discretion.

5.   All repainting of exterior storefronts, window mullions, doors or other exterior decor shall be of the colors used by the Tenant for original construction, or those approved by Landlord at the time of repainting.

6.   All metal storefronts shall be prefinished and may not be painted.

7.   All changes to Tenant's storefront design or signage after design plans have been approved by Landlord shall require the resubmittal of revised plans to Landlord for prior written approval of all changes.

8.   All planters, wall mounted lights, landscape lighting, pole mounted pedestrian lighting, parking lighting and shopping center signs provided by Landlord shall not be removed or altered by Tenant without prior written approval of Landlord.

9.   Tenant's storefront sign design shall be submitted in accordance with the Sign Criteria attached to the lease as "Exhibit A".

| INITIAL |  |
| --- | --- |
| Landlord | Tenant |
|  | *T* |





**CHANNEL LETTERS - REMOTE TRANSFORMER**

**RACEWAY MOUNTED CHANNEL LETTERS**

SPECIFICATIONS:

1. 5" DEEP ALUMINUM CHANNEL LETTERS; RETURNS AND BACKS PAINTED BRONZE 313

2. 1" BRONZE PLASTIC TRIM CAP RETAINERS

3. #2837 YELLOW TRANSLUCENT PLASTIC FACES.

4. INTERNALLY ILLUMINATED WITH 04580 COOL WHITE NEON

5. LETTERS ARE ATTACHED TO A .125" ALUMINUM BACK PANEL, BRUSHED ALUMINUM FINISH.

6. RACEWAY PAINTED TO MATCH SHERWIN WILLIAMS #6108 "LATTE"













ALL VINYL GRAPHICS TO BE
SIZED AT 80% OF THE
WINDOW WIDTH

## GLASS DOOR/WINDOW VINYL LAYOUT

Scale: n.t.s.

**GLASS WINDOW VINYL SPECIFICATIONS:**
1. "THE" CA-H" AND "ST-RE" COPY LETTERS ARE BLACK VINYL.
2. "$" (DOLLAR SIGN) & LETTER "O" ARE #75 GREEN VINYL.
3. ALL COPY AND LOGO ARE APPLIED TO WHITE VINYL BACKGROUND FIRST SURFACE.
4. ALL COPY & BULLETS ARE WHITE VINYL.
5. ALL VINYL IS APPLIED TO GLASS FIRST SURFACE.















EXHIBIT E - TENANT DESIGN CRITERIA

10. Tenant is responsible for verifying that any additional openings in C.M.U. walls are to be a minimum of 2 feet from any panel joint (expansion control joint).

11. All connections by Tenant to C.M.U. wall openings shall be a minimum of 3" from any C.M.U. face/edge.

12. The Tenant may not at any time infill or cover up a storefront window opening (i.e. spandrel glass or film or paint) without written consent by the Landlord. Tenant shall provide a display window with a minimum of 3 feet depth or per ADA requirements, whichever is greater.

13. Any changes required in the existing aluminum storefront for the Tenant's layout, including glazing, is to be by the Tenant. This includes any required replacement of glazing with Tempered Glazing to meet building and safety codes. Any added or modified aluminum storefront is to match the existing for assemblage, appearance and finish. The Tenant is not permitted to paint the existing aluminum storefront on interior or exterior, without the Landlord's approval. Tenant is to submit proposed details and actual color samples of proposed paint, for Landlord's review. If painting of mullions is approved by the Landlord, Tenant is responsible for upkeep on the painting to maintain a new appearance.

## SITE SIGNS

1. No individual Tenant monument or pylon sign shall be approved by the Landlord for the common area of the shopping center. Landlord may, at his sole discretion, install a shopping center monument or pylon sign(s), which may include space for Tenant's business name. Design of the sign(s), size, type, and color of lettering will be at Landlord's sole discretion. If Tenant's name is approved for the monument or pylon sign, Landlord shall manufacture and install Tenant's name on the sign(s), and Tenant shall reimburse Landlord for the cost of the sign(s).

## AWNINGS AND CANOPIES

1. Awnings shall be provided by the Landlord, as shown on the drawings.

## RECESSED ENTRY

1. When the Tenant intends to use a recessed entry the Tenant shall provide a sloped slip resistant floor finish at all recessed entries. Option #1 – The Tenant may saw cut and hammer remove a maximum of 1/2" depth of existing concrete floor slab in preparation to set or pour an exterior surfacing material, sloped a minimum of 1% (1/8" per foot) or maximum 1.75%. Tenant shall provide any required interior "floor stoning" to raise interior floor finish material up flush with the recessed entry topping, while utilizing a standard maximum 1/2" high aluminum entrance door threshold. Option #2 – The Tenant may saw cut and hammer remove the existing reinforced concrete floor slab. New recessed floor slab is to be poured back and doweled into the existing floor slab edge and grade beam in preparation to set or pour an exterior surfacing material which is to be sloped a minimum of 1% (1/8" per foot) or maximum 1.75%. Tenant shall provide any required interior "floor stoning" to raise interior floor finish material up flush with the recessed entry topping, while utilizing a standard maximum 1/2" high aluminum entrance door threshold.

## EXTERIOR PLANTING & FURNITURE

1. Tenants shall be permitted to place flower pots, planters, and furniture within their entrance areas, and window boxes at Tenant's sole cost and expense, subject to Landlord's approval, and in accordance with Landlord's maintenance, safety and circulation standards, to be set and modified at any time by Landlord in his sole discretion. Landlord shall have Tenant remove any planting or furniture that he deems is not maintained, is unsafe, or is not in keeping with the overall design concept. Tenant shall remove any planting or furniture within five (5) days after receiving written notice from Landlord. Any damage caused by said planting or furniture shall be repaired by Landlord at the Tenant's expense.

2. No plastic, Mexican glazed or fired pots will be allowed. No thorny or toxic plants will be allowed (i.e. cacti and other plants with a potential of harmful toxicity.)

| INITIAL | |
|---|---|
| Landlord | Tenant |
|  | |

EXHIBIT E – TENANT DESIGN CRITERIA

3.  All furniture should be durable and intended for exterior use. Strap iron metal with baked on coating is an acceptable material. No plastic chairs, play equipment or tables will be allowed.

4.  Submit photograph or cut sheet on all furniture to Landlord for review and approval prior to installation or placement.

## INTERIOR DESIGN ELEMENTS

Tenant shall construct its Premises within the Shell Building at its sole cost and expense. Tenant's Work shall include:

### FINISHES:

1.  Rear service doors shall have institutional lever locksets keyed from both sides with brushed chrome finish (US26D) provided by Tenant. Cores will be interchangeable.

2.  Ceiling material shall be noncombustible equal to Class "A" installation. Ceilings must terminate tight against wall surfaces or be returned to roof deck and sealed as required by code. Ceilings shall not terminate at storefront. A curtain wall or other design element shall be provided 6 feet behind the storefront or transom.

3.  Tenant shall provide a gypsum board, plaster, metal or wood ceiling to be approved by Landlord the first 6 feet behind the storefront. 2 X 2 or 2 x 4 lay-in ceiling will be allowed behind the 6 foot control line. If there is a change in ceiling material, there shall be a furr-down or transitional height difference of 4 inches minimum between the two materials subject to review and approval.

4.  Hard surfaces such as ceramic tile, wood, or stained concrete is required within the first 6 feet of any Sales entrance. Vinyl composition tile, rubber tile, and sheet vinyl or rubba will not be allowed within the first 6 feet of any storefront display window with the exception of permanent material "walk-off" matts.

5.  Stained concrete is only allowed at the sole discretion of the Landlord. Tenant shall submit a sample of the stain color. Stained concrete floors shall be a chemically reactive stain such as Lithochrome Chemstain or approved equal. Tenant shall prepare floor surface and install stain per manufacturer's recommendation.

6.  Fluorescent lighting will not be allowed within the first 6 feet of the storefront. Exposed fluorescent tubes shall not be permitted in areas visible to the public or adjacent to any storefront display window. Fluorescent light fixtures shall not have prismatic lens in Sales Areas. (Note: Parabolic fixtures are acceptable.)

7.  No ceiling mounted or suspended track lights are to be installed within 12 inches of the storefront or be visible through the storefront.

8.  All store fixtures shall be a minimum of 3 feet behind the storefront without special consideration by the Landlord. This does not include display fixtures expressly designed for storefront display. All fixtures are subject to review and approval by Landlord.

9.  Tenant shall comply with flame spread ratings on all interior finishes per local code for designated building type.

10.  Wood paneling or any combustible material, when allowed by codes, shall be installed (i.e. firestopping, etc.) as required per all applicable codes. All interior finishes are subject to review and approval by Landlord.

11.  Any changes required in the existing hollow metal exit/service doors (when present) and hardware including thresholds are to be by Tenant, at no cost to the Landlord. Any changes required in the sidewalks, stoops or floor slabs at the existing doors are to be by Tenant, at no cost to the Landlord.

### STOREFRONT:

1.  Storefront shall be subject to Landlord's approval. Storefront shall be at Tenant's sole cost and expense. No construction, storefront or design elements shall be permitted to project beyond Tenant's lease line, without Landlord's prior written approval. No applied safety rails will be allowed. All horizontal mullions shall be full mullions. Tenant shall provide tempered glass as required by all governing codes.

2.  Showcase windows shall be subject to Landlord's approval. Showcase windows shall be at Tenant's expense. Tenant shall submit colored drawings or photos for review and approval of proposed showcase windows.

3.  No shading or pattern films or false muntins/mullions are to be applied to the storefront glazing without submittal to and approval by Landlord. If horizontal rails are desired on the storefront, they are to be true horizontal mullions.

A-8

| INITIAL | |
|---|---|
| Landlord | Tenant |
|  | R |

EXHIBIT E - TENANT DESIGN CRITERIA

4. Tenant is to submit for review details of the coordination between the aluminum storefront and the Tenant provided interior wall furring, including jambs, heads and sills. It is recommended that Tenant isolate the gypsum board furring returns at the heads and jambs from the storefront with continuous caulked joints. Tenant should hold the furring return thickness to a maximum of ± 3/4".

5. All storefront is to have a weather strip gasketted head receiving channel to allow for a possible 3/4" vertical storefront movement.

6. Tenant is to provide all required head, jamb and sill metal flashing and sealants, for a complete finished installation.

**ROOF:**

Roof insulation provided is R-11 typically. (Variations may occur where required by lease.) Tenant may add extra insulation under roof deck at Tenant' expense. For additional roofing information, see Structural.

**PARTITIONS:**

4. Exterior walls shall be insulated and finished on their interior surfaces by Tenant. Landlord will provide a R-3 wall assembly (no furring) and a roof R-11 assembly, typical. Tenant shall obtain overall assembly for walls and roofs per local codes. Tenant shall verify all requirements with the City. Tenant shall not penetrate exterior walls without first obtaining Landlord's written approval.

2. Tenants shall provide the demising partition and insulation separating Premises from adjacent Tenants. Demising walls shall be constructed as required by code and local ordinances. All penetrations for sleeves, conduit, pipe, etc. shall be sealed airtight. No sound transmission or vibration transmission shall be transmitted by Tenant outside the Premises, and demising walls shall be insulated to prevent such transmission. All other interior partitions shall be of metal stud construction and shall have gypsum board finish on all sides, taped and bedded. All other materials shall be noncombustible and shall have U.L. approval and mill stamp indicating type of treatment. Field applied treatment of combustible materials shall not be permitted.

3. The Tenant is to verify in their Lease Agreement the Landlord's and Tenant's "Scope of Work" in reference to the "Demise Partition' construction. Construction scope options are as described in notes following:

   a. When Tenant constructs the One Hour U.L. rated system demise partitions we recommend that the wall be constructed of 6" eighteen (18 ga.) galvanized metal studs at 16" o.c. with one (1) layer each side of 5/8" Type X gypsum board on Tenant's side. With continuous horizontal lateral bracing of 1-1/2" 16ga. galvanized steel CR channels at 8'-0" o.c. vertical, clip attached to studs, for full wall height, starting at 4'-0" A.F.F. Tenant is to provide for a minimum of 3/4" vertical slab movement in the construction of the demise partition by using either a Flex Head or Friction Fit studs in a deep leg head track condition that meets U.L. Design requirements. Tenant is to tape, bed and finish gypsum board on Lease Side. Second Tenant to provide fire rated 3-1/2" batt insulation retained with clips. (Wall to meet requirements of U.L.).

   b. When Landlord constructs the One Hour U.L. rated system demise partitions, consisting of metal studs, and insulation, Tenant is to install the 5/8" Type X gypsum board on Lease Side, tape, bed and finish wall.

   c. When Landlord constructs the One Hour U.L. rated system demise partitions, consisting of metal studs, gypsum board (screwed to studs only) and insulation, Tenant it to tape, bed and finish gypsum board on Lease Side. Any modifications or replacements to screwed in place gypsum board is to be done by Tenant, at no cost to the Landlord.

| INITIAL | |
|---------|-------|
| Landlord | Tenant |
|  | FE |

EXHIBIT E - TENANT DESIGN CRITERIA

4. The Tenant is to provide for a minimum of 3/4" vertical slab movement in their construction of full height, floor to roof or roof structure, partition walls. Either by use of a Flex Head top stud track or a Friction Fit stud wall head in a deep leg top track. Tenant is to submit details for approval.

5. All penetrations through One Hour U.L. Demise Partitions above and below ceilings are to be Fire Stop sealed with an authorized U.L. Fire Rated System. All joints in One Hour Demise Partitions are to be a minimum of Fire Taped above ceilings. Full perimeter gypsum board edge joints are to be fire caulked.

6. Demising walls shall have a 1-Hour Fire Rating minimum. Tenant is to maintain the integrity of the One-Hour Fire-Rated demising wall. Any Tenant applied finishes or modifications to the fire-rated partition (i.e., wall standards, plywood, wood blocking and cleats, slotwall, etc.) are not to impede the integrity of the fire rating. Shelf standards are not to be recessed in the 1-Hour rated demise partitions without submittal of U.L. approved details and system numbers and or a letter of approval from the City approving the installation.

7. It is recommended that interior wall furring on existing exterior walls have full depth true drywall control joints aligning with the existing wall masonry control. Control joints should be formed using two separate metal studs (one each side of masonry control/panel joint) and a standard gypsum board control joint. This applies to both corner and intermediate masonry control/concrete panel joints.

8. It is recommended that all exposed existing C.M.U. walls be sealed to reduce moisture penetration and dusting. This includes walls concealed behind wall store fixtures.

## STRUCTURAL:

1. Floor slab utility leave out and additional slab removals shall be filled by Tenant following underslab utility installation and shall match or exceed existing floor thickness, reinforcing, joint treatment and materials and shall meet the Shell Structural Engineer's requirements and the Geotech Report for subsurface/backfill requirements. Concrete surface shall be steel troweled finish, flush with existing floors. Tenant shall not penetrate or cut Landlord provided slab without first obtaining Landlord's written approval and said work shall be conducted during non-shopping center business hours. Any plumbing, clean-outs, valves, etc. must remain accessible in plain sight or by access panel by Tenant. The location shown for the existing utility slab leave-out is approximate. Tenant is to field verify exact configuration, size and location.

2. Structural columns falling within the fire rated demise walls shall be fireproofed with the appropriate U.L. rating from floor to underside of roof deck. Wherever possible column cladding is to be flush with Tenant's demise wall surfaces. Exposed structural steel columns within the Tenant lease area do not require fireproofing.

3. Tenant shall submit to the Shell Structural Engineer the weight and location of all proposed safes, heavy equipment or design elements placed on the slab for review and approval. Also submit size and weight of all roof mounted equipment.

4. Tenant is not to suspend any items from the bottom of the roof deck or from the bottom roof joist or joist girder chords, without written approval of the building Shell Structural Engineer of record. Tenant is to submit proposed details and the weight, for items suspended from the roof structure, for review by Shell Structural Engineer. An additional review fee will be charged to Tenant. In

| | INITIAL |
|---|---|
| Landlord | Tenant |
| | _(signature)_ |

EXHIBIT E - TENANT DESIGN CRITERIA

general, no duct work, fixtures, conduits, pipes, banners, signage, or curtain/ suspended furr-downs or walls are to be suspended from the bottom of the roof structure or roof deck, without approval. No Tenant finish-out work is to be suspended from any work by another trade, from joist bridging, X-bracing or from steel wall bracing.

5.    "Trenching" of the existing reinforced concrete floor slab shall be kept to a minimum quantity and width. Where codes permit, group under floor utilities in single trenches. The minimum trench cut width is to be 12 inches. Minimum slab pour back to be per Item 1 above.

## ROOFING

1.    All roof penetrations and patching are to be done in accordance with the Landlord's requirements. Tenant shall obtain pre-approved roof penetration locations from the Landlord. Patch back of all roof penetrations shall be per Landlord's requirements, by the original shopping center roofer, and shall be installed as per the roofing manufacturer's specifications. There are no "pitch-pocket" roof penetrations allowed, all penetrations must be through preformed boots, metal flashed boots as per S.M.C.N.A., or through prefabricated curbs with water tight covers. In no case will the Tenant be allowed to endanger the Landlord's Roofing Warranty.

2.    When Tenants finished roof level is above an adjoining roof level, Tenant is to furr their demise wall, where it is exposed to the exterior, to provide insulation R value.

3.    It is required for the Tenant to provide a 24" wide walk board path around all roof top units at no cost to the Landlord. The walk boards are to be of the type and installation recommended by the manufacturer for the existing roofing system installed. Walk board paths should be spaced 12" from the sides and duct drop ends of the units, and 24" from the condenser end of the units.

4.    Tenant's contractor is not to install any vent or conduit penetrations through existing standing seam metal roofs or awnings, without prior Landlord approval. When existing sewer vent stacks are available, sewer vents are to be routed to an existing remote location. Tenant is to submit details and locations for proposed venting. If sewer vents must penetrate existing standing seam roofs then Tenant is to submit proposed locations and details for penetrations. Penetrations through standing seam roofs must meet all applicable codes and roofing manufacturer's standards for venting and flashing through their standing seam roofing system.

5.    Any Tenant required modification, demolition and removal of existing exterior walls must be fully detailed and approved by Hodges & Associates, P.L.L.C. and the Landlord. Any alterations affecting the existing structure must be reviewed by the Shell Structural Engineer and any modifications affecting the existing ground or wall mounted utilities must be reviewed by the Shell M.E.P. Engineers.

Tenant's contractor is to take extreme care in construction, while working adjacent to existing buildings and lease spaces, to prevent damage to existing structures. Provide all required circulation, environmental and hazard protection for existing structures and pedestrians. Tenant's contractor is to protect all existing below grade/slab utilities. Tenant's contractor shall repair all damaged items to existing condition.

## MECHANICAL / ELECTRICAL / PLUMBING

1.    Tenant shall provide access to the signage junction box above the ceiling at the storefront with an access panel painted to match the soffit.

| | INITIAL |
|---|---|
| Landlord | Tenant |
| | *P* |

EXHIBIT E - TENANT DESIGN CRITERIA

2. Sanitary sewer shall be tapped from Landlord stub-out provided in leave out within premises and all other plumbing work shall be installed in accordance with all applicable codes. A minimum of one (1) floor drain shall be installed in each kitchen or toilet area. All clean-outs, valves, etc. shall be accessible, in plain sight or access panel.

3. Electrical service shall be provided by the Landlord from the point of service to a service tap can located on the exterior rear wall of the building. Tenant shall arrange for the delivery and installation of a disconnect (if required) and any special transformers with local utility companies. Tenant shall provide conduit and conductor from the tap can to the meter to complete the electrical and all wiring installation within the Premises in accordance with applicable codes. Tenant shall be responsible for installing any required transformers. Electrical plans submitted to Landlord for approval must have all load requirements detailed and must include complete panel, lighting fixture and equipment schedules.

   Tenant's electrical drawing submittal must include a tabulation of the electrical load including quantities and sizes of lamps, appliances, signs, water heaters, HVAC equipment, etc., and KW demand for each installed item. A complete electrical panel schedule is required for each installation.

4. Telephone system shall be connected to local telephone company distribution point outside the Premises at a telephone distribution box through Landlord provided conduit to the Premises. All telephone equipment panels, outlets, conduit and wiring shall be Tenant's responsibility.

5. Domestic water shall be connected to Landlord supplied overhead shut off valve within the roof structure to a point at the rear of the premises. Tenant will connect at this shut-off valve for Tenant distribution. If Tenant prepares and sells food for on or off Premises consumption or if Landlord designates Tenant as a large consumer of water, Tenant shall furnish and install a water meter in a location easily accessible to Landlord within the Premises.

6. Natural gas service shall include required meter provided and installed by the Tenant and all piping to the Premises from Landlord's manifold or service riser at building's exterior service area. All piping shall then be directly routed to interior of building and extended to Tenant's service locations concealed within the building per local codes and regulations. No exterior pipe routing permitted.

7. Fire protection system shall be connected to Landlord supplied trunk line in the Premises and shall be installed by a licensed sprinkler contractor approved by Landlord. Sprinkler system installation will be subject to approval by all governing authorities and Landlord's insurance carrier.

   All main and branch fire sprinkler grid lines are to be run within the roof structure space wherever possible. When lines are run below the roof structure, they are to be held as high as possible to the bottom of the structure. All lines are to be suspended from top chords of joist and joist girders. Tenant is responsible, if applicable, for any required modifications to the sprinkler grid, for all new sprinkler head drops and for modifying existing drops to fit their space and ceiling heights/types. Tenant is responsible for any required modifications of the existing fire risers including the adding of exterior Fire Department connections serving their space. Tenant is responsible for adding any interior fire hoses and racks and fire extinguishers as may be required by codes and the local Fire Marshall.

8. Heating, ventilating and air conditioning systems shall be Lennox, Trane, Carrier or equal, and installed as either self-contained roof mounted units or "split system" type with an air cooled condensing unit located on the roof and a floor mounted or structure mounted fan coil in the Premises. No exterior ground mounted units will be allowed. No flex duct or fiberglass ductwork shall be permitted unless concealed and allowed by code. Exposed ductwork is to be galvanized sheet metal meeting ASHRAE and SMACNA and applicable codes. Roof top units shall be placed within the mechanical zone indicated on the Roof Plan.

| INITIAL | |
|---|---|
| Landlord | Tenant |
| | *Fc* |

EXHIBIT E – TENANT DESIGN CRITERIA

9.   If a grease trap or traps is required, said grease trap shall be supplied and installed by Tenant at Tenant's expense at a location approved by the Landlord.

10.  Tenant is to show and coordinate all existing risers for sanitary sewer, domestic water, fire water, roof drain, roof overflow drain, natural gas etc.

11.  Tenant is to verify that from all points on the site that all roof top equipment including H.V.A.C. units, exhaust fans, ventilation fans, vent stacks and roof top antennas (pole and dish), are all fully concealed behind roof parapets.

12.  All horizontal conduit and piping support on top of roof must meet roofing manufacturer's details for installation on roofing system installed.

13.  All of Tenant's roof top units are to be installed on level curbs. Curb is to be tapered to follow roof slope, so that top of curbs are level. All openings made in roof are to have steel angle frames, as indicated in the shell structural details. Roof top equipment frames are to bear and attach to structure. Openings through existing roof are to be kept to a minimum with R.T.U. openings inside the roof top frames limited to the outside size of the duct penetrations. Seal around all penetrations through the existing roof. Tenant is to submit structural drawings detailing support for roof top frames, roof openings, stiffening of roof deck at frames and anchorage of roof frames to structure. Tenant is to have the roofing contractor provide cricketing in the roof insulation board, on the high sides of R.T.U. curbs to facilitate surface drainage around the curbs.

14.  Tenant is to submit an electrical riser diagram, for their proposed connection to the existing electrical bus gutter, to the Landlord for review. The "drawn to scale" drawing is to include dimensions for the proposed length of bus gutter to be used, the Tenant shall not use more than 18" of gutter length to mount their meter can and disconnect. Electrical power capacity being provided for the Tenant will not exceed 15 watts per square foot of Lease Area.

15.  Concerning interior extension of power from exterior electrical service to Lease Spaces: No exposed conduits serving a specific Lease Area are to be run exposed through an adjacent Lease Space. All conduits are to be run concealed within interior furring on exterior walls, through adjacent Lease Spaces. Conduits are to be neatly collected within specific wall furring areas, in a location reviewed and approved by the Landlord. Tenant must coordinate with the Landlord on all work to be performed in adjacent Lease Spaces.

16.  Concerning the routing of all interior exposed telephone and electrical conduits with junction boxes, supports, etc., sanitary sewer, vent piping, roof drain/roof overflow piping, associated valves, etc., fire sprinkler piping, drops, valves, cutoffs, etc., and domestic water piping, wrap insulation, valves, cutoffs, etc. All piping at exposed roof structure areas, wherever possible, are to be run above the bottom chords, within the structure height and supported from the top joist chords. Piping is to be run parallel with the rear Lease Area wall and then extended at a 90 degree angle to the rear wall, into the exposed roof area, running parallel to the roof joists. Piping should be neatly collected and extended in groups. No exposed diagonal runs (not being parallel to structure) are permitted. Piping and accessories are to be painted a color to be approved by the Shell Architect, typically the same color as the exposed roof deck and structure.

17.  There are to be no HVAC units, condensers, compressors, exhaust air fans, grease exhaust fans, smoke evacuation fans, smoke vents, skylights etc. mounted on existing standing seam metal roofs without prior approval from Landlord. Tenant must submit complete drawings for proposed items and locations for Landlord approval.

18.  Where Tenant's added conduits, buss gutters, junction boxes, panel boxes, meters, pipes etc. are mounted exposed on rear Service Area walls, all items are to be three (3) coat painted by the Tenant to match the color of the existing wall on which items are mounted. All exposed conduits, pipes, junction boxes, galvanized or aluminum sheet metal, etc. added by Tenant, above the roof

C:\DOCUMENTS AND SETTINGS\FHGODERS\DESKTOP\CUSTOMWOOD FINANCIAL – NORTH GARLAND.DOC
6/17/08 10:25AM                        Δ–13

| | INITIAL |
|---|---|
| Landlord | Tenant |
| | F |

EXHIBIT E - TENANT DESIGN CRITERIA

both in mid field areas and on backs of parapets, are to be three (3) coat painted by the Tenant in a color to be selected by the Shell Architects and are to be supported and elevated above the finished roof. Any penetrations through exterior walls shall be caulked. Caulk color shall be selected by Shell Architect.

19.   Tenant is not to drain roof top unit condensate drains onto the roof. All R.T.U. condensate drain lines are to be extended and connected to the nearest sanitary/storm sewer (per code).

20.   Tenant shall provide permanent galvanized steel mounting, anchored through to roof structure, for all roof top mounted R.T.U. disconnect switches. No "loose set" supports permitted.

## SAMPLE BOARD

The sample board shall indicate all exterior and interior materials, color selections and finishes to be used at the Premises. All items shall be mounted to crescent board or other suitable material. (Loose samples shall not be submitted) All items shall be clearly identified and labeled to correspond with the working drawings (i.e. CPT-1 corresponds to the floor finish plan where the location of CPT-1 is shown). All materials, color selections and finishes are subject to Landlord review and approval.

## GENERAL CRITERIA

1.   Tenant is responsible for compliance with all Federal, State and Local Building Codes, Ordinances and Covenants.

2.   Tenant is responsible for full compliance with all applicable Federal, State, and Local ADA Accessibility Standards, and for submittal for review and inspection, by TDLR (State of Texas).

3.   Tenant is to coordinate and indicate new or existing roof access ladders (and OSHA cages when bottom of roof deck is over required height) and roof access scuttles, within their space. Tenant shall not block access to roof access ladders.

4.   Tenant is responsible for compliance with all applicable Federal, State and Local Codes for construction finish-out of their space. This includes but may not be limited to, roof/ceiling insulation R values for roof assemblies and exterior wall assembly insulation R values.

5.   Tenant is to verify dimensioned Lease Areas from fixed building structural elements as defined in their Lease Agreement for both dimensions and square footages. Dimensions are to be indicated on Tenant's finish-out drawings.

## BASE DRAWINGS

Landlord shall furnish Tenant with one (1) set of Base Drawings giving technical and design information describing Tenant's Premises and Landlord's Work and this Tenant Design Criteria (hereinafter defined).

## PRELIMINARY DESIGN DRAWINGS

| INITIAL | |
|---|---|
| Landlord | Tenant |
|  | *(initials)* |

### EXHIBIT E - TENANT DESIGN CRITERIA

1.  Within 30 days of receipt of Base Drawings from Landlord, Tenant shall submit to Landlord one (1) set of reproducible sepia prints and three (3) sets of blueprints of Preliminary Design Drawings (sheet size shall be 24" x 36" or 30" x 42" only and all sheets within a set shall be of the same size and bound together as a set) showing intended design, character, and finishing of the Premises. The Preliminary Design Drawings shall be stamped "Preliminary". The Preliminary Design Drawings shall include, but not be limited to, exterior (where applicable) and interior design of the Premises, including storefront plans with all overall leaseline dimensions and storefront opening dimensions, storefront jamb details at neutral pier, reflected ceiling plans, elevations (showing awning locations, design and signage) and preliminary storefront sections. (Note: neutral pier details and storefront sections may be preliminary sketches showing design intent.) Landlord will not review incomplete sets.

2.  Upon receipt of all items required by Landlord under paragraph 1 above, Landlord and the Tenant Coordinator shall review Tenant's Preliminary Design Drawings and within a reasonable period of after receipt of the Preliminary Design Drawings, Landlord shall return to Tenant one (1) set of prints of Preliminary Design Drawings marked either "Proceed to Working Drawings" or "Revise and Resubmit" or a Tenant review letter stating the status of the submittal.

3.  If the Preliminary Design Drawings are returned to Tenant marked "Revise and Resubmit", said drawings shall be revised immediately by Tenant and resubmitted to Landlord for review. If drawings are marked "Proceed to Working Drawings", Tenant shall proceed with the Working Drawings.

### WORKING DRAWINGS

1.  Tenant shall, at its sole expense, utilize the services of an Architect with current and valid registration in the state of construction to prepare all working drawings and specifications (hereinafter referred to collectively as the "Working Drawings"). All Working Drawings, prepared by or on behalf of Tenant, shall be submitted to Landlord for approval in the form of one (1) set of reproducible sepia prints and two (2) blueline prints. (Sheet size shall be 24" x 36" or 30" x 42" only and all sheets within a set shall be of the same size and bound together as a set).

    The Working Drawings shall include, but are not limited to, exterior (where applicable) and interior design and details to completely convey the design of the Premises, including complete storefront plans with all dimensions, storefront head details (1-1/2" = 1'-0"), storefront jamb details at neutral piers (1-1/2" = 1'-0" min.), reflected ceiling plans (showing all materials and height), elevations, storefront sections, interior sections, finish plans with all finishes noted, and a sample board indicating all exterior and interior materials, color selections, and finishes to be used at the Premises. Tenant shall provide separate drawings for signs in accordance with the Sign Criteria attached to the lease. Tenant shall also provide MEP. loads and calculations for review. Tenant shall also locate all HVAC units and other rooftop equipment with sizes and weights shown. Landlord will not review incomplete packages.

2.  With reasonable promptness after receipt of Tenant's Working Drawings, the Landlord and Tenant Coordinator shall review Tenant's Working Drawings and shall return to Tenant either one (1) set of prints or a Tenant Review Letter. If the drawings are marked "Revise and Resubmit" the Tenant shall make the revisions as noted and within seven (7) days after receipt thereof, shall make appropriate revisions and resubmit the Working Drawings to Landlord. Landlord shall then approve

INITIAL

| Landlord | Tenant |
|----------|--------|
|          |  |

EXHIBIT E - TENANT DESIGN CRITERIA

or disapprove said revised drawings as set forth herein. Tenant shall apply for his building permit only after receipt of Working Drawings from Landlord marked "No Exception."

3.  Tenant shall submit and obtain approvals for the following:

    a.  Complete working drawing set
        1. Architectural
        2. Structural
        3. MEP
    b.  Signage shop drawings
    c.  Sample board

    Tenant shall not proceed with any work until the Tenant has obtained approval on all items. The Tenant shall have a copy of all Tenant approval letters, or a set of working drawings marked Approved as noted, at the site at all times. It will be at the sole discretion of the Landlord to allow any work to proceed prior to all approvals having been received.

4.  Tenant shall have sole responsibility for compliance with all applicable statutes, codes, ordinances, and other regulations for all work performed by or on behalf of Tenant on the Premises. Tenant is responsible for compliance and submittal to Texas Accessibility Standards. Landlord or Landlord's agents or representative's approval of Tenant's Working Drawings or of Tenant's Work shall not constitute an implication, representation, or certification by Landlord that said Working Drawings or Tenant's Work is in compliance with all statutes, codes, ordinances and other regulations. In instances where several sets of requirements must be met, Landlord's insurance underwriter or the strictest standard shall apply where not prohibited by applicable code.

5.  All drawings should be submitted:

    1 copy to:
    Festa Real Estate Services
    Atn: Bob Barnes
    120 Austin Highway, Suite 105
    San Antonio, Texas 78209
    Phone: 210-930-4111

    1 copy to:
    Hodges & Associates, P.L.L.C.
    Atn: Gerald E. Luecke
    13642 Omega Road
    Dallas, Texas 75244
    Phone: 972-387-1000

CONSTRUCTION SITE

| | INITIAL |
|---|---|
| Landlord | Tenant |
| | *TE* |

EXHIBIT E - TENANT DESIGN CRITERIA

1.  All Tenant contractors are required to attend a preconstruction meeting.

2.  The Contractor shall have a copy of all approvals as noted under working drawings Item #3.

3.  All Tenant's contractors shall comply with all OSHA and INS regulations.

4.  Tenant's contractor shall not allow any unauthorized person on the construction site (i.e. family members, friends, etc.). All personnel shall check in at the office.

5.  Tenant contractors shall preserve and protect all existing planting areas from damage during construction related activities. Damaged plant material will be replaced by the Landlord and backcharged to the Tenant.

6.  All uses and activities shall be constructed, maintained, and operated so as not to be injurious or offensive to the occupants of adjacent premises by reason of the emission or creation of noise, vibration, smoke, dust, or other particulate matter; toxic or noxious waste materials, odors, fire and explosive hazard, or glare.

## DISCLAIMER

The Owner's representative shall review drawings and shop drawings submissions solely for their conformance with the Architect's design intent and conformance with information given in the Landlord's construction documents. The Owner's representative shall not be responsible for any aspects of a drawing submission that affect or are affected by the means, methods, techniques, sequences and operations of the construction, safety precautions and programs incidental thereto, all of which are the Contractor's responsibility. The Owner's representative does not guarantee coordination. It is the Tenant Architect's responsibility to verify all coordination issues. The Tenant shall provide a written description of all items not conforming to Tenant Criteria Standards at time of submission. Items not called to the Owner's attention that are later discovered to not be in keeping with the design intent or center standards shall be removed and replaced at Tenant's expense.

|   | INITIAL |
|---|---|
| Landlord | Tenant |
|   | TE |

## EXHIBIT F - CONTRACTOR'S AFFIDAVIT/RELEASE

STATE OF TEXAS                                                  §
KNOW ALL MEN BY THESE PRESENTS:                                 §
COUNTY OF BEXAR                                                 §

TO WHOM IT MAY CONCERN:

The undersigned, being duly sworn, deposes and says that he is _____ of
_____ who is the contractor for the _____ work on the building located at
_____ and owned by _____. That the total amount of the contract including extras is $
_____ of which he has received payment of $_____ prior to this payment. That all waivers presented herewith
are true, correct and genuine and delivered unconditionally and that there is no claim either legal or equitable to defeat
the validity of said waivers. That the following are the names of all parties who have furnished material or labor, or both,
for said work and all parties having contracts or subcontracts for specific portions of said work or for material entering
into the construction thereof and the amount due or to become due to each, and that the items mentioned include all labor
and material required to complete said work according to plans and specifications:

| NAMES | WHAT FOR | CONTRACT PRICE | AMOUNT PAID | THIS PAYMENT | BALANCE DUE |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| TOTAL LABOR AND MATERIAL TO COMPLETE |  |  |  |  |  |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person
for material, labor or other work of any kind done or to be done upon or in connection with said work other than above
stated, and that no chattel mortgages, conditional sale contracts, security agreements, financing statements, retention of
title agreements, or personal property leases have been given or are now outstanding as to any materials, fixtures,
appliances, furnishings, or equipment placed upon or installed in or upon the aforesaid premises or the improvement
thereon by the affiant.

SIGNED this _____ day of _____.

BY:

STATE OF TEXAS                §
                              §
COUNTY OF BEXAR               §

BEFORE ME, the undersigned, a Notary Public in and for the State of Texas, on this day personally appeared
_____, known to me to be the person whose name is subscribed to the foregoing instrument
and acknowledged to me that the same was the act of the said _____ and that he executed
the same as the act of said _____ for the purposes and considerations therein expressed, and
in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____ day of _____.

Notary Public, State of Texas

Printed Name
My Commission Expires:

C:\DOCUMENTS AND SETTINGS\RODGERSDIXIE\PCOTTON\WOOD FINANCIAL—NORTH GARLAND.DOC
8/17/04 10:36AM

F—1

| | INITIAL |
|---|---|
| Landlord | Tenant |
|  | 7 |

**EXHIBIT F - CONTRACTOR'S RELEASE AND CERTIFICATE**

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF BEXAR | § | |

Pursuant to the terms of that certain contract dated _____, and amendments or modification thereof, if any, between _____ (hereinafter called "Owner"), and the undersigned, _____ (hereinafter called "Contractor"), for the construction of _____ to be occupied by _____, located at _____, Bexar County, Texas, the undersigned

1. COVENANTS and WARRANTS that:

   a. The undersigned has paid or duly provided for the payment in full for all the labor, services and materials in connection with said contract, whether performed, rendered and furnished by the undersigned or performed, rendered and furnished by any subcontractor, materialman, laborer or other person.

   b. There are no outstanding claims or demands or rights to liens against the undersigned or against the premises affected by said labor, services and materials, or otherwise, arising out of said contract, on the part of any person, firm or corporation, including any such subcontractor, materialman, laborer or other person.

   c. Said premises are free of and from any and all such claims, demands or liens arising out of said contract.

2. WAIVES and RELEASES for the undersigned and, to the extent permitted by law, for the undersigned's subcontractors, materialmen, laborers and all other persons furnishing services, labor or materials in connection with said contract, any and all liens or rights of liens that may now or hereafter exist or be claimed on or against said premises, and agrees to furnish upon demand a good and sufficient waiver of any such lien or right of lien from any such claimant thereof.

3. COVENANTS and AGREES:

   a. To indemnify and save harmless Owner from any such claim, demand, lien or right of lien, and to defend all actions arising out of the same, and to pay any costs, expenses or counsel fees incurred by Owner in connection therewith; and

   b. That any and all monies received by the undersigned from or on behalf of Owner with respect to said contract shall be received by the undersigned as a trust fund, to be applied first for the purpose of paying for unpaid work performed, services rendered and materials furnished in connection with said contract, if any.

IN WITNESS WHEREOF, the undersigned has hereunto set its hand this _____ day of _____.


BY:

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

BEFORE ME, the undersigned, a Notary Public in and for the State of Texas, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said _____ and that he executed the same as the act of said _____ for the purposes and considerations therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____ day of _____.


Notary Public, State of Texas


Printed Name
My Commission Expires:

C:\DOCUMENTS AND SETTINGS\FF.RODGERS\DESKTOP\COTTONWOOD FINANCIAL--FORTH OAM AND.DOC
8/15/06 10:26AM

Φ–2

| INITIAL | |
|---|---|
| Landlord | Tenant |
| | *FZ* |

**EXHIBIT F - SUBCONTRACTOR'S AND/OR SUPPLIER'S RELEASE**

STATE OF TEXAS  §
 §  KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF BEXAR  §

Pursuant to the terms and conditions of that construction contract, and any amendments or modification thereof, as originally evidenced by agreement dated _____, between (hereinafter called "Contractor"), and _____ (hereinafter called "Subcontractor and/or Supplier"), for work to be performed or materials supplied by the undersigned, located at _____, owned by _____, ("Owner").

1.   The undersigned COVENANTS and WARRANTS that:

   a.   The undersigned has paid or duly provided for the payment of all the labor, services and materials in connection with said contract, whether performed, rendered and furnished by the undersigned or performed, rendered and furnished by any of undersigned's subcontractor, materialmen, laborers or other persons retained or employed by the undersigned.

   b.   There are no outstanding claims, demands or rights to liens against the undersigned or against the property affected by said labor, services and materials, or otherwise, arising out of said contract, on the part of any person, firm or corporation, including any subcontractor, materialman, laborer or other person retained or employed by the undersigned.

   c.   Said property is free of and from any and all such claims, demands and liens arising out of said contract with the undersigned.

2.   The undersigned WAIVES, RELEASES AND FOREVER DISCHARGES for the undersigned and, to the extent permitted by law, for the undersigned's subcontractors, materialmen, laborers and all other persons furnishing services, labor or materials in connection with said contract, any and all liens, rights to liens or rights to make claim against any surety or bond that may now or hereafter exist or be claimed on or against said property, and the undersigned agrees to furnish upon demand a good and sufficient waiver of any such lien or right of lien from any such claimant.

3.   The undersigned COVENANTS and AGREES:

   a.   To indemnify and save harmless Contractor and Owner from any such claim, demand, lien or right of lien, and to defend all actions arising out of the same, and to pay any costs, expenses or counsel fees incurred by Contractor or Owner in connection therewith; and

   b.   That any and all monies received by the undersigned from Contractor shall be received by the undersigned as a trust fund, to be applied first for the purpose of paying for unpaid work performed, services rendered and materials furnished in connection with said contract, if any.

IN WITNESS WHEREOF, the undersigned has hereunto set its hand this _____ day of _____.

BY:

STATE OF TEXAS  §
 §
COUNTY OF BEXAR  §

BEFORE ME, the undersigned, a Notary Public in and for the State of Texas, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said _____ and that he executed the same as the act of said _____ for the purposes and considerations therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____ day of _____.

_____
Notary Public, State of Texas

Printed Name
My Commission Expires:

| INITIAL. | |
|---|---|
| Landlord | Tenant |
|  | ℱ |

## EXHIBIT G - EXTENSION OPTIONS

Provided no Event of Default has occurred and Tenant is occupying the entire Premises at the time of such election, Tenant may renew this Lease for two (2) additional period(s) of five (5) years each at the same terms provided in this Lease (except as set forth below), by delivering written notice of the exercise thereof to Landlord not sooner than nine (9) months, nor later than six (6) months, before the expiration of the Term. On or before the commencement date of the extended Term in question, Landlord and Tenant shall execute an amendment to this Lease extending the Term on the same terms provided in this Lease, except as follows:

(1)   The Minimum Guaranteed Rental payable for each month during each such extended Term shall be at $34.00 per square foot for years 6 through 10 or Fair Market Value for years 11 through 15. For purposes of this paragraph, the term "Fair Market Rental Rate" shall be determined in accordance with the following procedure: First, Tenant and the Landlord then owning the Property shall attempt, in good faith, to agree upon such Fair Market Rental Rate, using their best good faith efforts. If Tenant and Landlord fail to reach agreement by the date that is thirty (30) days following the date such dispute arises (the "Outside Agreement Date"), then each party's good faith determination of Fair Market Rental Rate shall be submitted by sealed envelope to arbitration in accordance with the following procedure:

(i)   Not later than thirty (30) days following the Outside Agreement Date, Tenant and the Landlord then owning the Property shall each appoint one independent arbitrator who shall by profession be a real estate appraiser (with the professional designation of MAI or, if MAI, ceases to exist, a comparable designation from an equivalent professional appraiser organization), or office leasing broker who shall have been active over the ten (10) year period ending on the date of such appointment in appraising or leasing of commercial properties in the San Antonio area. The determination of the arbitrators shall be limited solely to the issue of whether Tenant's or Landlord's submitted Fair Market Rental Rate is the closest to the Fair Market Rental Rate as determined by the arbitrators, taking into account all relevant elements.

(ii) The two arbitrators so appointed shall, within ten (10) days of the date of the appointment of the last appointed arbitrator, agree upon and appoint a third arbitrator who shall be qualified under the same criteria set forth hereinabove for qualification of the initial two arbitrators.

(iii)       The three arbitrators shall, within thirty (30) days after the appointment of the third arbitrator, reach a decision as to whether the parties shall use Tenant's or Landlord's submitted Fair Market Rental Rate and shall notify Tenant and Landlord thereof in writing.

(iv) The decision of the majority of the three arbitrators shall be binding upon Tenant and Landlord and judgment upon such decision may be entered into by any court having jurisdiction over Tenant and Landlord.

(v)  If the two arbitrators fail to timely agree upon and appoint a third arbitrator, both arbitrators shall be dismissed and Tenant and Landlord shall submit the dispute to the American Arbitration Association (herein the "AAA"). The AAA shall appoint an arbitrator who will select either the Tenant's or the Landlord's submitted Fair Market Rental Rate in accordance with the provisions of this paragraph 6.

| INITIAL | |
|---|---|
| Landlord | Tenant |
|  | |

(vi) The cost of arbitration shall be paid by Tenant if Landlord's submitted Fair Market Rental Rate is selected and by Landlord if Tenant's submitted Fair Market Rental Rate is selected.

(vii)    Notwithstanding the foregoing, if either Tenant or Landlord fails to appoint an arbitrator within thirty (30) days after the Outside Agreement Date as provided for in clause (i) of this paragraph 6 and such failure to appoint an arbitrator is not cured within ten (10) days after receipt by such failing party of written demand to do so by the other party (which other party shall have appointed its arbitrator prior to sending such written demand), then the arbitrator appointed by the party sending such demand, acting alone, shall reach a decision on the applicable Fair Market Rental Rate, notify Tenant and Landlord in writing thereof, and such arbitrator's decision shall be binding on the Tenant and Landlord.

(2)    Tenant shall have no further renewal options unless expressly granted by Landlord in writing; and

(3)    Landlord shall lease to Tenant the Premises in their then-current condition, and Landlord shall not provide to Tenant any allowances (e.g., moving allowance, construction allowance, and the like) or other tenant inducements.

Tenant's rights under this Exhibit shall terminate if (1) this Lease or Tenant's right to possession of the Premises is terminated, (2) Tenant assigns any of its interest in this Lease or sublets any portion of the Premises, (3) Tenant's annual Gross Sales for the 12-month period preceding Tenant's extension notice to Landlord is less than $_____, or (4) Tenant fails to timely exercise its option under this Exhibit, time being of the essence with respect to Tenant's exercise thereof. _____

| INITIAL | |
|---|---|
| Landlord | Tenant |
|  | *(initials)* |

## LEASE ADDENDUM

Comments: When it is determined which exhibit this will be (e.g., D, E, F, etc.), delete this page numbering style and insert the correct one.

The Lease shall remain in full force and effect pursuant to the terms and conditions contained therein, subject to the addendums set forth in this Lease Addendum. All of the terms, conditions and provisions of the Lease are incorporated herein by this reference the same as if more fully set forth herein and to the extent of any conflict, the terms of the Addendum shall control. The following addendums are hereby made to the Lease:

1. ASSIGNMENT AND SUBLETTING BY TENANT. Tenant shall have the right to freely assign its interest in this Lease and to sublet to any third party with the consent of Landlord, which consent shall not be unreasonably withheld.

2. DEFAULT BY TENANT. If a default is of a nature that cannot reasonably be cured in 30 days, the Tenant will not be in default if he is diligently pursuing the cure to completion.

3. CHANGE OF LAW. In the event there is a change of any Federal, State or local law, rule or regulation and such change has an adverse effect on the business or business prospects of Tenant, Tenant may terminate this Lease by giving ninety (90) days written notice of such change to Landlord and by paying four (4) month's rent as penalty.

4. EXCLUSIVE. Landlord agrees that it will not, during the Original or any Optional Term of this Lease Agreement, lease other space within the shopping center to any party whose business *The same as* is ~~competitive with~~ that of Tenant. Landlord also agrees not to allow any existing tenants who do *PWB R* not currently offer a product competitive with that of Tenant's product to later begin offering a product competitive with Tenant's product. *TENANT AGREES THAT LANDLORD WILL NOT be responsible for PWB E OTHER TENANT USE CLAUSES in the Shopping Center THAT LANDLORD has NO right to control.*

5. COMMON AREA. Landlord covenants and agrees that it will not: (1) make changes to the Common Area that materially and adversely affect the visibility or frontage of the Premises, (2) materially and adversely interfere with the conduct with Tenant's customary business; (3) construct any permanent kiosk within twenty-five (25) feet of the Premises.

6. TITLE TO BUILDINGS, IMPROVEMENTS, FIXTURES AND EQUIPMENT. All trade fixtures and equipment shall remain and continue to be the sole and absolute property of Tenant and may be replaced at any time during the term of this Lease and may be removed at the expiration of this Lease; provided, however, that such removal shall not impair the structural integrity of the building. Tenant shall repair or replace any damage or damaged structures resulting from such removal. Tenant may grant a security interest or other lien in any and all fixtures and equipment which it has a right to remove and Landlord agrees that, upon request by Tenant, Landlord will execute written waivers of any lien on or right to such equipment and fixtures. Landlord shall have no liability for the repayment of any loan made to Tenant by a third party.

7. EMERGENCY ACCESS BY LANDLORD. In the event of an emergency situation Landlord or its agent may enter the property at any time without the Tenant being present to correct the emergency situation, however Landlord shall be responsible for securing the leased premises and responsible for any damage to the leased premises or the contents thereof should Landlord or its agent enter the property. *CAUSED BY LANDLORD PWB F*

8. INDEMNIFICATION. Tenant agrees to indemnify and save Landlord harmless from and against all claims arising from any act, omission or negligence of Tenant, or its contractors, licensees, agents, servants or employees, or arising from any accident, injury or damage whatsoever caused to any person occurring during all the demised term.

The Landlord agrees to indemnify and save Tenant harmless from and against all actions, claims, demands, costs, damages, or expense of any kind on account thereof, including costs of defense, which may be brought or made against the Tenant by reason of the Landlord's negligent performance of the Landlord's obligations under this Lease.

9. ATTORNEY FEES AND COSTS. In the event that either party shall find it necessary to retain an attorney for the enforcement of any of the provisions hereof occasioned by the fault of

the other party, the party not at fault shall be entitled to recover reasonable attorney's fees and court costs incurred as a result thereof.

10. <u>CONSENTS AND APPROVALS</u>. No consents or approval required of either party shall be unreasonably withheld.

11. <u>SIGNAGE APPROVAL</u>. Both Landlord and Tenant recognize that there are four (4) pages of attached signage artwork attached to this exhibit and following this page. It is hereby understood and recognized by both Tenant and Landlord that execution of the Lease is deemed to be written approval by the landlord of the attached signage artwork and such approval is deemed to satisfy the requirements for written approval from the Landlord of the signage as required by any provision of this exhibit and as elsewhere required in the Lease. Furthermore, Landlord and Tenant recognize that, due to the fact that the premises has not yet been constructed, minor changes in physical dimension of the signage may be necessary, but in no way does such a change allow for deviation in either color, form, function, illumination, position, or content of the signage to be placed at the premises, unless approved in writing by both the Landlord and the Tenant. *Notwithstanding Anything herein contained, LANDLORD AND TENANT AGREE THAT the City of GARLAND SIGN criteria AND Regulations will control.*

*RO E*

**LANDLORD:**
North Garland Crossing, Ltd

By: Name
Its: Title

**TENANT:**
Cottonwood Financial Texas L.P.
a Delaware Limited Partnership

By: Timothy Rodgers
Its: Director of Real Estate

H-2

**THIRD AMENDMENT**
**TO**
**STANDARD COMMERCIAL SHOPPING CENTER LEASE**

This Third Amendment to Standard Commercial Shopping Center Lease (this "Third Amendment") is made by and between **North Garland Crossing, Ltd.** ("Landlord"), and **Cottonwood Financial Texas, LLC**, successor in interest by conversion to Cottonwood Financial Texas, L.P., d/b/a The Cash Store ("Tenant"), to be effective as of March 4, 2019 (the "Third Amendment Effective Date").

**RECITALS**

A.    Landlord and Tenant's predecessor-in-interest entered into that certain Standard Commercial Shopping Center Lease dated as of August 23, 2004 (the "Lease"), as amended by (i) that certain Amendment to Standard Commercial Shopping Center Lease, between Landlord and Tenant dated effective as of March 12, 2009 (the "First Amendment"), and (ii) that certain Second Amendment to Standard Commercial Shopping Center Lease, between Landlord and Tenant dated effective as of April 30, 2014 (the "Second Amendment;" the term "Lease", as hereinafter used, shall mean the Lease as further modified and amended by the First Amendment and the Second Amendment), pursuant to which Landlord leased to Tenant, and Tenant leased from Landlord, certain premises containing approximately 1,050 square feet in the shopping center located at the intersection of State Highway 190 and North Garland Road in Garland, Dallas County, Texas (defined in the Lease as the Premises; capitalized terms used and not otherwise defined in this Third Amendment shall have the meanings given them in the Lease).

B.    Landlord and Tenant desire to enter into this Third Amendment to confirm and evidence the renewal and extension of the Term of the Lease, all subject to and as more fully provided by the terms and provisions of this Third Amendment.

**AGREEMENTS**

NOW, THEREFORE, in consideration of Ten and No/100 Dollars ($10.00) cash and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed by Landlord and Tenant, the parties hereby agree as follows:

1.    (a)    Subject to and conditioned upon the other terms and provisions of this Third Amendment, Landlord and Tenant hereby modify the Lease to renew and extend the Term so that the Term will have an expiration date of November 30, 2024 (the extended period of the Term is called the "Third Amendment Term," and "Term" shall mean the Term as so extended).

(b)    Commencing on December 1, 2019 and continuing through the Third Amendment Term ending on November 30, 2024, the Minimum Guaranteed Rental, based on $34.00 per square foot per year, shall be $35,700.00 for the Minimum Guaranteed Rental annually, and $2,975.00 for the Minimum Guaranteed Rental per month, with the sum of $2,975.00 (together with the monthly sums of Additional Rent owing under the Lease) being due and payable on the first day of December, 2019, and on the first day of each following month throughout the remainder of the Third Amendment Term otherwise in accordance with the terms and provisions of the Lease.

2.    Tenant shall have the right to extend the Term of the Lease for one (1) additional five (5) year period beyond the extended Term as described in Paragraph 1 of this Third





Amendment, for an expiration date of November 30, 2029 (said 5-year period, if properly exercised shall commence on December 1, 2024 and end on November 30, 2029 (the "Additional Renewal Term")). Such extension and the exercise thereof by Tenant otherwise shall be subject to and pursuant to the terms and provisions of Exhibit G attached to the Lease *except* that the Minimum Guaranteed Rental, based on $39.00 per square foot per year, shall be $40,905.00 for the Minimum Guaranteed Rental annually, and $3,412.50 for the Minimum Guaranteed Rental per month, during such Additional Renewal Term.

3.     Landlord and Tenant acknowledge and agree that there are no other or remaining extension options or rights of Tenant to extend the Lease other than as expressly provided in Paragraph 2 of this Third Amendment.

4.     Tenant represents and warrants to Landlord that no Event of Default has occurred under the Lease, and no event which with the giving of notice and/or the passage of time could constitute an Event of Default has occurred, and Landlord is not in default under the Lease and that Tenant has no claims or defenses against Landlord, all of which (if any exist) hereby are fully and irrevocably released, waived and discharged. Tenant further represents and warrants to Landlord that Tenant is occupying the entire Premises.

5.     Except as expressly changed herein, all of the provisions, conditions, and covenants of the Lease are hereby agreed to and confirmed by Landlord and Tenant, and Landlord and Tenant acknowledge and agree that the Lease, as amended by this Third Amendment, is in full force and effect. Tenant further acknowledges and agrees that all obligations of Landlord with respect to any work to be performed by Landlord on or in connection with the Premises have been satisfactorily completed, and accepted by the Tenant. Tenant hereby leases the Premises from Landlord throughout the remainder of the Term as so extended in their current condition, and acknowledges and agrees that Landlord does not owe, and shall not provide, to Tenant any allowances (e.g., moving allowance, construction allowance, and the like) or other tenant inducements.

6.     This Third Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same document.

*{Signature Page Follows}*

| LANDLORD | TENANT |
| --- | --- |

Executed to be effective for all purposes as of the Third Amendment Effective Date.

**LANDLORD:**      NORTH GARLAND CROSSING, LTD.,
a Texas limited partnership

By:    North Garland General LLC,
a Texas limited liability company
its general partner

By: _____
Michael A. Reilly, Manager

Date: 3 / 26 / 19

**TENANT:**      COTTONWOOD FINANCIAL TEXAS, LLC,
a Delaware limited liability company,
d/b/a The Cash Store,
successor by conversion to Cottonwood Financial Texas, L.P.,
a Delaware limited partnership

By: _____
Name: Travis Cooks
Title: Chief Operating Officer
Date: 3 | 19 | 2019

3

| LANDLORD | TENANT |
|----------|--------|
|          |        |

November 15, 2021

The Cash Store
Cottonwood Financial
1901 Gateway Drive, Suite 200
Irving, TX 75038
Attn: Synthia Farley

      Re:    Notice of Change of Ownership of North Garland Crossing

Dear Tenant:

This letter shall serve as formal notice to you that the retail shopping center located at 5401 and 5345 N. Garland Avenue, Garland, Texas and known generally as "North Garland Crossing" (hereinafter referred to as the "**Property**") has been sold to **GR ASSOCIATES, LLC**, a Texas limited liability company ("**New Landlord**") effective as of November 15, 2021 (the "**Closing Date**").

1.    From and after the Closing Date, your new landlord with respect to your lease at the Property is **GR ASSOCIATES, LLC**.

2.    Any security deposit or prepaid rental, if any, with respect to your lease has been assigned, transferred and delivered by your former landlord to your new landlord. Your new landlord shall therefore be solely responsible to you with respect to any such security deposits and pre-paid rental, as provided in your lease. The amount of the security deposit transferred to your Landlord is $3,260.48.

Hereafter, all rent payments under your lease should be made payable to your new landlord **GR ASSOCIATES, LLC** and delivered to the management office whose address is:

                GR Associates, LLC
                c/o Bianco Properties
                P.O. Box 411273
                Creve Coeur, MO 63141

New Landlord's address for notice and other purposes is:

                GR Associates, LLC
                c/o Bianco Properties
                 680 Craig Road, Suite 240
                Creve Coeur, MO 63141

Should you have any questions regarding the sale, or with respect to your lease, please direct your inquires to your New Landlord at the above address.



**EXHIBIT**

C

Page 2

Thank you for your attention to this matter.

FORMER LANDLORD:

**NORTH GARLAND CROSSING, LTD.,**
a Texas limited partnership

By: North Garland General LLC,
  a Texas limited liability company,
  General Partner

  By: _____
    Michael Reilly, Manager

NEW LANDLORD:

**GR ASSOCIATES, LLC,**
a Texas limited liability company

By: C. A. Bianco, Inc., a Missouri corporation,
  its Manager

By: _____
Name: _____
Title: _____

F:\REILLY\02021 North Garland Crossing\211110 Tenant Notice Letter (The Cash Store).doc

Page 2

Thank you for your attention to this matter.

FORMER LANDLORD:

**NORTH GARLAND CROSSING, LTD.,**
a Texas limited partnership

By:   North Garland General LLC,
a Texas limited liability company,
General Partner

     By:   _____
          Michael Reilly, Manager

NEW LANDLORD:

**GR ASSOCIATES, LLC,**
a Texas limited liability company

By:   C. A. Bianco, Inc., a Missouri corporation,
its Manager

By:
Name:
Title:

F:\REILLY\02021 North Garland Crossing\211110 Tenant Notice Letter (The Cash Store).doc

3/5/2024 3:09 PM

**Lease Ledger**

Date: 03/05/2024

Property: gr

Tenant: t0007611 Cottonwood Financial Texas, LLC, a Delaware limited liability company

From Date: 11/15/2004  To Date: 11/30/2024

Move In Date: 11/15/2004

Unit(S): 380

| Date | Description | Unit | Charge | Payment | Balance |
|---|---|---|---|---|---|
| 12/1/2023 | Monthly Tax Estimate (12/2023) | 380 | 425.00 | 0.00 | 0.00 |
| 12/1/2023 | Cam Yr End Balance (01/2023 - 12/2023) | | 955.21 | 0.00 | 955.21 |
| 1/1/2024 | Monthly Rent ACH pmt (01/2024) | 380 | 2,975.00 | 0.00 | 3,930.21 |
| 1/1/2024 | Monthly CAM Estimate (01/2024) | 380 | 528.00 | 0.00 | 4,458.21 |
| 1/1/2024 | Monthly Insurance Estimate (01/2024) | 380 | 38.00 | 0.00 | 4,496.21 |
| 1/1/2024 | Monthly Tax Estimate (01/2024) | 380 | 430.00 | 0.00 | 4,926.21 |
| 1/2/2024 | Late Fees, 10% of $3971.00 | | 397.10 | 0.00 | 5,323.31 |
| 1/24/2024 | Chk# 01.24.24 ACH push Jan rent, late fee, ACH | | 0.00 | 4,368.10 | 955.21 |
| 2/1/2024 | Monthly Rent ACH pmt (02/2024) | 380 | 2,975.00 | 0.00 | 3,930.21 |
| 2/1/2024 | Monthly CAM Estimate (02/2024) | 380 | 528.00 | 0.00 | 4,458.21 |
| 2/1/2024 | Monthly Insurance Estimate (02/2024) | 380 | 38.00 | 0.00 | 4,496.21 |
| 2/1/2024 | Monthly Tax Estimate (02/2024) | 380 | 430.00 | 0.00 | 4,926.21 |
| 2/1/2024 | Chk# 02.01.24 ACH push February rent, ACH push | | 0.00 | 3,971.00 | 955.21 |
| 3/1/2024 | Monthly Rent ACH pmt (03/2024) | 380 | 2,975.00 | 0.00 | 3,930.21 |
| 3/1/2024 | Monthly CAM Estimate (03/2024) | 380 | 528.00 | 0.00 | 4,458.21 |
| 3/1/2024 | Monthly Insurance Estimate (03/2024) | 380 | 38.00 | 0.00 | 4,496.21 |
| 3/1/2024 | Monthly Tax Estimate (03/2024) | 380 | 430.00 | 0.00 | 4,926.21 |
| 3/2/2024 | Late Fees, 10% of $3971.00 | | 397.10 | 0.00 | 5,323.31 |

Page 1 of 1

**EXHIBIT**

D

App. 073